# UNITED STATES DISTRICT COURT
Southern District of Florida
Case Number: 03-81110-CIV Hurley Hopkins

MAUREEN STEVENS, Individually and )
as Personal representative of the estate of )
Robert Stevens, deceased, and on behalf of )
NICHOLAS STEVENS, HEIDI HOGAN, )
CASEY STEVENS, survivors, )
                              )

        Plaintiff )
                              )

v. )
                              )

UNITED STATES OF AMERICA, )
                              )

        Defendant )

---

## DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO STAY PROCEEDINGS

---

PETER D. KEISLER
Assistant Attorney General, Civil Division

JEFFREY S. BUCHOLTZ
Deputy Assistant Attorney General, Civil Division

J. PATRICK GLYNN, S.D. Fla. Bar No. A5500800
Director, Torts Branch

DAVID S. FISHBACK
Assistant Director, Torts Branch

CHRISTINA M. FALK, Trial Attorney,
    S.D. Fla. Bar No. A5500802
LELAND VAN KOTEN, Senior Trial Counsel
QUYNH BAIN, Trial Attorney
KARA K. MILLER, Trial Attorney
JASON S. PATIL, Trial Attorney,
    S.D. Fla. Bar No. A5500801
United States Department of Justice Civil Division

*Attorneys for Defendant United States of America*

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

    CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

    RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

    EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.    THE COURT HAS BROAD DISCRETION TO STAY A CIVIL PROCEEDING DURING THE PENDENCY OF A RELATED CRIMINAL INVESTIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.    THE COURT SHOULD STAY THIS CIVIL PROCEEDING TO AVOID COMPROMISING THE CRIMINAL INVESTIGATION OF THE ANTHRAX ATTACKS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.  Plaintiff's Wrongful Death Action Is Substantially Related to the Ongoing Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.  Proceeding With This Civil Action Would Expose Sensitive Law Enforcement Information That Could Compromise the Anthrax Investigation. . . . . . . . . . . . 12

III.    PROCEEDING WITH THIS CIVIL ACTION RISKS EXPOSING SENSITIVE NATIONAL SECURITY INFORMATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.    A TEMPORARY STAY OF PROCEEDINGS IS NOT IMMODERATE OR UNREASONABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## TABLE OF AUTHORITIES

## CASES

Afro-Lecon, Inc. v. United States, 820 F.2d 1198 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . 11, 12, 14

Baranski v. Fifteen Unknown Agents of ATF, et al., 195 F. Supp.2d 862 (W.D. Ky. 2002) . . . . 9

Barcford v. General Dynamics Corp., 973 F.2d 1138 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . 20

Benevolence Int'l Found. v. Ashcroft, 200 F. Supp.2d 935 (N.D. Ill. 2003) . . . . . . . . . . . 9, 10, 23

Brock v. Tolkow, 109 F.R.D. 116 (E.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 24

C3, Inc. v. United States, 5 Cl. Ct. 659 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 12, 14

Campbell v. Eastland, 307 F.2d 478 (5th Cir. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10

Capital Engineering & Mfg. Co., Inc. v. Weinberger, 695 F.Supp. 36 (D.D.C. 1988) . . . . . . . . 12

Dellwood Farms, Inc. v. Cargill, Inc., 128 F.3d 1122 (7th Cir. 1997) . . . . . . . . . . . . . . . . . 25

Dept. of the Navy v. Egan, 484 U.S. 518 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Founding Church of Scientology v. Kelley, 77 F.R.D. 378 (D.D.C. 1977) . . . . . . . . . . . . . . 12

Grand Jury Proceedings (Williams) v. United States, 995 F.2d 1013 (11th Cir. 1993) . . . . . . . 24

In re Polypropylene Carpet Antitrust Litigation, 181 F.R.D. 680 (N.D. Ga. 1998) . . . . . . . . . . 25

Integrated Generics, Inc. v. Bowen, 678 F. Supp. 1004 (E.D.N.Y. 1998) . . . . . . . . . 9, 12, 16, 18

Landis v. North American Co., 299 U.S. 248 (1936) . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 24

McDonnell Douglas Corp. v. United States, 323 F.3d 1006 (Fed. Cir. 2000) . . . . . . . . . . . 20, 21

Metz v. United States, 723 F. Supp. 1133 (D. Md. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 20

S.E.C. v. Dresser Industries, Inc., 628 F.2d 1368 (D.C. Cir. 1980) (en banc) . . . . . . . . . . . . . 8

S.E.C. v. Doody, 186 F. Supp.2d 379 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 9

St. Paul Fire & Marine Ins. Co. v. United States, 24 Cl. Ct. 513 (1991) . . . . . . . . . . . . . 9, 10, 12

Totten v. United States, 92 U.S. 105 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Hugo Key and Son, Inc., 672 F. Supp. 656 (D.R.I. 1987) . . . . . . . . . . . . . . 9, 18

United States v. Kordel, 397 U.S. 1 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9

United States v. Lot 5, Fox Grove, Alachua County, Fla., 23 F.3d 359 (11th Cir. 1994) . . . . . . . 8

United States v. Reynolds, 345 U.S. 1 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

United States v. Sells Eng'g, 463 U.S. 418 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

United States v. Shane Co., 147 F.R.D. 99 (M.D.N.C. 1992) . . . . . . . . . . . . . . . . . . . 10, 16, 24

United States v. Viscome, 144 F.3d 1365 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 20

Walsh Securities Inc. v. Cristo Property Mgmt., 7 F. Supp.2d 523(D.N.J. 1998) . . . . . . . . . . . . 9

Weinberger v. Catholic Action of Hawaii/Peace Education Project. 454 U.S. 139 (1981) . . . . . 19

Zuckerbraun v. General Dynamics Corp., 935 F.2d 544 (2d Cir. 1991) . . . . . . . . . . . . . . . 19, 20

## RULES

Fed. R. Civ. P. 26(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Crim. P. 6(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

EXHIBITS

Declaration of Richard L. Lambert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab L

Ex. A, Andrew H. Card, Jr., Action to Safeguard Information Regarding Weapons of Mass Destruction and Other Sensitive Documents Related to Homeland Security, Mar. 19, 2002, and attachment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab A

Ex. B., Plaintiff's administrative claim of Feb. 7, 2003 (excerpt). . . . . . . . . . . . . . . . . . Tab B

Ex. C, Kathy Bushouse, Widow Files U.S. Claim in Anthrax Death, *South Florida Sun-Sentinel*, Feb. 15, 2003, at 1, 2003 WL 11555973. . . . . . . . . . . . . . . . . . . . . . . . . Tab C

Ex. D, Kathy Bushouse, Widow Ponders Suing over 1st Anthrax Death; Lawyer Is Exploring Wrongful Death Suit Against Government, *South Florida Sun-Sentinel*, Oct. 10, 2002, 2002 WL 101348357. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab D

Ex. E. Caroline Graham, Why Is the White House So Frightened to Tell Me How the Anthrax Killer Murdered My Husband?; British Widow Suing US Government for Pounds 30 Million Accuses FBI of Cover-up over Bio Terror, *Mail on Sunday*, Feb. 23, 2003, 2003 WL 10410090. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab E

Ex. F, Kathy Bushouse, Woman Gives First U.S. Interview since Husband's Anthrax Death, *South Florida Sun-Sentinel*, Feb. 27, 2003, 2003 WL 14868260. . . . . . . . . . . . . . . . Tab F

Ex. G, Kathy Bushouse & Jon Burstein, Anthrax Victim's Widow Files Suits Negligence Is Alleged in U.S. and State Courts, *South Florida Sun Sentinel*, Sept. 25, 2003, 2003 WL 64117334. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab G

Ex. H, Jill Barton, Anthrax Widow Sues for $50 Million, Alleging Lax U.S. Security, *Associated Press Newswires*, Sept. 25, 2003. . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab H

Ex. I, Kathy Bushouse, Widow's Case Stalled by Security National Bioterrorism Issues Will Be Central to Her Lawsuit, *South Florida Sun Sentinel*, Sept. 28, 2003, 2003 WL 64117891. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab I

Ex. J, U.S. Dept. of Defense News Briefing, Sept. 4, 2001. . . . . . . . . . . . . . . . . . . Tab J

Ex. K, U.S. Dept. of Homeland Security, Advisory to Security Personnel, Nov. 21, 2003.   Tab K

## INTRODUCTION

In fall 2001, the nation suffered the worst bioterrorism attack in its history, when the biological agent anthrax was transmitted through the United States Postal Service. Public officials, prominent members of the media, and ordinary citizens were targeted. Twenty-two persons were infected with anthrax; five died, including Robert Stevens. At least 17 public buildings were contaminated. The attacks wreaked havoc on the Postal Service and disrupted government and commerce, resulting in economic losses estimated to exceed one billion dollars. More significantly, the attacks spread anxiety throughout the nation — already in a heightened state of alert in the wake of September 11 — and left behind a lasting sense of vulnerability to future acts of bioterrorism. In response to the attacks, the government has embarked on one of the largest and most complex criminal investigations in law enforcement history. To date, the Federal Bureau of Investigation has expended almost 251,000 agent-hours in investigating the attacks – the equivalent of 97 work years, as described in the declaration of Inspector Richard L. Lambert of the FBI. On December 2, 2003, Plaintiff Maureen Stevens, as personal representative of the estate of Robert Stevens, and on behalf of herself and her children, individually, filed this wrongful death suit under the Federal Tort Claims Act, alleging, in pertinent part, that United States government activities related to anthrax caused Mr. Stevens' death.

Plaintiff and her counsel have made repeated public statements showing that they are unhappy with the government's investigation of the anthrax attacks. At times accusing the United States of knowing but covering up the identity of the perpetrator, and at times charging that the investigation is "meandering" unsuccessfully, Plaintiff has proclaimed her intention to use this lawsuit as a tool to pry open the investigative files and to "reinvigorate" the

1

investigation. See *infra* at 4-5. Plaintiff's frustration that the murder of her husband remains unsolved and her desire to help the United States' investigation to succeed are understandable. Unfortunately, however, the means that Plaintiff seeks to employ – stripping the investigation of its secrecy and conducting her own parallel investigation via this civil suit – would be extremely harmful rather than helpful. The United States' investigation of the anthrax attacks that killed and injured Mr. Stevens and many others is intensely active, and, as with criminal investigations generally, maintaining the secrecy of this investigation is crucial to its prospects of success. Well-intentioned though it is, Plaintiff's campaign to expose the investigation in order to improve it would have precisely the opposite effect.

Because Plaintiff's suit seeks to litigate substantially the same issues as the United States is currently investigating in its criminal probe of the anthrax attacks, the United States requests that proceedings in this suit be stayed for a six-month period while the investigation continues, with the need for and the duration of the stay to be reviewed at the end of the six-month period. Courts have widely recognized that civil proceedings should be stayed where they substantially overlap with pending criminal investigations, in order to avoid compromising the secrecy and integrity of the investigations. See Campbell v. Eastland, 307 F.2d 478, 487 (5th Cir. 1962); United States v. Kordel, 397 U.S. 1, 12 n. 27 (1970) (citing Campbell) (cataloging cases where civil proceedings were stayed at government request). Litigation of Plaintiff's suit could allow Plaintiff to take discovery of the government's investigative files and to depose investigative officials regarding matters tightly bound up with the substance of the investigation, thereby threatening to compromise sensitive investigative information. Litigation of this suit also would pose a significant risk of disclosing classified or sensitive information relating to the acquisition,

2

development, and use of weapons of mass destruction such as anthrax, a risk that independently justifies a stay. The public's dual interests in protecting this extraordinarily significant investigation and avoiding disclosure of sensitive information pertaining to biological weapons outweigh Plaintiff's interest in litigating her tort claims at this time.

## BACKGROUND FACTS

1. The United States' active, ongoing AMERITHRAX investigation (or "anthrax investigation") was initiated in October 2001. See Declaration of Richard L. Lambert, Federal Bureau of Investigation ("FBI") ¶ 3 ("Lambert Decl.").[2] With almost 251,000 agent hours expended to date, the scope and complexity of the AMERITHRAX investigation are unprecedented in the FBI's history. See id. ¶ 5.

2. On March 19, 2002, the White House issued a memorandum to the heads of all the Executive Departments and agencies restricting the disclosure of information that could assist in the development or use of biological weapons. See Ex. A, Andrew H. Card, Jr., Action to Safeguard Information Regarding Weapons of Mass Destruction and Other Sensitive Documents Related to Homeland Security, Mar. 19, 2002, and attachment. The memorandum provides:

> As noted in many discussions during the past several months, you and your
> department or agency have an obligation to safeguard Government records
> regarding weapons of mass destruction. Weapons of mass destruction include
> chemical, biological, radiological, and nuclear weapons. Government information,
> regardless of its age, that could reasonably be expected to assist in the
> development or use of weapons of mass destruction . . . should not be disclosed
> inappropriately.

---

[2] The attached public declaration is necessarily limited in the degree of detail it can provide regarding the anthrax investigation. An additional, *ex parte* declaration has been prepared and is being stored in a secure container because it contains classified national security information. The United States requests the Court to review the classified declaration *in camera*.

Id. at 1. Authoritative guidance accompanying the memorandum imposes restrictions on classified, declassified, and unclassified but sensitive information related to weapons of mass destruction and other information that, if improvidently or inappropriately disclosed, could threaten homeland security or pose other national security concerns. See id. Anthrax, of course, is a biological weapon capable of causing mass destruction.

3. On February 7, 2003, Plaintiff, through counsel, sent an administrative claim to the Secretary of the Army, alleging that as a result of purported government activities relating to anthrax, "Robert Stevens was exposed to Anthrax Bacillus . . . and ultimately died . . ." Ex. B at 5. As witnesses to the claim, Plaintiff named FBI agents Scott Decker and Mark Wilson and others providing advice and assistance regarding the FBI's investigation into the anthrax attacks; current and former employees, contractors, and fellows involved at the United States Army Medical Research Institute of Infectious Diseases; and journalists. See id. at 5-6. Plaintiff filed an amended administrative claim containing the same allegations on May 27, 2003.

4. On February 15, 2003, Plaintiff's counsel announced that the claim had been filed to obtain more information about Mr. Stevens' death and to "reinvigorate" the investigation:

> Frustrated by the government's silence on almost every detail surrounding her husband's death, Maureen Stevens is pursuing a financial settlement, her lawyer said. In the process, she would like more information about what led to her husband's death, possibly to reinvigorate the investigation, said Richard Schuler, a West Palm Beach lawyer. . . . "There have been no arrests. There's been no information given to her, no indication that the investigation is progressing," Schuler said. . . . Schuler did not rule out a settlement, saying Stevens wants information about her husband's death. "This family and this country deserve some answers," the lawyer said.

Ex. C, Kathy Bushouse, Widow Files U.S. Claim in Anthrax Death, *South Florida Sun-Sentinel*, Feb. 15, 2003, at 1, 2003 WL 11555973.

4

5. Plaintiff's filing of a claim with the announced intention to "reinvigorate" the investigation was consistent with her counsel's previous statements expressing Plaintiff's concern that the investigation was "meandering" unsuccessfully and stating that Plaintiff was considering filing a lawsuit in order to "get to the bottom of" Mr. Stevens' death:

> [T]he attorney for Maureen Stevens says the widow of American Media Inc. tabloid photo editor Bob Stevens has gotten scant information about what led to her husband's death, nor has she received any financial help from the federal government. A lawsuit could be Maureen Stevens' only option for getting answers and money, said attorney Richard Schuler. "We're in a position where she's out on an island, isolated," Schuler said. "The FBI hasn't communicated with her. No branch of the government has done anything for her or her family. . . . The ultimate thing is to get to the bottom of how this happened." . . . Schuler stressed that they didn't want to compromise the criminal investigation into Bob Stevens' death, but said they were concerned about its course. "We want it to succeed," Schuler said. "It just seems to be meandering."

Ex. D, Kathy Bushouse, Widow Ponders Suing over 1st Anthrax Death; Lawyer Is Exploring Wrongful Death Suit Against Government, *South Florida Sun-Sentinel*, Oct. 10, 2002, at 3B, 2002 WL 101348357.

6. In an interview reported on February 23, 2003, Plaintiff and her counsel reiterated that the purpose of the claim was "to make sure the spotlight stays on this case" in order to help bring the anthrax killer to justice:

> "It's not about the money," [Maureen Stevens] told me. "I am so angry. I just need to know what's being done. There's so much nonsense being talked. All I want are some answers so I can put this thing to rest." [Maureen Stevens'] Miami-based lawyer, Richard Schuler, agrees. He said: "We believe the authorities know who the anthrax killer is but that they are stonewalling to save face. Maureen just wants justice to be done. Our government does not want the world to know this crime was perpetrated by one of its own." . . ."I am hopeful that the justice system will work, but you have to understand the federal courts handling this case are run by the same government that is trying to withhold this information. It is a vicious circle." . . . "Now she feels that higher powers are at work to prevent the killer's identity being known. The authorities are protecting

5

> one of their own. It's a disgrace. This is not about the money, this is about finding out who killed Bob Stevens and bringing them to justice." . . . Schuler says: ". . . Our lawsuit is to make sure the spotlight stays on this case and that it is not swept under the carpet." . . . "Bob's widow and family deserve to know the truth. We are confident that eventually it will come out, no matter how much the government tries to stonewall us."

Ex. E, Caroline Graham, <u>Why Is the White House So Frightened to Tell Me How the Anthrax Killer Murdered My Husband?; British Widow Suing US Government for Pounds 30 Million Accuses FBI of Cover-up</u> over Bio Terror, *Mail on Sunday*, Feb. 23, 2003, at 38, 2003 WL 10410090.

7.  In an interview with CBS News, Plaintiff stated "that all she wants is answers from the FBI about her husband's death." Ex. F. Kathy Bushouse, <u>Woman Gives First U.S. Interview since Husband's Anthrax Death</u>, *South Florida Sun-Sentinel*, Feb. 27, 2003, at 17A, 2003 WL 14868260.

8.  On September 24, 2003 Plaintiff filed a wrongful death suit against the United States, alleging that government activities relating to anthrax caused Mr. Stevens' death. <u>Stevens v. United States of America</u>, No. 03-CV-80906 (S.D. Fla.) [Docket Entry # 1]. This suit was dismissed without prejudice on October 28, 2003. <u>See id.</u> [Docket Entry # 5].

9.  On September 25, 2003, Plaintiff's counsel again stated the purpose of the lawsuit: "West Palm Beach attorney Richard Schuler, who is representing Maureen Stevens, said the purpose of the lawsuit[] is simple: 'To find out how this was done and who did it.'" Ex. G, Kathy Bushouse & Jon Burstein, <u>Anthrax Victim's Widow Files Suits Negligence Is Alleged in U.S. and State Courts</u>, *South Florida Sun Sentinel*, Sept. 25, 2003, at 1B, 2003 WL 64117334.

10.  Also on September 25, 2003, Plaintiff's counsel expressed dissatisfaction with the

investigation and revealed the hope that the lawsuit against the government would force it to act on its criminal investigation of the anthrax attacks:

> Maureen Stevens hopes the lawsuit forces the government to take action on its languishing investigation and provides answers to the victims' families, said her attorney, Richard Schuler. . . . Schuler said government officials have provided Maureen Stevens with no answers about her husband's death in the two-year-old case. "She has no indication from any government source that the investigation is progressing as it should progress," he said.

Ex. H. Jill Barton, Anthrax Widow Sues for $50 Million, Alleging Lax U.S. Security, *Associated Press Newswires*, Sept. 25, 2003.

