FOR OFFICIAL USE ONLY

# Security Review of the United States Army Medical Research Institute of Infectious Diseases Fort Detrick, Maryland

*Final Report*

Sandia National Laboratories
Albuquerque, New Mexico  87185

September 26, 2002

**For Official Use Only**
Contains information which may be exempt from public release under the Freedom of Information Act (5 USC 552) exemption number 2. Approval by the cognizant Sandia National Laboratories or Department of Defense Departmental Element prior to public release is required.

**Originator**: Ivan Waddoups
**Date:** September 26, 2002

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3                          ARMY02-010253

**FOR OFFICIAL USE ONLY**

Intentionally Left Blank

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010254

FOR OFFICIAL USE ONLY

# Contents

**Executive Summary** ...................................................................................................... 7

**Nomenclature** .......................................................................................................... 10

**1.    Introduction** ...................................................................................................... 12

**2.    Objectives for the Security Assessment and Conceptual Design** ................... 13
     2.1    High-Consequence Pathogens and Toxins ............................................. 13
     2.2    Defined Targets .................................................................................... 14
     2.3    Threat of Diversion ............................................................................... 15
            2.3.1    Incidents of Diversion ............................................................. 16
            2.3.2    Historical Record of Bioterrorism ............................................ 17
            2.3.3    Technical Hurdles to a Mass Casualty Bioterrorist Event ........ 18
            2.3.4    Summary Threat Assessment .................................................. 19
     2.4    Defined Threats .................................................................................... 20
     2.5    Implication of Defined Threats ............................................................... 21
     2.6    Need for Validation of Threats ............................................................... 23

**3.    Facility Description and Vulnerability Assessment** .......................................... 24
     3.1    Location and Operations ....................................................................... 24
            3.1.1    Building 1425 ........................................................................ 25
            3.1.2    Building 1412 ........................................................................ 26
     3.2    Existing Security System ....................................................................... 27
            3.2.1    Fort Detrick Garrison .............................................................. 27
            3.2.2    USAMRIID Guard Force ......................................................... 27
            3.2.3    Alarm and Access Control System .......................................... 28
            3.2.4    Cyber and Information Security ............................................... 29
                    3.2.4.1    Objectives of the Cyber Security System .................... 29
                    3.2.4.2    Description of Current System ................................... 30
                    3.2.4.3    Vulnerability Assessment of Current System .............. 31
            3.2.5    Personnel Reliability ............................................................... 32
            3.2.6    Material Accountability ........................................................... 34
            3.2.7    Shipping and Receiving ......................................................... 36
     3.3    Summary of Current System Limitations ................................................. 37

**4.    Conceptual Design Background Considerations** .............................................. 39
     4.1    Methodology ........................................................................................ 39
     4.2    Strategy .............................................................................................. 40
            4.2.1    Outsider Protection ................................................................ 40
            4.2.2    Insider Protection ................................................................... 41
            4.2.3    Continuity of Operations ......................................................... 42
            4.2.4    Graded Physical Protection ..................................................... 42
            4.2.5    General Considerations ........................................................... 43

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3         ARMY02-010255

FOR OFFICIAL USE ONLY

**5.    Conceptual Design Elements** .................................................................**45**
   5.1    Biosecurity Plan ............................................................................ 45
   5.2    Personnel Reliability ...................................................................... 45
   5.3    Material Accountability ................................................................... 46
   5.4    Shipping and Receiving .................................................................. 48
   5.5    Cyber and Information Security ....................................................... 49
       5.5.1    First Cyber Security System Design Option........................... 49
       5.5.2    Second Cyber Security System Design Option ....................... 51
   5.6    Graded Physical Security Design ..................................................... 52
   5.7    Exterior Protection ......................................................................... 53
       5.7.1    Perimeter Fence and Entry Points ....................................... 53
       5.7.2    Building Entrances ............................................................ 55
   5.8    Response Forces ........................................................................... 55
   5.9    Electronic Physical Security System ................................................ 56
       5.9.1    Alarm Communication and Display (AC&D) System ............... 56
       5.9.2    Access Control and Intrusion Detection ................................ 57
           5.9.2.1    Category 1 Door: Electronic Lock ....................... 58
           5.9.2.2    Category 2 Door: Access Control ........................ 59
           5.9.2.3    Category 3 Door: Special Access Control.............. 60
           5.9.2.4    Category 4: Emergency Exit—Crash-Out Door ...... 61
           5.9.2.5    Airlocks, Autoclaves, and Pass-through Boxes ...... 61
           5.9.2.6    Windows, Vents, and Ductwork ......................... 62
           5.9.2.7    Additional Intrusion Detection Sensors ................ 62
       5.9.3    Access Control System for Building 1425............................... 63
           5.9.3.1    Building 1425 Limited Areas .............................. 63
           5.9.3.2    Building 1425 Exclusion Areas ........................... 69
           5.9.3.3    Building 1425 Special Exclusion Areas................. 73
       5.9.4    Access Control System for Building 1412 .............................. 76
           5.9.4.1    Building 1412 Limited Areas .............................. 76
           5.9.4.2    Building 1412 Exclusion Areas ........................... 82
           5.9.4.3    Building 1412 Special Exclusion Area .................. 82
   5.10   Procedural Requirements ............................................................... 83
   5.11   Programmatic Security Training and Oversight ................................. 84
   5.12   Incident Response Planning ............................................................ 85
   5.13   Summary of Conceptual Design ...................................................... 85

**6.    Expected Effectiveness of the Conceptual Design** ..............................**87**

**End Notes** ...............................................................................................**89**

FOR OFFICIAL USE ONLY

4

FOR OFFICIAL USE ONLY

# Figures

1. USAMRIID Building 1425 ................................................................ 20
2. Southeast side of Building 1425 .................................................... 25
3. Northwest side of Building 1425 .................................................... 24
4. Southeast Side of Building 1412 .................................................... 26
5. Northwest Side of Building 1412 .................................................... 26
6. Alarm Display Panel in Building 1425 ............................................ 28
7. Current computer network security design ..................................... 30
8. Results of Web server scan by SNL using NMAP .......................... 31
9. FileMaker Pro Database for Category A Agents ........................... 35
10(a). USAMRIID 1425 receiving dock (closed gate) ....................... 33
10(b). USAMRIID 1425 receiving dock .......................................... 33
11. Internal transport container ......................................................... 48
12. Dunk box on a biocontainment door ............................................ 48
13. First proposed network modification option ................................. 49
14. Second network modification option ............................................ 51
15. Proposed limited and exclusion areas for the first floor of Building 1425 .......... 54
16. Category 1 Door ......................................................................... 58
17. Category 2 Door ......................................................................... 59
18. Category 3 Door ......................................................................... 61
19. Category 4 Door ......................................................................... 61
20. Building 1425: First Floor, Category 1 Doors .............................. 65
21. Building 1425: Second Floor, Category 1 Doors .......................... 66
22. Building 1425: First floor, Category 4 doors ............................... 67
23. Building 1425: Second floor, Category 4 doors ........................... 68
24(a). Interstitial space stairwell ...................................................... 69
24(b). Half-door on stairwell landing ................................................ 69
25. Building 1425: First Floor, Category 2 Doors .............................. 70
26. Building 1425: Interstitial space cages and Category 2 doors; Category 3
      door on Toxinology storage ....................................................... 71
27. Building 1425: Second Floor, Category 2 doors and Category 3 door on
      Toxinology storage .................................................................... 72
28. Building 1425 First Floor Category 3 Doors ................................ 74
29. Typical Suite .............................................................................. 75
30. Typical suite entrance ................................................................ 76
31. Building 1412: First Floor, Category 1 Doors .............................. 77
32. Building 1412: Basement Category 1 Doors ................................ 78
33. Building 1412: First Floor, Category 4 Doors .............................. 79
34. Second Floor, Category 4 Doors ................................................ 80
35. Building 1412: Attic, Category 4 Doors ....................................... 81
36. Building 1412: Containment Entrance and Main Entrance Mantrap ................ 82

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3                ARMY02-010257

**FOR OFFICIAL USE ONLY**

Intentionally Left Blank

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010258

FOR OFFICIAL USE ONLY

# Executive Summary

A team from Sandia National Laboratories (SNL) conducted a security review at the U.S. Army Medical Research Institute of Infectious Diseases (USAMRIID), Fort Detrick, Maryland from 29 April to 3 May 2002 and 21–22 May 2002. The review was conducted to gain a basic understanding of the facility operations, to evaluate the effectiveness of the existing security program at USAMRIID, and to recommend security improvements to deter, detect, respond to, and contain unauthorized access to high-consequence pathogens and toxins (HCPTs) and critical information specifically related to HCPTs. The security review focused on (1) maintaining the integrity of those areas where HCPTs are in storage, use, or transit, (2) protecting information related to HCPTs that could be useful for a potential bioterrorist, and (3) maintaining continuity of operations against defined threats.

Primary target areas (what to protect) and threat categories (what adversary capabilities to protect against) were discussed and identified at various meetings during the site visits. These defined "targets and threats" established the objectives for the security system. The primary targets were defined as HCPTs and critical information specifically related to HCPTs. Nine separate threat categories were defined, and they can be summarized as an insider, a small, covert outsider, and a package or vehicle bomb.

HCPTs are defined as those microorganisms and their by-products that are capable of severely affecting U.S. public health, safety, economy, and national security. In particular, HCPTs are microorganisms that would most likely be targeted for diversion to be used to conduct bioterrorism or pursue biological weapons proliferation. In other words, HCPTs are those agents with properties and attributes that would make them effective biological weapons (BW). Many microorganisms that cause highly infectious disease would not necessarily be effective BW agents. At the present time, a working list of HCPTs at USAMRIID includes *Bacillus anthracis, Clostridium botulinim* or its toxins, *Yersinia pestis, Francisella tularensis,* Ebola virus, and Marburg virus.

There may be certain HCPTs that deserve more protection than most other HCPTs. For example, viruses that cause highly communicable diseases, such as smallpox and certain novel strains of influenza, could be used malevolently to cause a mass casualty event. It is important to recognize that, at the present time, USAMRIID does not store, use, or transport viruses that cause smallpox or highly communicable forms of influenza. Thus, the report recommends the same level of physical protection for all areas where HCPTs are in storage or use at USAMRIID.

To develop and implement an effective biosecurity strategy, the extent of protection provided to a specific security interest (referred to as a target) must be proportionate to the potential impact of loss, destruction, or misuse of the target (referred to as a consequence). This graded approach ensures that targets whose loss would have the most serious impact on national security or the health, safety, and well being of the public or environment have the benefit of the highest level of protection. A comprehensive biosecurity system should include all of the following elements: physical protection, personnel reliability, programmatic security training and oversight, pathogen and toxin accountability, information security, transportation security, and incident response planning.

The current biosecurity system at USAMRIID does not adequately protect HCPTs and related information against the defined threats. The following are the salient comments on the current system:

- Perhaps the most important observation in this report is that the culture at USAMRIID does not reflect the same indisputable commitment to security as it does to research. The effectiveness of any security system depends on the willingness of the individuals who work at the site to support the mission of the security system. The unique nature of microbiological research, particularly the facts that diversion of small quantities of material can be significant

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010259

**FOR OFFICIAL USE ONLY**

and that organisms cannot be reliably detected, makes the effectiveness of a biosecurity system dependent on the development and sustainability of a research culture that is clearly supportive of a balanced, well conceived security program.

- USAMRIID does not have a comprehensive security plan that incorporates the details of the strategies, objectives, elements, and procedures associated with the site's biosecurity system. The plan should also identify those individuals who are accountable for implementing and updating the plan. A completed biosecurity plan may compel a review and revision of the conceptual design presented in this report.

- USAMRIID does not have a Memorandum of Understanding with the Fort Detrick Provost Marshal's Office that clarifies exactly how the Garrison police will respond to a security incident outside or inside USAMRIID.

- The USAMRIID guard force is unarmed, not highly trained, and does not function at the professional level commensurate with this type of federal facility.

- The access control and alarm system has not been well maintained or adequately tested. As a result, there are many alarm points that do not report in a timely manner or simply do not function at all. The system is in the process of being upgraded. However, the upgrade is a beta development system and is taking a considerable amount of time to install. The contractor has not provided USAMRIID with final design drawings or system architecture description for the installation.

- USAMRIID's sensitive information assets reside on Fort Detrick's single, shared domain, which has no isolated network segments and is administered by USAMISSA. USAMISSA's external firewall configuration does not adequately protect the network. Because USAMRIID's sensitive information assets are not properly segmented and firewalled within the USAMISSA network, they are vulnerable to external probing and manipulation.

- Individuals are often given access to the facility and the network, which may include access to HCPTs and/or sensitive HCPT information, prior to the completion of a National Agency Check background investigation. Personnel screening does not recur. A clear set of personnel in-processing and out-processing policies and procedures to manage facility and network access does not exist. Communication among the various USAMRIID and Garrison offices that handle personnel information has not been consistent or clear.

- Although material accountability at USAMRIID is adequate, the process has not been formalized. There are no policies and procedures that establish a chain of custody for HCPTs when they are in transit from one secure laboratory (or building) to another within USAMRIID. USAMRIID's new "inventory database" program is not currently part of an automated, user-friendly system that is available within all of the laboratory suites, and it has not been consistently used or completely updated since early in 2002. Procedures have not yet been established for how often the database will be updated or who will have responsibility for control and oversight of the database itself.

- The shipping and receiving area is within the USAMRIID facility, and incoming packages are not screened for explosives.

This report provides a discussion of the objectives and rationale for the security assessment and conceptual design (Section 2), an evaluation of the effectiveness of each of the elements of USAMRIID's current biosecurity system (Section 3), a methodology and strategy for redesigning the USAMRIID biosecurity system (Section 4), and a conceptual design and set of recommendations for an upgraded biosecurity system at USAMRIID (Section 5).

**FOR OFFICIAL USE ONLY**

8

**FOR OFFICIAL USE ONLY**

This report contains information about constraints of the current security system and limitations of the proposed conceptual design. Therefore, this report is intended for distribution only to the appropriate site and DoD representatives.

**FOR OFFICIAL USE ONLY**

9

FOR OFFICIAL USE ONLY

# Nomenclature

| | |
|---|---|
| BPRP | Biological Personnel Reliability Program |
| BSL | biosafety level |
| BW | biological weapons |
| CCTV | closed-circuit television |
| CDC | Centers for Disease Control and Prevention |
| CFR | Code of Federal Regulations |
| DA | Department of the Army |
| DoD | Department of Defense |
| ECS | entry control system. |
| ftp | File transfer protocol |
| HCPTs | high-consequence pathogens and toxins |
| ICIDS | integrated commercial intrusion detection system |
| IDS | intrusion detection system |
| LAN | local area network |
| NAC | National Agency Check |
| NACI | National Check and Inquiry |
| NACLC | National Agency Check with Law and Credit |
| PMO | Provost Marshal's Office |
| PPS | physical protection system |
| ROM | rough order-of-magnitude |
| SNL | Sandia National Laboratories |
| USAMISSA | U.S. Army Medical Information Systems and Services Agency |
| USAMRIID | U.S. Army Medical Research Institute of Infectious Diseases |
| USAMRMC | U.S. Army Medical Research and Materiel Command |
| VPN | virtual private network |

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010262

**FOR OFFICIAL USE ONLY**

Intentionally Left Blank

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010263

FOR OFFICIAL USE ONLY

# 1. Introduction

A team from Sandia National Laboratories (SNL) conducted a security review at the U.S. Army Medical Research Institute of Infectious Diseases (USAMRIID) 29 April to 3 May 2002 and 21–22 May 2002. Team members from SNL were Reynolds Salerno, John Milloy, Bruce Hazlewood, Susan Caskey, Richard Wayne, James Larson, and Roger Showalter. The review was conducted to evaluate the effectiveness of the existing security system at USAMRIID and recommend security improvements to deter, detect, respond to, and contain unauthorized access to high-consequence pathogens and toxins (HCPTs).

The security review involved gaining a basic understanding of the facility operations, evaluating the current security system, and developing a conceptual design for improvements to the security system. This security review was primarily focused on maintaining the integrity of those areas where HCPTs and related information are in storage, use, or transit and secondarily on evaluating appropriate measures to maintain continuity of operations against defined threats.

Primary target areas (what to protect) and threat categories (what adversary capabilities to protect against) were discussed and identified at various meetings during the site visits. The results of these meetings are described in a memorandum from Reynolds M. Salerno, SNL, to Lt. Col. Kathleen Carr, USAMRIID, dated 30 May 2002. Primary target assets included high-consequence pathogens and toxins. Secondary target assets included information databases, mission critical support facilities, reagents, and facility blueprints. Nine separate threat categories were defined.

This security review process engaged many site officials and representatives with regard to the current security posture of the site. These individuals were extremely helpful in assisting the review team during visits to facilities, and in providing site drawings and information related to the existing security system, including information on proposed security upgrades. The site officials and representatives were an integral part of identifying recommendations for security system upgrades.

The observations and recommendations contained in this report are designed to deter, detect, respond to, and contain a malevolent insider or outsiders as defined by USAMRIID. Because this report describes the site's current vulnerabilities and the constraints on the SNL conceptual design, this report is intended for distribution only to the appropriate site and DoD representatives.

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010264

FOR OFFICIAL USE ONLY

## 2. Objectives for the Security Assessment and Conceptual Design

During meetings held between 29 April and 22 May 2002, officials from USAMRIID determined the objectives for this vulnerability assessment and conceptual security design. The objectives for this work are based on clearly defined targets and threats. The primary mission of the security system was determined to be: to protect the defined targets against USAMRIID's designated threats, impacting operations only to the level required, and not unnecessarily hindering the laboratory's primary research mission.

### 2.1 High-Consequence Pathogens and Toxins

An effective and efficient biosecurity system should protect high-consequence pathogens and toxins (HCPTs),[1] and HCPT-related information that could be used in bioterrorism, at a level higher than organisms that are not judged to be HCPTs. HCPTs are defined as those microorganisms and their by-products that are capable of severely affecting U.S. public health, safety, economy, and national security. This includes microorganisms that would most likely be targeted for diversion[2] so that they could be used to conduct bioterrorism[3] or pursue biological weapons proliferation.[4] In other words, HCPTs are those agents with properties and attributes that would make them effective biological weapons (BW). Many microorganisms that cause highly infectious disease would not necessarily be effective BW agents. There are currently no federal guidelines to assist in developing a list of HCPTs and no official policy within the U.S. Department of Defense (DoD) on which agents should be classified as HCPTs.

At the present time, a draft DoD directive[5] implies that all 36 select agents should be protected as HCPTs. A select agent is defined as an agent, virus, bacteria, fungi, rickettsiac, or toxin listed in Appendix A of Federal Register 29327 (42 CFR Part 72) titled, "Additional Requirements for Facilities Transferring or Receiving Select Agents."[6] The Select Agent List[7] was created as a result of the Antiterrorism and Effective Death Penalty Act of 1996, which required the Secretary of the Department of Health and Human Services to develop and maintain a list of biological agents that could pose a threat to the public health and to regulate the transfer of such agents while maintaining the availability of these agents for research, education, and other legitimate purposes. The Select Agent List includes many pathogens and toxins that would not likely be targeted for diversion from legitimate research laboratories for bioterrorism purposes. In fact, many if not most of the select agents, especially the viruses (with the exception of smallpox), would not be good candidates for use in a bioweapon.

In contrast to the draft DoD directive, interim Department of the Army (DA) guidance[8] suggests that the Centers for Disease Control and Prevention (CDC)'s six "Category A" agents should be protected as HCPTs. Category A[9] agents are those that "have the greatest potential for adverse public health impact with mass casualties, and most require broad-based public health preparedness efforts." Category A agents are not necessarily those judged to be the most likely agents targeted for diversion from legitimate research laboratories for bioterrorism purposes, because characteristics such as ease of amplification and environmental hardiness were not important considerations.

Therefore, at the present time, neither the Category A list nor the Select Agent list may be satisfactory as a definition for HCPTs. HCPTs will encompass a range of unique characteristics. It has been suggested that the attributes that typify the "perfect" BW agent for military purposes would include: (1) high virulence in the targeted host; (2) high degree of controllability; (3) high degree of resistance to adverse environmental forces; (4) lack of timely countermeasures; and (5) ability to camouflage the BW agent with relative ease.[10] A recent assessment of possible terrorist use of modern biotechnology

FOR OFFICIAL USE ONLY

13

FOR OFFICIAL USE ONLY

techniques argues that there are eight properties or traits of microorganisms that could be used to conduct bioterrorism:[11] (1) hardiness;[12] (2) resistance;[13] (3) infectivity;[14] (4) pathogenicity;[15] (5) specificity;[16] (6) detection avoidance;[17] (7) senescence;[18] and (8) the viable but nonculturable state.[19] The decision to designate a microorganism as an HCPT should be based on an evaluation of some or all of these characteristics. At the present time, a working list of HCPTs at USAMRIID includes *Bacillus anthracis, Clostridium botulinim* or its toxins, *Yersinia pestis, Francisella tularensis*, Ebola virus, and Marburg virus. Additional HCPTs may be added to this list in the future.

There are several unique characteristics of HCPTs that should influence the development of systems designed to protect those microorganisms against diversion. First, in spite of their potential use for hostile purposes, all HCPTs are valuable for a host of legitimate, defensive, and peaceful commercial, medical, and research applications. The protection of HCPTs at USAMRIID must ensure that the USAMRIID critical national security and public health research mission can continue. Second, HCPTs can be isolated from nature and are found in a variety of biomedical research institutes, clinical facilities, biotechnology industries, and culture collections around the world.[20] Third, HCPTs are living, self-replicating organisms and their by-products, which can be continually amplified throughout legitimate research activities. Fourth, within legitimate facilities, HCPTs can be isolated from a number of process streams. At USAMRIID, HCPTs can be found in petri dishes, cell cultures, environmental samples, clinical specimens, infected animal models, and animal carcasses, as well as stored in refrigerated or freeze-dried forms. Fifth, the amounts of an HCPT in use or storage within a research setting are typically small, involving microgram- to gram-sized quantities of material. The active and diverse nature of research, however, dictates that various quantities and types of HCPTs can be in use at any given time, spread across several laboratory suites. The self-replicating nature of HCPTs, the diverse places within a legitimate laboratory where HCPTs are located, and the various quantities of HCPTs required to do legitimate research indicate that the absolute amount of any given organism at USAMRIID (or other active biological research facilities) cannot be reliably quantified from day to day.

## 2.2   Defined Targets

The existing security system and suggested conceptual design will be evaluated on its ability to protect the following assets.

