FOR OFFICIAL USE ONLY



DEPARTMENT OF THE ARMY
INSPECTOR GENERAL

# SPECIAL INSPECTION OF

# U.S. ARMY BIOLOGICAL DEFENSE PROGRAM - ANTHRAX

# NOVEMBER 2001

23 January 2002

FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4

ARMY02-011078



**DEPARTMENT OF THE ARMY**
OFFICE OF THE INSPECTOR GENERAL
1700 ARMY PENTAGON
WASHINGTON DC 20310-1700

1 8 FEB 2002

SAIG-ZA

MEMORANDUM FOR SEE DISTRIBUTION

SUBJECT:  Special Inspection of the U.S. Army Biological Defense Program - Anthrax

1.  Enclosed please find a copy of the final report for the recently completed Department of the Army Inspector General Special Inspection of the U.S. Army Biological Defense Program - Anthrax, 23 Jan 02.  Subject inspection was performed at the direction of the Vice Chief of Staff, Army, who has determined that this final report should be treated as "CLOSE HOLD" and subject to the distribution restrictions set forth under Exemption 5 of the Freedom of Information Act and AR 20-1, Inspector General Activities and Procedures, 16 Apr 01.

2.  Please feel free to contact this office should you have any questions concerning this report, its findings, or its release procedures.

3.  DAIG POC is COL J. B. Elliott, DSN 329-1111; commercial (703) 601-1111.

FOR THE INSPECTOR GENERAL:

Encl

JOHN J. RYNESKA
Major General, USA
Deputy The Inspector General

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

 Printed On  Recycled Paper

SAIG-TI
SUBJECT:  DAIG Special Inspection (U.S. Army Biological Defense Program - Anthrax) (FY 02)--ACTION MEMORANDUM


INITIAL DISTRIBUTION:
DUSD (TSP&C)
DODIG
Director of the Army Staff
ASA (I&E)
The Inspector General
Deputy Chief of Staff, G-1
Deputy Chief of Staff, G-2
Deputy Chief of Staff, G-3
Army Safety Office
OTSG
AMC-IG
ATEC-IG
MEDCOM IG

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

2

**FOR OFFICIAL USE ONLY**



**DEPARTMENT OF THE ARMY**
OFFICE OF THE INSPECTOR GENERAL
1700 ARMY PENTAGON
WASHINGTON DC 20310-1700



SAIG-TI                                                                1 November 2001

MEMORANDUM FOR THE VICE CHIEF OF STAFF, ARMY

SUBJECT: Directive for Special Inspection (U.S. Army Biological Defense Program - Anthrax) -- ACTION MEMORANDUM

1. PURPOSE: To obtain the VCSA signature on the Directive for a Special Inspection (U.S. Army Biological Defense Program - Anthrax).

2. DISCUSSION: Recent events involving anthrax in the United States may result in a public crisis in confidence if it is perceived that all such pathogens under military control are not adequately protected and accounted for. As the designated DOD Executive Agent for the DOD Biological Defense Research, Development, and Acquisition (RDA) Program, the Army must be able to respond to legitimate requests for information concerning anthrax RDA in a timely and accurate manner. Absent a single Army POC for Biological Defense Accountability and Security, it is imperative that all anthrax data be compiled soonest in order to establish a baseline from which all subsequent discussions and taskings can be launched, to include public affairs releases to the media and American public. Accordingly, the DAIG should coordinate an inspection of Army installations in possession of reference and/or working stocks of *Bacillus anthracis* to assess their security and accountability programs. The inspection objectives of this inspection are:

   a. Assess the adequacy of policies governing U.S. Army Biological Defense Programs for Anthrax and identify systemic problems in execution.

   b. Assess the efficacy of existing oversight programs for Anthrax RDA.

   c. Assess guidance regarding Anthrax accountability, inventory management, and personnel training/screening, to include current DA anthrax inventory rollup.

   d. Assess the adequacy of physical security measures for protection of anthrax stocks at Army installations.

**1**



Printed On   Recycled Paper

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4          ARMY02-011081

# TABLE OF CONTENTS

Table of Contents                                                    i

Action Memorandum - TIG to VCSA, 1 Nov 01                            1

Directive - VCSA to TIG, 5 Nov 01                                    2

Action Memorandum - TIG to VCSA, 25 Jan 02
    To Include VCSA Approval, 1 Feb 02                               3

Release of IG Information                                            4

Executive Summary                                                 ES-1

Chapter I          Inspection Structure                            1-1

Chapter II         Findings                                        2-1

Appendix A         Consolidated List of Recommendations            A-1

Appendix B         Glossary of Abbreviations                       B-1

"This document contains information
EXEMPT FROM MANDATORY DISCLOSURE
under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except
as authorized by AR 20-1."

## FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4            ARMY02-011082

SUBJECT:  Directive for Special Inspection (U.S. Army Biological Defense Program - Anthrax) -- ACTION MEMORANDUM

3. RECOMMENDATION:  VCSA sign the directive at the TAB A.

MICHAEL W. ACKERMAN
Lieutenant General, USA
The Inspector General

_____  Approved

_____  Disapproved

_____  Comments

1-2

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4



**DEPARTMENT OF THE ARMY**
OFFICE OF THE VICE CHIEF OF STAFF
201 ARMY PENTAGON
WASHINGTON DC 20310-0201

REPLY TO
ATTENTION OF

5 NOV 2001

MEMORANDUM FOR THE INSPECTOR GENERAL

SUBJECT:  Directive for Special Inspection (U.S. Army Biological Defense Program - Anthrax)

1.  You are directed to conduct a special inspection of Army installations storing anthrax.

2.  The special inspection will focus on, but not be limited to, the accountability and physical security procedures for anthrax bacterium in storage at U.S. Army installations and the current system of DA/MACOM oversight.  As a minimum, you will:

    a.  Assess the adequacy of policies governing U.S. Army Biological Defense Programs for Anthrax and identify systemic problems in execution.

    b.  Assess the efficacy of existing oversight programs for anthrax research, development and acquisition.

    c.  Assess guidance regarding anthrax accountability, inventory management, and personnel training/screening, to include a current rollup of the DA anthrax inventory.

    d.  Assess the adequacy of physical security measures for protection of anthrax stocks at Army installations.

3.  You are authorized to task the Army Staff and subordinate headquarters for those resources needed to ensure accomplishment of the mission.  You are authorized unlimited access to the Army Staff and other Army agencies necessary to complete this inspection.

4.  You will provide me a report at the conclusion of the assessment.

JOHN M. KEANE
General, United States Army
Vice Chief of Staff

2



DEPARTMENT OF THE ARMY
OFFICE OF THE INSPECTOR GENERAL
1700 ARMY PENTAGON
WASHINGTON DC 20310-1700

SAIG-TI

2 5 JAN 2002

MEMORANDUM FOR VICE CHIEF OF STAFF, ARMY

SUBJECT: DAIG Special Inspection (U.S. Army Biological Defense Program - Anthrax) (FY 02)—ACTION MEMORANDUM

1. Purpose: To obtain VCSA approval for the DAIG inspection report of the U.S. Army Biological Defense Program - Anthrax.

2. Discussion.

   a. As directed by VCSA, DAIG conducted a special inspection of Army installations storing anthrax during the period of 13-21 November 2001. Inspection objectives were as follows: assess the adequacy of policies governing U.S. Army Biological Defense Programs for anthrax and identify systemic problems in execution; assess the efficacy of existing oversight programs for anthrax research, development and acquisition; assess guidance regarding anthrax accountability, inventory management, and personnel training/screening, to include a current rollup of the DA anthrax inventory; assess the adequacy of physical security measures for protection of anthrax stocks at Army installations.

   b. Three different laboratories were inspected, each owned by a separate Army MACOM - Army Materiel Command (AMC), Army Test and Evaluation Command (ATEC), and the Army Medical Command (MEDCOM). The inspection methodology employed was similar to that which governs the chemical surety inspections normally performed by this inspection team IAW AR 50-6, Chemical Surety.

   c. Overall, each laboratory is making an effort to account for and protect their anthrax stocks in their own way. Each approach is largely based upon their own experiences and preferences. Local guidance concerning these matters has been established, but it is not always written and specific and is sometimes oral and implied. Some of the self-imposed requirements are a result of the permitting process established by a non-DOD agency - the Center for Disease Control (CDC). Traditional Army methods of accounting for property are simply not realistic for a living organism. Furthermore, it is not clear if anthrax (or any other biological agent for that matter) is considered to be "Army property" with all the normal controls and responsibilities inherent thereto.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

## FOR OFFICIAL USE ONLY

3

SAIG-TI
SUBJECT:  DAIG Special Inspection (U.S. Army Biological Defense Program - Anthrax) (FY 02)--ACTION MEMORANDUM

    d.  Absent quantifiable, achievable and verifiable accountability and inventory requirements for anthrax, security of the stockpile by default is based upon trusted personnel from within and physical security barriers from without.  However, Army personnel screening and hiring requirements for individuals working in the Bio-Safety Level 3 & 4 labs are not extraordinary and do not include the continuing evaluation mandates that are a vital aspect of personnel reliability programs that protect our national nuclear and chemical assets.  Physical security standards are not consistent throughout and are often based upon local interpretation and application of Army 190-series regulations or derive a collateral benefit from other security programs in place for that building, such as a pharmacy or chemical surety laboratory.

    e.  While focus of this inspection was upon control and management of Army anthrax stocks, it should be noted that the findings, recommendations, and conclusions can be applied to virtually any biological agent, pathogen, or toxin in the Army's inventory.

3.  Recommendations:

    a.  VCSA approve the report.

    b.  HQDA task appropriate agencies/headquarters to implement the recommendations specified in this report.

    c.  Department of the Army Inspector General disseminates this report to appropriate Army Staff and MACOMs.

Encl                                    MICHAEL W. ACKERMAN
                                        Lieutenant General, USA
                                        The Inspector General

DECISION:

APPROVED:_____ 1 FEB 2002

DISAPPROVED:_____

SEE ME:_____

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."