11. On September 28, 2003, Plaintiff's counsel announced Plaintiff's intent to employ the "subpoena power" to obtain information about the investigation:

> "The bottom line is that a lot of our [Freedom of Information Act] requests were not acknowledged or were not answered or responded to," Schuler said. "By filing the lawsuit, we have subpoena power." . . . Schuler said the Stevens family hopes to get both information and monetary damages from the case.

Ex. I. Kathy Bushouse, Widow's Case Stalled by Security National Bioterrorism Issues Will Be Central to Her Lawsuit, *South Florida Sun Sentinel* Sept. 28, 2003, at 1B. 2003 WL 64117891.

12. On December 2, 2003, Plaintiff filed this wrongful death suit against the United States, containing allegations identical to her initial suit against the United States. See Stevens v. United States of America, No. 03-CV-81110 (S.D. Fla.) [Docket Entry # 1].

13. Contrary to Plaintiff's statements that the United States' AMERITHRAX investigation is "meandering" and not progressing, that investigation has been and remains intensely active. Evidence continues to be collected, and new investigative leads continue to be generated. No fewer than 28 FBI Special Agents, including eight holding Ph.D. degrees in scientific disciplines related to the investigation, and 12 U.S. Postal Inspectors are assigned to the investigation.

Investigators have conducted 15 searches, interviewed over 5,000 individuals, and served more than 4,000 subpoenas. Investigators also have conducted, and are conducting, numerous scientific initiatives, many of which are scheduled to be completed within the next six months. See Lambert Decl. ¶¶ 4, 7-8.

14. The FBI and the entire Executive Branch ardently wish the AMERITHRAX investigation to succeed in identifying and bringing to justice the perpetrator(s) of the anthrax attacks, just as Plaintiff and the loved ones of the other victims wish. Unfortunately, in the FBI's considered judgment as the executive agency charged with conducting this investigation, allowing this suit to proceed would subject the investigation to significant harm as well as risk the disclosure of sensitive national security information. See Lambert Decl. ¶¶ 9-18.

## ARGUMENT

## I. THE COURT HAS BROAD DISCRETION TO STAY A CIVIL PROCEEDING DURING THE PENDENCY OF A RELATED CRIMINAL INVESTIGATION.

The Court's power to grant a stay of proceedings in this case is indisputable. As the Supreme Court recognized in Landis v. North American Co.:

> [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its dockets with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.

299 U.S. 248, 254-55 (1936). A court has broad discretion to grant or deny a stay, and its decision will not be disturbed absent an abuse of discretion. See id.; see also S.E.C. v. Dresser Industries, Inc., 628 F.2d 1368, 1376 (D.C. Cir. 1980) (en banc).

Civil proceedings should be stayed in deference to parallel criminal investigations "when

8

special circumstances so require in the interests of justice." <u>United States v. Lot 5, Fox Grove, Alachua County, Fla.</u>, 23 F.3d 359, 364 (11th Cir. 1994) (quoting <u>United States v. Kordel</u>, 397 U.S. 1, 12 n. 27 (1970)). Courts have often exercised their discretion to stay civil proceedings, or at least to stay discovery, when the civil actions threaten to interfere with related investigations. <u>See</u> <u>Campbell</u>, 307 F.2d at 487.[3] While various cases may apply marginally or semantically different tests, the essential governing principle of law is straightforward: If civil litigation cannot proceed without threatening to interfere with an ongoing criminal matter, and the public interest implicated by such interference outweighs the private interest of the civil litigant, then the civil litigation should be stayed. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>S.E.C. v. Doody</u>, 186 F. Supp.2d 379, 381-82 (S.D.N.Y. 2002); <u>Walsh Securities Inc. v. Cristo Property Mgmt.</u>, 7 F. Supp.2d 523, 527 (D.N.J. 1998). Although these cases generally involved a subject or target of the criminal investigation, the same animating principle – concern for the integrity of an ongoing investigation – applies here, where there is an acute danger that proceeding with this litigation would undermine the AMERITHRAX investigation by releasing secret investigative information into the public domain. The logic of the case law strongly supports a stay in this case, given Plaintiff's expressly and repeatedly stated intention to use this case as a means of opening up the investigation to public disclosure. <u>See</u> Background Facts ¶¶ 4-7, 9-11. As the Fifth Circuit noted in <u>Campbell</u>: "Administrative policy gives priority to the public interest in law enforcement.

---

[3] <u>See also</u> <u>Benevolence Int'l Found. v. Ashcroft</u>, 200 F. Supp.2d 935, 940-41 (N.D. Ill. 2003); <u>Baranski v. Fifteen Unknown Agents of ATF, et al.</u>, 195 F. Supp.2d 862, 870 (W.D. Ky. 2002); <u>Integrated Generics, Inc. v. Bowen</u>, 678 F. Supp. 1004, 1009 (E.D.N.Y. 1998); <u>St. Paul Fire & Marine Ins. Co. v. United States</u>, 24 Cl. Ct. 513, 517 (1991); <u>United States v. Hugo Key and Son, Inc.</u>, 672 F. Supp. 656, 659 (D.R.I. 1987); <u>C3, Inc. v. United States</u>, 5 Cl. Ct. 659, 662 (1984).

This seems so necessary and wise that a trial judge should give substantial weight to it in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his civil claims or liabilities." 307 F.2d at 487. The public interest in maintaining the integrity of an ongoing criminal investigation is all the more weighty when the investigation involves matters of national security. See, e.g., Benevolence Int'l Found., 200 F. Supp.2d at 941.

## II.   THE COURT SHOULD STAY THIS CIVIL PROCEEDING TO AVOID COMPROMISING THE CRIMINAL INVESTIGATION OF THE ANTHRAX ATTACKS.

Federal courts consider several factors in determining whether a stay of civil proceedings pending the outcome of a related criminal investigation is appropriate. These include: (1) whether the issues in the civil action are "substantially similar" or "related" to the issues in the criminal investigation; (2) whether the defendant has made a clear showing of hardship or inequity if required to go forward with the civil case while the criminal investigation is pending; and (3) whether the duration of the requested stay is immoderate. See C3, Inc., 5 Cl. Ct. at 660 (citing Landis, 299 U.S. at 255, Litton Systems, Inc. v. United States, 215 Ct. Cl. 1056, 1057-58 (1978)). See also St. Paul Fire & Marine Ins. Co., 24 Cl. Ct. at 515. In effect, a court must balance the civil plaintiff's right to litigate her case promptly against the public interest in withholding the full disclosure sought by the plaintiff. See Benevolence Int'l Found., 200 F. Supp.2d at 938 (citing Campbell, 307 F.2d at 490).

### A.   Plaintiff's Wrongful Death Action Is Substantially Related to the Ongoing Investigation.

In deciding whether to stay civil proceedings in light of a pending criminal investigation, the key issue is the risk of exposure, in the civil case, of evidentiary material collected and theories formulated in the criminal investigation. See United States v. Shane Co., 147 F.R.D. 99, 101

10

(M.D.N.C. 1992). See also Afro-Lecon, Inc. v. United States, 820 F.2d 1198, 1204 (Fed. Cir. 1987) (holding that "'deferrable civil proceedings constitute improper interference with the criminal proceedings if they churn over the same evidentiary material'") (citation omitted).

It is readily apparent that Plaintiff's civil action is directly related to the ongoing anthrax investigation and could easily undermine or interfere with that investigation. Indeed, Plaintiff and her counsel have proclaimed that the lawsuit is intended as an attack on the manner in which the criminal investigation is being conducted. See Background Facts ¶¶ 4-6, 9-11. After Plaintiff filed her initial administrative tort claim, she revealed that she filed the claim not for money, but rather in order to find out "what's being done" and to get "answers" regarding the investigation into Mr. Stevens' death. Id. ¶ 6 (Ex. E). In the same interview, Plaintiff's counsel revealed that the claim was brought to uncover an alleged government attempt to protect the identity of the person responsible for the anthrax attacks and to ensure that this person is brought to justice. Id. Plaintiff consistently has stated that she is suing the United States because (1) she believes that the FBI is suppressing the identity of the anthrax killer, and she wants the investigation to progress "as it should progress," id. ¶ 10; (2) she is dissatisfied with the secrecy surrounding the FBI's investigation of Mr. Stevens' death; and (3) she believes that the public is entitled to extensive information and answers about the anthrax attacks. See id. ¶¶ 4-6, 9-11. Plaintiff has declared her intent to use this civil suit and this Court's "subpoena power" to obtain information about the investigation that has so far been kept confidential. See id. ¶ 11. Plaintiff's own statements make crystal clear that she intends to use this action as a tool to open up the investigative files to expose an alleged government cover-up and to redirect the investigation in a manner to her liking. It would be hard to imagine a plainer risk of interference

11

with a criminal investigation.

    B.  Proceeding With This Civil Action Would Expose Sensitive Law Enforcement
        Information That Could Compromise the Anthrax Investigation.

The public interest in maintaining the integrity of the anthrax investigation favors a stay of this case. The justification for a stay is plain: The "secrecy and integrity" of a criminal investigation may easily be compromised if litigants are able to use civil discovery to obtain a window into the investigation. Capital Engineering & Mfg. Co., Inc. v. Weinberger, 695 F.Supp. 36, 41 (D.D.C. 1988); see St. Paul Fire & Marine Ins. Co., 24 Cl. Ct. at 516. "The scope of civil discovery is broad and requires nearly total mutual disclosure of each party's evidence prior to trial." Afro-Lecon, Inc., 820 F.2d at 1203. Civil discovery thus risks the inadvertent disclosure of information and documents containing sensitive investigative information – including theories of the case, evidentiary discoveries, forensic methods, witness identities, and ongoing and planned investigative initiatives. See id. That the civil litigant does not seek a window into the investigation in order to thwart scrutiny of herself as a subject or target is no answer, for disclosures of investigative information may enable other individuals to fabricate defenses, manufacture or conceal evidence, tamper with witnesses, or otherwise frustrate the investigation or prosecution of the criminal case. See id.; Integrated Generics, Inc., 678 F. Supp. at 1009; C3, Inc., 5 Cl. Ct. at 662; Founding Church of Scientology v. Kelley, 77 F.R.D. 378, 381 (D.D.C. 1977). Proceeding with this case would pose risks to the secrecy of the criminal investigation that would be far from speculative.

The United States could not make complete initial disclosures in this case without revealing

sensitive information from the criminal investigation.[4] Under Fed. R. Civ. P. 26(a)(1), unless otherwise stipulated or directed by court order, the United States must identify all persons, documents, and physical evidence that it may use to support its defenses. Given the substantial similarities between the criminal investigation and this suit, the United States' disclosure obligations from the earliest stages in this suit would pose a substantial risk of inadvertent release of sensitive investigative information. To defend against the exceptionally broad and unspecified allegations of government negligence that assertedly caused Mr. Stevens' death, the United States would have to make factual admissions or denials and present defenses of fact and law bearing directly on the central focus of the criminal investigation -- who perpetrated the anthrax attacks, and how.

For example, Plaintiff may pursue a theory of negligence that the United States failed adequately to screen its employees before allowing them access to anthrax, or that the United States failed to follow adequate security procedures to prevent unauthorized individuals from obtaining access to anthrax, with the result that an employee stole anthrax spores and used them to perpetrate the anthrax attacks. Allowing Plaintiff to explore such a theory in discovery, and requiring the United States to rebut it, would intrude directly into the ongoing investigation in which the United States is seeking to establish, *inter alia*, whether the perpetrator(s) obtained the anthrax used in the attacks from a federal facility and, if so, how. Moreover, one among several potentially applicable affirmative defenses could be that even if Plaintiff could prove that the

---

[4] To the extent that any investigative information is derived from grand jury proceedings, as opposed to other means, the government attorneys handling this civil action do not have access to such information and cannot provide it to Plaintiff. United States v. Sells Eng'g, 463 U.S. 418, 441-43 (1983).

13

anthrax that caused Mr. Stevens' death had been in the possession of the United States, a supervening criminal act of a third party – the perpetrator(s) whom the investigation is working to identify – would break any causal connection between the United States' alleged negligence and Plaintiff's injury. Evidence bearing on such a defense, including the identity of individuals with information concerning a supervening criminal act, plainly would have been developed in the criminal investigation. Likewise, documents and physical evidence, including the physical specimens of anthrax from the investigation, would have to be kept secret to avoid tipping off potential targets and subjects concerning the status or direction of the investigation.

Allowing Plaintiff's tort suit to proceed to discovery thus would "churn over the same evidentiary material" involved in the anthrax investigation. Afro-Lecon, 820 F.2d at 1204; C3, Inc., 5 Cl. Ct. at 661. Plaintiff fully bears the burden of proving the elements of her claims, and the United States intends to mount an appropriately vigorous defense. Since the anthrax investigation is, in pertinent part, an ongoing search for the cause of Mr. Stevens' death (and the deaths and injuries of others), it will overlap with a central element of Plaintiff's tort suit – causation. This connection has been made prominently and publicly in the comments by Plaintiff and her counsel linking the information that they need for their wrongful death claim with information gathered by the FBI in its investigation of Mr. Stevens' death. See Background Facts ¶¶ 4-7, 9-11. Litigation on the question of proximate causation inevitably would expose sensitive investigative information both with respect to Mr. Stevens' death and the other anthrax crimes, since the civil litigation and the criminal investigation would be aiming at the same information – the identity of the person or persons who obtained and transmitted anthrax such that it reached Mr. Stevens, and how this was done.

14

Plaintiff's requests for production of documents would risk exposing documents contained in the AMERITHRAX files that are infused with sensitive investigative information, such as the identity and location of U.S. government facilities possessing anthrax, including the specific strains, formularies, and quantities of anthrax maintained at those institutions; the nature, extent, and timing of anthrax experiments and research performed there; the identities, roles, and responsibilities of each facility's employees and all other persons having access to each facility at a relevant time; and the identities of persons under investigation by the FBI and all evidence collected pertaining to their knowledge of and/or involvement in the attacks.  Internal memoranda, witness statements, laboratory reports, and search warrant affidavits, as well as matters occurring before a grand jury and documents maintained under seal, would all be implicated because they all could be relevant to how the attacks were carried out and by whom.  The potential harm to the investigation resulting from the production of such documents is obvious:  Evidence, theories, investigative methods, identities of cooperating individuals, and countless other investigative details could be revealed.

Sensitive investigative information is not at the periphery of this civil suit, where it might be cabined off.  Instead, Plaintiff's position is that discovery would necessarily entail review of any FBI or DOJ documents containing investigative information.  See Background Facts ¶¶ 4-7, 9-11.  At the heart of Plaintiff's claim against the United States is the question whether the anthrax that killed Mr. Stevens came from a government source, as well as related questions concerning how the anthrax was obtained and then transmitted through the mail, and by whom.  All these questions are integral to the Executive Branch's investigation of the anthrax mailings.

Beyond document discovery, Plaintiff could be expected to seek depositions of those with

15

knowledge potentially relevant to her allegations, again creating serious risks to the integrity of the investigation. As noted, Plaintiff has already named as witnesses FBI agents Scott Decker and Mark Wilson and others providing advice and assistance in support of the FBI's investigation; current and former employees, contractors, and fellows involved at the United States Army Medical Research Institute for Infectious Diseases; and journalists. See Background Facts ¶ 2. Plaintiff's focus on the agents and officials conducting and overseeing, and witnesses with evidence central to, the AMERITHRAX investigation confirms that she has directly targeted the criminal investigation. See id. ¶¶ 4-7, 9-11. Establishing when an item of information came to be known by various agents and officials could easily shed light on the method by which the information was discovered, thus potentially revealing investigative techniques. More fundamentally, simply requiring investigative agents and officials to submit to interrogation about investigative matters _at all_ would create a situation rife with potential for accidental disclosure. The United States' evidence, theories, and future investigative plans would be front and center in any deposition in this case, and requiring investigators to discuss these matters in the relatively uncontrolled environment of a deposition would inevitably expose further investigative details. See Shane Co., 147 F.R.D. at 102 (a stay of discovery is appropriate where even partial discovery could interfere with a criminal investigation); Integrated Generics, Inc., 678 F. Supp. at 1009 (a stay of civil proceedings pending grand jury investigation is warranted because even limited discovery would be inappropriate). Plaintiff and her counsel have made clear that Plaintiff intends to penetrate as far into the investigation as the boundaries of allowable civil discovery permit and, what is more, to conduct her own parallel investigation through the medium of this civil suit. Putting the government in the position of persistently

16

having to defend those boundaries would place investigative information at constant risk.

If, in any of the above ways, sensitive investigative details were released through litigation of the case, the consequences for the investigation could be grave – not only with respect to the investigation of the death of Mr. Stevens, but also with respect to the other crimes within the scope of the AMERITHRAX investigation.  Disclosing such details in the context of a civil case would be tantamount to releasing the information into the public domain.  Individuals with interest in the investigation could use such information to glean much about the focus and direction of the investigation, as well as the specific evidentiary basis for the FBI's interest in them.  Equipping such individuals with such knowledge would greatly increase their ability to circumvent or impede investigative efforts.  See Lambert Decl. ¶¶ 9, 11-15, 17.

Additionally, the burden on the government to comply with discovery obligations would be substantial.  Aside from threatening to compromise the anthrax investigation, litigation of Plaintiff's case would further divert and distract DOJ and FBI personnel from investigating the most serious bioterrorism attack in United States history.  Reviewing and responding to pleadings and discovery requests would divert resources away from the investigation – yet another way in which this suit would have precisely the opposite effect of Plaintiff's intent to use this suit to "reinvigorate" the investigation and to help it succeed.  Given the size of the investigative files, investigators could be forced to review an enormous number of documents for information that is privileged, classified, or law-enforcement-sensitive to determine whether such information could be discovered or is protected by the attorney work-product doctrine, Fed. R. Crim. P. 6(e), the deliberative process privilege, or other law enforcement privileges.  They would be required to review any documents that are produced to ensure that informant identities,

material witnesses, and identities of subjects and targets of the ongoing investigation are not disclosed.  Depositions would likewise divert the time and attention of investigative personnel, and would themselves be fraught with privilege issues.  And potential witnesses or informants may be much less likely to come forward and cooperate with the investigation if they believe that their names might be made public as a result of the government's compliance with discovery in this tort action.

Ultimately, the sacrifice of secrecy may compromise the prosecution's ability to prevail in a future criminal proceeding against the perpetrator(s) of the anthrax mailing that resulted in Mr. Stevens' death or of the other anthrax-related crimes.  See, e.g., Integrated Generics, Inc., 678 F. Supp. at 1009 (court granted stay of civil proceedings during the pendency of a criminal investigation to avoid "revealing the focus of the criminal investigation"); Hugo Key, 672 F. Supp. at 659 (court granted stay of civil proceeding, citing prosecutor's concern that liberal civil discovery rules "would expose the strategy of the prosecution").  In addition to Mr. Stevens, twenty-one other individuals were infected with anthrax in fall 2001, and four others died.  An estimated 30,000 individuals underwent an antibiotic regimen to protect against anthrax infection.  Given the nature and extent of the anthrax attacks, there is an extraordinary public interest in the successful investigation and prosecution of those offenses and in the prevention of such attacks in the future.