**Primary Assets**
- High-consequence pathogens and toxins (HCPTs)

**Secondary Assets**
- Information databases
  - Lists and locations of organisms
  - Lists of workers and their access and assignments
  - Nonpublic high-consequence organisms/procedures
  - Information about aerosol stabilization and infection stability
  - Information about growth media and primer sequences

- Cyber targets
  - Human resource data systems (on USAMISSA server)
  - Pathogen inventory database (on USAMISSA server)
  - Immunization database (on USAMISSA server)
  - Research data (on researchers' computers)

- Mission-critical support facilities

FOR OFFICIAL USE ONLY

14

REMOVED FROM PROTECTIVE ORDER NO. 3                    ARMY02-010266

FOR OFFICIAL USE ONLY

- Reagents
- Facility blueprints

**Asset Locations**
HCPTs
- All Biosafety Level (BSL)-3 and BSL-4 suites
- Building 1425
  - Hallway storage (AA5)
  - BSL-2 Toxinology storage (857-858)
  - Special Pathogens Sample Testing Lab (AR 101, 102, 105, 108)
  - Radiation Protection Office (AA 501-502)
- Building 1412
  - Aerosol capability (Rooms 114, 119, 120, 211)
  - Rooms 208, 209, 007D

Critical facility operations
- Building 1425
  - Alarm communications (Office 128, Room 2)
  - Communications closet (Room 701)
  - Veterinary pharmacy (AR 111)
  - Alcohol storage (775A)
  - Classified storage (Room 111, Commander's vault)
  - Penthouse
  - Interstitial space
  - Basement under medical wing
  - Backup generator
  - Blueprint storage (Office 1, 3)
- Building 1412
  - Communications hub (Room 203A, 204)
  - Penthouse
  - Backup generator

## 2.3   Threat of Diversion

The development of systems designed to protect HCPTs against diversion should be based on not only an understanding of the unique characteristics of HCPTs, but also a comprehensive assessment of the threat of HCPT diversion. Certain intrinsic characteristics involving HCPTs make them vulnerable to illicit diversion. Because of the nature of HCPTs and the manner in which they are used in a laboratory setting, inventory controls will not necessarily deter or detect diversion of material. Additionally, current federal regulations[2] regarding the official transfer of HCPTs between registered facilities are inadequate to prevent diversion of material by a knowledgeable insider. Diversion of even small amounts can be significant, as HCPTs can be released in small amounts or amplified with common, commercially available equipment for bioterrorism purposes. HCPTs do not emit adequate amounts of energy or other signatures to be detected with available standoff technologies and, if properly contained, removal of most HCPTs would pose little health risk to the perpetrator(s). Therefore, HCPTs could be diverted or released from their controlled environments in research facilities for terrorism or proliferation purposes.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010267

FOR OFFICIAL USE ONLY

At the present time, however, the nature and extent of the threat involving HCPT diversion is controversial and there is no U.S. interagency consensus on the issue. The preferred method for identifying an appropriate threat level is based on data collected through past events coupled with information obtained from law enforcement and intelligence agencies. Subsequently, using inference, a reasonable prediction of likely, future events can be made. Unfortunately, as will be described in the following sections, little information exists in open literature or law enforcement and intelligence reports that document the diversion of HCPTs from federal laboratories.

Therefore, constructing a working threat assessment of HCPT diversion should involve a multifaceted approach, which takes the following three factors into account: (1) known incidents of diversion; (2) the historical record of bioterrorism; and (3) technical hurdles involved in producing a high-consequence bioterrorist event. These considerations will provide the guideposts for assigning the level of threats that HCPTs at USAMRIID should be protected against and the level of risk that USAMRIID should accept. In other words, this analysis of the threat of diversion of HCPTs will help provide the rationale for the design of an appropriate protection and security system at USAMRIID.

## 2.3.1 Incidents of Diversion

In February 2001, National Defense University published a study, *Bioterrorism and Biocrimes: The Illicit Use of Biological Agents Since 1900*.[22] In 11 of the 33 cases that involved the acquisition of biological agents, non-state operatives obtained the material from legitimate culture collections. This included *Yersinia pestis*, *Clostridium botulinum*, *Clostridium tetani*, and *Salmonella typhimurium*. The pathogens were obtained legitimately or through the use of falsified documents.[23] At the time of these events, there were no national regulations in place to control the possession or transfer of select agents. In an additional three cases, the perpetrators acquired their biological agents by stealing them from research or medical laboratories. The agents involved were *Shigella dysenteriae* type 2, *Salmonella typhi*, and *Ascaris suum*. The perpetrators were "insiders," scientific staff with legitimate access to the facilities where the pathogens were kept, who seemed to be motivated by personal grudges or desire for revenge. In all of these 14 cases, the perpetrators identified culture collections or repositories as the preferred source for acquiring pathogens even though they had the technical skills to culture the organisms from nature. The remaining 19 incidents consist of self-manufacture of ricin, acquisition from natural resources, and unknown sources.

There is little open literature information related to incidents of diversion at federal laboratories. In 1986 a former researcher at USAMRIID charged that 60 to 70 various sized vials containing almost 2,500 milliliters of Chikungunya virus[24] were missing in 1981. U.S. Army officials denied that the virus had been diverted, but a Congressional hearing was held on the subject in 1988. To date there has been no resolution on what exactly happened to the missing vials.[25] In 1992 an internal U.S. Army audit found that 27 specimens of various agents were missing from USAMRIID. A search of the laboratory subsequently turned up all but three of the missing 27 specimens. It is unclear whether those specimens contained any viable or virulent microbes.[26] Additionally, media reports have speculated that the anthrax attacks in the United States during the fall of 2001 were perpetuated by someone who had access to and removed virulent anthrax strains from a U.S. biomedical research laboratory.

Even with data on diversion of HCPTs, however, the prediction of actions by other human beings can never be perfect. Instead, the baseline threat categories, against which to design and evaluate a security system, must be established primarily based upon informed extrapolation of existing data, trends, and consequences of a malevolent act. In this context, examination of the historical use of HCPTs in bioterrorism can provide additional metrics for establishing the current threat level of diversion.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3                    ARMY02-010268

FOR OFFICIAL USE ONLY

## 2.3.2 Historical Record of Bioterrorism

Between 1968 and August 2001, terrorists worldwide killed approximately 1,000 U.S. citizens.[27] Prior to the fall 2001 anthrax attacks, no American citizen is known to have died from bioterrorism within the United States.[28] According to the Monterey Institute of International Studies terrorism database, since 1900 there have been 287 bioterrorist "events"[29] either in the United States or abroad. Of these, only 36 involved actual acquisition and use of agent; 251 were pranks, threats or hoaxes.[30]

On American soil, there have been 18 isolated incidents involving the use of biological agents for bioterrorism.[31] These incidents involved the use of the following agents: influenza virus, ricin, Medfly, *Bacillus anthracis*, *Salmonella typhimurium*, dead rats, medical waste, and sewage. None of these incidents can be defined as *mass casualty*[32] bioterrorism. With the exception of two incidents, virtually no illnesses or deaths resulted.

The two noteworthy U.S. incidents include the Rajneeshees and the 2001 anthrax attacks. In 1984 the Rajneeshee religious cult deliberately contaminated salad bars with salmonella bacteria on six separate occasions in The Dalles, Oregon. The cult planned to sicken enough residents to influence the outcome of local elections.[33] In the attack 776 people became ill, but no deaths resulted.[34] The malicious nature of the event went unnoticed until a Rajneeshee cult member confessed the crime after being arrested on unrelated charges over a year after the event.[35]

The second significant bioterrorism attack in the United States involved the distribution of a potent strain of *Bacillus anthracis* through the U.S. postal system during the fall of 2001. Since 3 October 2001, 11 inhalation and 11 cutaneous (7 confirmed and 4 suspected) anthrax cases have been identified in the United States. Five deaths resulted from contracting the inhalation form of the disease.[36] Approximately 10,000 individuals were potentially exposed to the bacteria and were recommended to take at least 60 days of post-exposure antibiotic prophylaxis.[37] Additionally, multiple government and public buildings were shutdown because of evidence of *B. anthracis* contamination. As of this writing, the perpetrator(s) are unknown. Although this incident of bioterrorism cannot be classified as mass casualty, it may be considered to be high consequence because of the significant economic, political, and social consequences.

Consistent with the U.S. record, international incidents of actual bioterrorism events have also failed to cause mass casualties. From the Monterey database, there are 18 recorded international incidents involving the use of the following agents: ricin, botulinum toxin, African milk bush plant, *Vibrio cholerae*, *Shigella*, *Yersinia pestis*, *Bacillus anthracis*, *Salmonella typhi*, *Salmonella typhimurium*, hepatitis virus, and sewer water. Of these incidents, only two caused any deaths. In 1964 Dr. Mitsuru Suzuki used *Salmonella typhi* and *Shigella* to infect up to 200 of his Japanese colleagues, patients, and family members for a variety of personal grudges.[38] His acts led to four deaths. Suzuki told police that he obtained typhoid cultures by stealing them from Japan's National Institute of Health.[39] In 1999 two Israelis died of Salmonella poisoning that may have been the result of eating eggs that had been contaminated by some Palestinians.[40]

One international bioterrorism case involves the Japanese religious cult Aum Shinrikyo. In the early 1990s, the cult developed an extensive BW capability to carry out its doomsday agenda. Aum's BW program had a cadre of university and graduate-level trained microbiologists, dedicated biotechnology facilities, and virtually unlimited funds. They worked undetected for four years. In spite of these resources, Aum's efforts to produce effective biological weapons were unsuccessful. The key factors in Aum's failure were its use of a vaccine strain of *Bacillus anthracis* for its anthrax weapon and its inadequate dispersal method.[41] No injuries or fatalities resulted from Aum's bioterrorism activities.[42]

Twelve of the 36 incidents described in the Monterey database involved the use of potential HCPTs (e.g., *B. anthracis*, ricin, *Y. pestis*, botulinum toxin), but only six deaths were caused. In 1933

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010269

FOR OFFICIAL USE ONLY

Benoyendra Chandra Pan used *Yersinia pestis* to kill his half-brother in order to inherit his father's estate.[43] Most agents that have been used for bioterrorism purposes have tended to be material that was easily accessible and required little to no modification.[44]

In contrast to the recent media hype, the historical record shows that bioterrorism has not caused mass casualties.[45] But it is important to recognize that bioterrorism has resulted in high-consequence events other than mass casualties. As the anthrax attacks in the United States during the fall of 2001 showed, low-casualty bioterrorism can cause significant economic, social, and political disturbances.

It should be noted that the vast majority of terrorists attacks have involved conventional means of attack, such as the use of guns, hijackings, and car and suicide bombs, for discriminate purposes. Although the reasons for this are unclear, some scholars cite the following self-imposed constraints: (1) the difficulty in coordinating and carrying out the logistics and other organizational hurdles for larger or more technologically complex operations; (2) the desire for publicity and *not* mass deaths; and (3) the desire not to alienate their members or supporters.[46] Furthermore, terrorists may prefer the instant gratification obtained from using conventional weapons in their attacks. Not only is the effect of a biological weapon delayed and nonexplosive, but also terrorists may believe that they will have more control over and more confidence in a conventional weapon's effectiveness than that of a biological weapon.

Yet in the 1990s terrorism analysts noted a new form of terrorism emerging, one that was more lethal, indiscriminate, and complex, involving new adversaries, motivations, and methods.[47] The events of September 11, 2001, as well as the anthrax attacks in the United States, have redefined and underscored the concern for what the future holds for bioterrorism. It is unclear whether bioterrorism will increase in the future. For this reason, it is important to evaluate the technical hurdles a would-be bioterrorist would have to overcome to perpetrate a successful bioterrorist event.

## 2.3.3 Technical Hurdles to a Mass Casualty Bioterrorist Event

Scholarly analyses of state offensive BW programs indicate that it is difficult to develop and weaponize HCPTs to produce a *mass casualty* weapon.[48] With the exception of the smallpox virus, it is difficult to cause large-scale killing using small quantities of HCPTs. To highlight these difficulties, it is useful to examine some of the technical constraints involved in turning a vial of an HCPT into a true weapon of mass destruction.

Typically, a successful, mass casualty biological weapons attack using HCPTs would require that the following demands be met: (1) acquiring a virulent pathogen or toxin; (2) amplifying the material to a sufficient quantity; (3) processing the material to withstand environmental stresses during storage and dissemination; (4) employing an appropriate delivery form and device; and (5) deploying in ideal weather or indoor conditions.[49] The historical record shows that states and a well-funded, scientifically competent terrorist group[50] have encountered difficulties in one or more of these steps, hampering or stymieing the development of their biological weapons capabilities. Although overcoming these hurdles is not insurmountable, they do provide some deterrence.

In particular, obtaining a vial of a high-consequence pathogen does not mean that it can be used directly as a biological weapon resulting in mass deaths. For example, each pathogen is composed of many different strains or isolates; *Bacillus anthracis* consists of over 70 different strains.[51] Although the strains of a particular pathogen may be immunologically similar, they can vary widely in terms of pathogenicity, lethality, transmission rates, environmental susceptibility, and other factors. If an avirulent strain of an HCPT is used for bioterrorism purposes, no significant disease outbreak will occur.[52] Once the right strain is selected, additional hurdles face the would-be bioterrorist. For a mass casualty attack, other technical constraints would involve additional production and purification of the pathogen or toxin.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010270

FOR OFFICIAL USE ONLY

Moreover, most HCPTs are not dermally active. Therefore, to cause incapacitation or death, these agents must enter a susceptible host either through ingestion or inhalation. Since most pathogens and toxins would not survive human digestive processes, aerosolization of agents for inhalation has been acknowledged to be the most effective method for a mass casualty biological attack.[53] Thus, the perpetrator(s) would need to master the skills for processing and formulating the material to obtain an optimum particle size and to protect it from environmental stresses.[54] Then the would-be bioterrorist would have to be able to select and use an appropriate delivery system. These steps require moderate to high levels of scientific expertise and would pose distinct obstacles to states and terrorists.[55]

Although mass casualties have not resulted to date, diversion and use of HCPTs has occurred. Furthermore, the fall 2001 U.S. anthrax attacks indicate that bioterrorists either possess or have access to relevant scientific expertise. Although detailed characteristics of the *B. anthracis* strain used in the attacks have yet to be publicly released, the unusually virulent nature of the strain,[56] as well as the small particle size of the spores and unique coating, was a critical factor in the five reported deaths. Therefore, increased safeguards on certain highly virulent strains of *B. anthracis* and other HCPTs can decrease their risk of diversion, making it more difficult for the would-be terrorist or proliferator to develop a mass casualty biological weapons capability.

## 2.3.4 Summary Threat Assessment

The risk of diversion of HCPTs for terrorism or proliferation exists. This is due to the inherent potential for harm that these materials possess, as well as the fact that small amounts can be diverted without detection and can be amplified with common, commercially available equipment. Yet the magnitude of this risk varies. The variables are dependent on the characteristics of the HCPT and the technical difficulties in turning the material into a weapon capable of large-scale deaths. Furthermore, the historical record of bioterrorism and diversion of microorganisms indicates that events involving HCPTs have been limited and have not resulted in mass casualties. It is fair to assume that this is because of the technical difficulties of turning a vial of an HCPT into a weapon of mass destruction cited in the prior section.

It is appropriate for USAMRIID to protect HCPTs to deter terrorists from targeting USAMRIID. A terrorist organization would then be more likely to obtain HCPTs from a less well-defended laboratory somewhere else in the world or be forced to isolate the organism from nature. In the estimation of the SNL review team, it would be counterproductive for a terrorist organization to violently assault USAMRIID to steal HCPTs for bioterrorism purposes. An attack using force would signal USAMRIID and multiple public health authorities to take appropriate medical countermeasures to mitigate the effect of a bioterrorist event. For this reason, if the aim of the terrorist organization were to cause death and destruction, it would likely choose a target other than USAMRIID. Therefore, while it is prudent for USAMRIID to protect itself against a covert attack by an outsider, it would be inappropriate for USAMRIID to expend resources to defend against a violent external assault by a large group.

However, USAMRIID should concentrate on protecting itself from the insider threat. An insider with malevolent intent could, without raising suspicion, take advantage of the research and development work at USAMRIID to perpetrate bioterrorism or to assist a would-be BW proliferator by diverting small amounts of HCPT material. That microorganism could then be used directly or amplified and weaponized outside USAMRIID facilities.

When designing security systems to protect against an insider and a small, covert outsider threat, USAMRIID should take into consideration the historical record of bioterrorism and the technical hurdles to achieve a mass casualty bioterrorist event. HCPTs are not in and of themselves biological weapons. Even after acquiring an HCPT, an individual would need considerable technical skill to successfully perpetrate a mass casualty event. To date, the majority of terrorist groups have been

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010271

FOR OFFICIAL USE ONLY

deterred from pursuing bioterrorism because of the high technical requirements and the improbability of causing mass casualties.[57] Although the possibility of mass destruction does exist with biological weapons, the more likely result is mass *disruption*.[58] Thus, it would be inappropriate to protect the HCPTs at USAMRIID in a manner commensurate with, or at a level of expenditure similar to, the protection of nuclear weapons.

## 2.4   Defined Threats

The existing security system and suggested conceptual design will be evaluated on their ability to protect the target assets against the threat categories listed below. Any increase or change in the adversary threats may have a significant impact on the design and cost of the security system.

**Insider**
- Intent is to steal and use a primary target asset, sabotage operations, or disrupt scientific achievements
  - One person
  - Nonviolent
  - System knowledge that can be used to his/her advantage
  - Has authorized access to the facility, the assets, or the physical protection system (PPS)
  - Will choose the best time to commit an act

**Temporary Workers**
- Intent is to steal and use a primary target asset or intellectual property, sabotage operations, or disrupt scientific achievements
  - Group (up to three people)
  - Nonviolent
  - May have system knowledge that can be used to their advantage
  - May have authorized access to the facility, the assets, or the PPS
  - Will choose the best time to commit an act

**Visitors**
- Intent is to steal and use a primary target asset or intellectual property, sabotage operations, or disrupt scientific achievements
  - Group (up to three people)
  - Nonviolent
  - May have system knowledge that can be used to their advantage
  - May have authorized access to the facility, the assets, or the PPS
  - Will choose the best time to commit an act

**Invited Colleague**
- Intent is to steal intellectual property and/or acquire samples
  - One person
  - Nonviolent
  - May have system knowledge that can be used to his/her advantage
  - May have limited, authorized access to the facility, the assets, or the PPS (a colleague with unlimited, authorized access is an "insider")
  - May choose the best time to commit an act

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010272

FOR OFFICIAL USE ONLY

**Coerced Insider**
- Intent is to steal a primary target asset
  - One person
  - May resort to violence but not willing to risk death
  - System knowledge that can be used to his/her advantage
  - Has authorized access to the facility, assets, or PPS
  - Will choose the best time to commit an act

**Incoming Packages**
- Intent is to damage or degrade facilities, infrastructure, or entire laboratory site, or to injure or kill site personnel
  - High explosives, chemical, or biological agents
  - Light weight (less than 40 pounds)

**Vehicle Bomb**
- Intent is to damage or degrade facilities, infrastructure, or entire laboratory site, or to injure or kill site personnel
  - Single vehicle
  - Stationary or moving
  - Up to 2,000 pounds of explosives

**Animal Rights Activists**
- Intent is to destroy property or to release animals. Acts may result in a release of pathogens or infected animals into the environment.
  - Group (up to three people)
  - May have system knowledge that can be used to their advantage
  - May resort to force or threats of violence but not willing to kill or risk death

**Single Outsider**
- Intent is to breach the security of the facility to steal pathogens or release pathogens into the environment
  - Acting alone without inside information
  - May be armed with a handgun, shotgun, or semiautomatic rifle up to 7.62 caliber
  - May resort to violence
  - May be suicidal

## 2.5    Implication of Defined Threats

One threat category includes the potential use of a semiautomatic weapon. The inclusion of a semiautomatic weapon in the threat categories is not intended to result in a security system that is designed to prevent workplace violence or occupational homicide; this can occur in virtually any organization in American society. The majority of these occupational homicide incidents are between employees and supervisors or employees and clients. Moreover, USAMRIID is not at high risk for robbery (or other crimes that afflict the more traditional retail, transportation, or restaurant businesses) because it does not exchange money with the public, is not located in a high-crime area, and is not involved in guarding high-value items.[59] However, workplace violence has become an area of concern for DoD management, and programs have been initiated that incorporate methodologies that attempt to prevent the violence.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010273

FOR OFFICIAL USE ONLY

It is important to note that only the single outsider has weapon capabilities; the insider threats are not armed. By definition, the outsider would not successfully gain legitimate access to the facility. It was the opinion of both USAMRIID and SNL that weapons would likely not be used by insiders to further the diversion of HCPTs. Because only individuals who could gain legitimate access to the facility would be subject to metal detection and x-ray screening, it would therefore not be cost effective or appropriate to use metal detectors and x-ray machines to screen staff members, temporary workers, visitors, or invited colleagues.

However, the existence of a semiautomatic weapon in the threat definition compels USAMRIID to take other substantial physical protection measures. The USAMRIID guard force will need to be trained to carry and use semiautomatic weapons comparable to the weapon that the outsider would be carrying. In addition, the main entrances to Buildings 1425 and 1412, as well as the guard posts at the front and back of Building 1425, will all need to be hardened to withstand an armed assault by an outsider using a semiautomatic weapon as discussed in Section 5.7.1.

Another threat category includes the possibility of a 2,000-pound truck bomb. It would be impossible to protect USAMRIID against this threat without radically altering the traffic and parking patterns around the facility or massively reconstructing the facility itself. The standoff distance required for a 2,000-pound truck bomb is approximately 200–400 feet depending on the thickness of the building walls and the size and type of the barriers that can be erected around the buildings.[60] Therefore, to adequately protect against this threat, the Garrison would have to prohibit all traffic on Porter Street, Randall Street, and Sultan Drive. Vehicle barriers would need to be erected along these streets as well as across all potential lines of access between the Main Gate and USAMRIID. Additionally, there could be no parking within 200–400 feet from USAMRIID, effectively eliminating USAMRIID's current main parking lot. Other facilities in the vicinity fall within the required setback distance and would have their operations impacted. The distance from Building 1425 southwest to the running track is approximately 315 feet. The distance from the front of Building 1425 southeast to the front of the gymnasium across the street is approximately 330 feet.