2

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**
3-2

```
*************************************
*   DISSEMINATION, REPRODUCTION AND   *
*   RETENTION OF INSPECTOR GENERAL    *
*   REPORTS OR EXTRACTS THEREOF IS    *
*   PROHIBITED EXCEPT AS AUTHORIZED   *
*   BY AR 20-1                        *
*************************************
```

"This document contains information
EXEMPT FROM MANDATORY DISCLOSURE
under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except
as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

**4**

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4

ARMY02-011087

## EXECUTIVE SUMMARY

At the direction of the Vice Chief of Staff of the Army (VCSA), the Department of the Army Inspector General (DAIG) conducted a special inspection of Army facilities that store anthrax with an emphasis on accountability and security from 13-21 November 2001. At a minimum, the DAIG was to focus on the following objectives:  assess the adequacy of policies governing U.S. Army Biological Defense Programs for anthrax and identify systemic problems in execution; assess the efficacy of existing oversight programs for anthrax research, development and acquisition; assess guidance regarding anthrax accountability, inventory management, and personnel training/screening, to include a current rollup of the DA anthrax inventory; assess the adequacy of physical security measures for protection of anthrax stocks at Army installations.

The DAIG Technical Inspections Division conducted this special inspection with augmentation from the U.S. Army Safety Office (ASO) and the Office of the Surgeon General (OTSG). Furthermore, representatives from the Department of Defense Inspector General (DODIG) accompanied the team during visits to the first two sites. The special inspection covered the U.S. Army Medical Research Institute of Infectious Diseases (USAMRIID) at Ft. Detrick, MD; the Edgewood Chemical Biological Center (ECBC) at Aberdeen Proving Ground, MD; and the West Desert Test Center (WDTC) at Dugway Proving Ground, UT.

While the focus of this inspection was upon the control and management of Army anthrax stocks, it should be noted that the findings, recommendations, and conclusions could be applied to virtually any biological agent, pathogen, or toxin in the Army's inventory.

### Inspection Findings

<u>Assess the adequacy of policies governing U.S. Army Biological Defense Programs for anthrax and identify systemic problems in execution.</u>

Inadequate policies currently govern U.S. Army Biological Defense Programs for anthrax and other etiological agents. While the safe handling, storage and physical security of biological materials has been of paramount importance to both Program Managers and laboratory personnel since the inception of the Biological Defense Research Program (BDRP), efforts with regards to personnel security can be significantly improved.

In numerous instances, required security clearances for several individuals had lapsed and their five or ten-year

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

## FOR OFFICIAL USE ONLY

ES -1

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4        ARMY02-011088

periodic reinvestigations were outdated.  Additionally, these individuals did not have their access restricted to hazardous biological materials during the reinvestigation process.  Some workers, originally hired to occupy noncritical-sensitive positions, have been upgraded to critical-sensitive without proper justification.  One individual with dual-citizenship was granted an interim security clearance.  The presence of foreign nationals raised the concern of their probable improper access.  Furthermore, in some instances, organizations were slow to identify all personnel with access to their various biosafety levels (BSLs).

Organizations have different personnel security investigative (PSI) requirements for individuals with access to hazardous biological material.  These positions are coded as critical-sensitive, noncritical-sensitive, or nonsensitive.  However, individuals in different organizations may perform similar duties; yet have varying PSI requirements due to different position codes.  As such, there is a significant variation in the personnel security investigations of individuals having access to hazardous biological material.

Adequate policies were not demonstrated to assure coordination between Occupational Health Clinics and research activities. This results in fragmented Occupational Health services. Workers with potential medical problems that may impact their ability to reliably and safely perform their duties are not being identified. This policy gap can result in workers that are potentially medically unqualified being allowed to perform duties that might pose a hazard to themselves or others, the activity, or the community.

<u>Assess the efficacy of existing oversight programs for anthrax research, development and acquisition.</u>

There is no visible oversight program for biological agent accountability or security being conducted by either the MACOMs or Headquarters Department of the Army (HQDA). There is a periodic DA biological defense safety inspection program mandated for the Army Safety Office by AR 385-69, Biological Defense Safety Program, but their mission is largely limited to safety.

There is no common standard from the Army Staff (ARSTAF) for oversight of the Biological Defense Research, Development, Test, and Acquisition operations for the Army's Biological Anthrax Defense Program.  The only Army Command actively involved in the Biological program is Army Medical Command (MEDCOM).  AR 70-65, Management of Controlled Substances, Ethyl Alcohol, and Hazardous

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

ES -2

Biological Substances in Army Research, Development, Test, AND Evaluation Facilities, dated 1 September 1979, promulgated by the Surgeon General, established policy and guidance for controlled hazardous biological substances.  It has not been updated in the past twenty-two years and is not well known or adhered to. AR 385-69, Biological Defense Safety Program, dated 31 Dec 1993, only establishes the Army Safety Program for the Army's Biological Defense Program.  There is not a dedicated ARSTAF responsible for establishing common standards and policies, only an ARSTAF presence on Joint boards.