III. PROCEEDING WITH THIS CIVIL ACTION RISKS EXPOSING SENSITIVE NATIONAL SECURITY INFORMATION.

Apart from the public's interest in maintaining the integrity of the anthrax investigation, the public interest in protecting national security favors a stay of this case, because, as the attached

18

FBI declaration makes clear, Plaintiff's broadly worded allegations implicate classified national security information. In order to determine precisely what state secrets are implicated by the suit, and in order to determine what remedy is appropriate, the Executive Branch needs time to conduct a careful review. "[P]ublic policy forbids the maintenance of any suit in a court of justice, the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." Weinberger v. Catholic Action of Hawaii/Peace Education Project, 454 U.S. 139, 146-47 (1981) (citing United States v. Reynolds, 345 U.S. 1 (1953), and Totten v. United States, 92 U.S. 105, 107 (1876)). The state secrets privilege allows the government to withhold evidentiary material when there is "a reasonable danger" that production of the evidence will expose matters that, in the interest of national security, should not be divulged. Reynolds, 345 U.S. at 10; see also Zuckerbraun v. General Dynamics Corp., 935 F.2d 544, 547 (2d Cir. 1991). As is shown by the FBI's declaration in support of this motion, proceeding with this lawsuit could present a "reasonable danger" that sensitive information will be disclosed in such a way as to injure the nation's security. Because protecting such information and preventing its misuse is a paramount concern for the United States, the government seeks a stay, in the first instance, to determine whether this lawsuit could proceed without exposing information that the state secrets privilege is intended to protect.[5]

_____

[5] The broad scope of Plaintiff's complaint puts at issue the United States' bioterrorism protection program and threatens disclosure of classified information that would reveal scientific and technological matters related to national security; special intelligence collection activities, sources, and methods; and the vulnerabilities and capabilities of installations, projects, and plans relating to the nation's bioweapons defense. See Lambert Decl. ¶ 16. Such disclosures could also reveal non-public information concerning strains of anthrax the United States has used and is using as vaccine challenge agents – information highly coveted by our enemies who are

While the existence and general nature of the United States' biological defense research program – including anthrax – are matters of public knowledge, the government is concerned that details of that program put at issue by Plaintiff's allegations, if disclosed, could facilitate the acquisition, development, and offensive use of anthrax.[6] Even before the anthrax attacks of 2001, the secrecy of the United States' biological defense research program was consistently maintained because of the "serious national security concerns" that would arise by making the information available to those with hostile intentions. Ex. J, U.S. Dept. of Defense News Briefing, Sept. 4, 2001, at 10; cf. Metz v. United States, 723 F. Supp. 1133, 1137 (D. Md. 1989) (recognizing the interest in secrecy regarding anthrax experimentation at Fort Detrick). This is not an abstract threat. The Department of Homeland Security recently issued an advisory that stated "the acquisition, production, or theft of [chemical, biological, radiological, or nuclear] material and subsequent dissemination is a top Al-Qaeda objective." Ex. K, U.S. Dept. of Homeland Security, Advisory to Security Personnel, at 2 (Nov. 21, 2003). The Executive

---

attempting to genetically engineer the anthrax genome to enhance its virulence. See id. When national security interests could be impaired by a civil case, the remedy ranges from dismissal (where the very subject matter of the action is a matter of state secret) to discovery limitations (where state secrets are at risk of disclosure, even though the core of the action is not secret). See generally Reynolds, 345 U.S. at 10; Bareford v. General Dynamics Corp., 973 F.2d 1138, 1141-43 (5th Cir. 1992); Zuckerbraun, 935 F.2d at 546-48; McDonnell Douglas Corp. v. United States, 323 F.3d 1006, 1021 (Fed. Cir. 2000). A stay would provide a reasonable opportunity for the United States to review the national security information implicated by Plaintiff's allegations and to decide what must be protected by the state secrets privilege – a decision not lightly made and one that requires careful consideration and formal invocation by the head of an agency. See Reynolds, 345 U.S. at 7-8.

[6] See United States v. Viscome, 144 F.3d 1365, 1371 (11th Cir. 1998) (observing that "Congress finds that the use and threatened use of weapons of mass destruction . . . gravely harm the national security . . . and disturb the domestic tranquility of the United States") (quoting H.R. Conf. Rep. No. 102-405, at 46 (1991)).

20

Branch's responsibility to protect national security information from unauthorized disclosure is well-settled. See Dept. of the Navy v. Egan, 484 U.S. 518, 527 (1988). By early 2002, recognizing that the release of information relating to anthrax and other select biological, chemical, or nuclear agents could potentially facilitate the offensive use of such weapons, the President's Chief of Staff directed federal agencies to review and protect any information that could assist malefactors in obtaining and using such weapons. See Background Facts ¶ 2. Thus, notwithstanding the public availability of certain information regarding anthrax, including some information confirmed by the government, federal agencies are now obligated to review, reclassify, and safeguard information that, if released, could pose a threat to the security of the nation. See id. These safeguards are predicated on the Executive Branch's judgment that there is a reasonable risk that release of such information would expose matters that, in the interest of national security, should not be divulged. See id.; Reynolds, 345 U.S. at 10; McDonnell Douglas Corp., 323 F.3d at 1021. The allegations in Plaintiff's Complaint are so closely tied to protected information that litigation would pose a serious risk of compromising such information.

The language of the Complaint reveals the extent to which Plaintiff's allegations, and the information sought to address them, are intertwined with potentially classified or privileged matters. First, the Complaint puts at issue the United States' "manufacturing, handling, transporting, utilizing, processing, analyzing, distributing, warehousing, storing, testing, and experimenting with anthrax." Compl. ¶ 15; see id. ¶ 10, 17 (similar allegations). A core basis of this suit is the government's purportedly negligent security procedures regarding anthrax.[7]

---

[7] See id. ¶¶18-A (alleging failure "to properly or securely maintain or store" anthrax); 18-D (alleging failure "to maintain its premises in a manner precluding unauthorized individuals from having access to anthrax"), 18-E (alleging failure "to employ proper security measures to

21

Disclosing information concerning each federal facility's internal procedures and practices to prevent unauthorized access to select biological agents would jeopardize national security.

Second, Plaintiff's allegations relate not only to activities regarding anthrax at federal facilities, id. ¶ 7, but also at all other institutions – many of which act as contractors for the United States – to which the United States ships anthrax to test antidotes or vaccines. See id. at ¶¶ 12, 18-N. Discovery on Plaintiff's allegations would result in public disclosure of a list of locations where the deadliest strains of anthrax can be found, as well as the identities of federal employees, contractors, and other persons who had access to and knowledge concerning the utilization of various strains of anthrax. See id. ¶¶ 18-A to 18-N.

Since Plaintiff's allegations squarely call into question the nation's entire bioterrorism program and the security mechanisms for that regime – information that could facilitate the acquisition and use of biological weapons such as anthrax – requiring the United States to defend these allegations would present grave risks of injury not only to those in possession of the information, but also to the security and welfare of the entire nation.

IV.   A TEMPORARY STAY OF PROCEEDINGS IS NOT IMMODERATE OR UNREASONABLE.

Given the extraordinary importance of the anthrax investigation, the public interest weighs

---

prevent the improper use, possession, access, and/or disbursement" of anthrax), 18-F (alleging failure "to establish appropriate procedures or protocols concerning the access of employees or independent contractors" to anthrax), 18-H (alleging failure "to take appropriate security measures to insure the possession and access to the anthrax would be limited to those individuals with proper clearance), 18-I (alleging failure "to implement adequate security measures to prevent access to anthrax by unauthorized individuals"), 18-J (alleging failure "to act in a reasonable, prudent, and careful manner in conducting background investigations" regarding anthrax), 18-K (allegations similar to 18-J), 18-M (alleging failure "to take appropriate action upon actual or constructive notice of . . . problems with individuals or security involving access to anthrax . . .").

heavily in favor of a stay.  See, e.g., Benevolence Int'l Found., 200 F. Supp.2d at 940-41.

Ultimately, the balancing of the competing interests turns on whether the Court finds that the public's interest in protecting the ongoing criminal investigation and in protecting the national security by avoiding disclosure of sensitive information concerning weapons of mass destruction outweigh Plaintiff's private interest in a prompt resolution of her claims.  Id.  Plaintiff's own statements make clear that she has brought this suit as a means to attack the criminal investigation, to make public sensitive law enforcement investigative information, and to alter the course of the investigation in a manner more satisfactory to her.  See Background Facts ¶¶ 4-7, 9-11.  A lesser intrusion into even an ordinary criminal matter generally implicates a sufficient public interest to warrant a stay.  Here, in particular, the public interest in a stay is multiplied by the immense importance of the investigation at issue.

The stakes riding on the investigation of the anthrax attacks are extraordinary.  The attacks caused 22 known infections and over one billion dollars in commercial losses, forced the shutdown of the United States Senate, and fueled widespread fear of an unprecedented magnitude.  The Executive Branch has devoted, and continues to devote, millions of dollars and countless hours to investigating the attacks.  It is crucial that the integrity of the investigation be maintained so that the investigation has the best possible chance of success.

The government does not deny that Plaintiff has an interest in pursuing a tort action.  Balanced against the unquestionable significance of the criminal investigation to which the action relates, and the attendant national security concerns discussed *supra* at 20-22, however, that private interest should yield temporarily in the face of the substantial risk that litigation of this suit would threaten the integrity of the investigation as well as the nation's security.

Moreover, the very interest that Plaintiff and her counsel have repeatedly expressed – finding out who killed Mr. Stevens and bringing that person or persons to justice – is best served by allowing the comprehensive criminal investigation to proceed unimpeded by interference from this tort action. As the Supreme Court has recognized: "Especially in cases of extraordinary public moment, the individual may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted." Landis, 299 U.S. at 256.

The government's stay request is "not immoderate in extent and not oppressive in its consequences." Id. The government does not seek to stay the case indefinitely: it requests a stay for a six-month period during which the investigation can continue unhindered and the United States can work to identify any state secrets that must be protected. Within five months after a stay order is entered, the United States will report to the Court on whether it believes that a further stay is necessary in light of the status of the investigation at that time and of national security concerns. The United States' request to stay civil proceedings in deference to a criminal investigation is "presumptively reasonable." See Shane Co., 147 F.R.D. at 101. Moreover, because the remedy that Plaintiff seeks in this wrongful death action is money damages, a stay will not cause Plaintiff any irreparable harm. See Brock v. Tolkow, 109 F.R.D. 116, 120 (E.D.N.Y. 1985) (delay in potentially receiving compensation is not a compelling factor in considering a stay).[8] Nor will a stay infringe any constitutionally protected interest.

---

[8] Indeed, a stay ultimately could benefit Plaintiff, if the criminal investigation results in findings that are consistent with Plaintiff's allegations. Cf. Grand Jury Proceedings (Williams) v. United States, 995 F.2d 1013, 1018 n.11 (11th Cir. 1993) ("Although stays delay civil proceedings, they may prove useful as the criminal process may determine and narrow the remaining civil issues").

24

Finally, it bears emphasis that Plaintiff's consistently stated purpose for this lawsuit – to expose and to redirect the FBI's investigation – is not, under our system of separated powers, a proper basis on which to proceed with this suit.  In Dellwood Farms, Inc. v. Cargill, Inc., 128 F.3d 1122 (7th Cir. 1997), Judge Posner observed that:

> Unlike France, Italy, and other European countries in which judicial officers control the investigation of crimes, the United States places the control of such investigations firmly in the executive branch. . . . The plaintiffs in these civil suits, who are seeking to obtain material from the government's criminal investigation, are not criminal suspects or defendants. They thus have no definite legal right to the fruits of the FBI's investigative endeavors conducted in confidence; and it seems to us that neither should they have a right to force the government to tip its hand to criminal suspects and defendants by disclosing the fruits of . . . surveillance that the FBI conducted. . . . The victim of a crime cannot force the government to prosecute the criminal; equally he cannot say to the government, "Speed up your investigation, or get out of the way, because I want to seek a civil remedy."

Id. at 1125.  See In re Polypropylene Carpet Antitrust Litigation, 181 F.R.D. 680, 687 (N.D. Ga. 1998) (concluding that the Eleventh Circuit would follow Dellwood in recognizing "the strong policy justifications" for protecting investigatory information)  The government is sympathetic to Plaintiff's loss of her husband and her frustration that the investigation remains ongoing, and the government does not question the good intentions behind Plaintiff's effort to "reinvigorate" the investigation by filing this lawsuit in order to conduct her own parallel investigation through civil discovery.  Nonetheless, the paramount goal shared by all parties to this case – a successful resolution to the AMERITHRAX investigation – will be best served by staying this suit to protect the secrecy and viability of the Executive Branch's ongoing, intensely active investigation of the anthrax attacks.

25

## CONCLUSION

For the foregoing reasons, the United States' motion to stay proceedings should be granted.

Dated:  January **26** , 2004

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General, Civil Division

JEFFREY S. BUCHOLTZ
Deputy Assistant Attorney General, Civil Division

J. PATRICK GLYNN, S.D. Fla. Bar No. A5500800
Director, Torts Branch

DAVID S. FISHBACK
Assistant Director, Torts Branch

CHRISTINA M. FALK, Trial Attorney,
   S.D. Fla. Bar No. A5500802
LELAND VAN KOTEN, Senior Trial Counsel
QUYNH BAIN, Trial Attorney
KARA K. MILLER, Trial Attorney
JASON S. PATIL, Trial Attorney
   S.D. Fla. Bar No. A5500801
U.S. Department of Justice
Civil Division, Torts Branch
Environmental Torts Section
P.O. Box 340
Benjamin Franklin Station
Washington, D.C.  20044
Tel.: (202) 616-4216
Fax: (202) 616-4989
Email: Christina.Falk@usdoj.gov

*Attorneys for Defendant United States of America*

26

# DECLARATION OF RICHARD L. LAMBERT

## UNITED STATES DISTRICT COURT
### Southern District of Florida
Case Number: 03-81110-CIV Hurley Hopkins

MAUREEN STEVENS, Individually and )
as Personal representative of the estate of )
Robert Stevens, deceased, and on behalf of )
NICHOLAS STEVENS, HEIDI HOGAN, )
CASEY STEVENS, survivors )
)
          Plaintiff )
)
v. )
)
UNITED STATES OF AMERICA )
)
          Defendant )

## DECLARATION OF RICHARD L. LAMBERT
## ON BEHALF OF DEFENDANT UNITED STATES OF AMERICA

I, Richard L. Lambert, declare as follows:

1. On December 2, 2003, Plaintiff Maureen Stevens, as personal representative of the estate of Robert Stevens, and on behalf of herself and her children, individually, filed a wrongful death suit under the Federal Tort Claims Act alleging that United States government activities involving anthrax caused the death of her husband. This declaration is submitted in support of the government's motion to stay the proceedings in this civil action because of the pendency of a joint FBI/U.S. Postal Inspection Service criminal investigation into the anthrax attacks which killed Plaintiff's husband and four others. The statements made in this declaration are based on my personal knowledge of facts and information obtained and reviewed in the course of my official duties.

2.  I am a Special Agent of the Federal Bureau of Investigation (FBI).  I entered on duty with the FBI in July 1988.  I have been a Special Agent for over 15 years.  My education consists of a Bachelor's Degree, Master's Degree in Political Science, Master's Degree in Public Administration and Doctor of Jurisprudence Degree.  I am licensed to practice law in the State of Texas.  Before entering on duty with the FBI, I practiced law in Austin, Texas.  Since entering on duty with the FBI, I have served as a white collar crime and violent crime investigator in the St. Louis Field Office; as a Supervisory Special Agent in the Legal Counsel Division and Office of Professional Responsibility at FBI Headquarters; as a Supervisory Special Agent of an Organized Crime/Drug Squad in the Norfolk Field Office; as an Assistant Inspector in the Inspection Division at FBI Headquarters; and as an Assistant Special Agent in Charge of counterterrorism and foreign counterintelligence matters in the San Diego Field Office.  Since October 5, 2002, I have been assigned as the Inspector in Charge of the joint FBI/U.S. Postal Inspection Service investigation known as "AMERITHRAX."

3.  The AMERITHRAX investigation was initiated in October 2001.  The objective of the investigation is to identify and to prosecute the individual or individuals responsible for the worst bio-terrorism attack in U.S. history.  These attacks involved the mailing of four anthrax-laden letters:  two letters were mailed to New York, New York on or about September 18, 2001 and two letters were mailed to Washington, D.C. on or about October 9, 2001.  It is suspected that a fifth anthrax-filled letter was mailed to Boca Raton or Lantana, Florida on an undetermined date.  Two United States Senators and two highly prominent members of the news media were specifically targeted for anthrax exposure by the perpetrator(s) of the attacks.  The FBI has recovered four envelopes containing letters and anthrax powder

- 2 -

which were used in these attacks. These envelopes were addressed to Tom Brokaw at the National Broadcasting Corporation, the "Editor" of the New York Post newspaper, U.S. Senator Tom Daschle, and U.S. Senator Patrick Leahy.

4. As a consequence of these mailings, 22 persons were infected with anthrax; five persons died and 17 survived. It is estimated that over 30,000 individuals underwent an antibiotic regimen to protect against anthrax infection. At least 17 post offices and other public office buildings were contaminated with anthrax requiring the expenditure of millions of dollars for clean up and remediation. The total estimated economic damage from these attacks stands at over one billion dollars. The concomitant injury to the collective American psyche is incalculable. These acts of bioterrorism exacerbated the trepidation and vulnerability felt by the American people in the aftermath of the September 11, 2001 terrorist attacks, spawning nationwide fear about the safety of all mail delivered through the U.S. postal system.

**Investigative Methodology**

5. The scope and complexity of the AMERITHRAX investigation are unprecedented in the FBI's 95 year history. To date, the FBI has expended over 250,931 Agent hours in the investigation of the anthrax attacks - the equivalent of 97 Agent work years.

6. To advance the AMERITHRAX investigation, the FBI has developed an analytical framework for prioritizing investigative initiatives. This framework consists of a bifurcated approach which focuses concurrently on traditional evidence collection methods targeting people and places, and scientific evidence collection procedures aimed at profiling and exploiting the forensic characteristics of the anthrax evidence itself.

7.  This second prong of the AMERITHRAX investigation is focused principally on the anthrax spores which were found within the envelopes mailed to the victims of the attacks, or collected from areas believed to be associated with the attacks.  Anthrax is a living bacterial organism technically known as *Bacillus anthracis*.  Accordingly, the anthrax powder collected during this investigation possesses certain unique physical, chemical, and genetic properties which have been identified and continue to be examined.  As a result of these examinations, a specific forensic signature is continuing to emerge which characterizes the anthrax used in the attacks.  To forensically characterize the anthrax evidence and to facilitate the development and refinement of the techniques and protocols necessary to do so, the FBI has contracted with 19 government, commercial, and university laboratories which are performing research, analyses and evaluations to assist the FBI Laboratory.  Most of these scientific initiatives are scheduled to be completed within the next six months.  If successful, these initiatives will, inter alia, facilitate the attribution of the anthrax used in the attacks to one or more U.S. and/or foreign laboratories.

8.  Both of these investigative prongs are intensely active with the ongoing collection of additional evidence and the generation of new investigative leads.  At present, there are 28 FBI Special Agents and 12 U.S. Postal Inspectors assigned to the AMERITHRAX investigation on a full-time basis.  Eight of these 28 Agents hold a Ph.D. degree in a scientific discipline related to the investigation.  To date, investigators have conducted 15 searches, interviewed over 5,000 individuals and served more than 4,000 subpoenas.