Even if it were possible to make these changes to the traffic and parking patterns, USAMRIID would remain vulnerable to a car or truck bomb because of the short distance between the main entrance to Fort Detrick and USAMRIID, the multiple numbers of vehicles pathways to USAMRIID, and the difficulty in implementing comprehensive explosive detection searches upon vehicle entry into Fort Detrick. Therefore, it would also be necessary to shift Fort Detrick's main entrance from Gate Two to Gate Four and to significantly improve bomb searches on all vehicles that enter the Garrison.

It is the opinion of the SNL review team that all these steps are not justified by the low-probability event of a car or truck bomb attack on USAMRIID. If the intent of the truck bomber were to kill people, he would likely attack a more highly populated and readily accessible target than USAMRIID. If the intent of the truck bomber were to cause destruction and panic, the consequences would not likely be a catastrophic outbreak of infectious disease. A truck bomb would likely destroy HCPTs. If the bombing were to somehow achieve a release of organisms into the environment, the effects of the adverse event could be controlled by medical countermeasures. Comprehensive incident response planning, including a well-defined public relations plan, is the best protection against this low-probability threat.

Because of the low probability of a truck bomb attack on USAMRIID and the extremely high cost to effectively reduce the risk, it is the recommendation of the SNL review team that USAMRIID dedicate its available resources to other more pressing security priorities. To address this type of threat, USAMRIID should conduct and regularly review its incident response planning.

REMOVED FROM PROTECTIVE ORDER NO. 3          ARMY02-010274

**FOR OFFICIAL USE ONLY**

## 2.6    Need for Validation of Threats

USAMRIID should ask appropriate federal, state, and local law enforcement and intelligence agencies to review these threat categories and assumptions. If additional information suggests modification to the categories, a revised threat should be developed and the security systems should be evaluated for effectiveness against the revised threat.

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010275

FOR OFFICIAL USE ONLY

# 3. Facility Description and Vulnerability Assessment

## 3.1   Location and Operations

The U.S. Army Medical Research Institute of Infectious Diseases (USAMRIID) is located within the perimeter fence of Fort Detrick, which is surrounded by the city of Frederick, in the foothills of the western Maryland Catoctin Mountains. Fort Detrick is under the control of the U.S. Army Garrison and is host to several other major installations including the U.S. Department of Agriculture, Agricultural Research Service Foreign Disease-Weed Science Research Unit, the National Cancer Institute (Frederick), the 110th U.S. Army Signal Battalion (which provides critical command and control and satellite communications in support of the DoD and the Joint Chiefs of Staff), and numerous other U.S. Army medical facilities and services.



Figure 1. USAMRIID Building 1425

USAMRIID is an organization of the U.S. Army Medical Research and Materiel Command (USAMRMC), and is the lead medical research laboratory for the U.S. Biological Defense Research Program. As the DoD lead laboratory for medical aspects of biological warfare defense, USAMRIID conducts research to develop vaccines, drugs, and diagnostics for laboratory and field use. In addition to developing medical countermeasures, USAMRIID formulates strategies, information, procedures, and training programs for medical defense against biological threats. USAMRIID plays a key role in national defense and in infectious disease research because it is the largest biological containment laboratory in the DoD for the study of hazardous diseases. USAMRIID investigates naturally occurring infectious diseases that require special containment, and provides a critical capability to the U.S. Army's infectious disease research program as the only DoD laboratory equipped to study highly hazardous viruses at Biosafety Level 4. USAMRIID also operates a world-renowned reference laboratory for definitive identification of biological threat agents and diagnosis of the diseases they produce.

Although the primary focus of USAMRIID is protecting military service members, its research programs have applications that benefit society as a whole. USAMRIID investigators actively contribute to advances in scientific knowledge and collaborate with the Centers for Disease Control and Prevention (CDC) in Atlanta, the World Health Organization in Geneva, and academic centers of excellence worldwide.

Medical products developed at USAMRIID to protect military personnel against biological attack include drugs, vaccines, diagnostic capabilities, and various medical management procedures. These products are intended to eliminate or minimize the effects of disease and preserve fighting strength. Because there are many natural hazardous disease threats that could affect deployment of forces into endemic areas, medical countermeasures for those diseases are studied as well.

USAMRIID has over 10,000 sq. ft. of BSL-4 and 50,000 sq. ft. of BSL-3 laboratory space. The Institute also has a 15-bed research ward where clinical trials of vaccines and drugs are conducted according to rigorous DoD and Food and Drug Administration regulations. Additionally, a special

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3                                    ARMY02-010276

FOR OFFICIAL USE ONLY

BSL-4 patient containment ward is available for medical care of patients who may have been accidentally exposed to infectious agents within the laboratory, or who may have acquired a highly hazardous disease in an endemic area.

The USAMRIID military and civilian staff of 678 includes physicians, veterinarians, microbiologists, pathologists, chemists, molecular biologists, physiologists, and pharmacologists, and a technical and administrative staff necessary to support the research. Current studies include work on improved vaccines for anthrax, Venezuelan equine encephalitis, plague, and botulism, and new vaccines for toxins such as staphylococcal enterotoxins and ricin. Research on medical countermeasures to viral hemorrhagic fevers and arboviral illnesses also is conducted. A significant effort is devoted to developing both laboratory and field diagnostic assays for agents considered to be biological warfare or endemic disease threats.

The staff also includes approximately 70 Medical Research Volunteer Subjects who are essential to the mission and are unique to USAMRIID. The volunteers are highly trained laboratory technicians who have requested the opportunity to participate in clinical trials of vaccines and drugs developed within the USAMRMC. These clinical trials are the first phase of human testing in the long and thoroughly monitored research and development process that leads to approval of a vaccine or drug, and thus to another medical countermeasure to protect U.S. troops.

USAMRIID deploys teams on short notice to train those who are charged with establishing diagnostic laboratories in theaters of combat operations. Other teams specialize in rapid response to investigate disease outbreaks anywhere in the world, and can evacuate patients under BSL-4 isolation using special handling and transportation equipment.

### 3.1.1   Building 1425

Building 1425 is the larger of the two buildings that comprise the USAMRIID complex. It houses the command and administrative offices of the institute, the BSL-4 laboratories and repository, and the larger portion of the BSL-3 laboratory space. The building is very large and mechanically complex. Figures 2 and 3 show the southeast and northwest sides of the building; the main entrance is on the southeast side and the rear entrance is on the northwest side.



Figure 2. Southeast side of Building 1425



Figure 3. Northwest side of Building 1425

The ground floor is approximately 180,000 sq. ft. All of the BSL-3 and BSL-4 containment laboratory space is on the ground floor and is configured as nine major independently controlled suites, the main pathogen repository, and the medical isolation unit—totaling about 42,000 sq. ft. The remaining occupancy is comprised of military and civilian administrative offices: library and auditorium, technical and support staff offices and shops, and the medical wing. A two-story modular

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010277

FOR OFFICIAL USE ONLY

office building and a 2,500-sq.ft walk-in cold storage unit are attached to the central core of the building.

The second floor, approximately 90,000 sq. ft., houses approximately 25,000 sq. ft. of laboratory and office space for the Toxinology Unit and the second floor of the medical wing. The balance of the space, approximately 65,000 sq. ft., houses the fans, filters, compressors, and pumps that maintain and control the containment environment of the building and its laboratories.

Between the first and second floor, and occupying nearly the same total floor space as the first floor, is a 6-ft high interstitial crawl space that contains most of the ductwork and piping associated with the containment suites and the building.

There are two personnel entrances to the building. The main entrance and lobby are located on the southeast side near the south end. The second entrance is at the rear of the building at the midpoint of the northwest side. Both entrances have guard stations from which the glass entry doors can be controlled.

There are two loading docks serving the logistic needs of the building. The main dock is on the southwest end, providing access to the central core between the office wing and the containment laboratory wing. The other dock is on the northeast end centered on the hallway that bisects the containment laboratory wing.

### 3.1.2   Building 1412

Building 1412 is the older of the two USAMRIID buildings. It is a three-story structure plus basement. The construction is heavy concrete frame with concrete and masonry walls. Total floor space enclosed is 69,400 sq. ft., of which 20,800 sq. ft. is BSL-3 containment. One 640-sq.ft-lab inside containment on the first floor is convertible to BSL-4 if required. All air handling, filtration, and conditioning equipment required to maintain containment is located on the third floor, also referred to as the attic.




Figure 4. Southeast Side of Building 1412          Figure 5. Northwest Side of Building 1412

The main entrance is on the southeast side of the building, and opens into a small lobby that provides access to offices on the first floor, and a stairwell leading to the second floor and another suite of offices. Also opening off this lobby are the locker and shower rooms that serve as the only normally used passages to and from containment.

A loading platform on the southwest side of the building leads to a receiving area and an animal housing area. An elevator on the loading platform provides access to a larger animal housing area on

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010278

FOR OFFICIAL USE ONLY

the second floor. At the rear of the building is a downward ramp that leads to a loading dock and a large roll-up door leading into the basement.

The BSL-3 containment extends over the first and second floors and the basement, with the levels connected by an elevator and stairwell inside the containment envelope. Labs and work areas are located on the first and second levels. The basement level has two large autoclaves, one smaller autoclave, and air lock—all opening into a mechanical room and loading dock outside containment.

## 3.2    Existing Security System

USAMRIID is located inside the Fort Detrick perimeter and is therefore provided security coverage and response forces through the Provost Marshal's Office (PMO). Additionally, USAMRIID has an internal security alarm system that covers the two buildings and a separate unarmed guard force that monitors the central alarm-reporting console and patrols the buildings and grounds.

### 3.2.1    Fort Detrick Garrison

USAMRIID is under the jurisdiction of the Fort Detrick PMO, which provides law enforcement response to security incidents and alarms for the entire post. The PMO police force is comprised of DoD police officers that are armed and trained in enforcement tactics. Since the World Trade Center attack on 11 September 2001, the police force has been augmented by a contingent of Military Police reservists from the Washington, DC National Guard. The MPs will eventually leave the post when the declared security condition returns to normal.

The DoD police officers are positioned at the two principal gates to the post. Gate Two (the Main Gate), which is about 200 yards from the USAMRIID complex, is the entrance and exit for most of the vehicular and pedestrian traffic during business hours. Gate Four (Old Farm Gate), also provides vehicular access, and is the only gate through which commercial truck traffic is admitted to the post. Gate Four is closed during off-hours, but the Main Gate is open and manned at all times. Gates One and Three are not currently used. The officers are also responsible for patrolling the five miles of fence that comprises the post perimeter.

The Military Police reservists provide armored vehicle coverage at the gates and patrol the perimeter in military vehicles. They serve as backup for the DoD police.

The PMO, which is near the Main Gate, is the police force command post. The office building houses the front desk, administrative offices, the arsenal, shift briefing room, and the central alarm system, which is a military-specified integrated commercial intrusion detection system (ICIDS). The ICIDS console monitors intrusion detectors throughout the post, which are mostly door alarms, and serves as the central processing point for the access control system. Fire alarms and radio traffic are monitored at separate panels of the console, and the officer on console duty serves as dispatcher for all of these functions.

### 3.2.2    USAMRIID Guard Force

The USAMRIID guard force is composed of uniformed civilian officers augmented by military personnel during high-traffic business hours. The guards, both civilian and military, are unarmed and have no intermediate force weapons.

These security officers monitor the USAMRIID central alarm reporting console and CCTV monitors in the guard post inside the rear entrance of Building 1425. They also man the guard desks at the front entrance to Building 1425 during business hours and the rear entrance at all times. Additionally, they man a post in the Entrance Lobby of Building 1412 during business hours.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010279

FOR OFFICIAL USE ONLY

The central alarm processing and entry control system, which is described in detail below, is not configured to assess alarms in real time, nor is there a graphic interface that shows the origin of an alarm. A text display that identifies the alarm point is the only information available to the console operator.

Because the guards are unarmed, the current practice when responding to an alarm is to first direct another guard to conduct a local assessment and, if necessary, to call the PMO and request armed police response. By remaining at the console and maintaining radio and phone contact with the PMO, the console operator can be actively involved in directing the response team with real-time updates and subsequent alarms. The operator also has access to multiple CCTV cameras, some of which are pan-tilt-zoom capable, which can also be useful in monitoring activity for directing responders.

## 3.2.3    Alarm and Access Control System

The existing alarm and access control system is a combination of an older Monitor Dynamics (MDI) distributed system and a new MDI ULTRAK hybrid distributed system. The new system is being phased in and, at the time of the SNL review, had replaced about 25 to 30 percent of the older system. The ULTRAK replaces all of the older system except for the field devices (card readers, BMS, keypads, etc.). Neither system is interfaced with the video surveillance cameras.



Figure 6. Alarm Display Panel in Building 1425

The existing system (both old and new) has no graphics terminal to quickly alert the guards to the exact location of an alarm. There is also no automatic call-up of an assessment camera to show the guard what may have caused the alarm. When an alarm occurs, notification of the alarm is displayed on a text display. The guard must decide which camera, if any, is capable of assessing the alarm, and then manually call up the correct camera. The USAMRIID security alarms are not automatically sent to the PMO. However, the USAMRIID alarm station has a duress alarm that is directly connected to the PMO that can be used by the console operator to summon police responders.

During several periods of observation by the SNL review team, alarms were acknowledged and cleared as soon as the guard identified the location. No follow-up responses occurred because the guard was confident, through experience, that the alarms were likely false alarms. Additionally, the guard stated that he was generally reluctant to respond and assess alarms because he had been reprimanded in the past for "bothering the doctors."

The existing system is a combined intrusion detection system (IDS) and entry control system (ECS). The architecture combines a "tree" structured polling process with a newer "Ethernet" architecture. Both the new and the older system are subject to extensive buffered "bottlenecks," which can cause significant delays in alarm reporting speed.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3                    ARMY02-010280

FOR OFFICIAL USE ONLY

The SNL review team conducted a few limited tests to verify overall usability of the alarm system. Voice commands using radios were used to start the timing process and a stopwatch to measure elapsed time. Seven alarm locations were tested. Two locations did not alarm at all; one of these two eventually went into alarm but only after many attempts to create the alarm condition. Three locations alarmed after two or three attempts to create the alarm. Two locations alarmed correctly. The alarm reporting time ranged from 1.04 to 5.65 seconds with only 30 samples taken, indicating that the system polling process allows the ECS to significantly interfere with the alarm reporting function, which causes significant delays in the reporting of alarms.

Since the staff was admittedly unfamiliar with the test process, some of the results may have been caused by confusion in the test process. Regardless, the poor results of this limited field test and the staff's unfamiliarity with alarm testing are concerns.

This system clearly has difficulty handling the current alarm and entry control load and should not be considered for any kind of expansion or integration of other monitoring functions.

The following security upgrade contracts are currently in place:

- DAMD17-01-P-0826          Dome Cameras
- GS-07F-7840C               IDS/ECS System Upgrade
- DAMD17-00-P-0144          Maintenance

It should be noted that the maintenance contract calls for a maintenance plan to be provided by the vendor no later than 30 days after receipt of order. At the time of the SNL review, no maintenance plan existed. The contract also calls for preventive maintenance and testing of the entire system on a periodic basis. It is unclear whether the vendor has done any preventive maintenance or system testing; the contractor's work has focused on installing the upgraded system and repairing identified malfunctioning components. This contract should be reviewed to determine how it should be modified or replaced to provide the necessary support.

It is the recommendation of the SNL review team that all contracts for security equipment or enhancements should be suspended until a comprehensive security plan is completed and precise needs and performance standards are identified.

## 3.2.4    Cyber and Information Security

### 3.2.4.1    Objectives of the Cyber Security System

The objectives of the cyber security system should be based on a clear description of the critical information assets that require protection as well as a definition of the threats against which that information should be protected. The cyber security system should effectively protect the integrity, confidentiality, and availability of those data against the defined threats. It should be understood that any computer-based information network, even if well protected, is vulnerable to penetration by very sophisticated, very determined cyber terrorists. In other words, the operator of the cyber system must accept a level of risk. However, prudent steps can be taken to ensure that an effective cyber security system is in place and that critical information assets are not vulnerable to a defined set of cyber threats.

USAMRIID houses several critical information assets that are accessible via the internal network as well as the Internet. These assets fall under the Department of the Army Information Security Program (AR 380-5) as Sensitive Unclassified Information and should be limited to only those with a valid need. These systems include:

- HCPT Database
- Immunization Database

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010281

**FOR OFFICIAL USE ONLY**

- Human Resource Database
- Researchers' files stored on their local systems

The HCPT Database and any new data inventory system developed under the DoD directive 5200.1are required to be highly secure to protect the integrity, confidentiality, and availability of the data stored.

During the site visit and subsequent discussions between USAMRIID and SNL, several threats against USAMRIID's critical information assets were discussed. Of these threats, the following were selected as whom the cyber security system should protect against and still allow a normal working environment.

- Moderately sophisticated attacker from the Internet
- Knowledgeable attacker from within Ft. Detrick
- Knowledgeable attacker from within USAMRIID

### 3.2.4.2    Description of Current System

The U.S. Army Medical Information Systems and Services Agency (USAMISSA) provides all the network services for USAMRIID, as well as for other facilities on post. The Defense Research Network provides the Internet connection to the post (Figure 7). USAMISSA is connected to the post's Internet feed via a Cisco Pix firewall with a limited set of default firewall rules. USAMISSA is responsible for providing the network security from this firewall to all their users. USAMISSA also maintains and stores USAMRIID critical assets on a set of database servers.



Figure 7. Current computer network security design

**FOR OFFICIAL USE ONLY**

30

**FOR OFFICIAL USE ONLY**

USAMISSA provides several physical network segments within the post, including USAMRIID, but they are configured into a single shared network. At USAMRIID, these network segments are connected via managed switches or through wireless access points. All the systems on this network are given the same levels of access to the servers, the Internet, and to each other. The wireless access points are used within the labs where physical cable installation is not possible. The wireless systems are maintained by the USAMRIID information office and USAMISSA jointly. They have a joint plan to install a virtual private network (VPN) client for use on the wireless networks within the labs and connect it to a VPN concentrator on the shared network.

Several USAMRIID researchers remotely share hard drives among their different computers using Windows folder sharing on the network. This allows data to be shared with various researchers as well as from the lab computers to a researcher's desktop.

### 3.2.4.3    Vulnerability Assessment of Current System

An analysis of the USAMRIID/USAMISSA network in its current state shows a number of vulnerabilities. It would appear that the USAMISSA external firewall configuration is not protecting the network from potential problematic Internet traffic. This is evident by the logs provided by a USAMRIID researcher working on the internal network running a personal firewall; they show several network probes from both outside and inside the network IP addresses. Attackers often use these probes to gain information about the inside of the network, but these could be easily blocked by the firewall. Also, several scans were run against the Web server and firewall by SNL on an outside computer. These scans showed several open ports that may be exploited by cyber attackers. Figure 8 shows the results of the scan run on the Web server. Most or all of the ports listed below should not be open on a secured system. As a Web server, this system should not be running telnet, smtp, gopher, nntp, exec, login, shell, or issa unless they are specifically needed and properly configured.



Figure 8. Results of Web server scan by SNL using NMAP

The only type of access control within the USAMISSA shared network is via Windows authentication or by a database (FileMaker Pro) password. On this shared network, these passwords can easily be

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010283

FOR OFFICIAL USE ONLY

stolen and cracked (decrypted) by anyone running a simple program that can be downloaded from the Internet for free. Most of these programs require no special skill to use and will provide the passwords in just a few hours. Any computer on the network that has network-shared folders is at risk of having these folders viewable to anyone else on the network.

The servers that house the critical assets are standard Windows systems that appear to have several unneeded services running and are being used for multiple purposes. Examples of these unneeded services include the print server, the domain name service, file transfer protocol (ftp), and the IIS web server. Any extra software or services running on a computer can often allow an unnecessary opening into the computer that can be used to gain illicit access into the system.

Although the wireless systems do run a risk of wireless network sniffing, the USAMRIID building is not conducive to radio waves, and the antennas used for this purpose are mounted internally. Therefore, it would be very difficult for an individual to network sniff from any significant distance.

## 3.2.5   Personnel Reliability

As indicated in Section 2, small quantities of a high-consequence pathogen can be strategically significant. One viable microorganism can be cultured, weaponized, and deployed with common, commercially available equipment. This circumstance, combined with the fact that pathogens emit so little energy that they cannot be detected at a distance with currently available technology, reveals how easy it would be for an individual with authorized access to a facility to remove a small amount of pathogenic material without raising suspicion. This person could then sell the dangerous pathogens to a would-be bioterrorist or become one himself. In other words, the effectiveness of a security system at a high-containment biological research laboratory will depend first and foremost on the integrity of the individuals who have access to the high-consequence organisms.

At the time of the SNL review, there were 678 USAMRIID employees (256 civilians, 58 military officers, 147 enlisted personnel, and 217 others). The positions at USAMRIID are designated by one of three categories based on the type of information the individual in that position will be required to access:

- Critical-sensitive positions require a Top Secret security clearance
- Noncritical-sensitive positions require a Secret security clearance
- Nonsensitive positions do not require a security clearance

At the time of the SNL review, 13 USAMRIID employees held a Top Secret security clearance and 168 USAMRIID employees held a Secret security clearance. Thus, the overwhelming majority, 497 USAMRIID employees, held no security clearance.

It is important to note that the USAMRIID "position sensitivity roster" was most recently updated in November 2000. The Garrison Personnel Security Office requires that this roster be updated annually to verify that the individuals who hold critical-sensitive and noncritical-sensitive positions hold the correct security clearance.

Because USAMRIID is designated as a "restricted area" at Fort Detrick, every employee is required to have a National Agency check completed. There are three different types of National Agency checks:

- National Agency Check (NAC) SF 86/85P: Access to previous federal investigations and a FBI national criminal history fingerprint check
- National Agency Check with Law and Credit (NACLC) SF 86: NAC plus past five-year law enforcement check, past seven-year credit search of national credit bureaus

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010284

**FOR OFFICIAL USE ONLY**

- National Agency Check and Inquiry (NACI) SF 86/85P/85: NAC plus past five-year law enforcement check, past five-year employment inquiry, past five-year education inquiry, past three-year residence inquiry, reference contacts

Different staff members are subject to different types of background checks. Officers and contractors receive a NAC, enlisted personnel receive a NACLC, and civilians receive a NACI. There are a few security vulnerabilities in this personnel reliability system.