Oversight of contractor laboratories working with hazardous biological materials is primarily limited to the requirements found in the regulation governing the Biological Defense Safety Program.  There are no other Army requirements for accountability, inventory management, and personnel training/screening of individuals placed on these laboratories. Unfortunately, there is the potential for unauthorized access to these materials and resulting possible harm to individuals or negative reactions to the Army's involvement.

There is a lack of coordination between special immunizations programs and Occupational Health.  Special immunizations programs appear to be doing portions of Occupational Health, but little information is shared. Though some information pertaining to investigational new drugs may not be shared, much information should be shared.

<u>Assess guidance regarding anthrax accountability, inventory management, and personnel training/screening, to include a current rollup of the DA anthrax inventory.</u>

There is no standard Army policy for the management and control of anthrax stocks. Three different laboratories were inspected, each owned by a separate Major Army Command (MACOM) - Army Materiel Command (AMC), Army Test and Evaluation Command (ATEC), and MEDCOM.  Each laboratory was taking a different approach because there is no standard Army policy in effect for the accountability and security of Army anthrax stocks.  While Army Regulation 70-65, Management of Controlled Substances, Ethyl Alcohol, and Hazardous Biological Substances in Army Research, Development, Test, and Evaluation Facilities, 1 September 1979, has not been superceded and is still considered current by some, two of the three laboratories (and their MACOMs) were not aware of its existence.  The third laboratory was not following this regulation since they felt it was so outdated.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

## FOR OFFICIAL USE ONLY

ES -3

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4

ARMY02-011090

Each laboratory is making an effort to account for and protect their anthrax stocks in their own way.  Each approach is largely based upon their own experiences and preferences.  Local guidance concerning these matters has been established, but it is not always written or specific and is sometimes oral or implied.  Some of the self-imposed requirements are a result of the permitting process established by a non-DOD agency - the Center for Disease Control (CDC).  Traditional Army methods of accounting for property are simply not realistic for a living organism.  Furthermore, it is not clear if anthrax (or any other biological agent for that matter) is considered to be "Army property" with all the normal controls and responsibilities inherent thereto.

<u>Assess the adequacy of physical security measures for protection of anthrax stocks at Army installations.</u>

Absent quantifiable, achievable and verifiable accountability and inventory requirements for anthrax, security of the stockpile by default is based upon trusted personnel from within and physical security barriers from without.  However, Army personnel screening and hiring requirements for individuals working in the Bio-Safety Level 3 & 4 labs are not extraordinary and do not include the continuing evaluation mandates that are a vital aspect of personnel reliability programs that protect our national nuclear and chemical assets.  Physical security standards are not consistent throughout and are often based upon local interpretation and application of Army 190-series regulations or derive a collateral benefit from other security programs in place for that building, such as a pharmacy or chemical surety laboratory.

### Inspection Results

A briefing of these findings was prepared by the DAIG inspection team and presented to the VCSA on 30 November 2001.  As a result, the VCSA directed that an Army Biological Surety Program be established.  All subsequent recommendations made in this report serve to implement that decision.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

ES -4

# Chapter I

## Inspection Structure

1. **General.** As directed by the VCSA and in accordance with the provisions of AR 20-1, Inspector General Activities and Procedures, the DAIG conducted a special inspection of Army facilities that store anthrax.

2. **Objectives.** The purpose of this special inspection was to examine accountability and physical security procedures for anthrax bacterium in storage at U.S Army installations and the current system of DA/MACOM oversight. At a minimum, the DAIG was to assess: the adequacy of policies governing U.S. Army Biological Defense Programs for anthrax and identify systemic problems in execution; the efficacy of existing oversight programs for anthrax research, development and acquisition; guidance regarding anthrax accountability, inventory management, and personnel training/screening, to include a current rollup of the DA anthrax inventory; and the adequacy of physical security measures for protection of anthrax stocks at Army installations.

3. **Methodology.**

   a. Formal in briefs were provided to the leadership of all three Army installations. Inspection team members interfaced with their counterparts and reviewed pertinent records and reports to include: regulations; Standard Operating Procedures (SOPs); logs; journals; and personnel security information.

   b. The team conducted the inspection at the following locations:

   (1) USAMRIID, Ft. Detrick, MD.

   (2) ECBC, Aberdeen Proving Ground, MD.