-4-

## Specific Harms Reasonably Anticipated from Proceeding on Plaintiff's Suit

9. A stay of plaintiff's civil action is viewed by the FBI as critical to the integrity and successful resolution of the AMERITHRAX investigation. Litigating plaintiff's suit before the criminal investigation is resolved will undermine the government's ability to investigate and prosecute the perpetrator(s) of this crime and potentially permit the restrictive rules of criminal procedure to be circumvented. These harms will accrue by the concurrent operation of two factors. The first is Federal Rule of Civil Procedure 26(b)(1) which entitles plaintiff to obtain discovery of any information deemed "reasonably calculated to lead to the discovery of admissible evidence." In addition to the sweeping scope of discovery requests authorized by this standard, the disclosure of information to a party in response to a Rule 26 discovery demand is tantamount to the release of that information into the public domain.

10. The second factor is Plaintiff's broadly worded predication for each of the two counts in the complaint. As a foundation for the strict liability claim in Count I, Plaintiff avers that "THE UNITED STATES OF AMERICA owned, managed, stored, grew, experimented with, and/or was in control of a certain strain of anthrax bacterium at its Fort Detrick, Maryland facility and other facilities." With regard to Plaintiff's claim of negligence in Count II, Plaintiff similarly alleges that "THE UNITED STATES OF AMERICA was in the business of manufacturing, handling, transporting, utilizing, processing, analyzing, distributing, warehousing, storing, testing, and experimenting with anthrax." These allegations represent a common nucleus of operative fact which is both the cornerstone of Plaintiff's civil action and at the crux of the FBI's criminal investigation.

-5-

11. By formulating this generalized pleading as the operand for Rule 26(b)(1), Plaintiff has laid the foundation for a panoply of omnibus discovery demands. In light of the publicly expressed intentions of Plaintiff and her counsel, as memorialized in various newspaper reports, it is reasonably anticipated that Plaintiff will demand disclosure of and access to <u>all</u> information collected under the auspices of the AMERITHRAX investigation, including: the identity and location of all U.S. government facilities possessing anthrax; the specific strains, formularies, and quantities of anthrax maintained at those institutions; the nature and extent of anthrax experiments and research performed there; the identities, roles and responsibilities of each facility's employees and all other persons accessing each facility; and. the identities of those persons under investigation by the FBI and all evidence collected pertaining to their knowledge of and/or involvement in the attacks.

12. The disclosure of such information would reveal, <u>inter alia</u>: (1) matters occurring before the grand jury protected from disclosure by the secrecy requirements of Federal Rule of Criminal Procedure 6(e)(2); (2) investigatory records compiled for law enforcement purposes, some of which remain under seal, including probative evidentiary documents and case summaries which reveal details of the investigation, the character and nature of evidence acquired, the identities of individuals who are cooperating, the names and addresses of persons interviewed, the substance of witnesses' statements, and ongoing and planned investigative initiatives (some of which are third party documents provided by other agencies); (3) investigative techniques and procedures; and (4) information classified pursuant to Executive Order 12958.

13. Allowing Plaintiff to take civil discovery of investigative files and to depose investigative agents and officials would easily enable Plaintiff to achieve the acknowledged purpose of this litigation - to probe into who is being investigated and why. Such discovery would provide Plaintiff, subjects of the investigation, the press and the general public with a voyeur's window into an active and ongoing major criminal investigation. Such discovery disclosures would reveal information concerning the focus and direction of the investigation, including the FBI's interest in specific individuals and the factual predicate for that interest. Arming subjects of the investigation and other individuals with such knowledge will afford them multiple opportunities to interfere with and obstruct the investigation by destroying, hiding, secreting, and otherwise concealing evidence; coercing, intimidating, harassing, or retaliating against witnesses; fleeing the country or avoiding FBI contact; or framing justifications, altering recollections, crafting alibis, manufacturing exculpatory explanations, or feigning lack of remembrance.

14. Revealing the specific investigative techniques being used by the FBI in this case will impair their effectiveness by permitting subjects and other individuals to identify and employ countermeasures aimed at thwarting them.

15. Once public, it is probable that these disclosures will subject both those persons under investigation and fact witnesses to intense media scrutiny, thus chilling the cooperation and diminishing the candor which might otherwise be forthcoming during interviews with the FBI.

16. The disclosure of classified information in this case would reveal scientific and technological matters related to national security; special intelligence collection activities,

-7-

sources, and methods; and the vulnerabilities and capabilities of installations, projects and plans relating to U.S. bio-weapons defense. In the hands of those hostile to the U.S., this valuable intelligence could aid state-sponsors of terrorism or terrorist organizations in their efforts to identify specific military installations, intelligence community facilities and commercial laboratories where work is ongoing in these sensitive technologies and would assist foreign intelligence services in their targeting and collection efforts. Such disclosures would also reveal non-public information concerning strains of anthrax the U.S. government has used and is using as vaccine challenge agents - information highly coveted by U.S. adversaries attempting to genetically engineer the anthrax genome to enhance its virulence. Collaterally, such discovery disclosures would alert the media to the existence and location of these classified projects and programs, guaranteeing their exposure in the often competitive enterprise of investigative journalism.

17. In addition to the foregoing harms posed by disclosure of the types of information described above, any discovery proceedings in this matter will divert and distract FBI Agents and Postal Inspectors from investigating the most serious bio-terrorism attack in U.S. history. Permitting discovery to go forward may impede investigators' ability to identify, gather and collect evidence in a timely manner. This consequence will accrue if investigators are embroiled in responding to interrogatories, requests for production of documents and depositions. Moreover, Plaintiff's administrative claim makes plain that this is precisely the course upon which Plaintiff intends to embark. In that claim, Plaintiff expressly designated two FBI Agents as fact witnesses in this matter: Scott Decker and Mark Wilson. Both of these Agents are integral to the successful resolution of this investigation. Dr. Scott Decker is the

-8-

supervisor of a squad of Agents responsible for all scientific and forensic initiatives in the AMERITHRAX investigation.  Supervisory Special Agent Mark Wilson is assigned to the Chemical/Biological Sciences Unit at the FBI Laboratory where he is responsible for oversight of several key initiatives being pursued by outside laboratories under contract with the FBI.

18.  All of the foregoing outcomes will seriously and adversely affect the FBI's ability to effectively and efficiently conduct the AMERITHRAX investigation.  It is not possible to proceed with discovery on any of these subjects without divulging sensitive information that will compromise and frustrate the AMERITHRAX investigation.

Pursuant to Title 28, United States Code, Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _/6 /6_ day of January, 2004.

Richard L. Lambert
Inspector
Federal Bureau of Investigation
Washington, D.C.

-9-

# EXHIBIT A

March 19, 2002

MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES

FROM:          ANDREW H. CARD, JR.
               Assistant to the President
               and Chief of Staff
SUBJECT:       Action to Safeguard information Regarding Weapons
               of Mass Destruction and Other Sensitive Documents
               Related to Homeland Security


As noted in many discussions during the past several months, you and your
department or agency have an obligation to safeguard Government records
regarding weapons of mass destruction.  Weapons of mass destruction
include chemical, biological, radiological, and nuclear weapons.
Government information, regardless of its age, that could reasonably be
expected to assist in the development or use of weapons of mass
destruction, including information about the current locations of
stockpiles of nuclear materials that could be exploited for use in such
weapons, should not be disclosed inappropriately.

I asked the Acting Director of the Information Security oversight office
and the Co-Directors of the Justice Department's office of Information and
Privacy to prepare guidance for reviewing Government information in your
department or agency regarding weapons of mass destruction, as well as
other information that could be misused to harm the security of our Nation
and the safety of our people. Their guidance is attached, and it should be
distributed to appropriate officials within your department or agency,
together with this memorandum, to assist in your undertaking an immediate
reexamination of current measures for identifying and safeguarding all
such information at your department or agency.

All departments and agencies should review their records management
procedures and, where appropriate, their holdings of documents to ensure
that they are acting in accordance with the attached guidance.  They should
report the completion, or status, of their review to my office through the
Office of Homeland Security no later than 90 days from the date of this
memorandum.

2

If agency officials need assistance in determining the **classification status** of records related to the development or use of weapons of mass destruction, they should contact the Information Security Oversight Office, at 202-219-5250. For assistance in determining the classification of nuclear and radiological weapons classified under the Atomic Energy Act, they should contact the Department of Energy's Office of Security, at 202-586-3345.  If they need assistance in applying exemptions of the Freedom of Information Act (F01A) to sensitive but unclassified information, they should contact the Justice Department's Office of Information and Privacy (01P), at 202-514-3642, or consult 01P's FOIA Web site at www.usdoj.gov/04foia/index/html.

MEMORANDUM FOR DEPARTMENTS AND AGENCIES

FROM:               LAURA L. S. KIMBERLY
                    Acting Director
                    Information Security Oversight Office
                    RICHARD L. HUFF
                    DANIEL J. METCALFE
                    Co-Directors
                    Office of Information and Privacy
                    Department of Justice

SUBJECT:            Safeguarding Information Regarding Weapons of Mass
                    Destruction and Other Sensitive Records Related to
                    Homeland Security

At the request of the Assistant to the President and Chief of Staff, we
have prepared this memorandum to provide guidance for reviewing Government
information regarding weapons of mass destruction, as well as other
information that could be misused to harm the security of our nation or
threaten public safety.  It is appropriate that all federal departments and
agencies consider the need to safeguard such information on an ongoing
basis and also upon receipt of any request for records containing such
information that is made under the Freedom of Information Act (FOIA), 5
U.S.C. § 552 (2000).  Consistent with existing law and policy, the
appropriate steps for safeguarding such information will vary according to
the sensitivity of the information involved and whether the information
currently is classified.

## 1. Classified Information

If the information currently is classified and is equal to or Less than 25
years old, it should remain classified in accordance with Executive Order
12958, Sec. 1.5 and Sec. 1.6.  Although classified information generally
must be declassified within 10 years of its original classification,
classification or reclassification may be extended for up to 25 years in
the case of information that could reasonably be expected to "reveal
information that would assist in the development or use of weapons of mass
destruction." Id.,Sec.:1-6(d)(2).

- If the information is more than 25 years old and is still classified, it should remain classified in accordance with Executive Order 12958, Sec. 3.4 (b) (2), which authorizes agency heads to exempt from automatic declassification any "specific information, the release of which should be expected to . . . reveal information that would assist in the development or use of weapons of mass destruction." (Agencies should note that the automatic declassification date for any classified information over 25 years old that involves the equities of more than one agency was extended until April 2003 by Executive Order 13142.  Agencies have until then to exempt such information from automatic declassification under any **one of the** pertinent exemption categories in Executive Order 12958, Sec. 3.4(b).)

In this regard, agencies should note that Department of Defense (DOD) information that involves the equities of more than one DOD component is considered to have multi-agency equities.  Information maintained by the Defense Technical Information Center (DTIC) or the National Archives and Records Administration (NARA) also is deemed to have multi agency equities, i.e., those pertaining to DTIC or NARA and those pertaining to the component agency or agencies that created the information.

## II.   Previously Unclassified or Declassified Information

- If the information, regardless of age, never was classified and never was disclosed to the public under proper authority, but it could reasonably be expected to assist in the development or use of weapons of mass destruction, it should be classified in accordance with Executive Order 129S8, Part 1, subject to the provisions of Sec. 1.8(d) if the information has been the subject of an access demand (or Sec 6.1(a) if the information concerns nuclear or radiological weapons).

- If such sensitive information, regardless of age, was classified and subsequently was declassified, but it never was disclosed to the public under proper authority, it should be reclassified in accordance with Executive Order 12958, Part 1, subject to the provisions of Sec. 1.8(d) if the information has been the subject of an access demand (or Sec 6. 1 (a) if the information concerns nuclear or radiological weapons).

### III.   Sensitive But Unclassified Information

In addition to information that could reasonably be expected to assist in the development or use of weapons of mass destruction, which should be classified or reclassified as described in Parts I and II above, departments and agencies maintain and control sensitive information related to America's homeland security that might not meet one or more of the standards for classification set forth in Part I of Executive Order 12958. The need to protect such sensitive information from inappropriate disclosure should be carefully considered, on a case-by-case basis, together with the benefits that result from the open and efficient exchange of scientific, technical, and like information.

All departments and agencies should ensure that in taking necessary and appropriate actions to safeguard sensitive but unclassified information related to America's homeland security, they process any Freedom of Information Act request for records containing such information in accordance with the Attorney General's FOIA Memorandum of October 12, 2001, by giving full and careful consideration to all applicable FOIA exemptions. See FOIA Post, "New Attorney General FOIA Memorandum Issued" (posted 10/15/01) (found at www-usdoj.gov/oip/foiapost/2001foiapost19.htm), which discusses and provides electronic links to further guidance on the authority available under Exemption 2 of the FOIA, 5 U. S. C - § 552 (b) (2), for the protection of sensitive critical infrastructure information.  In the case of information that is voluntarily submitted to the Government from the private sector, such information may readily fall within the protection of Exemption 4 of the FOIA, 5 U.S.C. § 552(b)(4).

As the accompanying memorandum from the Assistant to the President and Chief of Staff indicates, federal **departments and agencies** should not hesitate to consult with the Office of information and Privacy, either with general anticipatory questions or on a case-by-case basis as particular matters arise, regarding any FOIA-related homeland security issue. Likewise, they should consult with the Information Security Oversight Office on any matter pertaining to the classification, declassification, or reclassification of information regarding the development or use of weapons of mass destruction, or with the Department of Energy's Office of Security if the information concerns nuclear or radiological weapons.

# EXHIBIT B





## SCHULER & HALVORSON
### A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW

BARRISTERS BUILDING
1615 FORUM PLACE
FOURTH FLOOR
WEST PALM BEACH, FL 33401

TELEPHONE (561) 689-8180
FACSIMILE (561) 684-9683
E-MAIL ADDRESS admin@sh-law.com
WEB PAGE http://www.sh-law.com

JOSEPH H. GRAVES
STEVEN W. HALVORSON*
RICHARD D. SCHULER*
JASON D. WEISSER
———
*BOARD CERTIFIED CIVIL TRIAL LAWYER

INVESTIGATORS
JANE BRYAN
RICHARD L. EISNER
JOSEPH A. JOHNSTON

NURSE CONSULTANT
RHEA D. DORAN

February 7, 2003
## VIA CERTIFIED MAIL #7160 3901 9844 7549 7668
## RETURN RECEIPT REQUESTED

Honorable Thomas E. White
Secretary of United States Army
Department of Defense
1155 Defense Pentagon
Washington, D.C. 20301-1155

Re:    Federal Tort Claim Act of Robert Stevens, Deceased

Dear Secretary White:

Enclosed with this letter please find the appropriate Standard Form 95 prescribed by the Department of Justice pursuant to Section 28 Code of Federal Regulations Section 14.2. This form will put you on notice, pursuant to the above Regulation, of the intention of the Stevens family to make a claim against the United States of America for actions or inactions by the United States in failure to properly monitor and/or secure Anthrax in its possession. Robert Stevens, age 62, was exposed to this Anthrax and suffered a terrible death from the inhalation of Anthrax.

Attached to the "Claim for Damage, Injury, or Death" are copies of the Order appointing Maureen Stevens as Personal Representative of the Estate of Robert Stevens as well as copies of medical bills, funeral bill, medical records, and death certificate.

I trust that you will pass this along to the appropriate person at the Department of Justice for a response.

Sincerely,

Richard D. Schuler
RDS/slh
cc:    Mrs. Maureen Stevens

*30204750*

**ADMIN-00002**

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROROVED OMB NO. 1105-0008 EXPIRES 5-31-05 . |
|---|---|---|

| 1. Submit To Appropriate Federal Agency: | 2. Name, Address of claimant and claimant's personal representative, if any. (See instructions on reverse.) (Number, street, city, State and Zip Code) |
|---|---|
| Department of the Army Department of Defense | Robert Stevens, Deceased Maureen Stevens, Personal Rep. c/o Richard D. Schuler, Esq. 1615 Forum Pl, West Palm Beach, FL 33401 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M) |
|---|---|---|---|---|
| MILITARY CIVILIAN | 6/20/38 | Married | 10/5/01 | 4:00p.m. |

8. Basis of Claim *(State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof) (Use additional pages if necessary.)*

See Addendum

9. **PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT *(Number, street, city, State, and Zip Code)*

N/A

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF DAMAGE AND THE LOCATION WHERE PROPERTY MAY BE INSPECTED *(See instructions on reverse side)*

N/A

10. **PERSONAL INJURY/WRONGFUL DEATH**

STATE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE NAME OF INJURED PERSON OR DECEDENT.

Death by anthrax exposure

11. **WITNESSES**

| NAME | ADDRESS *(Number, street, city, State, and Zip Code)* |
|---|---|
| See Addendum | |

12. *(See instructions on reverse)* **AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL *(Failure to specify may cause forfeiture of your rights.)* |
|---|---|---|---|
| | | See Addendum | $50,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE ACCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM

| 13a. SIGNATURE OF CLAIMANT *(See instructions on reverse side.)* | 13b. Phone number of signatory | 14. DATE OF CLAIM |
|---|---|---|
| *Richard D. Sc...* | 561/689-8780 | 2/3/03 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant shall forfeit and pay to the United States the sum of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States. *(See 31 U.S.C. 3729.)* | Imprisonment for not more than five years and shall be subject to a fine of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the United States. *(See 18 U.S.C.A. 287.)* |

95-108
Previous editions not usable

NSN 7540-00-634-4046

Rec'd USARCS 3/13/03
BR

STANDARD FORM 95 (Rev. 7-85)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

ADMIN-00003

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
A. *Authority*: The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14

B. *Principal Purpose*: The information requested is to be used in evaluating claims.
C. *Routine Use*: See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond*: Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid".

## INSTRUCTIONS

### Complete all items - Insert the word NONE where applicable

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF

Any instructions or information necessary in the preparation of your claim will be furnished, upon request, by the office indicated in item #1 on the reverse side. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplemental regulations also. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with said claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file claim for both personal injury and property damage, claim for both must be shown in item #12 of this form.

The amount claimed should be substantiated by competent evidence as follows:
(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT, THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

(b) In support of claims for damage to property which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to completely execute this form or to supply the requested material within two years from the date the allegations accrued may render your claim "invalid". A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

Failure to specify a sum certain will result in invalid presentation of your claim and may result in forfeiture of your rights.

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or other aspect of this collection of information, including suggestions for reducing this burden,

| to Director, Torts Branch | and to the |
| Civil Division | Office of Management and Budget |
| U.S. Department of Justice | Paperwork Reduction Project (1105-0008) |
| Washington, DC 20530 | Washington, DC 20503 |

## INSURANCE COVERAGE

In order that subrogation claims be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of his vehicle or property.