First, the current USAMRIID policy requires that an employee must *initiate* a National Agency check prior to receiving access to the facility and the computer network. Access to the facility can include access to HCPTs. The policy does not require a *completed* National Agency check prior to receiving facility and network access. The NAC process can take from one to eight months. In other words, a new employee may have access to the facility and the computer network for up to eight months before USAMRIID learns that his background check suggests that he may not be a reliable employee.

Second, there is no requirement to renew the NAC as an employee's circumstances change over time or as an employee's responsibilities change. An employee could acquire a criminal record or go deeply into financial debt without USAMRIID officials knowing. Yet either of these changes in circumstances could affect that employee's reliability.

Third, there is no requirement to screen employees for substance abuse with a random breath analyzer test or to subject employees to random drug testing. (Only those employees with security clearances are subject to random drug testing.)

Fourth, there is no requirement for an employee to report foreign influences, such as visits to sensitive foreign countries and interactions with foreign nationals from sensitive foreign countries.

Fifth, although foreign nationals employed at USAMRIID must undergo a NAC, the NAC process is not designed to screen the backgrounds of foreign nationals. Most of the information available through the NAC process is domestically generated. If a foreign national has not lived in the United States for a significant amount of time, there is little likelihood that a NAC screening would identify any derogatory information about that individual. The only foreign nationals at USAMRIID who are reviewed by the Defense Intelligence Agency are the National Research Council fellows. Otherwise, there is no requirement to report the presence of foreign nationals to law enforcement or intelligence agencies, nor is there a requirement to ask law enforcement or intelligence agencies to screen foreign nationals before the facilities grant them access to containment areas.

The personnel reliability program at USAMRIID is dependent on close cooperation and communication between many different offices:

- USAMRIID Human Resources Office, which is responsible for personnel issues
- USAMRIID Security Office, which distributes badges and can limit employee access
- USAMRIID Network Administration, which provides employees' access to the USAMRIID computer network
- USAMRIID Operations Office, which is responsible for coordinating with USAMRIID security and network administration
- Fort Detrick Garrison Personnel Security Office, which processes all NACs and security clearances for USAMRIID employees
- Fort Detrick Garrison International Affairs Office, which is responsible for approving all visits by foreign nationals

Unfortunately, communication among all of these offices has not been consistent or clear. As a result, personnel information available through these offices is often contradictory. For instance, at the time of the SNL review, USAMRIID Human Resources Office, the Garrison Personnel Security Office,

**FOR OFFICIAL USE ONLY**

33

ARMY02-010285

FOR OFFICIAL USE ONLY

and the Garrison International Affairs Office did not have the same information regarding who was working at USAMRIID and what background checks had been completed. An April 2002 DoD Inspector General report indicated a discrepancy between information in the Garrison Personnel Security Office and the Garrison International Affairs Office regarding the number of foreign nationals with access to USAMRIID. Although the discrepancy has been explained and, in the opinion of the SNL review team, does not represent a security vulnerability at USAMRIID, the existence of the discrepancy is a concern.

Based on information obtained by SNL and the USAMRIID Operations Office, neither the USAMRIID Human Resources Office nor the Garrison Personnel Security Office has an accurate roster of current employees at USAMRIID. The USAMRIID Human Resources roster does not list 12 current employees but does list 56 individuals who no longer work at USAMRIID. The Garrison Personnel Security Office roster lists 80 individuals who no longer work at USAMRIID. Additionally, there are 213 employees at USAMRIID who are not listed on the database kept by the Garrison Personnel Security Office. This is a concern because the Garrison Personnel Office is responsible for processing all National Agency checks and security clearances. SNL was able to verify that at least some of these 213 individuals have submitted or completed the required background checks. Yet all of these individuals apparently have access to the facility, which could include access to HCPTs, and its computer network.

Again, the existence of several different personnel rosters does not necessarily represent a security vulnerability, but demonstrates a significant weakness in the overall personnel reliability program. In particular, the absence of a clear set of personnel in-processing and out-processing policies and procedures, to ensure that each relevant office receives timely and accurate information related to personnel changes and can take appropriate action (e.g., grant or discontinue access to the facility and the network), seems to have contributed to this perceived chaos in the personnel system.

## 3.2.6 Material Accountability

USAMRIID has many procedures currently in place that address material accountability issues. The USAMRIID biosafety office keeps a "registration database" that accounts for all pathogens and toxins that are stored and used at USAMRIID. This database tracks the agents according to building location, divisional responsibility, and principal investigator. Each division is responsible for updating its section of the database on a quarterly basis. Unfortunately, the database is not regularly updated; it was noted that many organisms at USAMRIID are currently registered to investigators that no longer work at USAMRIID.

The USAMRIID biosafety office has developed and maintains an internal registration system to ensure that only certain areas of the facility are used for working with certain organisms and vice-versa. It should be noted that the purpose of this registration system is not security but to ensure that individuals working in those areas are properly immunized against the agents in those areas. However, this registration system is an example of how biosafety and biosecurity can complement one another. The registration of certain areas of USAMRIID for the use of certain agents can and should be the basis for the elements of the access control system. Conversely, the access control system can support the biosafety mission by preventing individuals without proper immunizations from inadvertently entering areas that could jeopardize their health.

The USAMRIID biosafety office ensures that USAMRIID complies with 42 CFR Part 72—the Select Agent Rule. All shipments of Select Agents from USAMRIID are documented, both internally and with the CDC. USAMRIID requires a requestor of a Select Agent to complete and submit the EA101 form, justifying the request and indicating how the material will be used, prior to USAMRIID shipping the requestor the Select Agent. The requestor is then expected to notify USAMRIID that the Select Agent shipment has been received. The process for receiving Select Agents at USAMRIID is

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3   ARMY02-010286

**FOR OFFICIAL USE ONLY**

not as carefully controlled by the biosafety office. In those instances, it is the responsibility of the USAMRIID principal investigator (the requestor) to communicate with the institute that will ship the Select Agent, to complete and submit the EA101 form, and verify to the shipper that the Select Agent shipment has been received. It is then the responsibility of the USAMRIID principal investigator to inform the USAMRIID biosafety office that a new organism or strain has been received. This system is only as reliable as the individual principal investigators' willingness to report the receipt of shipments of Select Agents.

It should be emphasized that the Select Agent Rule does not provide for security of select agents while they are being transported from one institution to another. Although the Select Agent Rule assists in tracking the transport of a select agent, it does not provide basic protection of that agent, such as chain of custody, during the transport cycle.

During the fall of 2001, USAMRIID developed a FileMaker Pro database program to account for its six Category A agents (Figure 9). Over the winter of 2001, USAMRIID staff conducted a comprehensive review of its collections of Category A agents. The FileMaker Pro database program was used for this process. Unfortunately, the program is not currently part of an automated, user-friendly system that is available within all of the laboratory suites. As a result, this database has not been consistently used and it has not been completely updated since early in 2002. Additionally, procedures have not yet been established for how often the database will be updated or who will have responsibility for control and oversight of the database itself.



Figure 9. FileMaker Pro Database for Category A Agents

**FOR OFFICIAL USE ONLY**

35

FOR OFFICIAL USE ONLY

### 3.2.7 Shipping and Receiving

Shipping and receiving for the USAMRIID complex is currently handled in the main loading dock area and Rooms 775 and 776 of Building 1425. The procedures that are in place for this activity are both well defined and followed consistently.

#### Receiving

Shipments that are delivered to USAMRIID by truck or commercial courier enter the post through Gate Four, where they are screened by the DoD Police Officers in a designated truck lane. The screening consists of an examination of the delivery documents and periodic use of a dog trained to detect explosives and narcotics. After being screened, the trucks are escorted by a police vehicle to the loading dock gate of Building 1425. Contact is then established between the escort and loading dock personnel, and the truck is handed off to the receiving staff. This procedure is intended to ensure that the delivery vehicle makes no stops between the gate and USAMRIID.

Parcels are off-loaded at the loading dock and moved into the receiving area, where it is determined whether each parcel is a shipment in response to a purchase order, or if it is addressed to a specific person or department. If a parcel is in response to a Purchase Order, it is opened, and the contents are examined and compared to the PO description. If the comparison is favorable, the PO is marked complete and the recipient notified of the delivery. If a parcel is addressed to a specific person or department, and is not in response to a PO, it is placed in a locked cage and the addressee is notified. If there are time or temperature requirements marked on the package, the addressee is so notified, or the parcel is delivered to meet the stated requirements. When the item is picked up at the service counter, custody is officially transferred to the recipient and recorded.


Figure 10(a). USAMRIID 1425 receiving dock (closed gate)


Figure 10(b). USAMRIID 1425 receiving dock

#### Shipping

Outgoing shipments are made from a central shipping facility in Building 249 at the southwest corner of the post. Parcels are delivered to Shipping in Room 775, where they are recorded and packaged. The outgoing packages are picked up in the early afternoon and taken to the central shipping point in Building 249. Using software supplied by the commercial shipper, personnel generate and apply properly marked packing labels to the parcel. If special or expedited handling is called for, the appropriate special markings are applied. The outbound packages for that day are placed on a pallet and picked up by the shipping company truck in late afternoon. Under no circumstances are parcels kept in Building 249 overnight. If special handling conditions cannot be accommodated, the package is returned to the sender for safe keeping until the next day.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010288

FOR OFFICIAL USE ONLY

## 3.3    Summary of Current System Limitations

The current biosecurity system does not adequately protect HCPTs and related information against the defined threats.

**USAMRIID Guard Force and Alarm System**

The USAMRIID guard force is unarmed, not highly trained, and does not function at the professional level commensurate with this type of federal facility. Facility badges at both the front and rear guard posts are within easy reach of visitors. The guards conduct "searches" of bags entering the facility but these inspections are not consistently carried out. This is at least partially the result of poorly configured entrances that are not conducive to rigorous entry control. Nevertheless, it is evident that the guards are unsure of the search objective and have no established procedures in place should they discover a weapon or an explosive. Individual guards often have considerable difficulty manipulating or interpreting the video monitors and alarm system; this may be as much a function of the inadequate alarm system as a lack of proper training. However, the guards regularly ignore many alarms out of fear of upsetting certain researchers.

The access control and alarm system has not been well maintained or adequately tested. As a result, there are many alarm points that do not report in a timely manner or simply do not function at all. It cannot reliably indicate each individual's whereabouts within the facility at a certain time. Because many access control doors remain open for long periods of time and because the system lacks an anti-passback capability, personnel "piggybacking" is common and cannot be controlled. The absence of a graphical user interface for the alarm system makes it difficult for the guard force to assess, interpret, and respond to alarms.

The access control and alarm system is in the process of being upgraded. However, the upgrade is a beta development system and is taking a considerable amount of time to install. The contractor has not provided USAMRIID with final design drawings or system architecture description for the installation.

**Cyber and Information Security**

The USAMRIID computer system exists on Fort Detrick's shared network, administered by USAMISSA. There is a single, shared domain and no isolated network segments. Despite the USAMRIID sensitive information assets and the defined threats, USAMISSA does not properly firewall USAMRIID systems. The firewalls are not adequately monitored and are open to external probing. Additionally, any computer on the network that has network-shared folders is at risk of having those folders viewed by anyone else on the network.

**Personnel Reliability**

Individuals are often given access to the facility, which may include access to HCPTs prior to the completion of a National Agency Check background investigation. Personnel screening does not recur. The communication and coordination between USAMRIID and the Garrison Personnel Security Office should be improved.

**Material Accountability**

Although material accountability at USAMRIID is adequate, the process has not been formalized. Additionally, USAMRIID does not have any chain-of-custody procedures in place for the movement of HCPTs inside the facility but outside the biocontainment areas.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010289

FOR OFFICIAL USE ONLY

**Shipping and Receiving**

USAMRIID has a comprehensive shipping and receiving system that controls incoming and outgoing packages and mail efficiently and effectively. However, the shipping and receiving area is within the USAMRIID facility, and incoming packages are not screened for explosives. The defined package threat makes the current receiving system a vulnerability that will need to be adjusted as long as the threat definition remains unchanged.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010290

FOR OFFICIAL USE ONLY

# 4. Conceptual Design Background Considerations

The following section summarizes a methodology for the design and implementation of an upgraded, integrated, performance-based security system.

## 4.1   Methodology

To develop and implement an effective security strategy, the amount of protection provided to a specific security interest (referred to as a target) and the cost for that protection must be proportionate to the potential impact of loss, destruction, or misuse of the target (referred to as a consequence). This graded approach ensures that targets whose loss would have the most serious impact on national security or the health, safety, and well being of the public or environment are provided the resources to achieve the highest level of protection.

Once targets have been identified, a reasonable statement of possible goals and capabilities of likely threats must be established. These threats are identified in a threat statement that defines what the security system must protect against.

A well-designed PPS should be based on performance criteria (contribution to overall system effectiveness) rather than feature criteria (based only on the inclusion of specific components). For a PPS to perform well, there must be notification that an adversary is present (detection, including assessment), barriers to slow the adversary's progress after detection to achieve the goal (delay), and security personnel to contain the adversary before he can achieve his goal or escape (response).

Detection includes sensing of covert or overt actions, and reporting and assessing the validity of the alarm. In some cases, it is possible to assess an alarm by dispatching a security guard to the alarm location. However, this approach usually takes time, giving the intruder a tactical advantage over the responding personnel and putting them in potential danger. A more secure assessment approach is to employ properly positioned video cameras that view the sensor location or volume. Video recording of the cameras is also required to assure timely and reliable alarm validation. At the very least, video recording should commence immediately upon receipt of the alarm, and should continue for several seconds. The recorded video should be displayed automatically at the AC&D console.

This automatic display of the recording video is critical because the console operator cannot be expected to be watching the assessment monitor at the instant the alarm is received. In some cases, such as the Change Rooms at the containment suite entrances, it is not be acceptable for privacy reasons to mount an assessment camera on the secure side of the sensored door. Instead, pre-event-recording can provide the assessment capability. The assessment cameras operate in a continuous loop-recording mode and, after receipt of an alarm, save the several seconds of the recording before and after the alarm. The console operator is i9mmediately presented with video of the alarm point immediately prior, during, and after the sensor was triggered. This type of pre-event alarm display is the preferred technology for high security systems.

Access control is normally included as part of the detection function, permitting authorized personnel to enter, and detecting, reporting, and restricting entry attempted by unauthorized personnel. The access control system is comprised of two functions: first, a credential reader or biometric function that enables access to authorized personnel, and second, sensors on the doors that make up the access control portal. The credential reading function masks the door sensor alarm signal during an authorized access transaction. Unauthorized passage through the portal doors is annunciated at the AC&D console as an intrusion alarm. Access control is normally achieved with integrated technology.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010291

FOR OFFICIAL USE ONLY

Slowing an adversary's progress is the function of delay and can be accomplished by barriers, locks, and personnel. Delay is measured as the time required for an adversary to defeat the barrier. Delay is measured only after an adversary has been detected. The assumption is that, without detection, the adversary can work uninterrupted and for as long as necessary to defeat the delay mechanism. Without knowledge of the presence of the adversary, security personnel are not dispatched to respond, so the delay mechanism provides no value.

Response is defined as actions taken by security personnel to contain the adversary and prevent the adversary's escape. The response time is the time required for sufficient numbers of security personnel to effectively deploy after an intrusion has been detected and for them to interrupt the adversary.

## 4.2   Strategy

Ideally, every PPS would integrate all critical security system elements and support them not only with required maintenance, operations, and security force personnel but also with appropriate policies and procedures. To integrate these elements into a comprehensive security system to *prevent* unauthorized access to pathogens against an armed individual or group would result in a very high cost.

The primary security objective identified by USAMRIID is to protect the defined targets against USAMRIID-designated threats, impacting operations only to the level required, and not unnecessarily hindering the laboratory's primary research mission. USAMRIID was responsible for clarifying exactly where all HCPTs are stored, used, or transported within its facilities. As a general rule, physical security upgrades that focus on the target material provide the highest initial impact in risk reduction.

Protecting USAMRIID HCPTs against diversion requires that the site develop security programs designed to:

- Reduce the likelihood that an insider with authorized access to the designated biosafety containment areas would be inclined to commit a malevolent act;
- Detect that an unauthorized insider is attempting to gain undetected access to the designated biosafety containment areas;
- Significantly reduce the likelihood that an outsider could gain undetected access to the designated biosafety containment areas and escape with a HCPT.

This security design strategy could be described as "detect and deter" applied to the insider and "detect and contain" applied to the outsider.

### 4.2.1   Outsider Protection

Outside adversaries can employ force, stealth, and deceit tactics to achieve their goals. Using force, an adversary makes no attempt to conceal acts or intention; the adversary simply overwhelms the system and personnel. Using stealth, the outside adversary attempts to enter the facility undetected to accomplish his goal. An adversary using deceit will attempt to accomplish his goal under the guise of authorized access through the use of forged credentials or other methods. Obviously, a sophisticated and well-trained adversary could employ a combination of all three tactics.

A PPS to prevent an armed outside adversary from using force to gain access to pathogens is achievable, but at a substantial initial fixed cost and continuing life-cycle costs. Prevention of access to or escape with HCPTs by armed terrorists or criminals requires larger numbers of security personnel than adversaries. Additionally, the security personnel must be at least as well armed as the adversaries. To achieve this level of response, the security system must include effective intrusion

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3   ARMY02-010292

FOR OFFICIAL USE ONLY

detection and assessment systems. These features generally consist of a fully sensored, lighted, and video assessed double or triple fenced perimeter intrusion detection system located at a significant distance from the building or buildings housing the assets. This instrumented perimeter is intended to give sufficient early warning of an attack to allow response forces to commence deployment before the intruders can reach the buildings. The buildings, entrances, windows, and other openings must be of robust construction to further impede an adversary after detection, thus providing sufficient time for the armed security response forces to assume positions. It is unlikely that such a costly system could be justified for protection of USAMRIID assets.

Resources available to protect USAMRIID are finite, so the decisions as to what security technologies to employ and where to employ them must be carefully considered. An affordable security system can be designed to provide reasonable precautions to defend against the tactics of stealth and deceit employed by an outside or inside adversary and to summon appropriate law enforcement assistance upon detection.

The USAMRIID strategy to protect against an outsider is to detect as quickly as possible any unauthorized access to the biosafety containment areas through likely avenues of approach. Likely avenues of approach include doors, windows, and other openings that serve as normal access to the building interior and within the building. Accordingly, security areas have been identified and established to restrict access to only authorized personnel. The exterior of a building constitutes the initial protection boundary. A first level of access control and intrusion detection on doors will be associated with this perimeter. Assessment of intrusion detection alarms will be accomplished both by CCTV assessment cameras, where appropriate, and by a dispatched guard.

Higher security areas that contain HCPTs will be fully enclosed within the access controlled building perimeter, will have additional access controls to further limit access, and will have more comprehensive intrusion detection and assessment capabilities than those areas that do not contain HCPTs. The exterior of a building may serve as both the initial security perimeter and the boundary for a high-consequence containment location. In these situations, some modifications will be made to make it more difficult to gain forcible entry through the building perimeter (e.g., windows) and directly into the containment location or by installation of volumetric intrusion detectors. Although forcible entry through the walls or roof is possible, such entry could not be made quietly and would be detected if (1) employees were present, (2) employees reentered the area, or (3) random guard patrol entered area. Forced entry may damage or release HCPTs.

Once an intrusion is detected, law enforcement personnel can be summoned while appropriate on-site, armed guard response is initiated to either apprehend or contain the intruder(s).

This strategy does not provide early warning to interrupt armed attackers from gaining access to the buildings. The design must therefore ensure the survival of the armed guard force to track the attackers within the building and to position them in conjunction with the responding police force to prevent escape from the premises. The objective of the strategy is to prevent the outsider from escaping the facility with an HCPT.

## 4.2.2   Insider Protection

Insiders have unique access, authority, and knowledge of operating procedures. It is difficult for a physical security system to prevent diversion of microorganisms by insiders. Detailed accounting for individual microorganisms is unachievable and this fact underscores the need for a personnel security program for anyone with access to HCPTs.

Physical security protective elements are incorporated to impose strict access control measures on areas containing HCPTs. Additional access control measures are imposed on those areas of the buildings that surround the containment suites. The access control system is designed to enforce

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010293

FOR OFFICIAL USE ONLY

valid, sequentially defined access control transactions into areas that approach the containment suites and upon entrance to and exit from containment suites. These transactions are continuously monitored and logged to detect and report violations of containment security procedures. The access control system is designed to detect unauthorized access into designated containment areas by insiders and outsiders, and deter security violations by insiders.

Appropriate material control measures (e.g., chain of custody), and cyber security are also incorporated with access control and personnel security strategies for protection against a malevolent insider. The personnel security strategies begin with careful selection of personnel, which should include a reliable background investigation and periodic background investigation updates. Some high-security environments also have continuing human reliability programs that include supervisory training, annual physical examinations, random drug screening, and yearly updates of financial histories. Insider strategies also include strict escorting procedures.

### 4.2.3   Continuity of Operations

The secondary objective of the security system is to maintain the continuity of operations against defined threats to lower-consequence target assets. This objective involves avoiding the disruption of services, such as electricity, heat, water, waste removal, and communications. The consequences of a disruption of one or more of these services would vary in severity and duration depending upon the location and method of attack.

The nature of the defined threat dictates that the protection strategy for USAMRIID continuity of operations is to mitigate the severity of the event through response and recovery options planning. If the threat assessment were modified to include a more sophisticated and determined outsider threat, USAMRIID would have to invest heavily in infrastructure improvements, intrusion detection and assessment systems, increased structural delay, and a larger response force to protect continuity of operations. As discussed earlier, it may be impossible without the investment of extraordinary resources for USAMRIID to adequately protect against a sophisticated and determined outsider threat.

USAMRIID should continue to review the protection strategy for continuity of operations that would identify possible recovery options in the event of loss of power, water supply, waste removal, or communications.

### 4.2.4   Graded Physical Protection

The physical security system at USAMRIID should provide graded protection in accordance with the importance of the assets that require protection. USAMRIID has decided that the protection of high-consequence pathogens and toxins and information related to HCPTs will be given a high level of protection. Protection of other interests should have lower levels of protection.

Certain risks must be accepted (i.e., that actions cannot be taken to reduce the probability or consequences of all malevolent events to zero); however, an acceptable level of risk should be determined based on evaluation of a variety of facility-specific goals and considerations. This evaluation should be part of the USAMRIID physical security plan, which did not exist at the time of the SNL review. The physical security plan should describe, justify, and document the graded protection provided to HCPTs and information related to HCPTs. The plan should be reviewed and updated annually.