   (3) WDTC, Dugway Proving Ground, UT.

   c. The team included the DAIG and subject matter experts from the ASO and the OTSG as follows:



COL Elliott, DAIG, Team Chief                     DAIG
COL ▮▮▮▮▮ OTSG                                     DAIG
LTC ▮▮▮▮▮, DAIG                                    DAIG
MAJ ▮▮▮▮▮ DAIG                                     ASO

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

## FOR OFFICIAL USE ONLY

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4          ARMY02-011092

In addition, visits to the first two sites included the DODIG as follows:



LTC ██████, DODIG        Ms. ██████, DODIG
MAJ ██████, DODIG        Mr. ██████, DODIG

4. **Scope.** The team visited each of the installations for two days. During that time they reviewed records and reports and discussed procedures in five areas. Those areas were: Accountability; Medical; Personnel Security and Records; Physical Security; and Safety. The sites were visited as follows:

USAMRIID - 13-14 November 2001
ECBC - 15-16 November 2001
WDTC - 19-20 November 2001

"This document contains information
EXEMPT FROM MANDATORY DISCLOSURE
under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except
as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4

ARMY02-011093

# Chapter II

## Findings

### General

Three different laboratories were inspected, each owned by a separate Army MACOM - AMC, ATEC, and MEDCOM. Each laboratory was taking a different approach because there is no standard Army policy in effect for the accountability and security of Army anthrax stocks. While AR 70-65, Management of Controlled Substances, Ethyl Alcohol, and Hazardous Biological Substances in Army Research, Development, Test, and Evaluation Facilities, 1 September 1979, has not been superceded and is still considered current by some, two of the three laboratories (and their MACOMs) were not aware of its existence. The third laboratory was not following this regulation since they felt it was so outdated.

Each laboratory is making an effort to account for and protect their anthrax stocks in their own way. Each approach is largely based upon their own experiences and preferences. Local guidance concerning these matters has been established, but it is not always written and specific and is sometimes oral and implied. Some of the self-imposed requirements are a result of the permitting process established by a non-DOD agency - the CDC. Traditional Army methods of accounting for property are simply not realistic for a living organism. Furthermore, it is not clear if anthrax (or any other biological agent for that matter) is considered to be "Army property" with all the normal controls and responsibilities inherent thereto.

Biological agents and pathogens under the direct control of the U.S. Army are not afforded a standard, minimum level of protection similar to that, which is mandated for nuclear and chemical weapons. It must be noted, however, that there was no evidence during this inspection that any of the Army's anthrax stockpile is missing or has been misused. However, as noted earlier, that statement reflects the elusive nature of the organism in question and cannot be guaranteed to be completely accurate since there is no countable historical baseline from which to start and no scientific method by which additions and subtractions to the stockpile can be objectively measured. Since these agents are so difficult to inventory in the traditional sense, trusted personnel are perhaps more important in the control and protection of these items than for other special weapons for which the Army is responsible.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4

ARMY02-011094

While existing biological agent guidance embodied in AR 70-65 may have been sufficient for 1979, it may not be sufficient in today's environment. The ARSTAF must determine whether it wants to manage the Biological Defense Program as it manages the Army's nuclear and chemical weapons programs, or merely update existing guidance and continue to leave the three MACOMs involved free to determine their own requirements.

Absent quantifiable, achievable and verifiable accountability and inventory requirements for anthrax, security of the stockpile by default is based upon trusted personnel from within and physical security barriers from without. However, Army personnel screening and hiring requirements for individuals working in the Bio-Safety Level 3 & 4 labs are not extraordinary and do not include the continuing evaluation mandates that are a vital aspect of personnel reliability programs that protect our national nuclear and chemical assets. Physical security standards are not consistent throughout and are often based upon local interpretation and application of Army 190-series regulations or derive a collateral benefit from other security programs in place for that building, such as a pharmacy or chemical surety laboratory.

There is no visible oversight program for biological agent accountability or security being conducted by either the MACOMs or HQDA. There is a periodic DA biological defense safety inspection program mandated for the Army Safety Office by AR 385-69, Biological Defense Safety Program, but their mission is largely limited to safety.

It is critical that the research being conducted by Army laboratories is not unduly hindered as the Army Staff addresses this issue and proposes remedies. Therefore, it is vital that the scientific community be given a key role in determining what improvements can be realistically made to the biological defense management program and not simply adopt a nuclear/chemical surety-like program on a word-for-word basis.

While designated the DOD Executive Agent for Biological Defense by DOD Directive 5160.5 (Responsibilities for Research, Development, and Acquisition of Chemical Weapons and Chemical and Biological Defense), the Army should ensure that any new management initiatives for its laboratories are compatible with the standards established for other DOD and military service biological defense research laboratories.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4
ARMY02-011095

While the focus of this inspection was upon the control and management of Army anthrax stocks, it should be noted that the findings, recommendations, and conclusions could be applied to virtually any biological agent, pathogen, or toxin in the Army's inventory.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

FOR OFFICIAL USE ONLY

2 -3

## Observations

**FINDING 001:** Policies governing U.S. Army Biological Defense Programs for anthrax are inadequate. Execution of current procedures needs improvement.

**OBJECTIVE:** Assess the adequacy of policies governing U.S. Army Biological Defense Programs for anthrax and identify systemic problems in execution.