15. Do you carry accident insurance? Yes, if yes give name and address of insurance company (Number, street, city, State, and Zip Code) and policy number. No

N/A

| 16. Have you filed claim on your insurance carrier in this instance, and if so, is it full coverage or deductible? | 17. If deductible, state amount |
| Worker's Compensation Insurance | N/A |

18. If claim has been filed with your carrier, what action has your insurer taken or proposes to take with reference to your claim? *(It is necessary that you ascertain these facts)*

$288.47 paid bi-weekly plus medical bills starting 10/26/01

19. Do you carry public liability and property damage insurance? Yes. If yes, give name and address of insurance carrier (Number, street, city, State, and Zip Code) No

N/A

SF 95 (Rev. 7-85) BACK

* U.S. GOVERNMENT PRINTING OFFICE: 1989—241-175

ADMIN-00004

## 8.    BASIS OF CLAIM

That Robert Stevens was killed by Anthrax Bacillus on October 5, 2001. That it has come to the attention of his family that the strain of Anthrax Bacillus that killed him was manufactured, tested, stored, utilized, inventoried, maintained and/or controlled in a United States Government laboratory or its agents, representatives, subsidiaries, or associated laboratory that was engaging in this ultra hazardous activity. Alternatively, the laboratory involved, which we believe to be located at Fort Detrick, Maryland, did not take sufficient steps to monitor, maintain, store, account for, transport, identify, and/or secure (keep track of) the Anthrax that was grown and experimented with on its premises and its lack of security allowed a portion or portions of said Anthrax to be removed from its premises. Furthermore, that the Government knew or should have known of problems with security involving Anthrax samples a significant time period prior to Mr. Stevens' death and yet either failed or refused to take action to institute sufficient security procedures or develop any security procedures at all in spite of the fact that this ultra hazardous activity involved a high degree of risk of harm to others and that it knew that the potential for said harm would be great i.e., death. The United States Government failed to take appropriate steps to inventory, catalog and monitor said Anthrax and negligently distributed said Anthrax to other facilities through unsecure channels with virtually no tracking system. That as a result, Robert Stevens was exposed to Anthrax Bacillus at American Media Inc., in Boca Raton, Florida, several weeks before October 5, 2001, and ultimately died on that date.

## 11.    WITNESSES

Maureen Stevens, 6734 Massachusetts Dr., Lantana, FL 33462
Nicholas J. Stevens, Post Office Box 15696, Tallahassee, FL 32317
Heidi Hogan, 300 Masters Road, Palm Springs, FL 33461
Casey Stevens, 3715 Eastover Ridge Road #1303, Charlotte, NC 28211
Dr. Paul S. Keim, Northern Arizona University, Flagstaff, AZ 86001
Don Foster, Ph.D., Vassar College, 124 Raymond Avenue, Poughkeepsie, NY 12604
Mark Wilson, Federal Bureau of Investigation, Washington Field Office, Washington, D.C.
Scott Decker, FBI Agent, Washington Field Office, Washington, D.C.
Mr. David Pecker, President, American Media, Inc., Boca Raton, FL
Larry Bush, M.D., Infectious Disease Specialist, 5503 S. Congress Avenue, Lake Worth, FL
Dr. Jean Malecki, Director of PBCHD, 1050 15th Street West, Riviera Beach, FL 33404
Dr. Ayaad Assaad, 8019 Hollow Reed Court, Frederick, MD 21701
Dr. Barbara Hatch Rosenberg, Federation of American Scientists (FAS), NY
Richard Crosland, Ph.D., 6001 Executive Boulevard, Bethesda, MD 20892-9529
Mr. Ernesto Blanco, 14890 NE 11th Avenue, North Miami, FL 33161
Mr. Dave Altimari, Hartford Courant, 285 Broad Street, Hartford, CT 06115
Mr. Jack Dolan, Hartford Courant, 285 Broad Street, Hartford, CT 06115
Dr. Steven Hatfill, Washington, D.C.
Rosemary McDermott, 128 E. Main Street, Thurmont, MD 21788
Mr. William Patrick
Colonel Franz, USAMRID, Fort Detrick, MD
Colonel Arthur Friedlander, USAMRID, Fort Detrick, MD
Lieutenant Clint Taylor, USAMRID, Fort Detrick, MD

ADMIN-00005

Kay Mereish, USAMRID, Fort Detrick, MD
Elise Bridges, USAMRID, Fort Detrick, MD
John Ezzel, USAMRID, Fort Detrick, MD
Kathy Wilhelmsen, USAMRID, Fort Detrick, MD
Colonel Charles Eitzen, USAMRID, Fort Detrick, MD
Gary Matsumoto, ABC News, New York, NY
Bradley Perkins, CDC, Atlanta, GA

## 12c.   WRONGFUL DEATH

Robert Stevens, 62, earning $76,000 per year, doing photo editing for American Media Inc., would have worked to age 70. He had a life expectancy to age 77. His economic claims, under Florida law are worth approximately $600,000. He leaves the following survivors who have a claim for mental anguish, pain and suffering, loss of parental guidance and loss of support and services under Florida law:

| | | |
|---|---|---|
| Maureen Stevens (wife) | DOB: 11/05/42 | (claim worth $20,000,000) |
| Nicholas Stevens (son) | DOB: 09/07/61 | (claim worth $10,000,000) |
| Heidi Hogan (daughter) | DOB. 12/18/64 | (claim worth $10,000,000) |
| Casey Stevens (daughter) | DOB: 05/19/80 | (claim worth $10,000,000) |

**ADMIN-00006**

# EXHIBIT C

2/15/03 SUNSENT 1A
2/15/03 Sun-Sentinel (Ft. Lauderdale Fla.) 1A
2003 WL 11555973

South Florida Sun-Sentinel
Copyright 2003, South Florida Sun-Sentinel. All Rights Reserved.

Saturday, February 15, 2003

LOCAL

## WIDOW FILES U.S. CLAIM IN ANTHRAX DEATH
By Kathy Bushouse  Staff Writer Staff research Bill Lucey contributed to this
report.

A lawyer for the widow of the nation's first bioterrorism attack
victim says he has filed a $50 million wrongful-death claim with the
federal government, alleging that lax security at the U.S. Army's Fort
Detrick may have allowed the theft of a deadly strain of anthrax that
was used to kill her husband.

Tabloid photo editor Bob Stevens, who worked for American Media Inc.
in Boca Raton, died of inhalation anthrax on Oct. 5, 2001, after he
handled an anthrax-tainted letter at his desk.

Frustrated by the government's silence on almost every detail
surrounding her husband's death, Maureen Stevens is pursuing a financial
settlement, her lawyer said. In the process, she would like more
information about what led to her husband's death, possibly to
reinvigorate the investigation, said Richard Schuler, a West Palm Beach
lawyer.

"There have been no arrests. There's been no information given to her,
no indication that the investigation is progressing," Schuler said.
Stevens was particularly upset that she could not get a copy of her
husband's autopsy report, he said.

Schuler said he sent the claim to the Defense Department and the
Army.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

In it, he outlines his theory that the anthrax that killed Stevens came from a security breach at Fort Detrick in Maryland, home of the Army's Medical Research Institute of Infectious Diseases.

The Fort Detrick lab is the lead center "for developing medical countermeasures, vaccines, drugs and diagnostic tools to protect U.S. service members from biological warfare agents and naturally occurring infectious diseases," according to the institute's Web site.

Much of the information supporting the widow's claim came from a whistle-blower's lawsuit filed by two scientists against the government, Schuler said.

They claim they were fired because they asserted security at Fort Detrick was "just completely nonexistent, and they were trying to improve matters," he said.

The scientists' lawsuit included a 1992 internal Army memo with the subject line, "missing anthrax blocks, etc.," Schuler said.

A copy of this memo is included in Stevens' claim.

The memo goes into detail on anthrax and other specimens missing from the laboratory, although the lawsuit says many were recovered after an internal investigation, Schuler said.

If the government denies the claim, Schuler would have six months to file a lawsuit.

Chuck Dasey, an Army spokesman at Fort Detrick, had no comment on Stevens' claim or on security problems at Fort Detrick.

Stevens' claim would not be the first against the federal government in the wake of the anthrax attacks.

In January, a postal worker who survived inhalation anthrax filed a

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

lawsuit against the U.S. Postal Service, claiming his life was endangered because the Postal Service did not immediately close the Brentwood postal center, where he worked.

The postal center in Washington, D.C., was contaminated with anthrax and the government has spent up to $100 million to decontaminate it.

The building where Stevens worked remains under quarantine by the Palm Beach County Health Department.

Investigators from the FBI and other federal agencies have twice ventured inside to search for clues in the anthrax contamination, but no suspects have been named and the FBI has not indicated whether it ever found the anthrax-tainted letter thought to have been brought into the AMI building on Broken Sound Boulevard.

On Thursday, Congress approved a measure that will allow the federal government to buy the AMI building for $1, then assume the cleanup cost.

There is no timetable for the cleanup, but government and AMI leaders are expected to meet in Boca Raton next week to work out details for the deal.

Scientists have determined that it was the Ames strain of anthrax used in the mail attacks that killed five people, including Stevens, and infected 13 others in the fall of 2001.

The Ames strain is the most widely used version of the bacteria and is available to many laboratories, said Gregory Evans, director of the Centers for the Study of Bioterrorism and Emerging Infections at the St. Louis University School of Public Health.

"It was a strain that was developed years ago, before we were ever really worried about terrorism," Evans said. "Many labs could have had access to that strain. ... I guess you can make a circumstantial case that these [government] laboratories are the ones most likely to be able to create [this kind of anthrax], but in reality it could have been

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

created by a scientist who had the equipment and had the knowledge."

Collecting information about the anthrax attacks from the federal government or proving government negligence contributed to Stevens' death could be difficult, said William Banks, a professor at Syracuse University's College of Law.

A settlement might be the most likely scenario, Banks said.

Schuler did not rule out a settlement, saying Stevens wants information about her husband's death.

"This family and this country deserve some answers," the lawyer said.

Staff research Bill Lucey contributed to this report.

Kathy Bushouse can be reached at kbushouse@sun-sentinel.com or 561-243-6641.

TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT DISPLAYABLE

PHOTO

Bob Stevens, a photo editor in the AMI building in Boca, died of anthrax poisoning.

---- INDEX REFERENCES ----

KEY WORDS:        TERRORISM AOA ANTHRAX DEATH LAWSUIT

NEWS SUBJECT:     English language content; Page-One Story; Content Types;
                  Front-Page Stories; Crime/Courts; Political/General News;
                  Crime; Acts Of Terror (ENGL NPAG NCAT PAG GCRIM GCAT CRM
                  GTERR)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

REGION:        United States - Florida; United States; North American
               Countries; Florida; North America; United States; Southern
               U.S. (USFL USA NAMZ FL NME US USS)


EDITION:        PALM BEACH


Word Count: 822

2/15/03 SUNSENT 1A

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 9:03-cv-81110-AMC   Document 13   Entered on FLSD Docket 01/28/2004   Page 60 of 114

# EXHIBIT D

Page 1

10/10/02 SUNSENT 3B
10/10/02 Sun-Sentinel (Ft. Lauderdale Fla.) 3B
2002 WL 101348357

South Florida Sun-Sentinel
Copyright 2002, South Florida Sun-Sentinel. All Rights Reserved.

Thursday, October 10, 2002

LOCAL

WIDOW PONDERS SUING OVER 1ST ANTHRAX DEATH;   LAWYER IS EXPLORING WRONGFUL
DEATH SUIT AGAINST GOVERNMENT.
By Kathy Bushouse  Staff Writer

It's been a year since her husband became the United States' first
victim of an anthrax attack.

But the attorney for Maureen Stevens says the widow of American Media
Inc. tabloid photo editor Bob Stevens has gotten scant information about
what led to her husband's death, nor has she received any financial help
from the federal government.

A lawsuit could be Maureen Stevens' only option for getting answers
and money, said attorney Richard Schuler.

"We're in a position where she's out on an island, isolated," Schuler
said. "The FBI hasn't communicated with her. No branch of the government
has done anything for her or her family. ... The ultimate thing is to
get to the bottom of how this happened."

Schuler confirmed Stevens is considering filing a wrongful death
lawsuit against the federal government, based on what Schuler alleges
was lax security at the U.S. Army Medical Research Institute for
Infectious Diseases. The strain of anthrax that killed Bob Stevens was
stored and studied at the Fort Detrick, Md., facility in the 1980s. It
also was shared with more than a dozen government, university and
private laboratories over a period of years.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Schuler said he is in the information-gathering phase, interviewing witnesses and requesting documents from the U.S. Army. Army spokesman Chuck Dasey declined comment.

If a lawsuit is filed, Schuler said it would be in federal court in West Palm Beach.

Schuler stressed that they didn't want to compromise the criminal investigation into Bob Stevens' death, but said they were concerned about its course.

"We want it to succeed," Schuler said. "It just seems to be meandering."

Schuler said Stevens would have been able to get money from the Sept. 11 Victims Compensation Fund, but federal legislation allowing anthrax victims' relatives to do that never passed.

Bob Stevens died on Oct. 5, 2001, from anthrax he contracted after breathing in spores from an anthrax-laden envelope mailed to AMI's Boca Raton offices. He was the first of five people to die last fall from inhalation anthrax.

Investigators initially thought Stevens came into contact with the bacteria during a trip to North Carolina, but it was later determined he contracted anthrax at work.

Should Maureen Stevens pursue a case against the government, the case would not go before a jury but would be instead be handled like any other federal negligence case, said Bruce Rogow, a constitutional law professor at Nova Southeastern University.

But he said it would likely be a difficult case to handle. Even if Maureen Stevens' attorney could determine the anthrax came from the Army lab at Fort Detrick, "then the question becomes is it reasonably foreseeable, even if they were lax in the storage, that some of it would be purloined and then used to murder someone," Rogow said.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Joe Little, a law professor at the University of Florida, also said the case could be daunting.

"The hard questions here are going to be questions of proof, putting it all together and showing the government was negligent," Little said.

Kathy Bushouse can be reached at kbushouse@sun-sentinel.com or 561-243-6641.

TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT DISPLAYABLE

PHOTO Bob Stevens was a photo editor for AMI until he died. His widow says she is getting no answers or help from officials.

---- INDEX REFERENCES ----

KEY WORDS:        AOA DISEASE ANTHRAX DEATH

NEWS SUBJECT:      English language content; Lawsuits; General News; Legal/Judicial; Crime/Courts; Political/General News; Crime; Corporate/Industrial News (ENGL LWS GEN C12 GCRIM GCAT CRM CCAT)

REGION:        United States - Florida; United States; North American Countries; Florida; North America; United States; Southern U.S. (USFL USA NAMZ FL NME US USS)

EDITION:        PALM BEACH

Word Count: 511

10/10/02 SUNSENT 3B

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT E

Page 1

2/23/03 BSX-MLSN 38
2/23/03 Mail on Sunday 38
2003 WL 10410090

Mail on Sunday
Copyright 2003

Sunday, February 23, 2003

# WHY IS THE WHITE HOUSE SO FRIGHTENED TO TELL ME HOW THE ANTHRAX KILLER MURDERED
MY HUSBAND? ; BRITISH WIDOW SUING US GOVERNMENT FOR pounds 30 MILLION ACCCUSES
FBI OF     COVER-UP OVER BIO TERROR
CAROLINE GRAHAM


NUMB with grief, Maureen Stevens picked up the phone and called
the medical examiner's office Less than 72 hours earlier, she had
sat tearfully by the bedside of her husband of 27 years while a
deadly disease killed him.


Now, the remains of her beloved Bob lay on

a cold stone slab in the mortuary following a post-mortem which
seemed certain to prove that the British expat had become the first
victim of the 'anthrax killer', a bioterrorist whose reign of terror
in the weeks after the September 11 attacks sent shockwaves through
America.


But Maureen was not prepared for what happened next. In a cool
and emotionless voice, Florida's chief medical examiner - the
equivalent of a British coroner - told her: 'I am sorry but I cannot
give you the autopsy results. The FBI has forbidden me to release
them to anyone.' Last week, 16 months after the death of Mr Stevens,
62, who worked in the Florida city of Boca Raton as a picture editor
for American supermarket tabloid The Sun, his widow filed a pounds
30 million lawsuit against the US government, which she believes is
involved in a cover-up and conspiracy of silence to prevent her
husband's killer being brought to justice.


While many initially believed the anthrax attacks were the work
of Al Qaeda, some of America's top scientists - and Maureen herself -

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

now believe, unequivocally, that the anthrax killer came from within the very heart of the US biotechnical world and is someone so well connected that the FBI is under orders to 'stall' the investigation into the attack which cost the lives of Bob Stevens and four others.

It's clearly agonising for Maureen.

'It's not about the money,' she told me.

'I am so angry. I just need to know what's being done. There's so much nonsense being talked. All I want are some answers so I can put this thing to rest.' A U R E E N ' S Miami-based lawyer, Richard Schuler, agrees.

He said: 'We believe the authorities know who the anthrax killer is but that they are stonewalling to save face. Maureen just wants justice to be done. Our government does not want the world to know this crime was perpetrated by one of its own.' Schuler, one of Florida's leading personal injury lawyers, says it is 'unheard of' for a widow to be refused a postmortem report. Bob Stevens's death certificate lists 'anthrax inhalation' as the cause of his death on October 5, 2001, but the results of the post-mortem remain a closely guarded secret.

The lawyer added: 'What are they trying to hide, and why?

Surely his widow has a right to see the results of his autopsy? I have never known a case like it.' Schuler has now started proceedings under America's Freedom of Information Act. He said: 'I am hopeful that the justice system will work, but you have to understand the federal courts handling this case are run by the same government that is trying to withhold this information. It is a vicious circle.' Maureen remains in seclusion in her modest bungalow in Lantana, a middleclass suburb an hour north of Miami, where she and her husband were living the American dream.

The couple, who met on a blind date in Maidenhead, Berkshire, in 1972, emigrated to America in 1974. Bob had two children from his first marriage and, in 1980, Maureen gave birth to a daughter,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Casey. Bob became a US citizen in 1988, but never forgot his British roots and often travelled back to the UK.

He was devoted to his wife, his children and seven grandchildren.

Maureen said: 'He is my hero and that won't ever change. I love him just M as much today as I did when I fell for him 30 years ago. But I never had the chance to say goodbye.

'My biggest wish is that I could have had the chance to tell him how much I loved him before he went into a coma.' ER lawyer added: 'Maureen is devastated. After Bob died, the FBI tore through her home and dug up her garden looking for evidence.

She co-operated with them fully.

'Now she feels that higher powers are at work to prevent the killer's identity being known. The authorities are protecting one of their own.

'It's a disgrace. This is not about the money, this is about finding out who killed Bob Stevens and bringing them to justice.' While many were at first sceptical of H

the conspiracy theories that arose in the wake of the anthrax attacks, which left dozens injured and affected hundreds more who had to take antibiotics after being exposed to the deadly bacterium, a growing band of leading scientists now fully backs the theory that whoever was responsible came from the heart of America's biological defence community.

Many of the voices now speaking out against the FBI were initially hired by the intelligence agency to establish links between the anthrax and Osama Bin Laden-backed terrorists.

Leading anthrax expert Dr Paul Keim, of the University of Northern Arizona, was hired to help with the investigation. He

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

expected the anthrax - which Stevens inhaled after receiving a letter at The Sun's newspaper offices - to be a 'crude and unsophisticated' version of the bacterium.

Instead, to his astonishment, his tests proved conclusively that it came from the advanced 'Ames' strain of anthrax - which is 'grown' only at the US Army Medical Research Institute of Infectious Diseases (USAMRIID) at Fort Detrick, Maryland.

Another eminent scientist, Professor Don Foster, a handwriting expert from New York's prestigious Vassar College, also joined the anthrax investigation at the behest of the FBI. He was given copies of four anthrax-laced letters and envelopes sent by the killer to two senators, a TV presenter and the editor of the New York Post.

The academic, whose evidence helped to convict Unabomber Ted Kaczynski, said: 'This was the work of a sophisticated person with inside knowledge.

'As I worked through these documents, it became apparent that USAMRIID was ultimately the best place for the FBI to begin looking for a suspect.'

ROFESSOR Foster has isolated two suspects - whom he refuses to name - and asked the FBI to provide writing samples from each. His request has been denied.