Using a graded approach to physical protection, USAMRIID should consolidate HCPTs within its facility as much as possible; concentrate intrusion detection and assessment systems at the locations where HCPTs are stored and used; and rigorously control access to these locations. To maintain

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010294

continuity of operations, the protection strategy should be to mitigate the severity of the event through response and recovery option planning.

### Security and Restricted Access Areas

The heart of the PPS should be controlling access into defined areas to certain authorized individuals with a valid need for access. An individual who does not have authorized access into a certain area should be escorted at all times by an authorized individual. Appropriate escort-to-visitor ratios should be established by the USAMRIID administration.

In addition to access controls, means should be provided to deter and detect unauthorized intrusion into limited, exclusion, and special exclusion areas, as defined below. Means include use of intrusion detection sensors and alarm systems, random patrols, and/or visual observation. The protection program should include suitable means to assess alarms. Access control and intrusion detection should be administered by protective personnel and/or automated systems.

### Property Protection Area—Lowest Level of Protection

A property protection area is a security area established to protect against damage, destruction, or theft of DoD-owned property.

### Limited Area—Intermediate Level of Protection

A limited area is a security area with barriers that identify its boundaries and encompass the designated space, and also has access controls in place to provide reasonable assurance that only authorized personnel are allowed to enter and exit the area without escort. Access to a limited area should require a unique item (i.e., proximity card) and an appropriate level of intrusion detection. Sufficient lighting should be provided to allow the protective force to assess intrusions.

### Exclusion Area—Next to Highest Level of Protection

An exclusion area, like a limited area, is a security area with barriers that identify its boundaries and encompass the designated space, as well as access controls to provide reasonable assurance that only authorized personnel are allowed to enter and exit the area without escort. Additionally, access to an exclusion area shall require a unique item (i.e., proximity card) *and* unique knowledge (i.e., personal identification number [PIN]), and an appropriate level of intrusion detection.

### Special Exclusion Area—Highest Level of Protection

A special exclusion area includes all of the features of an exclusion area but provides a higher level of access control. A special exclusion area is a security area with barriers that identify its boundaries and encompass the designated space, as well as access controls to provide highly reliable assurance that only authorized personnel are allowed to enter and exit the area. Access in and out of a special exclusion area shall require a unique item (i.e., proximity card) *and* unique knowledge (i.e., personal identification number or biometric identity verification). Locations in which HCPTs are stored and used are special exclusion areas.

## 4.2.5   General Considerations

An essential aspect of a security system design is that it must not unduly hinder the normal operations of the site. Most security measures introduce some level of inconvenience into the existing work environment, but yield benefits in personal security and safety, material accountability, and property control. Security-related impositions may increase some task times, and security equipment, personnel, and maintenance can be expected to add to recurring operational costs.

Several assumptions regarding proper operation of the security system were made when developing the design. These assumptions require careful review because the overall effectiveness of the security system will be seriously degraded if these assumptions are incorrect.

REMOVED FROM PROTECTIVE ORDER NO. 3   ARMY02-010295

FOR OFFICIAL USE ONLY

- USAMRIID will have a comprehensive biosecurity plan.
- USAMRIID will have a dedicated security operations manager, who is knowledgeable about the USAMRIID security system and responsible for maintaining both its technical elements and enforcing its associated policies and procedures.
- USAMRIID will have a dedicated "biosurety" manager, who is responsible for overseeing the personnel reliability program and material accountability initiatives.
- USAMRIID will have a dedicated cyber and information security professional who is responsible for overseeing network security.
- USAMRIID will have at least one security guard serving as the dedicated console operator, who will monitor the security system 24 hours a day, every day of the year. He/she will be responsible for ensuring that alarms caused by the security system are assessed.
- USAMRIID will have a trained, armed, and adequately staffed security guard force that can assess and respond to security system alarms.
- USAMRIID will be able to rely on the timely and effective response of the Garrison Police Force in the event of a security breach that the on-site guard force alone cannot address.
- The security system will be physically separate from, and not built into, the existing environmental monitoring system.
- The security system components will have a power supply that cannot be interrupted (i.e., uninterruptible power supply [UPS]), capable of supplying emergency power for a minimum of eight hours, or until contingency plans are in place.

REMOVED FROM PROTECTIVE ORDER NO. 3          ARMY02-010296

FOR OFFICIAL USE ONLY

# 5.    Conceptual Design Elements

The conceptual design elements include a biosecurity plan, personnel reliability, material accountability, shipping and receiving, cyber and information security, a perimeter system, response forces, an alarm and access control system, procedural requirements, programmatic security training and oversight, and incident response planning. All of these aspects must be integrated to achieve an effective biosecurity system.

## 5.1    Biosecurity Plan

USAMRIID should develop and document a comprehensive biosecurity plan. The biosecurity plan should describe in detail all the objectives, strategies, elements, and procedures associated with the site's biosecurity system. The biosecurity plan should address physical protection, personnel reliability, programmatic security training and oversight, pathogen accountability, information security, transportation security, and incident response planning (including public relations). The physical protection portion of the security plan should describe, justify, and document the graded protection provided to HCPTs and indicate how the system will deter, detect, respond to, and contain unauthorized access to HCPTs. The plan should be reviewed and updated annually. The conceptual design presented in this report may need to be reviewed and revised based on the completed biosecurity plan.

## 5.2    Personnel Reliability

The U.S. Army has distributed interim guidance on establishing a Biological Personnel Reliability Program (BPRP).[61] The U.S. Army intends for the BPRP to apply to individuals who have or require access to Category A agents. Among the suggested elements of the BPRP are a valid personnel-screening investigation less than five years old; an evaluation of the person's physical and mental capability and mental reliability; and initial and random urinalysis testing. Foreign nationals from countries designated as proliferators of weapons of mass destruction by the Department of State are precluded from BPRP-designated positions. A commander or facility director must determine that it is in the best interests of the United States for a foreign national to occupy a BPRP-designated position.

The DoD draft directive is even more restrictive, indicating that only U.S. citizens with a current NACLC, who are emotionally stable, physically fit, trustworthy, and adequately trained should have access to Select Agents at DoD facilities.[62]

The U.S. Patriot Act of 2001 has frequently been cited as establishing a requirement to prohibit *all* foreign nationals from having access to Select Agents. In fact, the Patriot Act only prohibits aliens illegally or unlawfully in the United States or foreign nationals from countries that sponsor terrorism from shipping, transporting, possessing, or affecting commerce in Select Agents.[63] It does not prohibit all foreign nationals or foreign nationals from all WMD proliferation states from working in biomedical research laboratories that store and use Select Agents.

Regardless of how DoD and U.S. Army personnel reliability policies evolve, USAMRIID should improve its personnel screening procedures, particularly for those individuals who have access to HCPTs. It is critical that the personnel screening process is both comprehensive and timely. Moreover, the reliability program must establish a mechanism to review the individual's background periodically or at least whenever job functions or responsibilities change.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010297

FOR OFFICIAL USE ONLY

### Recommendations for Personnel Reliability

Implementing the following recommendations would significantly strengthen the USAMRIID personnel reliability program:

1. Unescorted access to areas that store and/or use HCPTs should be based on a *completed* NACI check.
2. Employees with access to HCPTs should be required to update their NACI screening regularly or when their job responsibilities change.
3. Employees with access to HCPTs should be subject to an initial and random substance abuse screening.
4. Employees with access to HCPTs should be required to report foreign influences, such as visits to sensitive foreign countries and interactions with foreign nationals from sensitive foreign countries.
5. USAMRIID should require that federal law enforcement and/or intelligence agencies, as well as the Immigration and Naturalization Service, screen foreign nationals prior to granting access to the facility or the network.
6. USAMRIID should establish specific rules for allowing and/or restricting access by foreign nationals into its laboratories. The USA Patriot Act prohibits "restricted persons" from shipping, receiving, transporting, or possessing any organism on the Select Agent List.[64]
7. USAMRIID and the Garrison should establish a procedure to ensure consistency in personnel rosters and records to preclude personnel discrepancies.
8. Specific policies and procedures should be established for personnel in-processing and out-processing.
9. Specific rules should be published and distributed related to proper escorting procedures, visitors, prohibited items, and random entry and exit searches.
10. USAMRIID should update its "position sensitivity roster" on an annual basis.

## 5.3   Material Accountability

Material control and accountability are traditionally elements of insider security. Often referred to as "inventory control" in nuclear materials security systems, this process relies on the ability to state exactly how much of the target material is present in the facility at a certain time. Yet at a biological research facility, infectious material cannot be measured and may be found at any time in a wide variety of places, such as a storage freezer, a laboratory incubator, a living animal, an animal's excrement, or an animal carcass.

For this reason, effective implementation of material accountability activities *for the purpose of providing security* is fraught with problems in the biological environment. It is not physically possible to measure the amount of any one pathogenic organism present at USAMRIID at any one particular time. Moreover, it is not possible to quantify the rate of growth or decay of these organisms; bacteria and viruses grow at various rates depending on their genetic makeup, the reagents or other material used to supplement their growth, and the environment in which they are grown.

Although vials of pathogens in storage freezers can be counted, inventory control will not detect or deter the diversion of an HCPT. Additionally, a rigorous biological inventory control system, monitored by regular and random audits and a compliance process, may have more detrimental than positive outcomes.

First, even if the number of vials in the inventory were correct, an insider could remove a sample, amplify it, divert the amplified portion, and return the original amount to the freezer.

Second, it is generally recognized that an inventory at a biomedical research laboratory can only be imposed on the "repository collection" or the "reference stocks" of HCPTs. Yet these collections do

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3   ARMY02-010298

FOR OFFICIAL USE ONLY

not represent the entire amount of HCPT in the facility; an insider could divert an HCPT from the "working stocks" without affecting the repository's inventory.

Third, an inventory compliance investigation could identify discrepancies in the inventory that have nothing to do with diversion; HCPTs can self-replicate and degrade in ways that an inventory system cannot anticipate or account for. The institution may have difficulty explaining these inventory discrepancies to authorities, who may not be familiar with microbiology.

Fourth, until a largely automated inventory system is viable, many research scientists—frustrated by the new administrative obligations, confused by the absence of a rationale for keeping a vial-by-vial inventory, and fearful of being falsely accused of diversion—may take steps to circumvent the administrative controls. Based on SNL's conversations with many USAMRIID researchers, it is fair to assume that a principal investigator could fairly easily establish *two* "reference stocks": one that he/she would inventory and never disturb, and a second exact replica that he/she would use in his/her daily research. An auditor would not be able to discriminate between the duplicate reference collection and the investigator's "working stocks." If a new HCPT were brought into the lab, it could be added to the inventory and the duplicate reference collection at the same time. In this circumstance, the inventory system would be nothing but "smoke and mirrors," providing only the perception of protection and requiring an expenditure of significant resources.

### Recommendations for Material Accountability

1. Annual accounting of HCPTs

    It is politically and administratively important for USAMRIID to know what HCPTs it has in its facility, where in the facility those HCPTs are in use, who has access to those HCPTs, and who has oversight responsibility for those HCPTs. For that reason, USAMRIID should initiate an annual accounting of its HCPT collection and should establish a reporting system for the arrival of any new strains of an HCPT. It should be made explicitly clear that this accounting system would serve an important administrative function, but not necessarily a security function. If it is described as a required security measure, USAMRIID staff members will recognize that it does not provide security. This will make it considerably more difficult to generate support from the scientific staff for the overall security program.

2. HCPT chain-of-custody procedures

    The most important material accountability step that USAMRIID can take to improve the security of HCPTs in its facility would be to establish a chain-of-custody system for HCPTs. Frequently, HCPTs are moved within the facility from one biocontainment suite to another, from a biocontainment suite to the Radiation Protection Office and Irradiation Room, or to and from the shipping and receiving areas. Occasionally, HCPTs are moved from Building 1425 to Building 1412. Yet there are no procedures in place that document these transfers outside of containment.

    The conceptual security design presented in this report relies on a rigorous access control system into and out of the biocontainment suites where HCPTs are stored and/or used, supported by a personnel reliability program for those personnel with unescorted access into those HCPT biocontainment suites. Once an HCPT is removed from the HCPT biocontainment suites and into an area that is not as rigorously access controlled as the biocontainment suites, the security design is vulnerable. For instance, virulent and viable organisms are occasionally left unattended in dunk boxes on the outside of the biocontainment suites (Figure 11), awaiting retrieval to be taken to the Radiation Protection Office for destruction. These dunk boxes are not locked or access controlled. Procedures must be established so that HCPTs outside of the biocontainment suites are in constant physical custody of an individual who has been granted unescorted access to those particular materials.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010299

FOR OFFICIAL USE ONLY

There are specific containers for transferring organisms inside Building 1425 and between Building 1425 and Building 1412 (Figure 12). Yet, there is no requirement to use these containers at USAMRIID; some researchers use them, some do not. Consideration should be given to requiring that these containers be used and locked for HCPT transfers outside the biocontainment suites. It would not be necessary to impose this security measure on transfers of non-HCPTs within USAMRIID.



Figure 11. Internal transport container



Figure 12. Dunk box on a biocontainment door

3.   HCPT transport security procedures

Although outside the scope of this facility-specific assessment and design, USAMRIID should consider developing measures to secure HCPTs that are shipped out of USAMRIID. There are rigorous biosafety packaging standards for shipping infectious organisms, but these steps do not secure the organisms from diversion during the transportation cycle. Inexpensive, passive tamper-indicating tags and seals could be used on certain packages of HCPTs but would provide no assurance against diversion. More expensive active seals and tags, which would send out a signal if the package were tampered with, could also be considered for certain shipments. Small tracking devices, using global positioning satellite technology, could also be used to monitor the shipment of a high-value, very high-consequence agent in real time. It would not be necessary to impose these security measures on shipments of non-HCPTs.

## 5.4   Shipping and Receiving

To address the existence of a package bomb in the threat definition, the conceptual design includes a requirement to move the USAMRIID receiving area to an off-site location. It is recommended that all incoming USAMRIID packages be delivered to an area, such as the central shipping facility in Building 249, prior to their shipment to USAMRIID. Screening for explosives could be done at this off-site location. USAMRIID should ensure that the explosive screening that takes place at this location does not harm or otherwise negatively affect shipments of organisms.

After the packages are screened, they can be delivered to USAMRIID by a USAMRIID vehicle operated by a USAMRIID employee. This arrangement would also significantly reduce the amount of commercial vehicle traffic to USAMRIID and thus better protect USAMRIID against the car or truck bomb threat as well. Clear procedures will need to be written for screening the packages at the off-site location, for securing the packages while they are at the off-site location, and then transporting the packages from the off-site location to USAMRIID.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010300

FOR OFFICIAL USE ONLY

## 5.5    Cyber and Information Security

It is imperative that the level of security of USAMRIID cyber assets be improved. Today USAMISSA is responsible for the protection of these assets. Certain network modifications could dramatically improve the level of security of USAMRIID assets. Below are two different network models that would enhance the networks security and greatly reduce the risk to the critical assets. The first model would require USAMISSA to modify its network design, but would provide a less complicated system in the long term. These modifications would provide protection from the Internet and knowledgeable attackers within the post's network. This model also resembles a more standard network layout. The second model could be enforced within USAMRIID solely without any modifications by USAMISSA. It would provide protection from all users on the post, users internal to USAMRIID, and the Internet, but it would be more complicated to configure and maintain. Both models would provide a dramatic increase in the level of protection of USAMRIID cyber assets.

### 5.5.1 First Cyber Security System Design Option

The overall firewall and network security at USAMISSA should be improved to protect USAMRIID-defined information assets against USAMRIID-defined cyber threats. USAMISSA can isolate USAMRIID from the other systems on post by creating a private network (Figure 13).



Figure 13. First proposed network modification option

This can be done using the managed switches and firewalls that are already in place or by adding an additional firewall/router between the USAMRIID private network and the rest of the post. Additionally, USAMISSA should consider migrating from Windows-based authentication to a more

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3    ARMY02-010301

**FOR OFFICIAL USE ONLY**

secure and robust network authentication protocol system such as Kerberos. The following steps should be taken to fulfill the first cyber security system option:

- USAMRIID servers should be moved to a private network and any unneeded computer services should be removed. Ideally, the systems should only be running the required programs, such as the database and essential network services. If possible, these servers should also be physically located at USAMRIID. There should be no other access into these systems. This network can connect to the USAMRIID network via a firewall. Users with specific needs to access these severs can obtain access through the firewall, but users with no server requirements are not allowed.

- USAMRIID should install a Network IDS on the private network and monitor all the logs to understand what type of network traffic is expected on the network and be able to detect any unusual activity. An additional IDS should also be installed and monitored on the post's network outside of USAMRIID.

- USAMRIID should continue to use VPNs to connect from the wireless networks to the other systems; this will reduce the ability to wirelessly sniff network data. Additionally, incorporating the MAC address access control available on the 802.11B systems will make the wireless connection as secure as a hardwired connection.

- The email server and other Internet resource servers should be moved to a separate network off the main firewall. The access rules between this network and the others should be very specific to only allow the necessary access out of this network. All email traffic should be considered open to the public and any messages containing sensitive information should be encrypted.

- Shared folders on a researcher's computer should be configured to allow connections to and from specific computers.

- All the server's backup media (tapes, CDs, floppies) should be stored and locked at USAMRIID and stored separately from the physical computer.

- A detailed security policy should be designed and enforced that includes desktop and network security policies. This security policy can be appended to the current "proper use" guidelines and should include all requirements, including password length, timeframe for generating new non-word passwords, operating system patches, allowed or prohibited programs, antivirus software, and any other system specific security requirements.

**FOR OFFICIAL USE ONLY**

50

FOR OFFICIAL USE ONLY

## 5.5.2 Second Cyber Security System Design Option

If USAMISSA is not able to make changes to enhance the network as a whole, USAMRIID must make modifications to enhance the level of security at the desktop (Figure 14).



Figure 14. Second network modification option

Because the USAMISSA-provided local area network (LAN) cannot be trusted in its current configuration, each desktop will require its own security system. This system should be comprised of three components: a personal firewall, antivirus software, and VPN software. The following steps should be taken to fulfill the second cyber security system option:

- A personal firewall with performance characteristics comparable to ZoneAlarm Pro is recommended as it allows for a centrally managed system that will work jointly with most antivirus software. All systems will require a personal firewall, except for systems that do not store research data, do not connect to the servers, or do not have sensitive data. All systems will require some form of antivirus software, preferably software that is centrally managed and auto-updating. These firewall/antivirus programs can be fairly inexpensive, ranging from $15 to $50 per user. Each server will also require a firewall. The server firewall can be the same type of personal firewall as the users and also be centrally managed, but will have a more robust set of rules.
- As an additional level of protection, any system connecting to the servers should use a VPN tunnel as well as the firewall to protect all data storage and transmission. A VPN tunnel will protect the data as it is transmitting to and from a user to the server; this will enhance the data's integrity as well as its security. However, this can be a large network administration

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010303

FOR OFFICIAL USE ONLY

task, as hundreds of VPN connection rules will need to be managed. It may also be quite costly.

- Any researcher's shared network hard drive will require a specific firewall rule to allow it to connect and be connected to by a specific system. A VPN tunnel should be considered for this as well.
- USAMRIID should install a Network IDS on the private network and monitor all the logs to understand what type of network traffic is expected on the network and be able to detect any unusual activity. An additional IDS should also be installed and monitored on the posts network outside of USAMRIID.
- USAMRIID should continue to use VPNs to connect from the wireless networks to the other systems; this will reduce the ability to wirelessly sniff network data. Additionally, incorporating the MAC address access control available on the 802.11B systems will make the wireless connection as secure as a hardwired connection.
- The email server and other Internet resource servers should be moved to a separate network off the main firewall. The access rules between this network and the others should be very specific to only allow the necessary access out of this network. All email traffic should be considered open to the public and any messages containing sensitive information should be encrypted.
- Shared folders on a researcher's computer should be configured to allow connections to and from specific computers.
- All the server's backup media (tapes, CDs, floppies) should be stored and locked at USAMRIID and stored separately from the physical computer.
- A detailed security policy should be designed and enforced that includes desktop and network security policies. This security policy can be appended to the current "proper use" guidelines and should include all requirements including password length, timeframe for generating new non-word passwords, operating system patches, allowed or prohibited programs, antivirus software, and any other system specific security requirements

## 5.6   Graded Physical Security Design

At USAMRIID, the property protection area should be defined by the Fort Detrick perimeter fence line and boundary. Entry controls in and out of the Fort Detrick perimeter would not change from their current application.

The Limited Area includes the following specific areas.

- Building 1425
  - o   The front half of the building, which is predominantly administrative offices
  - o   Administrative and staff office area in the rear of the building
  - o   Basement under the medical wing
  - o   Mechanical spaces in the attic
- Building 1412
  - o   Administrative and staff office area
- The courtyard between Building 1425 and Building 1412 that would be defined by a new 8-ft standard security fence

The Exclusion Area includes the following specific areas.

- Building 1425

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3                    ARMY02-010304

FOR OFFICIAL USE ONLY

- o   The rear half of the building, not including the administrative and staff office areas
- o   Second floor Toxinology wing
- o   Interstitial space
- • Building 1412
  - o   Mechanical spaces in the attic

The Special Exclusion Area includes the following specific areas.

- • Building 1425
  - o   BSL-3 and BSL-4 containment suites
  - o   Hallway storage
  - o   Special Pathogen Sample Testing Laboratory
  - o   Toxinology storage room
  - o   Radiation Protection Office
- • Building 1412
  - o   Biocontainment area

## 5.7    Exterior Protection

## 5.7.1 Perimeter Fence and Entry Points

The conceptual design recommends that a standard eight-foot chain-link fence with three-strand in-riggers be installed to enclose the area between Buildings 1425 and 1412. This would not be a high-security fence with intrusion detection sensors and cameras as described in Section 4.2.1, and thus it should not be viewed as a mechanism to protect USAMRIID against a determined outside adversary. Instead, the purpose of the fence would be to define the boundaries of the USAMRIID security area and to discourage casual access to the exterior of Building 1412, the rear entrance to Building 1425, and the courtyard between the two buildings. In addition, the fence could provide a small level of protection for the movement of HCPTs from Building 1425 to Building 1412. The area inside of the fence would be considered a limited area, comparable to the administrative and staff areas in the front of Building 1425.