**INSPECTION RESULTS:**

1. While the safe handling, storage and physical security of biological materials has been of paramount importance to both Program Managers and laboratory personnel since the inception of the BDRP, efforts with regards to personnel security can be significantly improved. For example:

   a. In numerous instances, required security clearances for several individuals had lapsed and their five or ten-year periodic reinvestigations were outdated. Additionally, these individuals did not have their access restricted to hazardous biological materials during the reinvestigation process. Some workers, originally hired to occupy noncritical-sensitive positions, have been upgraded to critical-sensitive without proper justification. One individual with dual-citizenship was granted an interim security clearance.

   b. Organizations have different PSI requirements for individuals with access to hazardous biological materials. These positions are coded as critical-sensitive, noncritical-sensitive, or nonsensitive. However, individuals in different organizations may perform similar duties, yet have varying PSI requirements due to different position codes. As such, there is a significant variation in the personnel security investigations of individuals having access to hazardous biological materials.

   c. In some instances, organizations were slow to identify all personnel with access to their various BSLs. There was no readily available current roster identifying individuals and their social security numbers, PSI type and date, clearance, and their highest approved BSL to assist with access or to monitor the status of PSIs and clearances.

   d. A review of two person rule policies (if any) in place at the laboratories revealed the following:

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2-4

(1)   Documentation suggests that that foreign nationals have had sole access to BSL3 and 4 labs;  countries of origin: China, Latvia, Iraq.

(2)   There is evidence that maintenance personnel whose clearances are unknown are permitted sole access to labs (at times during non-duty hours).

2.   Adequate policies were not demonstrated to assure coordination between Occupational Health Clinics and research activities.  This results in fragmented Occupational Health services.  Workers with potential medical problems that may impact their ability to reliably and safely perform their duties are not being identified.  This policy gap can result in workers that are potentially medically unqualified being allowed to perform duties that might pose a hazard to themselves or others, the activity, or the community.  For instance, individuals were found with neuropsychiatric disorders, histories of alcohol dependence, claustrophobia, and asthma with no documentation that they had been cleared to work or restricted.  No apparent systems are in place to coordinate this information with the staff.

**RECOMMENDATIONS:**

1.  Army G3:

   Promulgate a regulation identifying disqualifying factors and PSI requirements for workers with BSL access.  Clearly identify personnel who are ineligible for BSL access (i.e. foreign nationals).

2.  Army G2:

   Review the sensitivity of positions with BSL access and include them in either the criteria for critical-sensitive or noncritical sensitive positions in AR 380-67, Personnel Security.

3.  Installations with biological material:

   a.  Ensure that personnel security investigations correspond to the access required.

   b.  Limit access by individuals to etiologic agents during periods of personal security reinvestigations or if an issue arises concerning an individuals' security qualifications.

   c.  Establish a roster identifying individuals and their social security numbers, PSI type and date, clearance, and their

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2-5

highest approved BSL to assist with access and to monitor the status of PSIs and clearances.

    d.  Improve coordination between the Research Activities and the Health Clinics to ensure that the Occupational Health services adequately address potential medical problems that may impact workers' abilities to reliably and safely perform their duties.

**ACTION CMD:**

1.  Army G3.

2.  Army G2.

3.  Installations with biological material.

**INFO CMD:**

1.  Commanding General AMC.

2.  Commanding General MEDCOM.

3.  Commanding General ATEC.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2 -6

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4

ARMY02-011099

**FINDING 002:** Existing oversight programs for anthrax research, development and acquisition are outdated and inadequate.

**OBJECTIVE:** Assess the efficacy of existing oversight programs for anthrax research, development and acquisition.

**INSPECTION RESULTS:**

1. There is no common standard from the ARSTAF for oversight of the Biological Defense Research, Development, Test, and Acquisition operations for the Army's Biological Anthrax Defense Program. The only Army Command actively involved in the Biological program is MEDCOM. AR 70-65, Management of Controlled Substances, Ethyl Alcohol, and Hazardous Biological Substances in Army Research, Development, Test, AND Evaluation Facilities, dated 1 September 1979, promulgated by the Surgeon General, established policy and guidance for controlled hazardous biological substances. It has not been updated in the past twenty-two years and is not well known or adhered to. AR 385-69, Biological Defense Safety Program, dated 31 Dec 1993, only establishes the Army Safety Program for the Army's Biological Defense Program. There is not a dedicated ARSTAF responsible for establishing common standards and policies, only an ARSTAF presence on Joint boards.

2. Oversight of contractor laboratories working with hazardous biological materials is primarily limited to the requirements found in the regulation governing the Biological Defense Safety Program. There are no other Army requirements for accountability, inventory management, and personnel training/screening of individuals placed on these laboratories. Unfortunately, there is the potential for unauthorized access to these materials and resulting possible harm to individuals or negative reactions to the Army's involvement. However, there is also a need to maintain a strong working relationship between Army researchers and these contractor laboratories.

3. There is an apparent lack of coordination between special immunizations programs and Occupational Health. Special immunizations programs appear to be doing portions of Occupational Health, but little information is shared. Though some information pertaining to investigational new drugs may not be shared, much information should be shared.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4    ARMY02-011100

**RECOMMENDATIONS:**

1.  Army G3:

    a.  Develop, implement and enforce stringent standards concerning the Army's Biological Agent Defense Program.

    b.  Explore standardized accountability, inventory management and personnel training/screening requirements for contractor laboratories, which reflect the current need for heightened precautions in dealing with hazardous biological materials.

    c.  As DOD Executive Agent for Biological Defense, effect necessary changes to the other Services biological material storage programs to ensure that they develop, implement and enforce the same stringent standards as the Army.