'It's very frustrating,' said Foster.

'Ordinarily with the FBI, if I need some documents, they're on my desk the next day. My two suspects both have CIA connections. These two agencies, the CIA and FBI, are often seen as rivals.

'My fear is that the FBI agents P assigned to this case are not getting full co-operation from the US military, CIA and witnesses who might have information about it.' The professor says certain 'key factors' about the letter writer prove it was someone with knowledge of Fort Detrick.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Each letter bore the date September 11 and was sent in the aftermath of the World Trade Centre attacks.

Foster says: 'The World Trade Centre was used as a cover. Why wrongly date a letter and do it so obviously? It was a tactic to try and throw us off track.' In another letter, the word penicillin is crudely spelled 'penacilin', another ruse, Foster believes, to make it appear a terrorist unfamiliar with English wrote it.

Two of the letters were sent from New Jersey, a fact designed, Foster says, to implicate two former workers at Fort Detrick who had left the agency under a cloud but who were later completely exonerated of any possible link to the anthrax attacks.

The professor adds: 'The letter sender clearly tried to implicate these two scientists. This is some-

one who's higher up the food chain and who has access to personnel information.' Although Maureen's lawyer refuses to name his two suspects. The Mail on Sunday's own investigations point to two US government scientists.

One is Professor Don Wiley, 57, who died mysteriously in November 2001 after falling off a bridge in Tennessee. While his death was ruled a suicide, Wiley - who specialised in lethal viruses, including anthrax - is widely believed to have sent the letters.

Top-ranking British government sources said last year they had classified information indicating the American authorities had chosen to assassinate the anthrax attacker rather than bring him to justice.

While Wiley's wife and family deny he was the killer, they also firmly believe he was incapable of killing himself.

Intriguingly, after his death, the anthrax attacks suddenly stopped.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

HE FBI has also questioned a former employee at Fort Detrick, and has searched his home for evidence on at least four occasions.

Schuler says: 'We are not going to start naming names. Our lawsuit is to make sure the spotlight stays on this case and that it is not swept under the carpet.' Maureen has received her husband's life assurance, but nothing from the various September 11 charity funds.

Last week, the case took another twist when The Mail on Sunday learned that the federal government paid a token one dollar (about 66p) to buy the offices of American Media Inc - Bob Stevens's employers.

A source at American Media said: 'Those offices were worth millions. It makes you ask why the government was so keen to get hold of them? And why did the company do such a seemingly crazy and uneconomic deal?' The crux of Maureen's lawsuit is proving that the anthrax strain which killed her husband came from the US Army facilities at Fort Detrick and that lax security allowed someone to steal samples of the deadly virus from there.

Schuler showed The Mail on Sunday a confidential memo which will form part of Maureen's case. It was written by a biologist at the research centre in 1992 and lists dozens of missing deadly viruses, including anthrax.

Schuler also cited an unrelated lawsuit filed by three scientists against the establishment in 1997, in which one, Dr Ayaad Assaad, stated: 'Security is non-existent.' Schuler said: 'We don't have to prove who the killer is - just that lax security at the research facility allowed him to get his hands on the anthrax. I have one witness who describes the security system at Fort Detrick as being less than you would get at a convenience store.

'Bob's widow and family deserve to know the truth. We are confident that eventually it will come out, no matter how much the government tries to stonewall us.' murderedmyhusband?

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

T

---- INDEX REFERENCES ----

NAMED PERSON:    MAUREEN STEVENS; STEVENS, MAUREEN; STEVENS, BOB; SCHULER,
                RICHARD; FOSTER, DON; WILEY, DON

NEWS SUBJECT:    English language content; Crime/Courts; Political/General
                News; Crime; Health; Health; Government Bodies; Domestic
                Politics (ENGL GCRIM GCAT CRM GHEA HLT GVBOD GPOL)

PRODUCT:        European News/Features (DEE)

GOVERNMENT:     Government of the United Kingdom; Governments of Non-U.S.
                Countries (UKGV IGV)

REGION:         United States; United States; North American Countries;
                North America; Europe; United Kingdom; Western Europe;
                Western European Countries; European Countries; European
                Union Countries (USA US NAMZ NME EU UK WEU WEURZ EURZ EECZ)

EDITION:        FB

Word Count: 1742

2/23/03 BSX-MLSN 38

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT F

2/27/03 SUNSENT 17A
2/27/03 Sun-Sentinel (Ft. Lauderdale Fla.) 17A
2003 WL 14868260
**(Publication page references are not available for this document.)**

South Florida Sun-Sentinel
Copyright 2003, South Florida Sun-Sentinel. All Rights Reserved.

Thursday, February 27, 2003

LOCAL

WOMAN GIVES FIRST U.S. INTERVIEW SINCE HUSBAND'S ANTHRAX DEATH
By Kathy Bushouse Staff Writer

A stoic Maureen Stevens appeared on the CBS morning news program The Early Show Wednesday, breaking nearly 14 months of silence to grant her first interview with an American reporter since her husband's death from inhalation anthrax.

Stevens, who earlier this month filed a $50 million wrongful-death claim against the Department of Defense and the Department of the Army, told CBS she still has difficulty grappling with her husband's death and still expects each day to see him "come in the door [with] a big smile and get a cold beer. He was just unbelievable and I miss him."

The network magazine program ran a 4-minute, 10-second segment Wednesday morning, talking with Stevens about the days leading to her husband's death and how she has coped in the months following.

Bob Stevens, a photo editor for American Media Inc. in Boca Raton, died of inhalation anthrax on Oct. 5, 2001. The source of the anthrax was determined to be a letter mailed to the AMI offices.

"They get strange letters sometimes, and the consensus seems to be that if Robert wasn't wearing his glasses and if it was something funny, he would hold the letters up to his face," Maureen Stevens said. "They think perhaps that's how he got it. Just bad luck."

Federal investigators have twice combed the AMI building for clues,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

removing hundreds of letters and office machinery in the course of their searches. The FBI has not revealed whether that anthrax-tainted letter ever was found, nor has it named a suspect.

The AMI building remains under quarantine by the Palm Beach County Health Department.

Stevens told CBS that all she wants is answers from the FBI about her husband's death. She blames lax security at the U.S. Army's Fort Detrick --the Maryland base where anthrax and other deadly bacteria are stored and used in experiments -- for allowing an anthrax strain to be taken from the base's laboratory.

Stevens' attorney, Richard Schuler of West Palm Beach, has said he thinks a strain of anthrax from a government laboratory was used in the bioterrorism attack. He could not be reached for comment Wednesday.

Spokesmen for the Department of Defense and the Department of the Army also could not be reached for comment.

CBS called Wednesday's segment exclusive, but it was not the first time Stevens spoke to the media since her husband's death. She gave interviews to AMI-owned tabloids in 2001, and did an interview to the British newspaper The Mail on Sunday. That article appeared Feb. 23.

Stevens continues to live in Lantana in the home she shared with her late husband.

Said Stevens in that article: "He is my hero and that won't ever change. I love him just as much today as I did when I fell for him 30 years ago. But I never had the chance to say goodbye."

Kathy Bushouse can be reached at kbushouse@sun-sentinel.com or 561-243-6641.

TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT DISPLAYABLE

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

PHOTO


Bob Stevens


---- INDEX REFERENCES ----


NEWS SUBJECT:     English language content; Defense Department; Executive
          Government; Government Bodies; Domestic Politics;
          Political/General News (ENGL GVDEF GVEXE GVBOD GPOL GCAT)


GOVERNMENT:     Defense Department (DEF)


REGION:     United States - Florida; United States; North American
          Countries; Florida; North America; United States; Southern
          U.S. (USFL USA NAMZ FL NME US USS)


EDITION:     PALM BEACH


Word Count: 485


2/27/03 SUNSENT 17A


END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT G

9/25/03 SUNSENT 1B
9/25/03 Sun-Sentinel (Ft. Lauderdale Fla.) 1B
2003 WL 64117334
**(Publication page references are not available for this document.)**

South Florida Sun-Sentinel
Copyright 2003, South Florida Sun-Sentinel. All Rights Reserved.

Thursday, September 25, 2003

LOCAL

ANTHRAX VICTIM'S WIDOW FILES SUITS NEGLIGENCE IS ALLEGED IN U.S. AND STATE
COURTS
BY KATHY BUSHOUSE AND JON BURSTEIN  STAFF WRITERS Staff Writers Peter
Franceschina and Patty Pensa and Staff Researcher Barbara Hijek contributed to
this report.

The widow of inhalation anthrax victim Bob Stevens filed lawsuits in state and
federal courts Wednesday, alleging negligence by either the U.S. government or
by at least two laboratories that handle the anthrax bacteria may have led to
her husband's death.  The two lawsuits outline the same arguments: that either
the federal government or the labs allowed someone to get a sample of Bacillus
anthracis that was later mailed to American Media Inc. in Boca Raton in the
letter that Stevens handled.

Stevens died Oct. 5, 2001, from inhalation anthrax. His was the first death in
a wave of bioterrorism attacks that killed five people.

Attorneys representing Maureen Stevens filed suit in federal court against the
U.S. government. The state lawsuit is against two companies: Battelle Memorial
Institute, a Columbus, Ohio, nonprofit research company with numerous U.S.
military contracts; and BioPort Corp., a Lansing, Mich., company that
manufactures the only FDA-approved anthrax vaccine.

The suit also names ABC Corp. and XYZ Corp., pseudonyms used to allow more
companies to be named later.

West Palm Beach attorney Richard Schuler, who is representing Maureen Stevens,
said the purpose of the lawsuits is simple: "To find out how this was done and
who did it."

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

The federal lawsuit comes after Maureen Stevens and her children filed a wrongful-death claim in February for $50 million against the Department of Defense and the Department of the Army. Since that claim wasn't settled, the federal lawsuit was filed, Schuler said.

Maureen Stevens had until Oct. 5 to file suit in state court, because that is when Florida's two-year statute of limitations for a wrongful-death lawsuit would have run out. In addition, filing the case in state court would ensure that a jury of Stevens' peers would consider the case. In federal court, the law requires a judge, not a jury, to consider the case since the legal action was filed against the federal government itself, Schuler said.

Schuler said he has filed a series of Freedom of Information Act requests with the federal government, but many of them were ignored.

However, he said, he has received some employee records from the U.S. Army Medical Research Institute of Infectious Diseases at Fort Detrick, the government facility in Maryland that Schuler thinks the anthrax may have come from.

Whistle-blowers

The federal lawsuit accuses the government of failing to adequately secure samples of the anthrax bacteria, and claims that as early as 1992, "samples of this formidable, dangerous and highly lethal organism were known to be missing from the lab at Fort Detrick ... along with samples of the Hantavirus and the Ebola virus."

Those allegations surfaced in a whistle-blower's lawsuit filed against the government by two scientists who claim they were fired because they asserted there was a severe lack of security at the Army facility.

Schuler said he talked to one former U.S. AMRIID employee who described walking out of a secured-area facility with three cardboard boxes that were never examined by guards. The boxes he had contained nothing harmful, but he was coming out of a containment area where potentially deadly diseases were handled.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Chuck Dasey, a spokesman for the U.S. AMRIID, declined to comment Wednesday. Officials at the Department of the Army at the Pentagon could not be reached, despite two phone calls seeking comment.

Thomas McClain, vice president of corporate communications for Battelle Memorial Institute, said the company had not yet received the complaint and declined comment.

Officials at BioPort Corp. could not be reached.

Mystery of 2001 persists

To this day, the source of the anthrax that killed Stevens has not been revealed, nor has it been revealed whether investigators ever found the letter that killed the longtime tabloid photo editor. The FBI still has not named a suspect, though it has identified "persons of interest" in connection with the anthrax case.

Federal investigators made two trips to the AMI building in their search for clues, removing hundreds of letters and office machinery.

FBI officials also could not be reached for comment Wednesday.

AMI's Boca Raton office building was quarantined Oct. 7, 2001, by the Palm Beach County Health Department, and remains under that quarantine today. Real estate developer David Rustine bought the building in April for $40,000. He has hired contractors that are now crafting cleanup plans for the building.

Maureen Stevens has collected worker's compensation insurance, and AMI also helped pay her husband's medical bills. Maureen Stevens could not be reached for comment Wednesday, but Schuler said she and her three children continue to mourn their loss.

"They miss their father and husband," Schuler said. "He was one of those guys liked by everyone."

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Page 4

Staff Writers Peter Franceschina and Patty Pensa and Staff Researcher Barbara Hijek contributed to this report.

Kathy Bushouse can be reached at kbushouse@sun-sentinel.com or 561-243-6641.

Stevens

TABULAR OR GRAPHIC MATERIAL SET FORTH IN THIS DOCUMENT IS NOT DISPLAYABLE

PHOTO

---- INDEX REFERENCES ----

NEWS SUBJECT:    (Legal/Judicial (C12); Crime/Courts (GCRIM); Corporate/Industrial News (CCAT); Political/General News (GCAT))

REGION.        (United States - Florida (USFL); North American Countries (NAMZ); United States (USA); Southern U.S. (USS))

EDITION:      PALM BEACH

OTHER INDEXING:   LAWSUIT ANTHRAX DEATH INVESTIGATION

Word Count: 866

9/25/03 SUNSENT 1B

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT H

9/25/03 APWIRES 01:03:15
**(Publication page references are not available for this document.)**

Associated Press Newswires
c) 2003. The Associated Press. All Rights Reserved.

Thursday, September 25, 2003

Anthrax widow sues for $50 million, alleging lax U.S. security
By JILL BARTON
Associated Press Writer

WEST PALM BEACH, Fla. (AP) - The widow of the photo editor killed in the nation's first anthrax attack in 2001 sued the federal government on Wednesday, alleging that lax security at an Army lab caused his death. Maureen Stevens is seeking more than $50 million in what is believed to be the first lawsuit aiming to hold the federal government accountable for producing and mishandling the deadly strain of anthrax that allegedly killed her husband.

Stevens also filed a state lawsuit in Palm Beach County circuit court against two companies -- Battelle Memorial Institute, a Columbus, Ohio, nonprofit research company with numerous U.S. military contracts; BioPort Corp., a Lansing, Mich., company that manufactures the only FDA-approved anthrax vaccine.

Robert Stevens, an editor for The Sun tabloid, is believed to have contracted the disease from a tainted letter sent to the Boca Raton headquarters of American Media Inc. He died October 5, 2001, from inhalation anthrax, a rare and particularly lethal form of the disease.

Anthrax was also sent through the mail to media outlets in New York and a congressional building in Washington, killing four others and sickening more than a dozen people.

Maureen Stevens hopes the lawsuit forces the government to take action on its languishing investigation and provides answers to the victims' families, said her attorney, Richard Schuler.

"She doesn't want this to get wrapped up in government red tape when there's a killer that has used this deadly anthrax and was able to get this stuff because

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

of lax security at a government lab," Schuler said. "Missing a little bit here or there is not good enough when you're dealing with the deadly anthrax bacillus."

Army spokesman Chuck Dasey declined to comment on the lawsuit. A message left after hours at Battelle was not returned. The number for BioPort would not accept messages.

Another victim who survived an anthrax attack, postal worker Leroy Richmond, also has sued, but his claim targets postal officials at Washington's Brentwood facility. He's asking for $100 million, alleging that postal managers endangered his life by waiting too long to close the postal facility where he worked after anthrax contamination was discovered.

Schuler said he believed DNA tests on the anthrax found at Stevens' office would prove it was an exact match to the anthrax produced at the U.S. Army Medical Research Institute of Infectious Diseases at Fort Detrick in Frederick, Md.

The lab develops vaccines and drugs to protect service members from biological warfare agents and has become a focus of the investigation because it is the U.S. military's main anthrax research center.

The lawsuit says government officials failed to act when security was breached at the facility and have failed to put new policies in place that would prevent a future attack. It further states that authorities didn't properly check the backgrounds of employees or monitor those with access to the anthrax.

Schuler said the lab had previously found other viruses and bacteria to be missing.

"They had no system back then to keep track of some of the most hazardous substances on earth," he said.

The tainted letter that infected Stevens was originally thought to have been thrown out and burned with the rest of the company's trash before investigators began gathering evidence in the case in October 2001. Last September, FBI officials revisited the American Media Inc. building, which is under federal

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

quarantine as it undergoes a massive cleanup, in hopes of reviving the stalled investigation and locating the letter.

FBI officials spent 12 days scouring the three-story, 67,000 square-foot building for clues in the attacks using new techniques to search for large quantities of anthrax spores.

Last month, FBI officials drained a pond in Frederick where authorities believed the suspect may have filled the envelopes with deadly spores under water for his own protection.

But authorities said they found no evidence. FBI officials would not comment on the lawsuit Wednesday.

Schuler said government officials have provided Maureen Stevens with no answers about her husband's death in the two-year-old case.

"She has no indication from any government source that the investigation is progressing as it should progress," he said.

---- INDEX REFERENCES ----

NEWS SUBJECT:     (Crime/Courts (GCRIM); Health (GHEA); Political/General
          News (GCAT))

REGION:        (United States (USA); United States - Florida (USFL); North
          American Countries (NAMZ); Southern U.S. (USS))

OTHER INDEXING:   AP State Wires: Florida; US State/Regional; FL Anthrax
          Florida; D7TP3TM80; tagpf1wcat; selflfl-; catn

Word Count: 726

9/25/03 APWIRES 01:03:15

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT I

9/28/03 SUNSENT 1B
9/28/03 Sun-Sentinel (Ft. Lauderdale Fla.) 1B
2003 WL 64117891
**(Publication page references are not available for this document.)**

South Florida Sun-Sentinel
Copyright 2003, South Florida Sun-Sentinel. All Rights Reserved.

Sunday, September 28, 2003

LOCAL

WIDOW'S CASE STALLED BY SECURITY NATIONAL BIOTERRORISM ISSUES WILL BE
CENTRAL
TO HER LAWSUIT
By Kathy Bushouse  Staff Writer

National security issues have hindered Maureen Stevens' hunt for answers about
her husband's death two years ago from inhalation anthrax. As Stevens moves
ahead with a wrongful-death lawsuit that could embarrass the U.S. government
and provide insight into the ongoing investigation of the fall 2001
bioterrorism attacks, it's certain those same national security arguments will
take center stage.

Stevens filed the case Wednesday in federal court in West Palm Beach.

That will give her subpoena power, and experts say the federal government won't
be able to withhold information simply by making unspecific claims of national
security interests.

Bruce Winick, a University of Miami law professor, said it will be up to a
federal judge -- not government officials -- to decide whether turning over
information related to the anthrax investigation creates a security risk.

"The speculation about it will occur in a way where, if they assert that sort
of a privilege, a federal district judge will rule on it," Winick said. "[The
judge] won't just take the government's assertion at face value."

That's what Richard Schuler, an attorney for Stevens, could be counting on.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Since Stevens' husband, Bob, died Oct. 5, 2001, from inhalation anthrax and became the nation's first victim of a bioterrorist attack, information for the family has been lacking.

Stevens, a tabloid photo editor for American Media Inc., died after coming into contact with an anthrax-laced envelope mailed to the company's Boca Raton office. Who did it, and where the anthrax came from, remains unknown.

A U.S. attorney handling the anthrax case recently visited Maureen Stevens, but revealed little of what the government knows about who killed her husband.

Thus the lawsuit, which claims that anthrax samples were known to be missing from an Army laboratory at Fort Detrick, Md., as early as 1992 and accuses the government of failing to adequately secure them.