The fence would attach to the southwest wall of Building 1425 just to the northwest of the main shipping dock. The fence would run along the northeast side of Randall Street to Sultan Drive. It would then run northeast along the southeast side of Sultan Drive, enclosing Building 1412. A fence currently exists along the southeast side of Sultan Drive behind Building 1412. The new fence could connect to that existing fence. The fence would then run southeast along the old fence line (between the current line of lampposts and line of trees). The fence would enclose the driveway that bends around the north corner of Building 1425, but not enclose the new storage building. It would attach to Building 1425 on the northeast side of the building directly to the southeast of the transformer area (or to the fencing that already exists on that side of the building). The fence would not extend around the front side of Building 1425.

The main entry point in the fence line would be on the west corner of Building 1425, where there is currently a vehicle access point and an unused guard shack. This entry point would be for both pedestrians and vehicles. The vehicle access gate would be operated remotely by the USAMRIID console operator upon approval by one of the roving guards. A call box will be provided to call the console operator who would dispatch the roving guard to the gate. The only pedestrian access through

REMOVED FROM PROTECTIVE ORDER NO. 3                    ARMY02-010305

FOR OFFICIAL USE ONLY

the fence would be at this entry point. The pedestrian access point would have a two- or four-lane turnstile that would only be activated with a proximity card. Employees would have to swipe their proximity cards on entry and exit. Figure 15 shows the approximate location of the recommended fence and entry points. The fence would also have a vehicle entry point at the road that runs between Buildings 1412 and 1414. This vehicle gate would be unmanned, but would be remotely operated by the USAMRIID console operator upon approval by a roving guard dispatched to the gate.



Figure 15. Proposed limited and exclusion areas for the first floor of Building 1425

FOR OFFICIAL USE ONLY

54

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010306

FOR OFFICIAL USE ONLY

## 5.7.2 Building Entrances

Because the threat definition includes an outsider armed with a semiautomatic weapon up to 7.62 caliber, and because no early detection capability is provided to warn of an armed attack until the adversaries reach the building entrances, the conceptual design recommends the hardening of four specific areas: the front and rear entrances to Building 1425 including the guard posts inside these two entrances, the main entrance to Building 1412, and the guard shack that will be next to the pedestrian and vehicle entry in the fence line. These three entrances and the guard shack should be hardened to withstand a 30-caliber ball ammunition. The guard stations inside these entrances and the alarm monitoring console area should be hardened to withstand 30-caliber ball to ensure survival and continued effectiveness of the guards during an armed attack. It is essential that the alarm station console operator is able to remain at his station during any security incident to provide continuing direction to response forces by relaying subsequent alarms and information received from assessment video and surveillance cameras. It is recommended that the alarm console and its associated communication equipment be located in a hardened room adjacent to but separate from the guard post at the rear entrance of Building 1425. Besides providing protection from hostile fire or forced entry, a separate hardened room will minimize distractions while on duty at the console. Adjacency to the guard station will facilitate duty rotation at the console.

In addition, it is recommended that a two-door mantrap entry system, with video capability between the two doors, be installed at the entrance of Building 1412. This mantrap system is described in Section 5.9.4.2, and is recommended to allow authorized access to Building 1412 during off-hours without providing a manned guard post at this entrance.

## 5.8   Response Forces

The conceptual design recommends that USAMRIID have seven trained, armed guards on duty during regular hours, and four trained, armed guards on duty during off hours. The guards need to be trained and qualified to carry and use semiautomatic weapons and ideally would have arrest authority. All guards would carry duress alarms.

During regular hours, one guard would be on duty at the vehicle/pedestrian guard shack on the fence line, two guards would be on duty at the front entrance to Building 1425 (one for visitor entry and one for employee entry), two guards would be on duty at the security desk at the rear of Building 1425 (one for employee entry and one to monitor the alarm system), and two guards would be available to patrol the grounds and respond to alarms.

During off hours, two guards would be on duty at the security desk at the rear of Building 1425 (one for employee entry and one to monitor the alarm system) and two guards would be available to patrol the grounds and respond to alarms.

A guard would not need to be on duty at Building 1412 day or night if the recommended mantrap entry system with video capability were installed at the entrance to Building 1412.

The potential for a firefight within the confines of the buildings further requires that formal rules of engagement be established to minimize the potential for damage to critical equipment or injury to authorized personnel.

The conceptual design also recommends that USAMRIID and the PMO sign a Memorandum of Understanding that clarifies exactly how the Garrison police will respond to a security incident outside or inside USAMRIID.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010307

FOR OFFICIAL USE ONLY

## 5.9    Electronic Physical Security System

## 5.9.1 Alarm Communication and Display (AC&D) System

An effective alarm communication and display (AC&D) system must transmit both alarm and assessment information to a central alarm station and present the information to a human operator in an easily understandable manner. AC&D systems must be robust, reliable, fast, secure, easy to use, and in some cases redundant. The single most important measure of an AC&D system's effectiveness is how quickly and clearly it communicates alarm data from sensors to the operator. It must report this information in sufficient time for the operator to assess the cause of the alarm and, if necessary, send a response to intervene. This requires that the system must be reasonably fast—approximately two seconds or less—from the time of the alarm event until display of alarm data and assessment video.

The operator console must minimize the number of actions required of the operator and provide prompts to the operator on the steps necessary to acknowledge and assess alarms, use the CCTV subsystem, change a sensor state, and reconfigure console monitors. To meet these requirements, the AC&D system must include a graphics terminal capable of displaying a site map and detailed building floor plans at a scale that clearly shows the location of the alarm to quickly alert the guard and to direct his attention to the exact physical location of the alarm. A text display must augment the graphic information with details of the alarm and appropriate response, and provide instructions specifically related to the alarm or other console operations. It must also automatically and immediately call up the associated CCTV assessment camera and display the video on a dedicated assessment monitor. Recording of the assessment camera video is essential for reliable assessment. Several seconds of the recorded assessment video is displayed on the assessment monitor. As discussed in Section 4.1, video cameras will probably not be acceptable in the Change Rooms of the containment suites to evaluate access control violations of the outer Change Room doors. In these cases, continuous loop recording by assessment cameras located in the hallways leading to the suites will be required to provide pre-event video assessment of the outer door alarm points.

Timely video assessment is preferable to video surveillance for a number of reasons. It is difficult for a human, even for short periods of time, to observe many cameras scanning and displaying on multiple monitors and to reliably detect unusual activity. A properly configured video assessment system will only require operator intervention upon sensor activation, at which point an audible signal will alert the operator. The system will automatically display the video associated with the activated sensor to allow the operator to determine the cause of the alarm and determine the appropriate response. This will allow the operator to sustain focus and efficiency in performing tasks; it also will reduce operator fatigue, eliminate response to nuisance alarms, and save time compared to waiting for a guard to get to an alarm point and determine the cause. At USAMRIID, the existing fixed CCTV surveillance cameras should be reconfigured for proper alarm assessment and interfaced with the AC&D system so that the appropriate camera is called up automatically and displayed. The CCTV data should be recorded and stored to provide historical information. The external pan-tilt-zoom (PTZ) surveillance cameras are of limited alarm assessment value and should be used for surveillance and tactical tracking.

To ensure effective alarm processing, no other activities, such as entry control or environmental system monitoring, should be allowed to interfere with or slow down alarm reporting time. Intrusion detection, access control, and other monitoring functions should be kept separate as much as possible. Older technologies that use tree-structured, real-time, distributed systems generally cannot provide a guaranteed path and priority timing for alarm signals. These system configurations cause polling bottlenecks that compromise timely alarm reporting. This type of technology is not recommended for USAMRIID.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3                     ARMY02-010308

FOR OFFICIAL USE ONLY

Open architecture systems that use multiple networks are preferred because they minimize or eliminate polling bottlenecks and timing problems. These systems make possible properly designed integration among detection, assessment, and access control functions. This architecture also provides the expansion capability to accommodate future system additions.

## 5.9.2 Access Control and Intrusion Detection

The Access Control System is comprised of a system of doors equipped with various configurations of locks, sensors, and credential readers, all connected to a central computer that tracks and regulates access to defined areas based on a formal set of rules.

The computer system is a network of distributed controllers that monitor and operate credential readers and locks on the doors. A central computer communicates with the remote controllers, grants access authority, tracks and records access control transactions, and enforces formally defined sequences of events that make up valid transactions. It must be capable of enrolling employees, contractors, and visitors into the system, and issuing credentials that grant the appropriate levels of access to each enrollee. It must also be capable of recording and storing transaction records for extended periods of time.

In the USAMRIID buildings, three levels of access control are proposed: limited area, exclusion area, and special exclusion area.

The limited area, which covers most of the office and administrative floor space, will require a valid proximity card for entry and exit. In this context, the card credential serves the same purpose as a key to the building, but because it is part of the access control system, limitations can be imposed on each door. For example personnel may only be allowed access to specific doors, and the length of time that a door may remain open (without an alarm) can be controlled.

The exclusion areas are intended as a layer of access protection around the BSL-3 and BSL-4 containment suites. Entry into these areas will require both a valid proximity card and a personal identification number (PIN) entered at a keypad. The proximity cards will be programmed to limit access to specific personnel who have a need to be in these areas, and the PIN verifies that the authorized cardholder is presenting the card. (A hooded keypad reduces the likelihood of others observing the PIN being entered.) Exit from these areas will require a valid proximity card read. Requiring the card read on exit will provide some anti-passback control. This means that once a person has entered into an exclusion area, the system will not allow another entry transaction until that person has logged out. Entry and exit can be from different doors, but a sequenced pair of actions is required by the system. Central logging of these transactions will also serve to monitor who is in the exclusion areas at all times for safety as well as security reasons.

The special exclusion areas include the BSL-3 and BSL-4 suites, and the biocontainment area in Building 1412. A proximity card and PIN will be required to enter the change room of the suite. Proximity card and PIN will be required to exit the suite from the change room. A PIN will also be required to enter the isolation area airlock and to exit the shower room. This sequence of entries is intended to impose strict control on who is authorized into specific suites, logs entry into and out of the isolation area, logs the authorized person out of the suite and verifies that the authorized person is holding the card on exit.

The special exclusion areas also include the hallway storage in Building 1425, the Special Pathogen Sample Testing Laboratory in Building 1425, the Toxinology storage room in Building 1425, and the Radiation Protection Office in Building 1425. In these areas, a proximity card and PIN will be required for both entry and exit.

For the USAMRIID facilities, four categories of doors are defined based on functions within the system and hardware and software associated with each type.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010309

FOR OFFICIAL USE ONLY

### 5.9.2.1    Category 1 Door: Electronic Lock

These doors will be controlled by proximity card readers and an electronic locking device, which would be either a magnetic lock or an electromechanical door strike. The doors also will be equipped with a balanced magnetic switch (BMS) sensor and pneumatic door closer. When the electronic access control system detects an authorized request for access (authorized card) it will release the lock and the door can be opened. The BMS will detect the door opening and transmit an alarm condition. However, since the door opening was the result of an authorized access request, the electronic access control system will mask the alarm condition from the alarm communication and display system.

The electronic access control system software will allow the system administrator to select a period of time that a particular door can remain open, typically 5 to 10 seconds, before forwarding the alarm condition to the alarm communication and display system. If the door does not close, a condition reported by the BMS sensor, the electronic access control system would forward the alarm condition to the alarm communication and display system. Assuming that the door closes within the allotted time, the electronic lock will activate and secure the door. The pneumatic door closer ensures positive re-lock of the door upon closing.

Exiting a Category 1 door will also require a valid proximity card read.

The locking device may be a magnetic lock or an electromechanical door strike. The magnetic lock has the disadvantage of failing open on loss of power unless equipped with a battery backup. Electro-mechanical door strikes can be configured to fail either open or secure on loss of power. They can also be fitted with mechanical crash-out hardware for emergency egress. If electro-mechanical locks are used, the recommended system is the frame-mounted locking hardware with active components mounted in the doorframe and the adjacent wall on the secure side. The available frame-mounted systems generally provide electrical contacts that are compatible with the alarm and database functions of available electronic access control systems.

Figure 16 depicts a Category 1 door.



(VIEW ON ENTRY)                                                                          (VIEW ON EXIT)

▷ Pneumatic Door Closer
▷ Balanced Magnetic Door Switch
▷ Magnetic Lock
▷ Prox Card Reader
▷ Emergency Exit Device

Figure 16. Category 1 Door

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3          ARMY02-010310

**FOR OFFICIAL USE ONLY**

### 5.9.2.2    Category 2 Door: Access Control

These doors will be controlled by a proximity card reader, a keypad for entering a PIN, and an electronic locking device. The doors also will be equipped with a BMS sensor and pneumatic door closer. When the electronic access control system detects an authorized request for access (authorized card <u>and</u> PIN), it will release the lock and the door can be opened. The BMS will detect the door opening and transmit an alarm condition. However, since the door opening was the result of an authorized access request, the electronic access control system will mask the alarm condition from the alarm communication and display system. The pneumatic door closer will ensure positive relock of the door upon closing.

Exiting a Category 2 door will require the use of a proximity card. This will release the locking device, and shunt the BMS while the door relocks. The doors also will be equipped with an emergency exit device, which can consist of a push button, crash-out emergency hardware, or similar device. This will allow personnel to override the access controls, including any door interlocks. A local annunciator will sound if the door is used as an emergency exit to notify other personnel of an emergency situation, and to discourage non-emergency use of the emergency exit device.

The proximity card and keypad combination will be configured at the electronic access control system to record log-in/log-out transactions. This feature maintains a record of who is in the exclusion areas. This information can be made available to emergency personnel in the event of fire or similar emergency. These records also can be used to determine who was present in an area at the time of a security incident.

Figure 17 depicts a Category 2 door.



1. Pneumatic Door Closer
2. Balanced Magnetic Door Switch
3. Magnetic Lock
4. Prox Card Reader/Key Pad
5. Prox Card Reader
6. Emergency Exit Device

(VIEW ON ENTRY)                    (VIEW ON EXIT)

CATEGORY 2 ENTRANCE DOOR (TYPICAL)

Figure 17. Category 2 Door

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3                    ARMY02-010311

FOR OFFICIAL USE ONLY

### 5.9.2.3    Category 3 Door: Special Access Control

These doors will be used to provide access to the containment suites, and are similar to the Category 2 doors except that an authorized card and PIN will be required both on entry and exit. The doors will be controlled on both sides by a proximity card reader and a keypad for entering a personal identification number (PIN); both operate an electronic locking device. The doors also will be equipped with a BMS sensor and pneumatic door closer. When the electronic access control system detects an authorized request for access (authorized card <u>and</u> PIN), it will release the lock and the door can be opened. The BMS detects the door opening and transmits an alarm condition. However, since the door opening was the result of an authorized access request, the electronic access control system will mask the alarm condition from the alarm communication and display system. The pneumatic door closer will ensure positive relock of the door upon closing.

Exiting a Category 3 door also will require the use of both a proximity card and PIN entry. This will release the locking device, and shunt the BMS while the door relocks. The addition of the PIN entry on exiting the special exclusion areas will ensure that the authorized person that entered the containment suite is the same one who exited. The doors also will be equipped with an emergency exit device, which can consist of a push button, crash-out emergency hardware, or similar device. This will allow personnel to override the access controls, including any door interlocks. A local annunciator will sound if the door is used as an emergency exit to notify other personnel of an emergency situation, and to discourage non-emergency use of the emergency exit device.

The proximity card and keypad combinations will be configured at the electronic access control system to record log-in/log-out transactions. This feature maintains a record of who is in the containment suites. This information can be made available to emergency personnel in the event of fire or similar emergency. These records also can be used to determine who was present in an area at the time of a security incident.

Figure 18 depicts a Category 3 door.



FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3            ARMY02-010312

FOR OFFICIAL USE ONLY

Figure18. Category 3 Door

### 5.9.2.4    Category 4: Emergency Exit—Crash-Out Door

In an emergency situation, an emergency exit door, equipped with crash-out emergency hardware, or similar emergency exit device, could be used to exit. In this event, during which the normal exit procedure is not used, the electronic access control system immediately will forward the alarm condition reported by the BMS sensor directly to the alarm communication and display system. A local audible annunciator should be included on these doors. This should be a device similar to those found in airports or emergency exits in retail stores. In addition to providing immediate notification to other personnel working in the area of a possible emergency condition, a local annunciator tends to discourage personnel from using the emergency exit unless there is a valid emergency. In addition, all hardware should be removed from the outside of the doors to preclude their use as entry points.

Figure 19 depicts a Category 4 door.



▷ Balanced Magnetic Switch
▷ Emergency Exit Hardware

(Exterior View)          (Interior View)

Figure 19. Category 4 Door

### 5.9.2.5    Airlocks, Autoclaves, and Pass-through Boxes

Controlling movement into and out of airlocks, autoclaves, and pass-through boxes will require a unique application of access control. HCPTs will often be deposited in one of these locations for subsequent removal from the containment areas.

The interior and exterior doors will be electronically or mechanically interlocked to prevent both doors from being open simultaneously. The outer doors will be locally and remotely alarmed to annunciate if both doors are opened simultaneously. Policies and procedures must be put in place to ensure that only authorized personnel gain control of HCPTs from these features.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3          ARMY02-010313

FOR OFFICIAL USE ONLY

### 5.9.2.6    Windows, Vents, and Ductwork

Glass pane windows, which give direct access to special exclusion areas, will require glass-break sensors or nine-gauge stainless steel grating. Attaching stainless steel mesh to the interior side of the window frame will make the window no less easy to penetrate than the adjoining walls and thus eliminate the window as a likely avenue of attack.

There are numerous glass pane exterior windows that are likely avenues of entry into the limited area of both buildings. The windows on both stories of the administrative and medical wings of Building 1425 are particularly attractive targets. The lobby and office areas of Building 1412 also have exterior windows into the limited area. These windows should be hardened with nine-gauge stainless steel grating or equipped with glass-break sensors to detect breaking and entering into the limited areas.

Any vents that are large enough to allow adversarial access to secure areas should be fitted with steel bars or stainless steel mesh attached to the vent frame on the secure side. The resulting hardened opening should be at least as effective a barrier as the surrounding wall structure.

Ductwork can also be used by the adversary to gain access to secure areas. The ducts must be large enough and of a shape that would allow their use as passageways. The on-site inspection revealed that the ductwork leading to the biocontainment suites are too small and circuitous to be used to access the suites. In Building 1425, the ducts between the containment suites and the fans and filters located in the attic mechanical space are routed through the congested interstitial space. It is possible that an adversary with access to the interstitial space could disconnect or breach ducts at their entry point into the suites below. If any of these duct openings are large enough to permit passage, they should be fitted with securely mounted bars to prevent access. As further protection, all entry points into the interstitial space will be equipped with Category 2 access control doors as discussed in Section 5.9.3.2.

In Building 1412, the ducts between the multi-level containment and the fans and filters in the attic mechanical space are routed through a tightly packed vertical utility chase, which makes them unlikely entry paths. If further inspection reveals that any of these ducts are large enough to permit passage, and accessible for use as such, they should be fitted with securely mounted bars. The attic mechanical space is also designated as an exclusion area and equipped with Category 2 access control doors as discussed in Section 5.9.4.2.

### 5.9.2.7    Additional Intrusion Detection Sensors

The Gold Standard Repository is surrounded by a limited area (not an exclusion area) in the front half of Building 1425. Therefore, in addition to the required door and window sensors, volumetric sensors (i.e., passive infrared sensors) and CCTV assessment cameras should be used to monitor the specific laboratory where HCPTs are stored inside the suite.

The Hallway Storage Area adjacent to the BSL-4 Suite AA5 is treated as a special exclusion area equipped with Category 3 access control doors as discussed in Section 5.9.3.3. Figure 28 shows that this hallway has an exterior building wall on one side. Since it is possible for an adversary to gain access to this storage area by penetrating the exterior building wall, and because this space is not usually occupied, this area should be equipped with PIR volumetric sensors, video assessment cameras, and adequate lighting.

The Standby Generator Rooms for Building 1425 are designated as a limited area in Section 5.9.3.1 and thus should be fitted with Category 1 access control doors, as shown in Figure 20. These generators are heavily relied upon to maintain containment during commercial power outages. Building 1425 is served by two separate incoming power feeds as a reliability feature, but the manual disconnects for both lines are visible and accessible to the adversary. It is recommended that the generator rooms be equipped with PIR volumetric sensors and video assessment cameras. Lighting

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3                    ARMY02-010314

FOR OFFICIAL USE ONLY

for the video cameras can be turned on by the AC&D system upon alarm signal from either the door BMSs or the PIRs.

The same concern for the security of the standby generator holds for Building 1412. This building has a single commercial power feed and a visible and accessible disconnect on the pole at the rear of the building. It is recommended that the Generator Room in adjacent Building 1414 be treated as a limited area and fitted with Category 1 access control doors, and that the room be equipped with PIR sensors and video assessment cameras.

The basement under the medical wing of Building 1425 is a dirt-floor area, part of which is currently used for storage. The ceiling of this area is the relatively thick concrete floor of the medical wing, which would be difficult to penetrate quietly enough to gain undetected access to the limited area above. A pipe tunnel leads from the rear of this area under the main floor of the building. The main entrance to this space is by way of an exterior stairwell at the end of the medical wing. This door should be equipped with a Category 1 access control door. A small steel hatch also provides access to this area from an exterior window well on the same end of the medical wing. This hatch should be locked or bolted shut and fitted with a BMS. Since an adversary cannot gain immediate access to HCPTs from this area, a dispatched guard can assess the alarms that originate from the doors to this area.

## 5.9.3 Access Control System for Building 1425

The operational concept proposed for Building 1425 is to divide the building into limited areas and exclusion areas, which serve to enclose the containment suites and limit access to those areas, and special exclusion areas, which are the containment suites themselves. The imposition of the special exclusion areas will allow more stringent control over who has access to these vital areas.

### 5.9.3.1    Building 1425 Limited Areas

The limited areas on the first floor are those not enclosed in the red outlines in Figure 20. Most of the front half of the building (containing mostly office space) and the portion at the rear of the building just inside the rear door (containing offices) are included in this category. On the second floor, the areas that comprise the mechanical space are designated as limited areas. These are the areas not enclosed in the red outline at the front of the building as shown in Figure 21.

The normally used entrances to these limited areas should be equipped with Category 1 doors, as defined above. In Figure 20 for the first floor, and Figure 21 for the second floor, these doors are enclosed in red circles.

Emergency exits, Category 4 doors, are shown in Figure 22 for the first floor and Figure 23 for the second floor. The doors are enclosed in red circles.

Because of the large distances between the normal guard posts and the sensor-equipped doors in this building, it is recommended that video assessment cameras be installed to provide immediate alarm assessment from the alarm console. These cameras should view the doors from inside the building and adequate lighting should be provided.