2.  OTSG:

    Appoint an Occupational Medicine physician to oversee the Occupational Health program and to coordinate the activities of special immunizations programs to ensure that information required to assure the worker is safe and reliable is shared between both programs.

3.  DAIG:

    Revise Army Regulation 20-1, Inspector General Activities and Procedures, to reflect the requirement to conduct compliance inspections of organizations with biological materials.

**ACTION CMD:**

1.  Army G3.

2.  OTSG.

3.  DAIG.

**INFO CMD:**

1.  Commanding General AMC.

2.  Commanding General MEDCOM.

3.  Commanding General ATEC.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2-8

**FINDING 003:** Guidance regarding anthrax accountability, inventory management, and personnel training/screening is either outdated, inadequate, non-existent or being disregarded. A current rollup of the DA anthrax inventory cannot be measured.

**OBJECTIVE:** Assess guidance regarding anthrax accountability, inventory management, and personnel training/screening, to include a current rollup of the DA anthrax inventory.

**INSPECTION RESULTS:**

1. There is no standard Army policy for the management and control of anthrax stocks. While Army Regulation 70-65, Management of Controlled Substances, Ethyl Alcohol, and Hazardous Biological Substances in Army Research, Development, Test, and Evaluation Facilities, 1 September 1979, has not been superceded and is still considered current, the inventory guidance established in paragraph 3-3d is not being followed. Local guidance concerning this matter has been published, but it is not being followed either.

2. Determining individual reliability prior to employees having access to hazardous biological materials is critical to counter internal threats. Documented supervisor reviews of laboratory workers personnel and security files prior to accession, with emphasis placed on a pre-employment interview, would better serve the existing BDRP. There are currently no standards for potentially disqualifying information to be used as a guide during these screenings to preclude acceptance of individuals of questionable reliability.

3. There is no requirement for biological defense workers to inform supervisors whenever their reliability status changed. Nor is there a requirement for supervisors to determine if the condition warranted restriction to etiologic agents for a temporary period of time. For example, if a worker is put on a narcotic pain medication or is undergoing a period of extreme emotional turbulence, this information is currently not required to be self-reported by the worker to the supervisor prior to resuming assigned laboratory duties.

4. Employees with access to hazardous biological materials are not in testing designated positions (TDP) to monitor for illegal drug use. However, it appears that such personnel perform duties, which clearly fall within the parameters of Executive Order 12564, Drug-Free Federal Workplace (i.e. national security or other functions requiring a high degree of trust and confidence).

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2 -9

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4     ARMY02-011102

5.  There is no unifying Army regulation, medical regulation or pamphlet, which allows enforcement of components of the Army biological program for medical purposes.  Mandatory drug testing, special immunizations, use of personal protective equipment, and potentially disqualifying information cannot be required of employees at present by regulation.  For instance, though some programs require urine testing for workers involved in biological warfare agent activities, participation in a drug-screening program is voluntary on the part of the worker.  This presents a considerable gap in our ability to medically assure that workers are safe and reliable to handle these agents.  The only regulation to cite might be AR 70-65 or the CFR 32 626/627 that "seems" to require this.

6.  There is no readily identifiable way to determine if a biological agent is present in a particular room (i.e., it may be a BSL3 or BSL4 room, however material may not be present).

**RECOMMENDATIONS:**

1.  Army G3:

    Develop, implement and enforce stringent standards regarding accountability, inventory management and personnel training/screening requirements for the Biological Agent Defense Program.  Include standards for potentially disqualifying information and make the requirement to self-report reliability issues a condition of employment.

2.  Army G1:

    Identify personnel positions with BSL access as TDPs and incorporate this into AR 600-85, Alcohol, Drug Abuse Prevention and Control Program.

3.  OTSG:

    Develop and implement a regulation, which addresses the requirements for special immunizations and personal protective equipment by personnel with BSL access.

4.  ASO:

    Incorporate a method in the safety regulation to enable differentiation of rooms that are certified for BSL2-BSL4 work from BSL rooms, which currently contain BSL2-BSL4 biological material.

**"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."**

**"Dissemination is prohibited except as authorized by AR 20-1."**

**FOR OFFICIAL USE ONLY**

2 -10

**ACTION CMD:**

1.  Army G3.

2.  Army G1.

3.  OTSG.

4.  ASO.

**INFO CMD:**

1.  Commanding General AMC.

2.  Commanding General MEDCOM.

3.  Commanding General ATEC.

"This document contains information
EXEMPT FROM MANDATORY DISCLOSURE
under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except
as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2 -11