"The bottom line is that a lot of our [Freedom of Information Act] requests were not acknowledged or were not answered or responded to," Schuler said. "By filing the lawsuit, we have subpoena power."

Schuler plans to use that power to get documents thus far unavailable to him, and to produce witnesses who could back his theory about government negligence ultimately leading to Bob Stevens' death.

Among the potential witnesses on Schuler's list:

Don Foster, an English professor at Vassar College, who wrote a scathing piece about the anthrax investigation in the October edition of Vanity Fair magazine.

Dr. Steven Hatfill, a bioterrorism expert labeled a "person of interest" in the anthrax investigation. In August, Hatfill sued U.S. Attorney General John Ashcroft and other officials, seeking to clear his name in connection to the case.

Dr. Ayaad Assaad, a former researcher at Fort Detrick, who has publicly alleged lax security at the facility and is involved in an age-discrimination suit after he lost his job there.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Federal investigators made two trips to the contaminated AMI building in their search for clues, removing hundreds of letters and office machinery.

Little else has ever been made public about the case.

The investigation's seemingly slow pace could benefit Stevens. It might make a judge less willing to grant the government any kind of exceptions to handing over information, said William Banks, a professor at Syracuse University's College of Law. "What's the justification for the continuing secrecy if you're not going anywhere in the investigation?" Banks said.

Still, a judge might grant a government request to withhold information concerning government facilities such as Fort Detrick. Banks said. The case might reach a point that the government chooses to settle the lawsuit rather than turn over sensitive information. Winick said.

"I suppose if [the case] causes the government to reveal info it doesn't want to reveal ... the natural thing would be for the government to settle." he said.

Schuler said the Stevens family hopes to get both information and monetary damages from the case.

The family has been through an ordeal few can comprehend, he said. They watched from behind a window as Stevens lay in isolation at the hospital.

Their backyard was dug up by investigators trying to determine whether the anthrax bacteria came from there. His clothes and personal items were hauled away as evidence.

Months later, Maureen Stevens had to write to the government to get his shoes returned. They arrived in a big box with no note attached, Schuler said.

"There were a lot of indignities," he said. "It's just been horrendous."

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Page 4

Despite that, Schuler said they would love nothing more than to see progress in the federal investigation.

"Hopefully, there will be an arrest. We're on their side," Schuler said. "We want them to find the person or persons who did this, and prosecute them. Anything we can do to help, we'll do."

Kathy Bushouse can be reached at kbushouse@sun-sentinel.com or 561-243-6641.

---- INDEX REFERENCES ----

NEWS SUBJECT:     (Crime/Courts (GCRIM); Health (GHEA); Acts of Terror
         (GTERR); Political/General News (GCAT); Risk News (GRISK))

REGION:         (United States - Florida (USFL); North American Countries
         (NAMZ); United States (USA); Southern U.S. (USS))

EDITION:      PALM BEACH

OTHER INDEXING:    DISEASE ANTHRAX LAWSUIT TERRORISM

Word Count: 848

9/28/03 SUNSENT 1B

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

# EXHIBIT J



**Defense*LINK***
**U.S. DEPARTMENT OF DEFENSE**

Search

Home   Site Map   DoD Sites

NEWS    IMAGES    PUBLICATIONS    TODAY    QUESTIONS?

## NEWS

 About News

---



United States Department of Defense.

# News Transcript

On the web:
http://www.defenselink.mil/news/Sep2001/t09052001_t0904asd.html

Media contact: +1 (703) 697-5131
Public contact: http://www.dod.mil/faq/comment.html or +1 (703) 428-0711

**DoD News** 

☐ Advisories

⌐ Contracts

↓ Live Briefings

📷 Photos

⌐ Releases

⌐ Slides

⌐ Speeches

▤ Today in DoD

⌐ Transcripts

---

**American Forces News**

⌐ Articles

↓ Radio

📺 Television

⌐ Special Reports

---

⌐ Search

---

⌐ *News* Archive

✉ *News* by E-mail

---

Other *News* Sources
Updated: 14 Jan 2003

**Presenter:** Victoria Clarke, ASD PA    Tuesday, September 4, 2001 2:00 p.m. EDT

### DoD News Briefing - Victoria Clarke, ASD PA

Clarke: Welcome back. Welcome back to everyone. I have got a few readers here, a couple of observations, and then we'll get underway.

First, most of you know Secretary Rumsfeld will testify tomorrow on the fiscal year '02 budget before the Defense Subcommittee of the Senate Appropriations Committee. The hearing is scheduled to begin at 10:00 in the Senate Dirksen Building, Room 192.

The secretary of the Air Force, Dr. James Roche, will host a ceremony honoring the retirement of General Mike Ryan, and the appointment of General John Jumper, as chief of staff of the Air Force. That will take place at 9:00 a.m. on Thursday, September 6th at Andrews Air Force Base.

And continuing our series of media roundtables, Doug Feith, the under secretary of Defense for policy, will be here today at 4:30 to talk to you and answer some questions. And I was giving him his briefing this morning, and I said, "I'm going to avoid all the tough ones, and when you're down at 4:30 you can do that."

A couple of observations about what I can and I can't do from up here. As I've said to some of you, I am not going to be able to stand up here and disassemble the tail rotor of a helicopter for you. Nor will I in many ways be able to do the kind of job that Admiral Quigley has done so well for so long. His level of detail and his experience is a tremendous asset. And I would just say, personally, Admiral Quigley and the kind of professionalism and dedication he demonstrates every day is one of the reasons I love working at this place. So my hat's off to him.

And with that, I will tell you what my six-year-old son was talking about last night. We were getting ready for today and we were talking about the fact that today is his first day of first grade, which is a huge deal, and so we're talking about what his week was going to be like. And he said, "Well what are you doing this week?" And

I said, "Well, as a matter of fact, tomorrow at about 1:30, 2:30 in the afternoon" -- and I tried to explain this process. And he just looks at me and he goes, "Wow! You better not mess up!" (Laughter.)

And with that very good counsel, I will take your questions very carefully.

Charlie?

Q: Torie, U.S. jets bombed air defense sites in southern Iraq for the fourth time in recent days, again today. Are these -- this is obviously an ongoing effort to degrade Iraq air defenses and to slow their aggressive attempts to shoot down a plane. Are these -- would you characterize these as pinprick attacks? And are they degrading Iraqi air defenses?

Clarke: Would I -- I'm sorry. I missed the first part --

Q: Would you characterize these as pinprick attacks, and are these -- are these efforts degrading Iraqi air defenses? It doesn't seem to be slowing down their attempts to shoot down aircraft.

Clarke: Well. I don't know how much I can help with you -- help you with -- on characterizations. But they are a continuing effort by Saddam Hussein to threaten coalition aircraft. The reason we're patrolling the no-fly zones is to make sure Saddam Hussein cannot threaten his neighbors, cannot impose aggression against his own people, as he has done. And he is the one and his people are the -- his folks are the ones who threatening the coalition aircraft. As long as they threaten coalition aircraft, we will respond.

Q: But these attacks don't seem to be slowing down their attempts to do it.

Clarke: Well, these strikes are an effort to degrade his systems.

Q: And --

Clarke: And the battle damage assessments over the last several strikes have shown we have been effective.

Yeah?

Q: Do the frequency of these attacks represent a new approach or some change in the way the administration is approaching this problem? The frequency of them --

Clarke: You know, I think the less information we provide about how and when and where we do this, or trying to characterize as one thing or another, is better. The less information we give Saddam Hussein, the better. So as we've said before, we will respond in a time and a manner and a place of our choosing. And again, if he was not threatening coalition aircraft, then these strikes wouldn't be occurring.

Q: Iraq has said that it's in a war with the United States and Great Britain. Would

you -- do you consider what's been -- what's going on in Iraq now, the regular bombings that take place, as a war? And if not, if it's not a war, what would you call it?

Clarke: Again, I'll leave the characterizations and the labels up to others. Saddam Hussein has made it clear what his intent is. He's made it clear that he would like to shoot down coalition aircraft. We consider these things aggressive, and we'll respond appropriately.

Yes?

Q: New topic?

Clarke: Sure.

Q: Just a quick question about the business side of things. The GD proposed merger with Newport News Shipbuilding, as well as the counteroffer by Northrop Grumman, has been going on for some time now -- deliberations at the Justice Department and here in DOD. It's understood from some news stories that came out last week that there has been at least a tacit if not outright endorsement by DoD of the General Dynamics position in that. Can you comment on that? The department has put out some views that are counter to that recently, but I don't know if that's changed. Has in fact DoD endorsed the --

Clarke: What I can tell you is, the merger is still under review. We're working closely with the Department of Justice on it. Despite what you may have seen or read or heard, no decisions have been reached and no preliminary recommendations have been made.

Q. Torie, can you give us any kind of timetable on when this thing is going to be resolved? It has been dragging on for some time.

Clarke: Not in a position to say that right now. We're working hard on it, working with the Department of Justice, but not prepared to say at this time, give you a timeline on it right now.

Yes? Second row.

Q: The administration recently announced that a Chinese manufacturer was exporting missile parts and components to Pakistan. And I know that export controls are primarily under the purview of the State Department, but to the extent the Defense Department is involved in this, would you characterize this as part of the Chinese government's ongoing efforts to proliferate missile parts and components to other countries? And do you think this should have an impact on where satellites fall under export control, be it under Commerce or under the State Department's ITAR [International Traffic in Arms Regulations] regulations?

Clarke: You know, we've made it clear pretty consistently, along with the rest of the administration, that we consider the proliferation of missile technology a serious

Case 9:03-cv-81110-AMC   Document 13   Entered on FLSD Docket 01/28/2004   Page 95 of 114

DoD News: DoD News Brief.    Victoria Clarke, ASD PA                    Page 4 of 16

concern. I think as recently as Secretary Powell's last meetings with the Chinese, he talked about this. And after those meetings he said we have raised these issues with them, we have concerns, in some places they're doing better than others. The administration had made very clear what we would do if the agreement was violated. Further than that, I just direct you to the State Department for those answers.

Q: (Off mike) -- do it better.

Clarke: Well again, for more, I'd have to direct you to the State Department.

Q: Okay.

Q: A different topic. Can you describe in any way the current efforts of the United States to conduct research into biological weapons and what the purpose of that research might be, and whether it falls within the confines of the Chemical -- Biological Weapons Convention?

Clarke: Again. we've said pretty consistently that we're very concerned about the threat of offensive biological weapons. of the proliferation of materials and technology that could enhance the proliferation of chemical and biological warfare. And we are doing work in places. All of the work is consistent with U.S. treaty obligations. All of the work is thoroughly briefed and gone through a heavy consultation process. both interagency and the appropriate legal reviews and the appropriate congressional briefings.

Q: What is the purpose of that research?

Clarke: The purpose is to protect the men and women in uniform and the American people from what we see is a real and growing threat.

Q: Does this research involve creating any germs in the laboratory?

Clarke: There has been. about 1997. I think it was, and what you're talking about, is some reporting about developing a strain, a new strain of anthrax. In 1997 there was a journal called "Vaccine" which reported on a new or modified anthrax strain that the Russians may have been developing. We have a vaccine that works against most of the known -- all of the known anthrax strains. What we want to do is make sure we are prepared for any surprises, we're prepared for anything else that might happen that might be a threat. So about in the early part of this year, the DIA started to look into the feasibility, and doing all the legal consultations, doing all the appropriate interagency consultations to look into how we could develop that modified anthrax strain so we could test our vaccines against it and make sure we prevent against any surprises, and make sure we could protect the men and women in uniform from potential threats.

Q: Are you growing it?

Clarke: Right now there is no work going on on the modified anthrax strain. The

director --

Q: Is it going to go forward?

Clarke: The director has made it very clear that he wants further interagency consultation work done -- that's with the DoD and other agencies; that he wants the legal reviews to continue; and further congressional briefings.

Q: Director of DIA?

Clarke: Yes.

Q: Well what work has been done prior? You say no work is being done now. Was this strain actually developed prior to today?

Clarke: In the United States? No.

Q: By the U.S. government --

Clarke: No.

Q: -- it wasn't?

Clarke: Right.

Q: Was it worked with? Did you get a hold of agent? Were there other bio-agents that were created for these programs?

Clarke: No.

Q: No bio-agent of any kind was created for these programs?

Clarke: For this particular program that we're talking about, which is this modified anthrax strain that was reported on in 1997, I believe it was, in this magazine "Vaccine," we have had consultations with the Russians about this, we have had cooperative efforts with the Russians on biological warfare in the past. But on this particular strain, no work has been done.

Q: And the U.S. had asked for a sample of the Russian and that was not provided; is that correct?

Clarke: To date, it has not been provided. And I've asked, I don't yet have the answer; I know as early as '97 we started talking to them about providing a strain so our folks could take a look at it and test the vaccine and see what we can do to prepare against those sorts of threats.

Q: The U.S. then didn't attempt to simulate that vaccine or create its own version of -- not of the vaccine, but of the agent, rather?

Clarke: No, that's what I was trying to say. Earlier this year, the DIA started to look into what it would take to get the legal approvals, to get the interagency coordination, to do the congressional briefings, to look into developing that strain so they could test vaccines and they could see what we have to do to make sure we're protected against it.

Q: That appears to be the path that you're now headed down, is doing that interagency process, making sure it is legal, and then going ahead and developing or growing this strain?

Clarke: Correct.

Q: That is? Okay.

And secondly, on the issue of making bomblets, which are some of the pieces of technology that other countries have done to dispense biological weapons, has the United States made these small bomblets for experimenting or any other reason?

Clarke: That comes under the Clear Vision program, which is a CIA project, so you should direct your questions over there.

Yes. Second row.

Q: In the -- you say the Russians haven't provided samples of this strain of anthrax. Have they provided notes or research or anything? How would we know that we're going to get the same strain that they came up with?

Clarke: You know, that we'll have to get back to you with some information. I just know there's been ongoing work with them in a cooperative nature on other elements when it comes to biological warfare. There's been a fair amount of communication lab to lab, if you will. But I don't know about all those aspects of -- [Update: the Department of Defense Cooperative Threat Reduction Program is funding a collaborative research project on anthrax monitoring with the State Research Center for Applied Microbiology in Obolensk, Russia. In August 2001 the State Research Center applied to the Russian Export Control Commission for a license to transfer the anthrax strain to the U.S. Centers for Disease Control. The application is currently pending a decision of the Russian Export Control Commission, and the U.S. government will seek Russian approval of the export license.]

Q: To the best of your knowledge, has the United States developed other strains of biological warfare agents in an effort to study them, strains of basically banned biological agents?

Clarke: I'll have to take that question. [Update: no, we do not develop biological weapons within the DOD.]

Q: Do the Russians acknowledge that they have, in fact, produced this hybrid strain of anthrax?

Clarke: Not to my knowledge.

Yes.

Q: New subject?

Q: Can we please stick on this subject?

Clarke: I'm sorry. How about Pam, and then back to you?

Q: So far, what is the legal determination with regard to the Bio Weapons Convention? Does DIA think they're going to be able to push ahead with this with no problem?

Clarke: We're compliant.

Q: This -- right now you're compliant because you haven't done it yet. But if you do it, will --

Clarke: We're compliant, and the legal reviews that have been done to date indicate that the work would be compliant. The Biological Weapons Convention allows you to do work that is purely defensive in nature. It allows you to have small quantities of a known agent, limited quantities of an agent if you want to study it for the purpose of protecting people against that threat.

Q: And is -- does the United States consider what Russia did compliant with the Bio Weapons Convention?

Clarke: You know, we have, as I said at the start of this questioning, we have concerns about the spread of biological and chemical warfare-enabling technology whatever the source and whoever is engaged in those activities. We have raised these concerns about chemical and biological warfare with the Russians, and we will continue to do so.

Q: Victoria, in the New York Times article today, according to the Times, the Times and ABC News were given a tour of a germ warfare laboratory in Nevada. Can you explain what the purpose -- what that facility does and what the purpose of it is?

Clarke: The facility, the Battelle facility of one that looks at -- I'm sorry, it's not the Battelle facility, it's the DTRA facility. And they are looking at signatures -- and I'm clearly going to get beyond my level of knowledge here -- but looking at signatures which indicate biological activity. They're using commercially available equipment, using commercially available organisms.

Q: And did -- are there any germs or biological agents produced at that facility?

Clarke: You know, that -- I'm going to have to refer you to DTRA. But on this particular project that was referred to in the New York Times, again, they were

using commercially available equipment and commercially available organisms to test again the signatures, which is your ability to -- the level of activity -- not the level, but the activities of organisms.

Q: Is that for detection purposes?

Clarke: I believe so.

Yes?

Q: What's the rationale for having kept this work a secret up to now?

Clarke: Which work are you referring to?

Q: The research that we've been talking about, these various projects --

Clarke: Well, the DIA, for instance, doing this work, is trying to protect us and protect the men and women in uniform against threats of chemical and biological warfare. There are certain countries that we know are trying to do very bad things out there. The less information we give them about it, the better. Intelligence activities tend to remain secret.

Q: This is going to sound a little cynical, but let me just ask, on behalf of the public, how can the American public be assured that as the United States government conducts this kind of research, which is aimed at protection, that in the process they don't -- they're not also at the same time developing some offensive capability or creating some new strain of dangerous bacterial agent?

Clarke: Well, for instance -- and I think we can provide you with a chronology of the activities that have to do with this modified anthrax strain -- the Jefferson project, as it's referred to. And you look at this -- there was a long litany of interagency coordination, legal reviews, congressional briefings, all of which are obviously to ensure the appropriate, you know, coordination. It's also to make sure that all the appropriate steps are taken to make sure we are compliant. This program's undergone serious, serious scrutiny by a number of people. We are compliant, and we will remain so. And the BWC does allow you to do these things, as Project Jefferson has done.

Q: Is it safe to say that -- as you said here, that the United States intends -- intends -- to go ahead and develop this strain of anthrax, unless something -- retain the interagency process, but you made pretty clear the United States feels that it would be legal, as of now, to do so, and you fully intend to do it?

Clarke: Yeah. And let me repeat, again, we take the threat of the spread of biological and chemical warfare very, very seriously. We have an obligation -- and it's an important obligation -- to make sure we protect, first and foremost, the men and women in uniform against those threats. There's absolutely an obligation and responsibility that we do so. So with all the appropriate legal reviews, with all the appropriate interagency coordination and congressional briefing, we plan to

proceed.

Q: Just to be clear, we'd be talking about in this instance a minute quantity of bacterial agent, or how would you characterize how much of this anthrax variant should be produced?

Clarke: You know, the question I asked before I came down here, and gotten the answer back, was to actually define that a little more clearly. But the BWC does make clear "small, limited quantities" of a known agent. And I'll try to get a better definition of that for you.

Yes?

Q: Was the desire to maintain the confidentiality and details of these programs related in any way to the administration's decision not to participate in developing a verification and on-site inspection protocol for BWC?

Clarke: Absolutely not. I mean, remember, we are signatories to the Biological Weapons Convention. This administration has made clear one of its priorities is to work against the threat of biological warfare. That is one of our top priorities. Concerns with the protocol had to do, one, it couldn't really do what some said it might be able to do; two, the information that would be revealed about our biodefense capabilities, as well as confidential business information.

But I dare say almost every meeting of every high-level administration official over the last several months, as we've met with friends and allies on a variety of issues, this issue has been put on the table and said this is a concern: we want to do everything we can together around the world to reduce this threat.

Q: Nevertheless, the verification protocol would have allowed demand inspections by any party to the treaty. And had any party demanded inspection rights to these projects, the United States would have been obliged to provide those inspections.