The exterior walls of the building serve as the perimeter of the Building 1425 limited area. On the first floor in the administrative wing and the two parts of the medical wing, the walls have numerous glass pane windows that are easily reached from ground level. These windows are likely avenues for intrusion. All of the exterior limited area windows should be either hardened with nine-gauge stainless steel grating or equipped with glass-break sensors to alert the console operator of an intrusion. It is not practical to assess each window sensor with a video camera, but the distance from the windows to the guard posts make timely assessment difficult, and could place a guard dispatched to assess the alarm in danger. A practical assessment approach involves the installation of fixed focus

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010315

**FOR OFFICIAL USE ONLY**

video cameras at opposite ends of the hallways adjacent to the window-equipped rooms. The glass-break sensors should be zoned so that an alarm from any window in the rooms along a hallway will call up the assessment cameras that cover the entire length of the corridor. Since an adversary gaining access through an exterior window must eventually emerge in the hallway, a real intrusion can be validated in this way. If no intruder enters the hallway and a guard needs to be dispatched to check the source of the alarm, the console operator can use the hallway cameras to observe and update the guard.

There are several card-reader equipped, power-operated double-leaf doors in the hallways of the proposed limited area. These card readers are not required as part of the proposed access control system, and can be removed. If the doors are required to regulate or direct air flow, they can be fitted to open automatically when approached, without a credential requirement. If they serve no flow-control purpose, the doors can be removed.

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010316

**FOR OFFICIAL USE ONLY**



Figure 20. Building 1425: First Floor, Category 1 Doors

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010317

**FOR OFFICIAL USE ONLY**



Figure 21. Building 1425: Second Floor, Category 1 Doors

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010318

FOR OFFICIAL USE ONLY



Figure 22. Building 1425: First floor, Category 4 doors

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010319

FOR OFFICIAL USE ONLY



Figure 23. Building 1425: Second floor, Category 4 doors

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010320

**FOR OFFICIAL USE ONLY**

### 5.9.3.2    Building 1425 Exclusion Areas

The exclusion areas lead to the containment suites. Most of the rear half of the building is included in this category which encloses the BSL-3 and BSL-4 containment suites. Access to this area will be through Category 2 access control doors. The hallway leading to the Gold Standard Repository is included in this category, and this requires the addition of a Category 2 door at the entrance to the hallway.

These areas will require a proximity card and PIN entry to gain access. The higher level of control will allow limiting access to those who need it. Requiring a proximity card for exit from the areas is intended to impose a level of anti-passback protection. The system will be configured to disallow exit from the area unless the person has previously logged in. It will also deny entry if the person is not logged out of a previous entry. Requiring the PIN on entry to the area ensures that a stolen card is not being used.

The first floor exclusion areas are outlined in red in Figure 25, and include the containment suites at the rear of the building, the Repository, and the Emergency Medical Unit. Figure 26 shows the entrances to the interstitial space that houses the ductwork for the containment suites. Figure 27 shows the exclusion area on the second floor that encloses the Toxinology Lab area. Category 2 doors are enclosed in red circles in Figures 25, 26, and 27. Double leaf doors currently equipped with card readers inside the proposed exclusion areas can be removed unless required for air-flow control.

The interstitial space is designated an exclusion area because the ductwork can serve as access paths to the containment suites, and because the space provides excellent concealment for adversaries to work undetected. Figure 26 shows that there are five stairwells, enclosed in red boxes, that lead down into this space from the second floor mechanical areas. Figure 24(a) is typical of these stairwells. These stairwells should be enclosed in heavy wire mesh cages fitted with Category 2 doors. There are also two half-doors on the landings of two of the stairwells at the front of the building, as shown in Figure 24(b). These stairwell doors are circled in red in Figure 26. These doors should be equipped as Category 2 doors. This arrangement of access control doors will allow admission of only authorized personnel to this space, and will verify exit from the area.

Because of the large distances between the normal guard posts and the sensor-equipped doors in this building, it is recommended that video assessment cameras be installed to provide immediate alarm assessment from the alarm console. Adequate lighting should be provided.



Figure 24(a). Interstitial space stairwell



Figure 24(b). Half-door on stairwell landing

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010321

FOR OFFICIAL USE ONLY



Figure 25. Building 1425: First Floor, Category 2 Doors

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010322

**FOR OFFICIAL USE ONLY**



Figure 26. Building 1425: Interstitial space cages and Category 2 doors; Category 3 door on Toxinology storage

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010323

FOR OFFICIAL USE ONLY



Figure 27. Building 1425: Second Floor, Category 2 doors and Category 3 door on Toxinology storage

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3     ARMY02-010324

FOR OFFICIAL USE ONLY

### 5.9.3.3    Building 1425 Special Exclusion Areas

The special exclusion areas are the BSL-3 and BSL-4 containment suites located in the exclusion area at the rear of the building, the BSL-4 Gold Standard Repository, and the Emergency Medical Unit also known as "The Slammer." the hallway storage area adjacent to the AA500 BSL-4 suite, the Special pathogen sample testing labs (AR100 hallway), the Radiation Protection Office (Room AA501), and the toxinology storage room (857) on the second floor are also special exclusion areas are. Access to each of these areas will be through Category 3 special access control doors.

This configuration is intended to impose the highest level of control on access to these vital areas, and to maintain continual record of occupants inside the suites for both safety and security reasons.

Figure 28 shows the locations of the Category 3 doors on the first floor that are not associated with the containment suites. The location of the Category 3 door to the toxinology storage room is noted in Figure 27.

Figure 29 shows a typical containment suite, with Category 3 Special Access Control Doors at the entrance to the Change Rooms and Category 4 Crash Out Doors at the opposite end of the suite. The airlocks, autoclaves, and pass-through boxes that provide access to the suites should be electronically or mechanically interlocked and alarmed.

Details of the entrances to a typical containment suite are shown in Figure 30. Doors numbered "1" are the Category 3 access control doors that require both a proximity card and PIN for both entry and exit from the suite. Door 2 will be equipped with a keypad on the change room side to allow entry of only authorized personnel into the airlock. Door 5 will have a keypad on the shower side to log exit of authorized personnel from the isolation area. Doors 2 and 5 will be fitted with electronic locks and BMS sensors that will interface with the access control system to control and monitor passages to and from the isolation areas. Doors 2 through 5 will be configured as an electronically interlocked set of doors that prevent any more than one of the doors to be open at a time. This provides continuous closure at the isolation area boundary. Doors 2 and 3 of the airlock should have no hardware on the isolation side to assure that passage through the airlock is inbound only. Door 4 should have hardware on the isolation area side to allow outbound entry into the shower. Door 5 should have no hardware on the Change Room side to preclude its use as an entry point.

Because of the large distances between the normal guard posts and the sensor-equipped doors in this building, it is recommended that video assessment cameras be installed to provide immediate alarm assessment from the alarm console. Since security alarms for these areas will generally emanate from the doors into the change rooms, video assessment cameras will have to be located in the hallways outside the suites. Fixed focus video assessment cameras should be located on opposite ends of the hallways leading to the containment suite entrances. These cameras must be provided with continuous loop recording to provide pre-alarm assessment. In this way, alarms can be validated even though the violator has passed into the change room.

The central corridor that runs along the backs of the containment suites should also be equipped with fixed focus assessment cameras located with overlapping fields of view because of the length of this corridor. The alarmed crash-out doors from the containment suites open into this corridor and can be assessed in this way. There are recessed areas where the suite airlocks and autoclaves are located that cannot be viewed by the hallway cameras. Alarms from any of these devices should call up and record the hallway cameras. Intruders and violators of containment procedures will eventually emerge into view of the cameras.

No video coverage is proposed inside the containment suites because the suites are compartmentalized to the extent that precludes practical video design. The conceptual design does not recommend any specific sensors or alarms inside the containment suites, thus there is nothing to call up the cameras for assessment. Further, surveillance cameras inside the containment suites would not

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3                    ARMY02-010325

**FOR OFFICIAL USE ONLY**

be able to distinguish an act of diversion by a certain individual. While there may be some biosafety benefits to having video surveillance inside the containment suites, cameras inside those areas would neither deter not detect the diversion of material. General video surveillance of an area or activity has been shown to provide ineffective security, except possibly for reconstruction of events after the fact.



Figure 28. Building 1425 First Floor Category 3 Doors

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010326

**FOR OFFICIAL USE ONLY**



Figure 29. Typical Suite

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010327

FOR OFFICIAL USE ONLY



Figure 30. Typical suite entrance

## 5.9.4 Access Control System for Building 1412

The operational concept proposed for Building 1412 is to divide the building into limited areas, exclusion areas, and a special exclusion area for the multilevel containment area.

### 5.9.4.1    Building 1412 Limited Areas

The limited areas include all of the floor space outside the multilevel containment except the attic area. The exterior doors accessing these areas will be equipped with Category 1 doors that require presentation of a valid proximity card on both entry and exit. In Figures 31 and 32, the Category 1 doors are enclosed in red circles for the First Floor and Basement.

Emergency exits, Category 4 doors, are shown in Figures 33, 34, and 35 for the first floor, second floor, and attic. The doors are enclosed in red circles.

Because of the large distances between the normal guard posts in Building 1425 and the sensor-equipped doors in this building, it is recommended that video assessment cameras be installed to provide immediate alarm assessment from the alarm console. These cameras should view the doors from inside the building and adequate lighting should be provided.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3        ARMY02-010328

**FOR OFFICIAL USE ONLY**



Figure 31. Building 1412: First Floor, Category 1 Doors

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010329

**FOR OFFICIAL USE ONLY**



Figure 32. Building 1412: Basement Category 1 Doors

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010330

**FOR OFFICIAL USE ONLY**



Figure 33. Building 1412: First Floor, Category 4 Doors

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010331

FOR OFFICIAL USE ONLY



Figure 34. Second Floor, Category 4 Doors

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010332

FOR OFFICIAL USE ONLY



Figure 35. Building 1412: Attic, Category 4 Doors

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010333

**FOR OFFICIAL USE ONLY**

### 5.9.4.2    Building 1412 Exclusion Areas

The exclusion areas include the attic mechanical area and the laboratories in Rooms 208 and 209 on the second floor and Room 007D in the basement. The elevator access to the attic and the doors to the three laboratories will be equipped with Category 2 doors that require a proximity card and PIN for entry and a proximity card for exit.

The main entrance to Building 1412 will be equipped as a remotely operated personnel trap, to preclude the need to post a guard in the building lobby during off-hours. Referring to Figure 37, Doors 6 and 7 will be equipped as Category 2 doors. Door 8 will have no credential reading hardware, but the double leaf door will be fitted with magnetic locks that can be opened by the guard from the alarm communication and display system console. The leaves of Door 8 will be hardened to preclude easy penetration.

During normal business hours, the keypads of Doors 6 and 7 will be disabled to allow the entry doors to function as Category 1 doors, requiring a proximity card for entry and exit, and the magnetic locks on inner Door 8 will be disabled. During off-hours, the keypads on Doors 6 and 7 will be enabled so that they function as Category 2 entry control doors. The inner Door 8 will be locked.

Video assessment cameras will be installed in the entry to allow the guard at the control console to assess any BMS alarms from Doors 6 or 7, and to clearly see who occupies the entry whether authorized or not. The entry will also be equipped with volumetric sensors to detect any intrusion not detected by the BMSs. Normal entry of authorized personnel during off-hours will be annunciated at the alarm communication and display system console, the guard will observe the occupant of the entrance, and will remotely unlock the inner Door 8 if he is satisfied that entry is authorized.

### 5.9.4.3    Building 1412 Special Exclusion Area

The special exclusion area is the multi-story containment area. The highest level of access control will be imposed on this area at the first floor, where individuals normally enter and exit. All emergency crash-out doors leading out of containment on all three floors will be equipped with Category 4 doors, local annunciators, and video assessment.

In the men's entrance to containment, the door into the men's change room from the men's entry room (Door 1 on the men's side in Figure 37) will be equipped as a Category 3 door, requiring proximity card and PIN on both entry and exit.

In the women's entrance to containment, the door into the hallway leading to the women's change room (Door 1 on the women's side in Figure 37) will be equipped with a Category 3 door, requiring proximity card and PIN on both entry and exit.

For both entrances to containment, Doors 1 serve as the main access control points. Both of these doors should be equipped with video assessment cameras located in the entry rooms to validate access control violations. These cameras must be provided with continuous loop recording to allow pre-event assessment. Doors 2 will be equipped with keypads on both sides to allow entry of only authorized personnel into the Airlocks and to log exit of authorized personnel from the isolation area. Both Doors 2 will be equipped with electronic locks and BMS sensors which will interface with the Access Control System to control and monitor passages of personnel to and from the isolation area. Doors 2 through 5 on both sides should be an electronically interlocked set of doors that prevent any more than one of the doors to be open at a time. This provides continuous closure at the isolation area boundary. Doors 3 of both airlocks should have no hardware on the isolation side to ensure that passage through the airlock is inbound only.

REMOVED FROM PROTECTIVE ORDER NO. 3       ARMY02-010334

FOR OFFICIAL USE ONLY



Figure 36. Building 1412: Containment Entrance and Main Entrance Mantrap

## 5.10  Procedural Requirements

The implementation process of a PPS includes the development of system operation approaches, system evaluation tools, and system modification techniques. Two elements are recommended: a site-wide security plan and system level operating plan and procedures.

The site-wide plan is a necessary tool for management to document the facility's security philosophies and objectives. The site-wide plan defines the goals and expectations regarding the conduct of security operations at the facility. This document provides the overall framework, in the form of security plans, facility configuration, organizational structure, roles, and responsibilities, for accomplishing the work. The plan specifies the commitment to meeting its regulatory obligations and defines the philosophy of operation. Because it is intended to apply broadly to security activities, the plan does not specify the details or mechanics required to perform the work. The physical protection portions of the security plan would include the following:

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3         ARMY02-010335

FOR OFFICIAL USE ONLY

- Installation of equipment (proper mounting of sensors, camera placement, disconnect sensor self-test or indicator lights[55]).
- Maintenance of sensors and cameras, resolution tests, replacement of failed lamps, all equipment (including radios).
- Pre-determined number of equipment spares on hand.
- Final acceptance test parameters.
- Equipment logs—for repair and performance metrics.
- Procedures for after-maintenance test to verify performance and to verify that tampering has not occurred.
- Incorporation of access rules into the access controls, which are monitored by AC&D system.
- At times, sensors will be in access (i.e., alarms are masked) and at other times sensors will be on and active. Procedures will be needed on the use of airlock doors, e.g., put alarms in access for a short period of time while airlock is in use and perhaps have the console operator observe the process.
- Procedures on visitor controls and escort procedures incorporating the new system.
- Lock and key control and accounting procedures.
- Procedures for maintenance of access control database and issuance of proximity cards.
- If maintenance is to be performed by a contractor, the contract should specify the time period for technical component testing, acceptable performance metrics, and a requirement that failed components will be replaced within a specified time.
- Description of required training to operate and manage the new system will be needed.
- Programming of alarm priorities within the system.

## 5.11  Programmatic Security Training and Oversight

Perhaps the most important recommendation in this report is the need to create a genuine security culture at USAMRIID. The effectiveness of any security system depends on the willingness of the individuals who work at the site to support the mission of the security system. The unique nature of microbiological research, particularly that diversion of small quantities of HCPTs can be significant and that organisms cannot be detected at a distance, makes the effectiveness of a biosecurity system dependent on the development of a supportive security culture.

In addition to the documentation of a security plan, programmatic security training and oversight will contribute to fostering and sustaining a security culture at USAMRIID. All staff, including scientific, support, and administrative staff, should receive this regular training. Visitors, students, and contractors should also receive training. USAMRIID should develop a training module that explains the rationale for and use of the security system, as well as the consequences of an ineffective and inefficient security system (to include personal consequences for non-compliance).

By creating a security culture, USAMRIID will ensure that security remains a supporting function that does not unnecessarily impede the laboratory's critical biomedical research mission. Without the staff's endorsement of and compliance with the biosecurity plan, many of the security measures recommended in this report will create only the perception of security.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3                          ARMY02-010336

FOR OFFICIAL USE ONLY

## 5.12  Incident Response Planning

A fundamental element of security is an understanding that there is no such thing as perfect security. The risk of the occurrence of an undesirable event cannot be reduced to zero. Protecting against every imaginable event is only possible at extraordinary financial and operational expense. Therefore, it is necessary to prioritize the various threats facing USAMRIID and appropriate countermeasures.

There are risks, such as a large truck bomb, that an effective and cost efficient biosecurity system cannot provide physical protection against. Instead, the biosecurity system for these types of threats and risks must depend on comprehensive incident response planning. Such planning would instruct USAMRIID personnel, including its guard forces, the Garrison police force, local law enforcement, and emergency responders, on the exact procedures to follow in the event of biosecurity incident. An essential component of this incident response planning should be the development of a public relations strategy that can calmly communicate the realities of the situation and its consequences to the public. Regular incident response planning will also contribute to the creation of a supportive biosecurity culture at USAMRIID.

## 5.13  Summary of Conceptual Design

The conceptual design has a high probability of detecting unauthorized access into the defined target areas by the defined threat assuming likely avenues of attack. In addition to installing intrusion detection sensors and access controls, the PPS design calls for the installation of a new AC&D system on an independent network, with an uninterruptible power supply, and with 24/7 guard-force monitoring.

As discussed in Section 4.2.1, a fully sensored and video assessed perimeter enclosing the USAMRIID buildings at a distance sufficient to provide early warning of an attack from outside would be very costly both in capital investment and in continuing life cycle costs. In consideration of budgetary and operational constraints, a more practical approach is proposed in the conceptual design. The underlying strategy is to focus the security system design on the containment areas where the HCPTs are located, and to detect, as quickly and reliably as possible, any unauthorized access to these biosafety containment areas by means of likely avenues of approach. The exterior walls of the buildings, therefore, constitute the initial protection perimeter, and the likely avenues of approach are the doors, windows, and other openings that provide access to the interiors of the buildings.

The design proposes in Section 5.7.1 that a perimeter fence line enclose the USAMRIID buildings and define the security boundaries of the facility. This fence line would have entry control points for pedestrians and vehicles to accommodate normally authorized traffic into the facilities. It would provide a measure of protection against casual intrusion into the area, and delimit the security patrol area during off-hours. It would not be configured or equipped to provide early warning of an adversary's approach to the buildings.

It is acknowledged that an adversary could scale the fence, cut through the exterior walls or roofs, and gain access to the buildings without timely notification of security personnel. However, the construction of the buildings is such that forcible entry cannot be made quietly, and consequently would be detected by employees or security patrols. In the relatively few cases where exterior walls serve as part of the containment envelope, or areas that are not normally occupied, volumetric intrusion detection sensors and video assessment are proposed.

The threats defined by USAMRIID include an outsider armed with a semi-automatic rifle. To account for the fact that the design does not provide early warning of an armed attack before the intruders arrive at the buildings, the conceptual design in Section 5.7.2 recommends hardening of the building entrances and the guard posts that defend them. It is further recommended that the central alarm post

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010337

FOR OFFICIAL USE ONLY

where the AC&D console is located be partitioned off from the active guard post and hardened to ensure continued operation of the security system during an attack.

The need to defend the facility against an armed outsider without early warning of attack will require, as discussed in Section 5.8, that the on-site USAMRIID security guards be armed with weapons at least as capable as the specified adversary and that they be trained and qualified to use these weapons.[66] The potential for a firefight within the confines of the buildings further requires that formal rules of engagement be established to minimize the potential for damage to critical equipment or injury to authorized personnel. USAMRIID should employ enough guards to have seven on duty during regular working hours and four on duty during nonworking hours. Additionally, because the response time of the Garrison police force is also critical to the effectiveness of the conceptual security design, USAMRIID should strengthen and formalize its relationship with the Garrison police force to ensure timely response in the event of a security breach that the site guard force cannot handle alone.

As indicated in Section 5.9.2, the design secures the biosafety containment suites by establishing concentric security envelops with increasing levels of access control. Attempted unauthorized access would be detected by the proposed access control system and reported to the central alarm console. To increase the control measures that are required to gain access to the containment suites, the design recommends a system that can identify a prescribed sequence of access control entries as valid transactions. Deviations from the defined sequences would be recognized as security infractions and reported to the central alarm console. These concentric control boundaries would serve to deter both the outsider and the insider from committing malevolent acts.

Access control measures are also applied to mechanical spaces that could be utilized to gain access to the suites or disrupt containment integrity. Since the insider threat includes knowledge of operations, systems, and procedures, the access control system, which monitors and regulates passage through these boundaries, also deters the insider from committing malevolent acts.

Access control transactions and records of access are generated by the proposed access control system and need to be captured and maintained in retrievable historical files. These data can be used to reconstruct the situation after an accident or security breach.

To protect against an attack by a package bomb, the design in Section 5.4 recommends moving the USAMRIID receiving area to a location remote from the secured USAMRIID buildings. Screening for explosives could be done at this off-site location. This change would also reduce the amount of commercial vehicle traffic in and out of Building 1425.

As indicated in Sections 5.2, 5.3, 5.5, and 5.10, the design's proposed electronic physical security system will not effectively protect the defined targets against the defined threats unless augmented by improved personnel reliability programs, proper escorting, strengthened material accountability and chain-of-custody procedures, robust cyber security, security training and oversight, and comprehensive security policies and procedures.

As discussed in Section 5.1, the overall effectiveness of the conceptual biosecurity design will depend on an all-encompassing biosecurity plan, which does not currently exist. The creation of such a biosecurity plan could result in the need to review and revise the conceptual design presented in this report.

Finally, as indicated in Section 5.11 and perhaps most important, the effectiveness of the design will depend on the creation of a security culture at USAMRIID that supports the mission and approach of the overall security system.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010338

FOR OFFICIAL USE ONLY

# 6. Expected Effectiveness of the Conceptual Design

Implementation of the conceptual design would substantially improve the effectiveness of the security system at USAMRIID to protect the defined targets (Section 2.2) against the defined threats (Section 2.4).