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4

**FINDING 004:** Physical security measures for protection of anthrax stocks at Army installations were inadequate.

**OBJECTIVE:** Assess the adequacy of physical security measures for protection of anthrax stocks at Army installations.

**INSPECTION RESULTS:**

1. A review of physical security plans and procedures in place at the laboratories revealed the following:

   a. One facility has no internal Physical Security Plan (PSP). Another facility has an internal Physical Security Plan but it does not adequately address basic physical security practices. The installation PSP contains information concerning the building that houses the Biological material, however, this is because the building also contains a pharmacy/controlled substances and/or chemical agent, and not because of the biological material.

   b. A formal vulnerability assessment (VA) has not been conducted at any of the facilities storing biological material. This would ensure that vulnerabilities associated with biological material are addressed.

   c. A Physical Security Inspection of rooms containing biological material has not been conducted by either the installation or the next higher commands.

   d. One facility has SOPs that govern key and lock control and badge requirements; however, these SOPs are outdated and, in numerous cases, are no longer applicable or being implemented.

   e. An analysis of the building structure versus the amount of time it would take a perpetrator to impede protective barriers has not been addressed. Specifically, such issues as the type of construction, window openings, exposed exterior bolts are not addressed. In addition, weaknesses in the construction such as dunk tanks on the doors, enclave openings, etc., have not been addressed.

   f. The U.S. Department of Agriculture (USDA) has a laboratory with biological material on an Army installation but there is no established Memorandum of Agreement to address its security. Procedures regarding this facility are undetermined.

2. A review of access controls in place at the laboratories revealed the following:

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2 -12

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4

ARMY02-011105

a.  Access is controlled by civilian security guards and military medical personnel through the front door.  There is no documentation to show that they have received any type of security/response type training.

b.  Permanent employees are provided with an electronic badge while visitors are given a visitors badge of the type that has been in circulation since 1987.  The electronic badge controls access through magnetic slide-type doors.  Although visitors are not issued this type of badge, two inspectors were able to gain access through two restricted areas by piggybacking with other permanent employees.

c.  Although local policy dictates that all bags, packages, and backpacks be checked upon entry into the facility, such checks were not being done consistently.  Even though the facility recognizes that the biggest threat to this facility is an internal threat, personal items such as brief cases and bags are not checked on the way out.

d.  No additional checks of bags are conducted when personnel enter or leave higher biosafety levels.

e.  Doors that lead to power supplies and air vents were unsecured.

3.  A review of key and lock controls in place at the laboratories revealed the following:

a.  Access to the biological material rooms as well as the refrigerators/cabinets is possible by one individual due to having only one lock protecting each of these sites.

b.  There are combination locks on doors containing biological material.  There is no record of who controls these combinations or when they have been changed.

c.  There are several different types (high, medium and low security) of locks on containers with biological material.  There was no inventory and/or accountability of these locks.

d.  There is a chain link door that houses numerous refrigerators containing BSL 3 and BSL 4.  Some of the refrigerators have built in locks, some only have the factory installed locks and two were found unsecured.

e.  Personnel authorized to receive keys/possess combinations are not designated by an official who is aware if they have continued access.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4          ARMY02-011106

4.  A review of intrusion detection systems (IDS) in place at the laboratories revealed the following:

a.  IDS is installed on the repository, however it is not tested on a routine basis.  There are no measures in place for when it is inoperable nor is there any record to show when it may have alarmed or malfunctioned.  Additionally, there are no maintenance records on the system.

b.  There is no IDS installed on the individual rooms storing biological material.

c.  There is no Closed Circuit Television (CCTV) in place either inside or outside the rooms storing biological material. Not only is this a deterring security measure, it could also aid in ensuring the safety of workers.

5.  A review of security policies in place at the laboratories revealed that security personnel are not checking rooms storing biological material.

6.  A review of training programs in place at the laboratories for their security personnel revealed the following:

a.  Military personnel controlling access to one facility receive no type of security/response type training.

b.  Security force personnel at one facility have no knowledge of biological material being stored there.

**RECOMMENDATIONS:**

1.  Army G3:

a.  Develop, implement and enforce regulatory requirements that cover:

(1)  Implementation of a PSP so that a uniform approach is not only known but practiced by employees.

(2)  Requirement that a vulnerability assessment (VA) be conducted.

(3)  Requirement for Physical Security Inspections of rooms containing biological material.

(4)  Implementation of key and lock, and badge control procedures.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4          ARMY02-011107

(5)  Construction standards for rooms storing biological materials.

(6)  Army biological material stored at non-military facilities.

(7)  Access control to include badging, package checks, and entrance into restricted areas.

(8)  Areas requiring IDS and CCTV and their maintenance instructions.

(9)  Minimum physical security measures to be implemented.

(10)  Minimum training standards for personnel who provide security for biological material.

2.  Installations with biological material:

a.  Ensure that key and lock, badge control, and access control SOPs are updated and adhered to.

b.  Ensure that stored biological materials are properly and adequately secured at all times.

**ACTION CMD:**

1.  Army G3.

2.  Installations with biological material.

**INFO CMD:**

1.  Commanding General AMC.

2.  Commanding General MEDCOM.

3.  Commanding General ATEC.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

REMOVED FROM PROTECTIVE ORDER NOS. 3 and 4

ARMY02-011108