Clarke: The protocol has lots of problems recognized by lots of people other than us. Foremost among them, it would make it very hard to do biodefense. It would make it very clear that some confidential commercial business information would be revealed. But again, I'd try to put the emphasis on what is really important, which is our commitment to the Biological Weapons Convention and the fact that we have made this issue and the priority of reducing the threat of chemical and biological warfare right front and center for this administration.

Q: Is it the intention of this administration to keep this kind of research as secret as the last administration did? Or is it the intention of this administration to be more forthcoming, to explain to the public what you are doing so there will be no misunderstandings about what the U.S. is doing behind closed doors?

Clarke: Let me clear up one thing and then come back.

No biological agents were produced, only simulants, as part of the research and the

study in Nevada. So there were no biological agents used there, they were just simulants. I hope that clears that up.

And, I'm sorry, just do it one more time quickly.

Q: Is it the intention of this administration to continue the very extreme levels of secrecy surrounding all of these projects, which the administration says are benign and within the purview of the various conventions, or is it the intention of this administration, as has been indicated in a newspaper article today, to keep it even more secret than the previous administration?

Clarke: Well, I believe the intention will be to keep that information secret that we think by not doing so would have serious national security concerns. Giving those who have hostile intent information about what we can do to protect against the threats they might be carrying out against us is not a good thing.

Q: Does the revelation of these three projects threaten the United States?

Clarke: I feel pretty confident. You know, I've looked into this pretty hard for the last couple of days, and I feel pretty confident with the way this program is being run, the way it is being executed, the way it's being briefed throughout the interagency process and getting the appropriate legal consultations and doing the correct and appropriate congressional consultations, I feel confident that we're on a good path. And again, I go back to what I think is most important: the threat is real, it is growing, and it is the responsibility of the country, of the United States, the United States military and this administration to take steps to protect us against it.

Q: Let me try it again. Does the disclosure of these three projects threaten the United States? In other words, in the future, if the disclosure of this doesn't threaten the United States and letting the public know what you're doing doesn't threaten the United States, why not continue to follow that path in the months and years ahead? Or does this disclosure threaten the United States? Has it done harm?

Clarke: I don't think there is a level of detail that has been revealed that has done any harm to the program.

Q: So one might conclude then that it's okay to talk about this and other projects which are currently classified as secret or top secret. Or does the press have to rule it out?

Clarke: It's hard -- no, it's hard for me to make a blanket statement about all things going forward. But I will say this: if it's good and important that people know something about the level and the nature of the threat, absolutely. Is it good and important that people know what this administration is trying to do to protect them and their friends and colleagues and family members in uniform? Absolutely. But I just -- I can't help you on a blanket statement going forward.

Yes, sir.

Q: Another topic?

Q: One more.

Clarke: I'm sorry, one more.

Q: Just to pick up on the thread of Jack's question, do the scientists who are involved in this research, are they involved in any exchange programs with foreign counterparts, much like scientists at Los Alamos, where they might be susceptible to, you know, espionage or something like that? Do they come into contact with any of their counterparts overseas?

Clarke: There is cooperative work, yes.

Q: With which countries?

Clarke: You know, I'll have to take that question.

Q: But -- but their activities are monitored --

Clarke: (Inaudible due to cross talk) -- but they're -- yes, there are cooperative activities underway.

Q: And on the same subject, was the very existence of these programs classified as secret or top secret?

Clarke: What -- I'm sorry, what do you mean?

Q: Was the fact that there was work going on in this area classified as top secret? Was the name of these -- were the names of these projects classified? Were these things really kept so secret, or is it the details of what's going on in these projects that was categorized as secret or top secret?

Clarke: Well, I can speak to the Jefferson project, which has been going on since 1997. And the Jefferson project covers a variety of issues in terms of preventing surprise on biological and chemical warfare. They do the work such as we're talking about, or may do the work such as we're talking about on the modified anthrax strain. They study literature. They consult with others. The Jefferson project, for instance, is one that has been known. Now, the level of detail in some of these projects has not.

Q: So the existence of these -- of this project, at least, was not classified.

Clarke: The Jefferson project. That's correct.

Q: Right. But the details of the work that was going on under that project may have been classified.

Clarke: Yes.

Q: And you're not sure when it comes to the other projects.

Clarke: Right.

Q: Okay.

Clarke: If you want, we can get a more detailed list of the kinds of work that they do, because it's pretty extensive. And again, it's a broad range of work designed to prevent surprise and make sure we have the capabilities we need to protect us.

Yes, sir.

Q: Yes. Any update, Ms Clarke, on NATO mission in Skopje for the disarmament of the Albanian extremists? And anything new on U.S. military involvement in that area?

Clarke: Well, they will start phase two. The parliament is meeting. The first phase was completed. NATO has reported they collected about a third of the weapons. And parliament is scheduled to meet. If that goes as planned, then phase two would start on the fifth, which is tomorrow.

Q: Collected a third of the weapons? How do they know that they're -- there are, like, millions of weapons out there --

Clarke: They collected about a -- a good catch. They're collected about a third of the weapons they intended to collect under part of Task Force Essential Harvest. And they said a number of about 3,300. And the U.S. involvement thus far is about 90 hours -- I think it was 90.4 hours -- of helicopter support.

Charlie.

Q: Another subject?

Clarke: Mm-hmm.

Q: Has the United States or does the United States intend to tell Chinese leaders that Washington has no opposition to the Chinese increasing the number of their nuclear warheads in order to gain support from the Chinese for missile defense?

Clarke: Absolutely not. You know, and --

Q: And -- and does --

Clarke: Absolutely not. The president's policy is to seek to reduce the number of nuclear weapons, offensive weapons around the world. He has made this one of the priorities of his administration. He wants to lessen the risk of nuclear war. He wants missile defense as one part of a broader deterrent strategy. In that context we have made clear, just as we've briefed our friends and allies and Russia, we will brief China on our plans for missile defense.

Q: But you do not intend to tell them that it's -- I mean, this building has said repeatedly that you expect the Chinese as a matter of course to increase the number of their warheads in modernizing their arsenal. But you don't intend to tell them that you have no qualms about that, you're not worried about that --

Clarke: Absolutely not. We are worried about it. We have made that clear before, and we'll make that clear going forward.

Q: Doesn't China have the right to build as many nuclear weapons as it wants?

Clarke: You know, I'm not going to speak for China. But increasing nuclear weapons is not a good way to enhance international stability and cooperation.

Q: If the Chinese --

Clarke: We have -- I'm sorry, go ahead.

Q: I'm sorry. If the Chinese say that they'd feel more comfortable if -- they say, "Sure, go ahead and build a national missile defense, or a missile defense system, but in order to make us feel more comfortable we're going to go ahead and build a few hundred more ICBMs "

Clarke· We've made clear our views on this, and we will do so again. This is not a matter of "If we do this, you can do that." We have made -- the president has made clear his desire to reduce nuclear weapons overall around the world. He has made clear his desire to use missile defense as one part of a broader deterrent strategy. He has made clear our intent to proceed with a missile defense program.

Yes?

Q: Yet some of those involved in forging this policy have written in the public literature that the whole point of doing away with -- one of the points of doing away with arms control agreements is to give the United States the latitude to build up, if it indeed deems it needs to do that, not just to reduce nuclear weapons.

Clarke: You know, I can't comment on what people -- some may have written or not written or said or not said. I can tell you what is the position of this administration and the position of this department.

Q: Just to be clear, what is the message to China regarding nuclear force levels and U.S. missile defense? Because I'm a little confused after reading some of the published reports recently.

Clarke: The position on nuclear weapons offensively is we want to reduce them. This president has made that clear repeatedly.

Our position on missile defense is that we intend to do an aggressive, robust research and development program with the intent to test and deploy a limited system that protects us, and our forces deployed abroad, and our friends and allies

from the threat of missile attack from rogue nations or an accidental launch. And the only ones who should be worried about that or concerned about that are those who have less than the best of intent toward us.

Yes, ma'am?

Q: Do you have a specific plan on briefing the Chinese?

Clarke: You know, there are several meetings coming up over the next several weeks. I don't have details on all of them, but interagency meetings will be coming up, and again, I'd direct to you State on some of those. But I think in the days and weeks going forward, we'll have a little bit more detail about the kinds of meetings that are going to take place.

Q: But do you have some details on the Navy meeting in Guam?

Clarke: Yes. September 13th and 14th, I believe it is, the U.S. and China have agreed to hold the Military Maritime Consultative Agreement Meeting, and this is to look at ways to enhance safety when it comes to military both in the air and on the seas.

Q: This is as a result of the EP-3 incident?

Clarke: No. this is as a result of an agreement that Secretary Cohen made with his counterpart back in 2000, I believe it was. It's an important step in terms of the relationship. an important action to take. and consultations to have to try to prevent those sorts of accidents.

Q: And who will take part?

Clarke: Admiral Steven Smith, the director for Strategic Planning and Policy, J5, at the U.S. Pacific Command, will lead our delegation.

Q: Is that a symbol for more military exchange with China?

Clarke: I'm sorry?

Q: The beginning of a normalized military exchange with China?

Clarke: It's an important step in working past the EP-3 incident.

Q: Will the issue of reconnaissance flights, you know, arising from the EP-3 incident, be discussed at that meeting?

Clarke: You know, I will try to get you more detail on the consultations, on what will actually go on. But it is to look in the broadest sense at how do we make sure that we have the right safety measures, the right planning in place to try to prevent those sorts of accidents, to increase safety and security in international airspace and on the high seas. But I'll try to get you some more detail about what the

conversations might cover. [Update: the objective of the meeting is to discuss principles of safe flight and navigation for military activities conducted on the high seas, in international airspace, and in exclusive economic zones. In addition, we will discuss ways to ensure the safety of ships and aircraft exercising the right of distressed entry.]

Yes?

Q: Secretary Rumsfeld, of course, has said that he intends to defend every nickel of the '02 amendment. I guess that effort will go into high gear this week. How would you regard an effort to shift some of the money in that amendment, let's just say, from missile defense research and development, for example, into improving strategic lift capability?

Clarke: Well, I think he's made it pretty clear and that the president has made it quite clear over the last couple of weeks -- the president has taken the opportunity in a few of his addresses to lay out his priorities, and he has put defense at the top of the list, and he too has said -- I'm paraphrasing -- we need every nickel of it -- how we have the dollars allocated is the result of a lot of hard work by the civilian leadership here, the military leadership, consultations with the Hill  And we think it represents a fairly good balance of the needs at this time.

So we think the package, as presented, is a very good approach, and we're going to work hard over the next several days and weeks to make sure people understand our case.

Yes?

Q: The -- Friday's ruling on the A-12 dispute involving the Navy, Boeing, and General Dynamics came as kind of a surprise, instead of a reversal from what previous courts have been saying about the case, and a very favorable ruling for the government. Do you have any comment on that? I know it's early days here --

Clarke: No, a very brief one. We're pleased with the court's decision to uphold what we did. It's premature -- until we've had a chance to take a look at it, premature to comment further than that, though.

Yes?

Q: Going back to the budget, you've talked about this being a very good balance. What will -- what would be the result of not just shifting within the defense budget, but a shifting of that money to non-defense spending -- what would that do in terms of all of the reviews that have been going on, the QDR, the defense planning guidance, the whole ball of wax?

Clarke: Well, I'd rather not speculate on that. I'd rather make sure we focus on what the secretary said, which is, we need every nickel, and we're going to be working very hard to make sure we get it.

Q: Thank you.

Clarke: Thanks, Charlie.

Printer-friendly Version                    Email A Copy

Privacy & Security Notice  |  External Link Disclaimer  |  Web Policy
About DefenseLINK  |  Contact Us

# EXHIBIT K





**DHS Advisory to Security Personnel, No Change in Threat Level**

The following Advisory was issued to security personnel by the Department of Homeland Security this afternoon. Protective Measures included in the original document have been removed for security reasons.

TITLE: Maintaining Awareness Regarding Al-Qaeda's Potential Threats to the Homeland

ATTN: Federal Departments and Agencies, Homeland Security Advisors, First Responders and Information Sharing and Analysis Centers

**OVERVIEW**

The Department of Homeland Security (DHS) has been aggressively monitoring and assessing information with other Federal agencies on potential terrorist threats in the United States (US). Based on a recent interagency review of available information leading up to the September 11th anniversary, we remain concerned about Al-Qaeda's continued efforts to plan multiple attacks against the US and US interests overseas. However, at this time, we have no specific information on individual targets or dates for any attack.

Arrests over the past several months of key Al-Qaeda members around the world may have delayed or even disrupted some plans. We do know however that operatives still at large view attacks on US territory as a priority and that they continue to pursue a range of targets, tactics, and capabilities to accomplish this objective. Al-Qaeda's primary intent is to conduct synchronized attacks against US interests. At the same time, recent terrorist incidents overseas highlight the possibility that Al-Qaeda could opt to conduct lower-scale attacks against softer target sets.

The Department of Homeland Security will continue to work with Federal partners in monitoring and assessing all intelligence reporting relative to Al-Qaeda operations. This Advisory is provided to increase the awareness of appropriate state and local authorities and the private sector responsible for security of critical infrastructure and other potential target sets.

DHS intends to update this Advisory should it receive additional relevant information, including information provided to it by the user community. Based on this notification, no change to the Homeland Security Advisory System (HSAS) level is anticipated; the current HSAS level is YELLOW.

**DETAILS**

*Aviation Threats*

A growing body of credible intelligence indicates Al-Qaeda continues to develop plans for multiple attacks against targets in the US involving commercial aircraft, with some plans calling for hijacking airliners transiting near or flying over the continental United States - but not destined to land at US airports. Operatives have been studying countries to determine which have the least stringent requirements for entry (visas or other documentation). Identifying which countries have the least restrictive requirements for entry may also tell terrorist operatives which airline flights would be easiest to board and take control in order to crash into targets in the US during over flight. Al-Qaeda's interest in the Transit Without Visa Program (TWOV) [Progam Suspended in August] demonstrates that the group sees international flights transiting the US as candidates for takeover and use in aerial suicide attacks against the US.

*Critical Infrastructure Threats*

Al-Qaeda views critical infrastructure targets in the US as attractive attack options because of their potentially

significant economic and psychological impacts. These targets include:

- Nuclear power plants and other energy facilities, including power generating stations, oil storage and distribution facilities.
- Petroleum, chemical, and petrochemical facilities.
- Transportation systems and facilities, including passenger rail, freight trains carrying toxic industrial chemicals, rail and vehicle bridges, tunnel, and mass transit systems.
- Water reservoirs and systems, including dams.
- Food supply, including food production, processing, and distribution facilities.
- Electric power grids.

A demonstrated capability of Al-Qaeda and other terrorist organizations against an infrastructure-type target involves the use of a vehicle carrying a large amount of explosives, commonly referred to as a car or truck bomb.

*Chemical, Biological, Radiological, or Nuclear (CBRN) Threats*

As far as we are aware Al-Qaeda to date has not executed a successful terrorist attack using any chemical, biological, radiological, or nuclear (CBRN) materials. However, the acquisition, production, or theft of these materials and subsequent dissemination is a top Al-Qaeda objective. We believe it continues to research more advanced CBRN operations, including production of pathogenic organisms and toxins, as well as, high impact dissemination methods such as contamination of water and food, and aerosolization of an agent in enclosed densely populated space.

*Threats against Soft Targets*

Recent mass-casualty attacks in Saudi Arabia, Indonesia, and Iraq used car bombs against hotels and housing compounds, suggesting that "soft" targets with minimum physical security measures could be viewed as attractive options in the US. Reports also mention operational plans involving apartment complexes, gas stations, and restaurants.

Previous attacks underscore Al-Qaeda's ability to employ suicide bombers - a tactic which can be used against soft targets and VIP's. Terrorists will employ novel methods to artfully conceal suicide devices. Male bombers may dress as females in order to discourage scrutiny. Al-Qaeda operative Richard Reid employed a novel and unique "shoe bomb" device in an attempt to destroy a transcontinental airliner in December 2001.

**UNITED STATES DISTRICT COURT**
**Southern District of Florida**
Case Number: 03-81110-CIV Hurley Hopkins

MAUREEN STEVENS, Individually and   )
as Personal representative of the estate of   )
Robert Stevens, deceased, and on behalf of   )
NICHOLAS STEVENS, HEIDI HOGAN,   )
CASEY STEVENS, survivors,   )
   )
       Plaintiff   )
   )
v.   )
   )
UNITED STATES OF AMERICA,   )
   )
       Defendant   )

---

**[PROPOSED] ORDER**

---

The Court, having considered Defendant United States of America's Motion to Stay Proceedings, and the grounds therefor, finds that proceeding with Plaintiff's complaint at this time would threaten to interfere with the ongoing criminal investigation into the anthrax attacks of 2001, and would unreasonably risk disclosure of sensitive information expected to assist in the acquisition, development or use of weapons of mass destruction, and therefore a stay is warranted. Accordingly, the Court GRANTS the Defendant United States' Motion to Stay Proceedings and ORDERS that this matter is STAYED for six months from the date of this Order. The parties are DIRECTED to file a status report with the Court within five months of the date of this Order, informing the Court of their respective positions regarding an extension of the stay beyond the six-month period.

Dated _____, 2004


_____
Chief Judge Daniel T. K. Hurley
United States District Judge


Counsel of record:

Richard D. Schuler, Esq                    Plaintiff
Schuler & Halvorson, P.A.
Barristers Building, Suite 4-D
1615 Forum Place
West Palm Beach, FL 33401
Tel. (561) 689-8180
Fax (561) 684-9683

J. Patrick Glynn, Director                 Defendant
Christina M. Falk, Trial Attorney
Jason S. Patil, Trial Attorney
U.S. Department of Justice
Civil Division, Torts Branch
P.O. Box 340, Ben Franklin Station
Washington, D.C. 20044
Tel. (202) 616-4200
Fax (202) 616-4473 / (202) 616-4989

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee of the United States of America and is a person of such age and discretion to be competent to serve papers. The undersigned further certifies that he is causing a copy of the following:

**(1) DEFENDANT UNITED STATES OF AMERICA'S MOTION TO STAY PROCEEDINGS AND CERTIFICATE OF COMPLIANCE WITH S.D. Fla. L.R. 7-1;**

**(2) DEFENDANT UNITED STATES OF AMERICA'S REQUEST FOR ORAL ARGUMENT ON ITS MOTION TO STAY PROCEEDINGS, AND CERTIFICATE OF COMPLIANCE WITH S.D. Fla. L.R. 7-1;**

**(3) DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO STAY PROCEEDINGS; AND**

**(4) PROPOSED ORDER**

to be served this date upon the parties in this action by placing a true copy thereof in a sealed envelope, and served as follows:

| | |
|---|---|
| ___ | **FIRST CLASS UNITED STATES MAIL** |
| √ | **FEDERAL EXPRESS OVERNIGHT MAIL** |
| ___ | **PERSONAL SERVICE (BY MESSENGER)** |
| ___ | **FACSIMILE (FAX)** Telephone No.:_____ |

to the parties addressed as follows:

Richard D. Schuler, Esq.          Plaintiff
Schuler & Halvorson, P.A.
Barristers Building, Suite 4-D
1615 Forum Place
West Palm Beach, FL 33401

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this Monday, January 26, 2004, at Washington, D.C.

Jason S. Patil, S.D. Fla. Bar No. A5500801
Trial Attorney, U.S. Department of Justice