The design *very significantly increases* protection and deterrence against diversion of HCPTs or critical information related to HCPTs by a visitor or an invited colleague, by including or improving upon the following:

- Biosecurity plan
- Procedures to screen visitors and notify intelligence community prior to visitors' arrival
- Appropriate and unique visitor credentials
- Escorting procedures enforced by the access control system
- Material accountability and chain of custody
- Access control, intrusion detection, and video assessment system
- Alarm communication and display system
- Cyber security system

The conceptual design *significantly increases* protection and deterrence against diversion of HCPTs or critical information related to HCPTs by an insider, a temporary worker, or a coerced insider,[67] by including or improving upon the following:

- Biosecurity plan
- Personnel reliability program
- Security training and oversight
- Material accountability and chain of custody
- Access control, intrusion detection, and video assessment system
- Alarm communication and display system
- Cyber security system

The design *significantly increases* protection against diversion of HCPTs or critical information related to HCPTs by an outsider or an animal rights group, by including or improving upon the following:

- Biosecurity plan
- Hardening of entrances to withstand armed attack
- Separation of alarm monitoring station from entry area
- Material accountability and chain of custody
- Access control, intrusion detection, and video assessment system
- Alarm communication and display system
- Cyber security system

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010339

**FOR OFFICIAL USE ONLY**

- Armed and trained guard force with clear rules of engagement
- Memorandum of Understanding with Fort Detrick Provost Marshal's Office
- Incident response planning

The design *significantly increases* protection against a package bomb, by including or improving upon the following:

- Biosecurity plan
- New shipping and receiving area outside Buildings 1425 and 1412
- Explosives detection (technologies and procedures)
- Incident response planning

The design *slightly increases* protection against a vehicle bomb, by including or improving upon the following:

- Biosecurity plan
- Incident response planning

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010340

FOR OFFICIAL USE ONLY

# End Notes

## SECTION 2

[1] "High consequence" is defined as encompassing a range of severe adverse events impacting either one or a combination of the U.S. economic, political, social, and public health sectors.

[2] "Diversion" is defined as the illicit removal of a microorganism from a legitimate biomedical research facility, whether by stealth or overt theft.

[3] "Bioterrorism" is defined as the unlawful use of HCPTs against persons, animals, plants, or property to intimidate or coerce a government, the civilian population, or any segment thereof, in furtherance of political, religious, social, and/or economic objectives.

[4] "Proliferation" is defined as the diversion of HCPTs to assist state or non-state operatives acquire and/or develop a biological weapons capability.

[5] Department of Defense, "Security Policy for Safeguarding Biological Select Agents," *Department of Defense Directive, Draft 5210.6X, No. 5210.XX*, April 19, 2002.

[6] http://www.cdc.gov/od/ohs/lrsat/42cfr72.htm. Also see U.S. Department of Health and Human Services, Centers for Disease Control and Prevention and National Institutes of Health, *Biosafety in Microbiological and Biomedical Laboratories*, Fourth edition, Government Printing Office: May 1999.

[7] The Select Agent list includes the following: (1) Bacteria: *Bacillus anthracis, Brucella abortus, Brucella melitensis, Brucella suis, Burkholderia (Pseudomonas) mallei, Burkholderia (Pseudomonas) pseudomallei, Clostridium botulinum, Franciscella tularensis, Yersinia pestis*; (2) Fungi: *Coccidioides immitis*; (3) Rickettsia: *Coxiella burnetii, Rickettsia prowzekii, Rickettsia rickettsii*; (4) Toxins: Abrin, Aflatoxins, Botulinum toxins, Clostridium perfringens epsilon; Conotoxins, Diacetoxyscirpenol, Ricin, Saxitoxin, Shigatoxin, Staphylococcal enterotoxins, Tetrodotoxin, T-2 toxin; (5) Viruses: Crimean-Congo haemorrhagic fever, Eastern Equine Encephalitis, Ebola viruses, Equine Morbillivirus, Lassa fever, Marburg, Rift Valley fever, South American Haemorrhagic fever (Junin, Machupo, Sabia, Flexal, Guanarito); Tick-borne encephalitis complex viruses, Variola major, Venezuelan Equine Encephalitis, Viruses causing hantavirus pulmonary syndrome, Yellow Fever. See Select Agents List: http://www.cdc.gov/od/ohs/lrsat/42cfr72.htm#Appendix A

[8] Department of Army, *Interim Guidance Message 2: Establishing the Army Biological Personnel Reliability Program*, February 2, 2002; Department of Army, *Interim Guidance Message 3: Applicability of the Army Biological Surety Program to Contractor Operations*, undated.

[9] The Category A agents are *Variola major, Bacillus anthracis, Yersinia pestis, Clostridium botulinum toxin, Francisella tularensis,* Filoviruses (e.g. Ebola, Marburg), and Arenaviruses (e.g. Lassa, Machupo). Lisa D. Rotz, Ali S. Khan, Scott R. Lillibridge, Stephen M. Ostroff, and James M. Hughes, "Public Health Assessment of Potential Biological Terrorism Agents," *Emerging Infectious Diseases* 8:2 (February 2002): 225–30.

[10] Raymond A. Zilinskas, "Recombinant DNA research and biological warfare," in Zilinskas and Zimmerman (eds.), *The Gene-Splicing Wars: Reflections on the Recombinant DNA Controversy* (New York: Macmillan, 1986): 167–203.

[11] W. Seth Carus and Raymond A. Zilinskas, *Possible Terrorist Use of Modern Biotechnology Techniques* (April 22, 2002 version, unpublished paper): 67–85.

[12] Hardiness is defined as "the ability of a microorganism or a bacterial or fungal spore to survive being enclosed in a storage container or munition and, after release onto the target, endure physical and chemical stresses encountered in the open environment."

[13] Resistance is defined as "the ability of a microorganism to defeat the actions of therapeutic drugs and preventives such as vaccines."

[14] Infectivity is defined as "the process whereby microorganisms attach to certain tissue cells of the host (such as the cells constituting the intestinal wall or walls of alveoli), enter the cells thereby penetrating the host's first line defense, and colonize the tissues of the host."

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010341

**FOR OFFICIAL USE ONLY**

[15] Pathogenicity is defined as "the ability of the pathogen, once it has successfully colonized the host, to traverse the bloodstream or lymphatics, evade the intrinsic defenses of the host, enter target tissues, and obtain nutrients for itself." For example, the pathogenicity of *Bacillus anthracis* is related to toxin production and capsule formation. Avirulent strains of *B. anthracis* lack the ability to either produce toxin and/or form a capsule. Michele Mock and Agnes Fouet, "Anthrax," in *Annu. Rev. Microbiol.* 55 (2001): 647–71.

[16] Specificity is defined as "a pathogen's propensity to prefer a specific host."

[17] Detection avoidance refers to "camouflaging a pathogen to be used for BW purposes; ... altering an organism to express surface antigens it normally would not express; ... [or] altering an organism to defeat immunological defense systems present in a target population."

[18] Senescence is defined as "genetically engineering BW agents so they die on cue."

[19] Viable but non-culturable state (VBNC) refers to a condition in which certain organisms (usually certain marine bacteria) are "viable but are in a dormant state and cannot be cultured employing standard microbiological technology."

[20] The one exception is the *Variola major* virus (the causative agent of smallpox), has been globally eradicated. The only two official repositories are the Centers for Disease Control, Atlanta (USA) and the State Research Institute for Virology and Biotechnology, Koltsovo (Russia). No U.S. Department of Defense facility possesses *Variola major*.

[21] Code of Federal Regulations, Title 42--Public Health, Part 72--Interstate Shipment of Etiologic Agents, http://www.access.gpo.gov/nara/cfr/waisidx_01/42cfr72_01.html.

[22] W. Seth Carus, *Bioterrorism and Biocrimes: The Illicit Use of Biological Agents Since 1900* (Washington DC: National Defense University, August 1998 (February 2001 Revision)), 13–15.

[23] Prior to 1996 there was no federal prohibition on individuals possessing any biological agents regardless of their lethality or whether the individual had a legitimate use for the agents. In 1996 the Antiterrorism and Effective Death Penalty Act was adopted which outlines specific restrictions and regulations regarding the use and transfer of certain high-consequence pathogens and toxins. http://usinfo.state.gov/usa/infousa/laws/majorlaw/s735_enr.htm; http://www.cdc.gov/od/ohs/lrsat/42cfr72.htm.

[24] Chikungunya virus is a togavirus that is rarely fatal but causes acute illness that can be incapacitating to humans. There is no treatment currently available.

[25] Philip J. Hilts, "Former Army Researcher Says Quart of Disease Virus Disappeared," *Washington Post* (September 24, 1986): A8; Hearings before the Subcommittee on Oversight of Government Management of the Committee on Governmental Affairs, United States Senate, 100th Congress, Second Session, July 27–28, 1988.

[26] Rick Weiss and Joby Warrick, "Army Lost Track of Anthrax Bacteria," *Washington Post* (January 21, 2002) http://www.washingtonpost.com/ac2/wp-dyn?pagename=article&node=&contentId=A12095-2002Jan20&notFound=true; Joby Warick, "'No One Asked Questions', *Washington Post* (February 19, 2002) http://www.washingtonpost.com/ac2/wp-dyn?pagename=article&node=&contentId=A30241-2002Feb18&notFound=true.

[27] Bruce Hoffman, "Re-thinking Terrorism in Light on a War on Terrorism," Testimony before the Subcommittee on Terrorism and Homeland Security, House Permanent Select Committee on Intelligence, U.S. House of Representatives, September 26, 2001.

[28] Jonathan B. Tucker and Amy Sands, "An Unlikely Threat, " *The Bulletin of the Atomic Scientists,* 55, no. 4 (July/August 1999): 4.

[29] The Monterey database does not restrict itself to documenting only incidents involving the actual use of a military-grade biological agent—it includes information referring to any indication of interest by subnational groups or individuals in biological materials. According to clearly delineated criteria, in certain circumstances incidents involving the use of non-warfare agents, the infliction of minimal casualties, and even threats of biological agent use are included in the database. See: Monterey Institute of International Studies, Center for Nonproliferation Studies' Weapons of Mass Destruction (WMD) terrorism database, (http://cns.miis.edu/db/wmdt/method.htm - subscription required).

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3          ARMY02-010342

**FOR OFFICIAL USE ONLY**

[30] The definition of Hoax/Prank/Threat as listed within the Monterey Institute database: a hoax occurs if the perpetrator claims that s/he used an agent in the commission of an act and delivered a "fake" substance in place of the real thing. Pranks only differ from hoaxes in that there is no "fake" substance delivered with the claim. The threat element is when there is no evidence of possession by the perpetrator. As there is no confirmation of a realistic threat of actual use, these cases are placed on the same level as hoaxes or pranks. See: Monterey Institute of International Studies, Center for Nonproliferation Studies' Weapons of Mass Destruction (WMD) terrorism database (http://cns.miis.edu/db/wmdt/method.htm - subscription required).

[31] See: Monterey Institute of International Studies, Center for Nonproliferation Studies' Weapons of Mass Destruction (WMD) terrorism database: http://cns.miis.edu/db/wmdt/bio.htm- subscription required.

[32] To date the U.S. government has not set an official definition of what constitutes mass casualties in a bioterrorism event. The metropolitan medical response systems under the Department of Health and Human Services use 1,000 casualties (physical injuries or death) as a basis for their planning purposes. For the purposes of this report, we will rely on this definition for mass casualties. U.S. General Accounting Office, *Combating Terrorism: Need for Comprehensive Threat and Risk Assessments of Chemical and Biological Attacks. GAO/NSIAD-99–163* (Washington, DC: U.S. General Accounting Office, September 1999), 7.

[33] The cult obtained *Salmonella typhimurium* from a legitimate medical supply company. Since the cult operated a state-licensed medical laboratory, they could legitimately buy the pathogen from a commercial supplier. Thomas J. Török, Robert V. Tauxe, Robert P. Wise, John R. Livengood, Robert Sokolow, Steven Mauvais, Kristin A. Birkness, Michael R. Skeels, John M. Horan, Laurence R. Foster, "A Large Community Outbreak of Salmonellosis Caused by Intentional Contamination of Restaurant Salad Bars, *Journal of the American Medical Association* 278, no. 5 (August 6, 1997): 389–395.

[34] Monterey Institute of International Studies, Center for Nonproliferation Studies' Weapons of Mass Destruction (WMD) terrorism database (http://cns.miis.edu/db/wmdt/incidents/1152.htm; http://cns.miis.edu/db/wmdt/incidents/357.htm - subscription required).

[35] Jessica Stern, *The Ultimate Terrorists* (Cambridge, MA: Harvard University Press, 1999).

[36] Thomas V. Inglesby, Tara O'Toole, Donald A. Henderson, John G. Bartlett, Michael S. Ascher, Edward Eitzen, Arthur M. Friedlander, Julie Gerberding, Jerome Hauer, James Hughes, Joseph McDade, Michael T. Osterholm, Gerald Parker, Trish M. Perl, Philip K. Russell, and Kevin Tonat, "Consensus Statement, Anthrax as a Biological Weapon, 2002: Updated Recommendations for Management," *Journal of the American Medical Association*, 287:17 (May 1, 2002): 2236–2252. http://jama.ama-assn.org/issues/v287n17/jst20007.html. For a description of the U.S. anthrax cases see: http://www.cdc.gov/nciDoD/EID/vol7no6/jernigan.htm.

[37] Centers for Disease Control and Prevention, "Notice to Readers: Evaluation of Post-Exposure Antibiotic Prophylaxis to Prevent Anthrax" *MMWR* 51:03 (January 25, 2002): 59. http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5103a4.htm.

[38] "Suzuki Confesses Spreading Typhoid," *Japan Times*, April 14, 1966, p. 1,3; "Dr. Suzuki Says Revenge Led Him to Spread Germs," *Japan Times*, April 16, 1966, p. 4.

[39] "Dr. Suzuki Makes New Confession," *Japan Times*, April 28, 1966, p. 3.

[40] See note 34.

[41] Milton Leitenberg, "The Experience of the Japanese Aum Shinrikyo Group and Biological Agents," in *Hype or Reality? The New Terrorism and Mass Casualty Attacks*, ed. Brad Roberts (Alexandria, VA: The Chemical and Biological Arms Control Institute, 2000): 159–170.

[42] On March 20, 1995, members of the Aum Shinrikyo cult released sarin, a deadly nerve agent, simultaneously on five different subway trains in Tokyo. Twelve people were killed and almost 3,800 were injured. The evidence indicates that Aum pursued chemical terrorism only after failing to succeed at biological terrorism.

[43] D.P. Lambert, "The Pakur Murder," *Medico-legal and Criminological Review*, vol. 5, July 1937, p. 297–302.

[44] The definition of HCPTs should take into account what agents have in fact been for bioterrorism purposes. For instance, Category A agents may not be the most likely agents diverted for use in bioterrorism.

[45] David Rappaport, "Terrorism and Weapons of the Apocalypse," *National Security Studies Quarterly* V, no.3 (Summer 1999), p. 49–67.

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010343

**FOR OFFICIAL USE ONLY**

[46] Bruce Hoffman, "Responding to Terrorism Across the Technological Spectrum," *Terrorism and Political Violence* 6, no. 3 (Autumn 1994); Walter Laquer, *Terrorism* (London: Weidenfeld and Nicolson, 1977); Brian Michael Jenkins, "International Terrorism: A New Mode of Conflict," in David Carlton and Carlo Schaerf, eds, *International Terrorism and World Security* (London: Croom Helm, 1975).

[47] Steven Simon and Daniel Benjamin, "America and the New Terrorism," *Survival* 42, no. 1 (Spring 2000), pp. 59–75; Bruce Hoffman, *Inside Terrorism* (New York: Columbia University Press, 1998); Ian O. Lesser, Bruce Hoffman, John Arquilla, David F. Ronfeldt, Michele Zanini, Brian Michael Jenkins, *Countering the New Terrorism* (Santa Monica: RAND, 1999).

[48] U.S. General Accounting Office, *Combating Terrorism*; Milton Leitenberg, "Biological Weapons in the Twentieth Century: A Review and Analysis," *Critical Reviews in Microbiology* 27, no. 4 (2001): 267–320.

[49] David R. Franz, Cheryl D. Parrott, and Ernest T. Takafuji, "The U.S. Biological Warfare and Biological Defense Program," in *Textbook of Military Medicine. Part I. Warfare, Weaponry, and the Casualty: Medical Aspects of Chemical and Biological Warfare* (Falls Church: Office of the Surgeon General, Department of the Army, 1997): 438; U.S. General Accounting Office, *Combating Terrorism*, 1-36; William C. Patrick III, "Biological Warfare: An Overview," in *Proliferation* ed. Kathleen Bailey (Livermore: Lawrence Livermore National Laboratory, 1994): 1–7.

[50] In a forthcoming book, *Malicious Motives: Assessing Terrorist Motivations and Behavioral Patterns*, edited by John Parachini, 15 cases studies of specific international terrorist groups such as the PKK, IRA, Hizbollah, Tamil Elam, and Al Qaeda are examined. In the public media, there are frequent allegations of the interest in or use of biological weapons by these groups. The book, however, finds that in virtually every case, with the exception of Al Qaeda, there is zero evidence that any of these groups produced any biological agents. Evidence regarding Al Qaeda seems to indicate only interest and the purchase of some laboratory equipment and supplies. In addition, detailed case studies of other terrorist groups such as RISE, the Red Army Faction, Minnesota Patriots Council, and the Weather Underground reveal a lack of technical skill and organization necessary for the development of mass casualty biological weapons. See: Jonathan B. Tucker, ed., *Toxic Terror: Assessing Terrorist Use of Chemical and Biological Weapons*, Cambridge: MIT Press, 2000; David Johnston and James Risen, "U.S. Concludes Al Qaeda Lacked a Chemical or Biological Stockpile," The New York Times, March 20, 2002; Michael R. Gordon, "U.S. Says It Found Qaeda Lab Being Built to Produce Anthrax," The New York Times, March 23, 2002.

[51] Paul Keim, Abdulahi Kalif, James Schuff, Karen Hill, Steven E. Travis, Kara Richmond, Debra M. Adair, Martin Hugh-Jones, Cheryl R. Kiske, and Paul Jackson, "Molecular Evolution and Diversity in Bacillus anthracis as Detected by Amplified Fragment Length Polymorphism Markers," *Journal of Bacteriology* 179, no. 3 (February 1997): 818–824.

[52] The elderly, children, and immune compromised individuals may still be susceptible to disease because of their weak immune systems.

[53] Even for botulinum toxin, the toxin would need to be concentrated in order for a small quantity to be effective in a food or beverage attack. Further, highly concentrated botulinum toxin is unstable unless correctly formulated. W. Seth Carus and Raymond A. Zilinskas, *Possible Terrorist Use of Modern Biotechnology Techniques* (April 22, 2002 version, unpublished paper): 20–21.

[54] In the fall 2001 anthrax attacks, the quality of anthrax used varied. The anthrax samples sent to U.S. Senators Daschle and Leahy were determined to be of a high concentration and purity, milled to yield a small particle size, and specially treated to eliminate static charge and promote aerosolization. However, many of these modifications to the *B. anthracis* strain could have resulted, in whole or part, from past national biodefense activities. Therefore, at the present time, it is impossible to determine whether the perpetrator(s) had the technical skill to produce such high quality anthrax or merely stole the material.

[55] Elisa Harris, Testimony on "Russia, Iraq and Other Potential Sources of Anthrax, Smallpox and Other Terrorist Weapons," before the Committee on International Relations, U.S. House of Representatives, 107th Congress, 1st Session, December 5, 2001; U.S. Government Accounting Office, *Combating Terrorism*.

[56] The strain of *B. anthracis* used in the U.S. anthrax attacks has been identified as the Ames strain. Virulent forms of anthrax, such as the Ames strain, carry two large plasmids that contain virulence factors of toxin and capsule production. Timothy D. Read, Steven L. Salzberg, Mihai Pop, Martin Shumway, Lowell Umayam,

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010344

FOR OFFICIAL USE ONLY

Lingxia Jiang, Erik Holtzapple, Joseph D. Busch, Timothy L. Smith, James M. Schupp, Daniel Solomon, Paul Keim, Claire M. Fraser, "Comparative Genome Sequencing for Discovery of Novel Polymorphisms in *Bacillus anthracis*," *Science*, 9 May 2002, pp. 1–9.

[57] It is important to recognize that high-consequence events other than mass casualties could result from the diversion of HCPTs. As the anthrax attacks in the U.S. during the fall of 2001 showed, low-casualty bioterrorism can cause significant economic, social, and political disturbances.

[58] *Variola major* virus (the causative agent for smallpox) and novel influenza strains are the only microorganisms that could easily be used malevolently to cause a mass casualty event. Using other HCPTs to cause a mass casualty event would require significant resources, infrastructure, technical skill, and ideal environmental conditions.

[59] M.D. Kelleher, New Arenas for Violence: Homicide in the American Workplace (Westport, CT: Praeger, 1996).

[60] U.S. Government, "Force Protection Battlelab Vehicle Bomb Mitigation Guide," July 1999. (FOUO)

## SECTION 5

[61] Department of Army, Interim Guidance Message 2: Establishing the Army Biological Personnel Reliability Program, February 2, 2002.

[62] Department of Defense, "Security Policy for Safeguarding Biological Select Agents," *Department of Defense Directive, Draft 5210.6X, No. 5210.XX*, April 19, 2002.

[63] "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism" (USA PATRIOT ACT) Act of 2001, H.R. 3162.

[64] The USA Patriot Act defines "restricted persons" as the following: (1) individuals under indictment for a crime punishable by imprisonment for a term exceeding one year; (2) individuals who have been convicted in any court of a crime punishable by imprisonment for a term exceeding one year; (3) fugitives from justice; (4) unlawful users of a controlled substance; (5) individuals who have been adjudicated as mentally defective or have been committed to a mental institution; (6) illegal aliens; (7) foreign nationals (other than permanent resident aliens) who are citizens of a country that the Secretary of State has determined has repeatedly provided support for acts of international terrorism; and (8) individuals who have been discharged from the Armed Services of the United States under dishonorable conditions.

[65] Sensor self-test or indicator lights are used to check the detection volume of a sensor. These lights should be disabled after testing so that the adversary will not know when they are detected.

[66] Assumes appropriate compliance with State and Federal regulations as well as site-specific training in appropriate response requirements.

## SECTION 6

[67] It needs to be emphasized that no security system, even one that required extensive searches of personnel upon every exit from each laboratory suite, can *prevent* the diversion of an HCPT by a determined insider with authorized access and system knowledge. The nature of microbiological research – the microgram quantities of self-replicating material used in research, the various places within a laboratory to acquire that material, and the fact that the material emits so little energy that it cannot be detected with standoff sensors – does not allow for the creation of a comprehensive, infallible security system. In other words, as stated in Section 3.2.5, the effectiveness of a security system at a high-containment biological research laboratory will ultimately depend on the integrity of the individuals who have access to the high-consequence organisms.

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NO. 3

ARMY02-010345

REMOVED FROM PROTECTIVE ORDER NO. 3