1

1              IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF FLORIDA

3        CASE NUMBER: 9:03-cv-81110-CIV-HURLEY/HOPKINS

4

5   MAUREEN STEVENS, as Personal

6   Representative of the Estate of

7   ROBERT STEVENS, Deceased, and

8   on behalf of MAUREEN STEVENS,

9   Individually, NICHOLAS STEVENS,

10  HEIDI HOGAN and CASEY STEVENS,

11  Survivors

12            Plaintiffs

13  vs.

14  UNITED STATES OF AMERICA

15            Defendant

16  _____/

17

18            The Videotaped deposition of PETER B.

19  JAHRLING, Ph.D. was held on Tuesday, June 7, 2011,

20  commencing at 9:23 a.m., at USAMRIID, 1520 Freedman

21  Drive, Second Floor, MWR Conference Room, Fort Detrick,

22  Maryland 21702, before Robert A. Shocket, Notary

23  Public.

24

25  REPORTED BY: Robert A. Shocket

2

```
 1   APPEARANCES:

 2

 3              ON BEHALF OF THE PLAINTIFFS:

 4              RICHARD D. SCHULER, ESQUIRE

 5                  Schuler, Halvorson & Weisser, P.A.

 6                  1615 Forum Place, Suite 4-D

 7                  West Palm Beach, Florida 33401

 8                  Telephone: 561.689.8180

 9                  Facsimile: 561.684.9683

10                  Email: rschuler@shw-law.com

11

12              ON BEHALF OF THE DEFENDANT:

13              LEON B. TARANTO, ESQUIRE

14              JASON S. PATIL, ESQUIRE

15                  United States Department of Justice

16                  Civil Division, Torts Branch

17                  1331 Pennsylvania Avenue

18                  Room 8004S

19                  Washington, D.C. 20044

20                  Telephone: 202.616.4231

21                  Facsimile: 202.616.4473

22                  Email: leon.b.taranto@usdoj.gov

23                  Email: jason.patil2@usdoj.gov

24

25   (APPEARANCES CONTINUED on the Next Page)
```

3

```
 1   APPEARANCES CONTINUED:

 2

 3   ALSO PRESENT:

 4

 5           JEFFREY B. MILLER, ESQUIRE

 6               U.S. Army Research and Materiel Command

 7               Office of the Staff Judge Advocate

 8               521 Fraim Street

 9               Fort Detrick, Maryland 21702

10               Telephone: 301.619.2065

11               Facsimile: 301.619.7250

12               Email: jeffrey.miller5@us.army.mil

13

14           SARAH A. JIROUSEK-WINT, ESQUIRE

15               Office of General Counsel

16               Federal Bureau of Investigation

17               935 Pennsylvania Avenue, N.W., PA 400

18               Washington, D.C. 20535

19               Telephone: 202.220.9333

20               Facsimile: 202.220.9355

21               Email: sarah.jirousek-wint@fbi.gov

22

23

24

25   (APPEARANCES CONTINUED on the Next Page)
```

4

```
 1    APPEARANCES CONTINUED:

 2

 3    ALSO PRESENT:

 4

 5                 MAJOR JOHN MALONEY, ESQUIRE (Via Telephone)

 6                      U.S. Army Research and Materiel Command

 7                      Office of the Staff Judge Advocate

 8                      521 Fraim Street

 9                      Fort Detrick, Maryland 21702

10                      Telephone: 301.619.2065

11                      Facsimile: 301.619.7250

12

13                 DAVID LANKFORD, ESQUIRE (Via Telephone)

14                      National Institutes of Health

15                      31 Center Drive

16                      Building 31 - Claude D Pepper Building

17                      Room 2B50

18                      Bethesda, Maryland 20892

19                      Telephone: 301-496-6043

20                      Email: david.lankford@nih.gov

21

22                 MATTHEW SEILER, Videographer

23                 STACY EDWARDS, Intern

24                 MORGAN STEPHENS, Intern

25
```

5

1                          INDEX

2            Deposition of Peter B. Jahrling, Ph.D.

3                      June 7, 2011

4

5    Examination By:                              Page

6    Mr. Schuler                                     8

7    Mr. Taranto                                     71

8    Mr. Schuler                                    105

9    Mr. Taranto                                    112

10

11   Plaintiff's Exhibit No.                     Marked

12   Exhibit 364    SNL-000289                      33

13   Exhibit 365    ARMY02-010682-724               34

14   Exhibit 366    SNL-000292                      41

15

16   Defendant's Exhibit No.                     Marked

17   Exhibit 86    JAHR-00001-3                     74

18   Exhibit 87    ARMY02-009164-68                 81

19   Exhibit 88    ARMY02-009826-28                101

20   Exhibit 89    ARMY02-009830-35                103

21

22

23

24

25

6

```
 1                      PROCEEDINGS

 2              VIDEOGRAPHER:  We are now on the record in

 3    the matter of Maureen Stevens as personal

 4    representative of the estate of Robert Stevens,

 5    Deceased, and on behalf of Maureen Stevens

 6    Individually, Nicholas Stevens, Heidi Hogan and Casey

 7    Stevens, Survivors, versus The United States of

 8    America, in the United States District Court, Southern

 9    District of Columbia, Case Number --

10              MR. SCHULER:  Florida.

11              VIDEOGRAPHER:  -- oh, Florida, Case Number

12    9:03-CV-81110-CIV-Hurley/Hopkins.  Today's date is June

13    7th, 2011.  The time is 9:23.  This is the

14    video-recorded deposition of Dr. Peter Jahrling being

15    taken at 1520 Freedman Drive in Frederick, Maryland.

16    My name is Matt Seiler on behalf of All Florida

17    Reporting and the court reporter today is Bob Shocket

18    also from All Florida.  All attorneys please identify

19    themselves and the parties they represent, beginning

20    with the party noticing this proceeding.

21              MR. SCHULER:  Richard Schuler on behalf of

22    the Stevens family and the Estate of Robert Stevens,

23    deceased.

24              MR. TARANTO:  Leon Taranto with the Civil

25    Division, Department of Justice, representing Defendant
```

7

1   United States.

2                   MR. PATIL:   Jason Patil Department of

3   Justice.

4                   MS. JIROUSEK-WINT:   Sarah Jirousek-Wint,

5   FBI.

6                   MR. MILLER:   Jeffrey Miller, United States

7   Army, Fort Detrick.

8                   MR. TARANTO:   And we also have counsel

9   appearing through telephone.   David Lankford, counsel

10   for National Institutes of Health, and Major John

11   Maloney of the Army Litigation Division.

12                   MR. SCHULER:   The gentlemen behind you is

13   with you?

14                   MR. TARANTO:   These are --

15                   MR. PATIL:   Clerks, clerks.

16                   MR. TARANTO:   -- interns with our office.

17                   MR. SCHULER:   Okay.

18                   MR. TARANTO:   They'll identify themselves.

19                   MR. STEPHENS:   Morgan Stephens.

20                   MS. EDWARDS:   Stacy Edwards.

21                   MR. TARANTO:   Okay.

22                   MR. SCHULER:   Not that I'm paranoid about

23   any additional lawyers.

24                   VIDEOGRAPHER:   Please administer the oath.

25

8

1    Whereupon,

2                    PETER B. JAHRLING, Ph.D.,

3    called as a witness, having been first duly sworn to

4    tell the truth, the whole truth, and nothing but the

5    truth, was examined and testified as follows:

6                    EXAMINATION BY MR. SCHULER:

7         Q    Would you state your name, please.

8         A    Peter B. Jahrling.

9         Q    And Dr. Jahrling, what is your address?

10        A    My, my home address?

11        Q    Yes, please.

12        A    ████████████████████████████████

13    ██████████

14        Q    And are you currently employed, sir?

15        A    I am.

16        Q    By whom are you employed?

17        A    National Institutes of Health.

18        Q    And what is your employment address for

19    that organization?

20        A    It is 8200 Research Plaza, Frederick

21    Maryland.

22        Q    Dr. Jahrling, have you ever had your

23    deposition taken before?

24        A    Only when I was getting divorced.

25        Q    Okay.  Other than that, that's the only

9

1    time?

2         A      That's the only time.

3         Q      All right.  Let me just go over a couple

4    basic ground rules.  Counsel may have mentioned this to

5    you already but all your responses have to be verbal so

6    we can make a good record on, on the record here and

7    it's always best to wait till I conclude my question

8    before you answer, so, because he can't take us both

9    down at the same time.  Finally, if any of my questions

10   are unclear, will you let me know so I have a chance to

11   rephrase them, sir?

12        A      Understood.

13        Q      Okay.  And can we assume that if you answer

14   my question you understood it?

15        A      Yes, you can.

16        Q      Okay.  Tell me a little bit about your

17   educational background, training and experience, Dr.

18   Jahrling, in your specialty.

19        A      Um, well --

20        Q      And if you would give the dates of

21   graduation, starting from undergraduate school and then

22   various --

23        A      Oh, my goodness.  Okay.

24        Q      And the various diplomas and so forth you

25   received?

1          A       Okay.  I graduated from Cornell University

2     with a bachelor of arts degree in 1967.  I went

3     immediately into the Cornell Graduate School of Medical

4     Sciences at Cornell Medical Center in New York City,

5     when I graduated with a Ph.D. in microbiology in 1972.

6     I went immediately into the Army as an officer and

7     found myself assigned to some place called USAMRIID in

8     March of 1972.  I spent, I was actually, I think my

9     position was immunologist but I was really a

10    virologist.  I spent four years as an officer at

11    USAMRIID.  And then my position, I was offered the

12    opportunity to take a civilian position as a GS-13,

13    which I did.

14          Q       What year was that?

15          A       And that was 19 -- let's see -- '72 to '76,

16    1976.  And I spent my entire career up until 2005 at

17    USAMRIID working my way up through the ranks.  So that,

18    you know, stops along the way were, I mean I was a

19    staff scientist for quite some period of time.  I

20    eventually became the chief of the virology division.

21    I am hard-pressed to tell you exactly when that was but

22    I'm going to say about 1989 or so.  And in 1992 I was

23    offered the position of principal scientific advisor,

24    working directly for the commander and at that point I

25    moved up to the command suite in 1972 and I kept that

11

1   position until --

2          Q      In 1992, you mean?

3          A      In 1992, um, and I was in that position

4   until I took the opportunity to move to NIH in 2005,

5   where the position is the director of the integrated

6   research facility across the street here and that's the

7   position I still hold.

8          Q      Now, from 1992 until 2005 then you were

9   chief scientific advisor, is that right, correct, at

10  USAMRIID?

11         A      Yeah, as a principal scientific advisor but

12  yes.

13         Q      And what generally were your duties and

14  responsibilities during that time period?

15         A      Well, you know, it was kind of a funny

16  position.  I was really the supervirology chief.  I

17  mean I had come from the virology division.  At the

18  time USAMRIID was, I think there was appear effort to

19  give mid-level officers opportunities for advancement

20  and were rotating them through the virology division

21  but, quite honestly, I don't think anybody felt they

22  were getting the kind of leadership they needed so I

23  basically ran the virology division from the front

24  office.  Over time my duties rather expanded.  We had

25  daily meetings with the commander, so --

12

1        Q      You say the commander, the commander of

2   USAMRIID?

3        A      Of USAMRIID, yeah.  So eight o'clock

4   meetings every morning with his principal staff, his

5   executive officers, deputy commander, his HR director

6   and, and what have you, and, you know, through that

7   process I sort of became immersed in whatever was hot

8   for the day.  So my duties kind of broadened out to

9   include, you know, programmatic decisions, resource

10  allocation decisions, that kind of thing.

11       Q      Okay.  So you weren't -- were you still

12  doing any scientific research during that time period?

13       A      I prided myself in getting into the lab and

14  putting on my space suit at least once a week.  So, so,

15  yes, I did, although quite honestly it was mostly

16  vicarious.  I had other people working for me.  I still

17  had, I still had a staff that working directly for me

18  so I still, I still was the principal investigator on

19  virology protocols.  I still wrote the animal care and

20  user reports and all that kind of thing but I had

21  staff, you know, post-docs and what have you doing the

22  hands-on work most of the time.

23       Q      Did you, as a chief scientific advisor, did

24  you have a staff that worked under you?

25       A      No, not really.  I had, I shared an

13

1    administrative assistant, secretary, if you will.

2         Q    And what was her name?

3         A    That was -- oh, God, we went through a few

4    of them but the one I remember the longest was Peggy

5    Zagorski.  And Peggy Zagorski took care of me as well

6    as the deputy commander and the executive officer,

7    okay, so I shared her.  And I mean there were other

8    staff members who were, you know, at my disposal for

9    what needed to be done.  If I needed a public affairs

10   officer, I had a public affairs officer.  If I had

11   (sic) a biosurety person, I had a biosurety person.  I

12   mean but they didn't work for me.  They all worked for

13   the commander.

14        Q    Did you have a role in appointing any of

15   the chiefs of the other divisions?

16        A    Uh, did not.

17        Q    What about the virology division?

18        A    No.  I had, actually, some of the chiefs

19   who were appointed were over my objection.

20        Q    Okay.  Now, since you became the chief

21   scientific advisor and you reported directly to the

22   commander, who were the various commanders during your

23   tenure that you reported to?

24        A    Oh, man, we went through them.  Let me try

25   to get them straight.  Okay.  The first one was Colonel

14

1    Ernie Takafuji, who was followed by Colonel Dave Franz,

2    who was followed by Colonel Jerry Parker, who was

3    followed I think by Ed Eitzen, and then Erik Henchal

4    was commander when I left.

5         Q     And that's in the space of roughly thirteen

6    years?

7         A     Correct.

8         Q     From 2000 -- or 1992 to 2005?

9         A     Correct.  Tenure in that job was about

10   three years.

11        Q     Okay.  Tenure in the job of commander?

12        A     Of commander, yeah.

13        Q     Was that by Army policy or it just happened

14   to work out that way?

15        A     I think it was sort of by Army policy.  I

16   mean usually that was, you know, they were full

17   colonels by that time.  They usually had enough time to

18   retire.  If they didn't get their star they retired.

19        Q     Now, Dr. Jahrling, did you have any

20   particular familiarity with the bacteriology division?

21   I know you said you were a virologist.

22        A     You know, I knew that question was going to

23   come and the honest answer is very little.  There was

24   actually another -- in fact he's still there -- another

25   senior scientist, Art Friedlander, who was in a similar

15

1    position for me, where he had been the bacteriology

2    division chief and they moved him up into the general

3    orbit of the command suite as well.  I don't recall

4    what his title was but he basically was the

5    superbacteriology division chief and I was the

6    supervirology division chief.  And we barely bumped

7    into each other, to be honest.

8         Q     And during this 1992 to 2005 time period

9    where physically was your office located?

10        A     It was in the command suite.  You know,

11   there's a, well, there's a command suite.  There's, you

12   know, one big room that was subdivided.  The commander

13   has a big office and then there were three little

14   offices.  I had one of the little offices.  And then

15   there was a general reception area with the

16   receptionists and what have you and I was in there.

17        Q     Was that in Building 1412 or 1425?

18        A     1425.

19        Q     Now, and the reason we're here today is,

20   and you have been listed as a witness by the United

21   States and in the summary of the disclosure of what you

22   intended to testify to was mentioned that your subject

23   of information is USAMRIID compliance with AR70-65 and

24   other requirements governing agent assurance and/or

25   biosecurity.  Do you have some knowledge of these

16

1   areas?

2        A     I was tangentially aware of them.  They

3   became more of an issue as time went on.  Back sometime

4   before the anthrax event, year, year and a half before,

5   something, there had been an exposure, occupational

6   exposure to um -- what the hell is it? -- Glanders.

7   And at the time I think the commander was Jerry Parker

8   and Jerry Parker I think quite wisely noted that

9   incidents like that really should not be repeated.  In

10  that case there was somebody who knowingly had an

11  exposure to Glanders virus, decided not to tell anybody

12  about it and waited until he was very sick and showed

13  up at the hospital.

14            And I mean that just violated not only

15  common sense but it violated the rules.  They were all

16  in the special immunizations program.  They knew they

17  were supposed to report such things if they had a known

18  exposure.  That was a violation.  And at that point --

19  I don't know why this fell to me but it did -- he asked

20  me to put together a task force to just look at the

21  whole damn thing, you know, are we playing a little

22  loosy-goosy here and the answer was yeah, we were.  I

23  mean there were -- we were in compliance with whatever

24  that rule was, 70-65 or something, AR --

25            Q     Correct.

17

1          A      Yeah.  I mean but that, you know, I mean it

2     needed to be tightened up and I'm not sure I was

3     thanked for my recommendations but I made them.

4          Q      And who was on the task force beside

5     yourself?

6          A      Oh, God, I, I honestly don't remember.  It

7     would have been the division chiefs, the major division

8     chiefs of virology, bacteriology.  I imagine it was all

9     the virology -- all of the division chiefs.  It would

10    have been the safety officer.  We had a safety officer

11    and I can't recall who that was at the time but it was

12    probably Bob Hauley.  There have been so many.  It was

13    probably -- whoever the safety officer was and I think

14    it was Hauley.

15               And Katie Carr was a lieutenant colonel and

16    she was, I don't know what her real title was but she

17    was essentially chief of staff.  So I had her on there

18    primarily to herd people in and participate in

19    something they perceived as a waste of time, you know,

20    and through that, I mean I remember I produced a

21    binder.  I was looking for that binder.  I can't find

22    it anymore.  But, you know, had it all tabbed out.

23         Q      About what year are we talking about here,

24    approximately?

25         A      It was, it was, um, you know, my

1   disappearing.  But, you know, I mean if you want to

2   really be safe, if you really want to have a record of

3   who went into where and what have you, there are these

4   other, other engineering things that you might want to

5   consider.  Of course, that was all very new at the time

6   and it was very expensive at the time.

7           And my recollection also is that USAMRIID

8   was starting to run onto really rough times on funding.

9   The budget was going down and expenses were going up

10  and we're saying, oh, we need a couple of tens of

11  millions of dollars worth of security tough was, yeah,

12  well, that's fine but who's going to pay for it, so, I

13  mean, so, anyway.

14          Q    Well, let me ask you about the, you touched

15  on inventory.  There was or there is a requirement, I

16  guess I should say was a requirement at the time back

17  in, prior to 2001 under AR 70-65 that a centralized

18  inventory be maintained for biological organisms,

19  correct?

20          A    That's correct.

21          Q    And who, prior to 2001, to your knowledge

22  -- and if you don't know just tell me and we'll move

23  on -- was charged with that responsibility, overall

24  responsibility for maintaining that?

25          A    Who, all right, I don't know who was

1   charged with overall responsibility for maintaining it.

2   I do know that whoever the chief of virology was at the

3   time was one of the two people required to access that

4   repository.  I can't remember who the second person was

5   but at one point I mean I was that person.  Okay?

6        Q    Okay.

7        A    So, and the way it worked, I mean it was so

8   primitive, it's amazing.  But, anyway, so this stuff

9   was in locked freezers inside a biocontainment suite

10  and the way it was accessed, it was so tightly

11  controlled that almost nobody ever went into the thing,

12  it was such a pain in the neck, frankly.  But if

13  somebody had a requirement to get something out of the

14  reference repository, it went, I guess it went through

15  the command suite and down to the chief of the virology

16  division.  And the chief of the virology division then

17  found whoever the other person was and opened the safe.

18  There was a safe in the virology division office and in

19  the safe was a block of keys.  Okay?  And -- what were

20  those keys for?

21            Okay.  I'm trying to remember how this

22  worked but you took that block of keys and you then

23  went into the hot suite, which was restricted access in

24  its own right because even back then they had prox

25  cards or maybe they were magnetic cards then but,

Page 23

1    anyway, you couldn't get into the suite unless you had,

2    were authorized to go into the suite.

3            And then within that suite there was a

4    locked room.  Oh, that was it.  The key was to open the

5    room.  And that room was under, um, had a motion

6    detector.  Okay?  And that motion detector was somehow

7    hooked in with the provost marshal.  And before you

8    went into that room you took the precaution of calling

9    the provost marshal and saying, hi, I'm whoever, and

10   I'm going into this room right now.  And at one point

11   they even introduced some kind of a moving code where

12   you had to go pull out your decoder ring and say

13   today's code is whatever it was and they would say

14   check, go ahead.

15           And then when you went into the room there

16   were combinations.  It was done with, you know, label

17   maker.  The combinations were out on this block and you

18   took the combination and each freezer had its separate

19   lock, you know, and even with the combination in your

20   hand it was almost impossible to open the damn locks

21   but eventually you got the locks open.  And then within

22   the freezer the agents were in sealed cans.  And by

23   sealed cans I mean these things were put in a canner

24   and go whir-whir-whir and to open them you had to get

25   the can opener and go (indicating), you know, extract

Page 24

1    the stuff and, you know, and then send it wherever it

2    was going.

3         Q    Was it mostly liquid?

4         A    Well, the stuff was in freezers and I would

5    guess most of it was liquid, yeah.

6         Q    Okay.

7         A    And, and that collection supposedly had at

8    least one representative sample of everything in the

9    building.  And to my knowledge --

10        Q    These were the reference stocks?

11        A    Weapons?  We never had weapons.

12        Q    Reference stocks.

13        A    Oh, reference stocks.  Yes, reference

14   stocks.

15        Q    All right.  So that's the way the reference

16   stocks were kept?

17        A    Correct.

18        Q    Okay.  And --

19        A    And that was in strict compliance with that

20   rule.

21        Q    The AR, what is it, 70-65, right?

22        A    Um, if you say so.  I, I don't recall the

23   numbers that --

24        Q    Okay.  The, there were two groups of people

25   that came in to study the biosecurity, if you will,

Page 27

1        A     No.  I don't -- I recall a report but I

2   haven't seen it.

3        Q     You saw, at one time you saw it?

4        A     At one time I saw it, when, you know, yeah,

5   along about 2002, whenever it came out.

6        Q     One of the things that Colonel Elliot's

7   group, the report from the inspector general said was

8   that -- and they looked at three laboratories, two

9   others, I think Dugway and the facility at Walter Reed

10  in addition to USAMRIID but one of the things they said

11  was two of the three laboratories were not aware of the

12  existence of AR 70-65, and the third laboratory was not

13  following the regulation since they felt it was

14  outdated.  Do you think that's an accurate criticism?

15       A     I don't know about the other two

16  laboratories.  I can tell you we were painfully aware

17  of 70-65.  I mean so we were aware of it, you know, and

18  by my recollection we were in strict compliance with

19  it.  Colonel Elliot seemed to view the world through a

20  different lens so maybe he saw something differently.

21       Q     Well, one of the things that, that he found

22  was that there was no oversight, visible oversight

23  program for biological agent accountability or security

24  at USAMRIID.  You disagree with that?

25            MR. TARANTO:  Object to form.  You may

Page 28

1    answer the question if you can.  And if you need it

2    read back that can be done too or Mr. Schuler can

3    restate it and I can object again.

4              THE WITNESS:  Well, I'll --

5              MR. TARANTO:  I'm sorry.

6              THE WITNESS:  No, I'll try to answer it but

7    I need you to repeat or rephrase it or --

8              BY MR. SCHULER:

9         Q    I said, one of the things that he found,

10   that there was no oversight program for biological

11   agent accountability or security being conducted at

12   USAMRIID; in other words, there were, there's no, there

13   was no accurate accounting for either the reference or

14   the working stocks.

15        A    Well, that's.

16             MR. TARANTO:  I'm sorry.  Object to form.

17   You may answer.

18        A    Okay.  I mean for him to say that with

19   regard to the reference stocks was simply wrong.  I

20   mean I just described for you how the reference stocks

21   were handled and that was certainly within strict

22   compliance with AR 70-65.  70-65 didn't say anything

23   about working stocks, and if, at least my recollection

24   is it didn't say anything about working stocks and if

25   Colonel Elliot's comment is that there was no strict

Page 29

1    accountability of working stocks, that's true.  Colonel

2    Elliot may have thought that it was a requirement for

3    that but that was not policy at the time.

4         Q    Okay.  In fact, AR 70-65 does reference

5    working stocks.  Let me show you a copy of it.  It's

6    paragraph 3-4 and this is the whole regulation so I

7    highlighted portions of it but --

8         A    Okay.  I'm sorry.  3-4?

9         Q    Yes.

10        A    Working stocks.  Well, okay.  So it says

11   that they will be securely stored and be transferred in

12   accordance with regulations and what have you.  And

13   they were securely stored.  They were in biocontainment

14   suites with restricted access and in many but perhaps

15   not all cases the individual freezers were locked

16   within biocontainment suites.  And certainly nothing

17   was transferred without due process.  At the time I

18   think it was CDC had something they called EA101s and

19   all transfer of materials out of the institute were in

20   strict accordance with that so I think Colonel Elliot

21   was wrong.

22        Q    Now, obviously Colonel Elliot was an

23   outsider to USAMRIID who came into, representing the

24   inspector general and I think General Keane ordered the

25   investigation to do the analysis, correct?

Page 56

1      A      Other than reporting?  You mean some kind

2  of independent detection system or something, is that

3  what you're asking?

4      Q      No.  Either, you know, labels on doors or

5  things of this nature.

6      A      Well, you know, it's hard for me to

7  remember what was in place at the time.  We went

8  through cycles at USAMRIID of putting labels on doors

9  and not putting labels on doors and you can argue it

10  both ways.  You know, some people felt it was good to

11  have it posted on the door.  Others felt why make it a

12  target for somebody who might be shopping for an agent

13  to say, oh, come in here, here's the anthrax.  The

14  people who were in there knew what was in there.  Um,

15  so I honestly don't recall.  We went through various

16  cycles of posting everything and posting nothing and I

17  just don't recall.

18      Q      Well, let me ask you, when you left in

19  2005, what was the status of that?

20      A      Stuff was posted on walls.

21      Q      All right.  Now, the other question, or I

22  think the other item that was listed under your name in

23  the disclosure had something to do with 17 Epon blocks

24  that were --

25      A      Yeah.

Page 57

1      Q      -- let me just finish the question -- were

2   reported missing.  Did you do or have some kind of

3   contact with that situation?

4      A      Um, yeah, I, I did and I'm trying to

5   recall.  Um, yeah, it sort of came up when accusations

6   were being made by former employees who were

7   disgruntled that USAMRIID was running a loose ship and

8   couldn't keep track of its stuff, and these anthrax

9   blocks were missing, was my recollection.  And, um,

10  okay.  And my -- okay, the story gets actually very

11  convoluted.  Turns out they, well, these were electron

12  microscopic blocks with Epon so, you know, there's no

13  live agent associated with it.

14            At one point I made a point to some Army

15  generals about how little concern this was by sticking

16  a couple blocks in my nose and saying here is how

17  dangerous these things are.  Okay?  I mean they're, it

18  was whatever was in the material was like a little

19  pinpoint of stuff at the bottom of a plastic cone that

20  was fixed in glutaraldehyde and heated in Epon and was

21  dead.  Okay?  The nature of that material, I mean so at

22  that point there's no need, absolutely no need

23  whatsoever to account for Epon blocks.  Okay?  They --

24  doesn't matter.  But the issue of whether they were

25  anthrax or not still seemed to be a concern.  And it

Page 58

1   turns out that the --

2        Q     Was this a concern after 2001, is what

3   you're saying, or before?

4        A     Um, no, it was after 2001.  It was when

5   everybody said, oh, you guys aren't keeping of track of

6   stuff, you don't have any idea where your inventory is.

7   Look at that, you lost all those Epon blocks.  Well, my

8   initial reaction to that was, so what if we lost the

9   Epon blocks?  They're Epon blocks.  Well, but they're

10  anthrax; how can you be so loose?  Not my issue but I

11  went up to pathology and tried to find out, well, what

12  are these things and where did they go and how can you

13  loose them.

14            And it turns out that the missing blocks

15  had actually been taken by somebody and they were taken

16  by somebody who was also a disgruntled employee who had

17  been running a study with some collaborators at another

18  organization on Simian immunodeficiency virus.  And

19  these, and we did not have a Simian immunodeficiency

20  virus program at USAMRIID but to get the material,

21  whatever it was, from this collaborative study

22  processed, the investigator logged them in as anthrax.

23  Okay?  They were never anthrax.  They were Simian

24  immunodeficiency virus.

25            And he was running it under the radar

Page 59

1    screen, which I mean is clearly unethical, and what

2    have you.  But it's not a danger; it's just stupid.

3    And, and then just sort of appropriated those blocks

4    like they don't need them, I'll take them.  And when

5    everything hit the fan and enough pressure was applied

6    the, all the blocks got returned except for one.  And

7    that one, you know, I don't recall what it was with

8    that one.  I don't know if that was just the 18th block

9    in this, in this study or if it was something else.  I

10   just don't recall.  But that's all I recall of that

11   incident.

12        Q     And I'm a little bit vague on your actual

13   connection with the incident.  Were you asked to

14   investigate by someone?

15        A     Yeah, I was ask to do investigate.

16        Q     Okay.  All right.  And did you write any

17   report on that?

18        A     Whew, if I did I'm sure you have it.  I, I

19   don't recall writing a report.  Oh, I do recall -- God,

20   amazing how you suppress this stuff.  I do recall there

21   was lots of concern about the stuff and we did a story

22   board, I remember, some kind of like a poster or

23   something and we, exhibits, you know, here's what we're

24   talking about and here's how we tracked it and all of

25   that.

Page 60

1              And it seems to me there was, uh, maybe an

2    executive summary or something that came out of the

3    public affairs office by whoever was the public affairs

4    person, Caree, maybe, Vander Linden.  Um, I think, I

5    think there was, yeah, I think there was an executive

6    summary and there was a story board and I was sort of

7    involved in all that.

8         Q     And who was the commander at the time, do

9    you recall, that asked you to be involved?

10        A     I'm pretty sure it was Eitzen.

11        Q     Now, the, the initial memo reporting these

12   things missing was in the early nineties, wasn't it; it

13   was like '92 or '93?

14        A     I don't recall.  I honestly don't recall.

15   I do remember it was sometime in the distant past when

16   the allegation was first raised that I know this stuff

17   went missing.  So it could well be, and when I think

18   about who was involved in that SIV study it could well

19   have been the early nineties.

20        Q     Who would have been commander back then?

21        A     Oh, God.  All the way back in the early

22   nineties, okay, it was, well, okay, I was already, I'm

23   going to say Takafuji but it could have been Takafuji's

24   predecessor and I don't even remember who that was.

25   David Huxsoll maybe.  I don't recall.  It was

Page 61

1    Takafuji's predecessor and I think it was Huxsoll but I

2    can't remember these guys anymore.

3         Q     Did you ever get involved in any other

4    situation where there were organisms that were claimed

5    to be missing?

6         A     I don't recall.  I don't think so.

7         Q     And your recollection is that all of these

8    blocks were pound or were there some still missing at

9    the end?

10        A     My recollection is that 17, there was one

11   missing, is my recollection, so I don't know if it was

12   17 of 18 or 16 of 17.  There was one missing.

13        Q     And do you remember what that block

14   contained?

15        A     No.  That's what I'm saying, I don't recall

16   if it was part of the SIV study or if it was yet

17   something else.  I, I just, and the thing is I mean

18   what was in the record was not representative of what

19   the material was.  I mean somebody fabricated the

20   record so I don't think anybody knows what that was.

21        Q     Do you know who fabricated the record?

22        A     I have my suspicions.

23        Q     Who do you suspect?

24        A     A guy named Phil Zack.

25        Q     Was, I think he was a military man, wasn't

Page 62

1   he?

2          A      He was.

3          Q      Wasn't he eventually let go or transferred?

4          A      Um, he wasn't around very long after this

5   incident.  I don't know, I don't know the circumstances

6   of his departure.  He might have been at the end of his

7   obligation and just moved on.

8          Q      Other than -- and I apologize if I asked

9   this earlier.  I don't think I did.  But other than

10  getting involved in looking at the anthrax powder under

11  electron microscopy were you asked to do anything else

12  with respect to the investigation of the anthrax

13  attacks?

14         A      Actually, no.

15         Q      Okay.  In terms of Dr. Ivins do you have

16  any opinion one way or the other as to whether you

17  think he was the perpetrator of these attacks?

18                MR. TARANTO:  I'll object to form for the

19  record and you may answer if you can.

20         A      Well, okay.  For the longest time I thought

21  it was totally absurd.  I just couldn't imagine that

22  guy doing that.  Okay?  He always kind of --

23         Q      Based on your knowledge of him?

24         A      Just on seeing him around.  I mean and, you

25  know, my observation, I always thought he was a little

Page 63

1    goofy.  He just seemed goofy.  And, you know, he had,

2    apparently one of the things he did was he did juggling

3    for kids' birthday parties and that kind thing.  And

4    whenever I saw Bruce Ivins I saw a guy with little

5    court jester feet, what have you.  And he was just kind

6    of a goofy guy.

7            Um, so, I thought, well, and then, you

8    know, when the FBI zeroed in on him, I thought, well, I

9    think they're just going for the weakest link, you

10   know, they're just going to drive this guy frigging

11   crazy.  Poor guy, you know, and they were harassing the

12   living crap out of him.  And I felt sorry for him.

13   Okay?  I'll get back to capability and what have you in

14   a minute but I mean it's very hard to ignore.  I was at

15   an ODNI meeting several weeks ago, where --

16       Q    ODNI?

17       A    Director of National Intelligence.

18       Q    Okay.

19       A    Um, and, there was a board of psychiatrists

20   that had been brought in to evaluate his medical record

21   and his history and all that stuff and they painted a

22   very compelling picture, circumstantial evidence,

23   nevertheless, but it's pretty hard to ignore what they

24   found.  Okay?  So at that point I came to believe that,

25   Jesus, it's possible he might actually have been the,

Page 64

1    he clearly was the right phenotype to do this.  You

2    know?  He was clearly living a --

3           Q       Phenotype being --

4           A       Just the type, his personality.  They were

5    very careful to say they don't profile people but

6    nevertheless if you were profiling somebody this is

7    somebody who you can imagine capable of doing what was,

8    he was accused of.  All right?  Can't ignore that.  I

9    mean and the circumstantial evidence is overwhelming.

10   Opportunity, motive, timing.  Got everything but the

11   smoking gun.

12           So my answer to you right now is yes, I

13   think he could have done it.  Now, how did he do it?

14   That I'm still not sure of because -- and again I'm not

15   a bacteriologist.  I don't know how much stuff you got

16   to cook up to make a powder with ten-to-the-twelve

17   spores per gram but I imagine you got to cook up a lot

18   of stuff.  And so I don't know how even if he was

19   working alone at night and all that stuff, how he could

20   have done it.  But again I, I, I don't know.  I think

21   it's plausible.

22           Q       Okay.  Did you ever have occasion prior to

23   2001 to discuss Dr. Ivins with any of his co-workers?

24   I know you basically focused on virology but I've got

25   to ask you the question anyway.

Page 65

1        A      Well, no, not really.  I mean I remember I

2    was travelling with, um, we went out to -- doesn't

3    matter where we went.  It was in an airport with

4    somebody from the bacteriology division.  I think that

5    was Bret Purcell.  And at the time, you know, Bret

6    Purcell was on a crusade to exonerate Bruce Ivins.

7    There was no way in hell he could have done it.  You

8    know, back of the envelope calculations off by three

9    orders of magnitude.

10       Q      Who is, who is Bret Purcell?

11       A      He is a colonel.  I think he may still be

12   in the bacteriology division.  And, you know, and he

13   was, he was just talking about how he really thought --

14   and, you know, I'm not even sure back then if Bruce

15   Ivins was the target.  I think it was Steve Hatfill

16   back then.  And he was just talking in general about

17   how that much material could not have been made under

18   the conditions that existed in the bacteriology

19   division and if it was lyophilized powder, which it

20   appeared to be, how could that possibly have been done

21   without contaminating the lyophilizer; it just didn't

22   come from here.

23              And, okay.  I think there's still some

24   questions to be asked about if that was a lyophilized

25   powder how come the lyophilizer wasn't contaminated.

Page 66

1   It was outside the containment suite.  It would have

2   killed somebody.  You know, so there are those

3   unanswered questions.  I don't think there's any doubt

4   whatsoever based on the forensic evidence that the seed

5   material that ultimately resulted in that powder came

6   from that flask, whatever it was.

7       Q    That was going to be my next question to

8   you.  You anticipated it.

9       A    I mean again I don't know.  I just know

10  what I read but I've heard very compelling arguments

11  from the FBI, openly presented, that, you know, my

12  understanding is that the fingerprint was that the

13  contents of that flask was actually a mixture.  It

14  wasn't pure anthrax or maybe it was pure anthrax but

15  they were different strengths of anthrax, anyway.  So

16  somebody who had the original A-strain of anthrax would

17  not have come up with something that had the exact

18  composition that was both in the flask and spores.

19  That's pretty close to a frigging smoking gun as far as

20  I'm concerned.  Okay?

21           That doesn't mean that the powder came from

22  that flask.  What it does mean is that the starter

23  material for making the powder came from that flask.

24  So I don't think there's any doubt that you can trace

25  the thread back to that flask.  But how many

Page 67

1    generations it went through, where it might have gone,

2    I don't know what that flask was even being maintained

3    for, to be honest with you.  But, um, you know, my

4    understanding is that that material was being used to

5    send out to laboratories that were developing

6    diagnostic tests and what have you and the contents of

7    that flask could have been transferred totally

8    legitimately to another party.

9             So, you know, and I've always maintained

10   that just because it came from that flask didn't,

11   doesn't mean that Bruce Ivins did it.  But, you know,

12   if you combine the circumstantial evidence and all of

13   that with that flask I think if it had gone to a jury

14   trial he would have been convicted.  That's just my

15   speculation.

16       Q     Okay.  Now, let me ask you about the flask.

17   Do you know -- and again I know you're focused on

18   virology but do you know or were you aware of the

19   existence of that flask in Dr. Ivins' laboratory?

20       A     I was not aware of it.  I had no idea what

21   went on in that laboratory until, you know, after the

22   whole FBI thing unfolded.  I didn't know their -- you

23   know, my understanding is that that flask was kind of

24   topped off on a regular basis with spores that were

25   produced at Dugway, dumped in there.  Strikes me as

1   very pure -- very poor microbiological technique, by

2   the way.  You just never add something to something

3   else like that without knowing lest you contaminate the

4   whole thing, as had apparently happened.  But, anyway,

5   I didn't know any of that until after the fact and

6   started reading the FBI reports.

7        Q    Based on what you read do you know where

8   the FBI asserts the flask was kept?

9        A    Um, I think, well, it was in one of the

10  bacteriology hot suites.  I think it was bacteriology

11  suite three but I'm not absolutely sure of that.  Um,

12  and I think it was, I think it was a liquid slurry and

13  it was I think in a cold room, walk-in cold room, is

14  what I think.  I, I don't know.  I was never in

15  bacteriology suite three.

16       Q    And again if you don't know just tell me.

17  I'm just trying to probe what your knowledge is here.

18  Do you know if that's where the flask was whether any

19  other persons other than Dr. Ivins would have had

20  access to it?

21       A    I don't know for a fact but if it was

22  sitting in a cold room in a hot suite I would guess

23  anybody who had access to that cold room had access to

24  it.

25       Q    And who would that likely be?

Page 69

1         A      That would have been people assigned to

2    bacteriology division, other investigators,

3    technicians.  I don't know if they had animals in there

4    but even animal caretakers if they had animals.  I

5    don't know if they did or not.

6              MR. SCHULER:  Okay.  I think that's all the

7    questions I have, Dr. Jahrling.

8              THE WITNESS:  Okay.

9              MR. TARANTO:  All right.  Oh, I have a few

10   questions.  I didn't know timewise how much is on the

11   tape.  Why don't we just take a break.

12             MR. SCHULER:  Fine.

13             MR. TARANTO:  All right.  I've got to move

14   positions.

15             VIDEOGRAPHER:  Going off the video record.

16   The time is 11:08.

17             (There was a break in the proceedings.)

18             VIDEOGRAPHER:  Back on the video record.

19   The time is 11:21 a.m.

20             BY MR. SCHULER:

21        Q    Dr. Jahrling, I do have another question

22   for you.  I know you left in 2005 but how did

23   investigators in 2005 keep track of their working stock

24   of high-consequence pathogens?

25        A    At the time I left, I mean working stocks,

Page 70

1   there was a requirement to keep track of your working

2   stocks and within virology division, at least within

3   the group of people I knew in virology division they

4   were taking that seriously, grumbling about it but

5   nevertheless doing it.  I don't know what was going on

6   elsewhere but within virology division I think there

7   was grudging acceptance of the need to do it.

8        Q    And I guess my question wasn't totally

9   clear.  What I was asking was, if you know, how

10  mechanically was that accomplished; what did they have

11  to do?

12       A    You know, just about the time I left they

13  were centralizing that in a centralized database.  And

14  I forget.  It had some acronym, began with A.  Um, I, I

15  think paper records were getting entered into a

16  computerized database and that was happening just about

17  the time I left.

18       Q    So they would, instead of keeping it in a

19  lab notebook they would transfer that to a computer

20  database?

21       A    Yeah.  I don't know if they didn't keep it

22  in a lab notebook but they certainly put in a

23  centralized database that was maintained by, I guess by

24  a surety office.

25            MR. SCHULER:  All right.  Now I have no

Page 71

1    further questions.   Thank you.

2              THE WITNESS:   All right.

3              EXAMINATION BY MR. TARANTO:

4        Q     Dr. Jahrling, you went through or Mr.

5    Schuler went through with you some of the procedures

6    concerning reference stocks and Army regulation 70-65.

7    Did the procedures for working stocks also include a

8    two-person rule for access?

9        A     No.

10       Q     Did they include requirements for

11   inventory?

12       A     For working stocks?

13       Q     Yes, for working stocks.

14       A     Are we talking prior to 2001?

15       Q     Right, for the Army regulation 70-65 before

16   2001.

17       A     I believe the regulation said that the

18   stocks had to be controlled and secured but there was

19   no requirement for vial-by-vial inventory.

20       Q     And was there, were the working stocks

21   controlled and secured at USAMRIID?

22       A     Yes.

23       Q     And how was that done for working stocks?

24       A     Working stocks were in freezers inside

25   biocontainment suites with restricted access.   It was

Page 72

1  variable whether those freezers were locked with

2  padlocks and hasks or not.  Within virology they were.

3  I don't know about Back-T.

4       Q      For working stocks prior to 2001 was there

5  any requirement for annual reports like there was for

6  reference stocks?

7       A      I don't believe so.

8       Q      Plaintiff's counsel asked you about Dr.

9  Ivins' flask, the flask that's referred to as RMR 1029.

10  Was that working stock or reference stock under the

11  Army regulation 70-65?

12       A      That was clearly not reference stock.  I

13  don't know if it qualifies as working stock or not.  I

14  guess it does.

15       Q      Was there any requirement to hold that in

16  the central repository for reference stocks?

17       A      No.  I mean that was truly a working stock.

18  It was getting topped off every week.

19       Q      And what's the purpose of having a central

20  repository for reference stocks?

21       A      Well, I mean I guess you, you want to have

22  low-passaged material that is, you know, authenticated

23  and known to be what the vial says it is.  You know,

24  it's the nature of biological agents that they

25  replicate and it's easy enough to make your own working

Page 73

1    stock and give it to somebody else, make a working

2    stock.  And, you know, from time to time you want to be

3    sure that what you're working with is what the vial

4    says it is and you may want to go back to the original

5    material to, you know, maybe start again or at least,

6    you know, if you're getting aberrant results with your

7    present material you might want to go back and validate

8    those results with the authenticated material.

9         Q    Prior to the anthrax letter attacks did you

10   or did the leadership or command at USAMRIID consider

11   the issue whether to require inventorying for working

12   stocks?

13        A    I don't think it was ever considered.

14        Q    And then after the anthrax letter attacks

15   did the issue come up about inventory for working

16   stocks?

17        A    It came up in that officials at the

18   Pentagon started questioning why we weren't doing it.

19        Q    All right.  Did you prepare a memorandum on

20   the subject?

21        A    I did.  I did.

22             MR. TARANTO:  I would like to have marked

23   as an exhibit, Defense Exhibit 86.  This document is

24   entitled memorandum for DOD officials and others who

25   would impose strict inventory accountability controls

Page 87

1    the same episode or incident involving Epon blocks that

2    you discussed with Mr. Schuler?

3         A    Yes.

4         Q    All right.  I'm going to show you what was

5    marked as exhibit, Plaintiff's Exhibit 93 to the

6    deposition of Dr. Eitzen.  The Bates number on it is

7    JAHR, number four through number eight.  It's dated

8    January 22, 2002.  It's entitled information paper,

9    response to news articles on anthrax research issues.

10   Dr. Jahrling, you previously referred to something

11   having been prepared by the public affairs or for use

12   of the public affairs or public information office at

13   USAMRIID by Caree -- I'm not sure if I heard her last

14   name.

15        A    Vander Linden.

16        Q    Is that Plaintiff's Exhibit 93 from Dr.

17   Eitzen's deposition, is that the deposition to which

18   you were referring?

19        A    That's the document.

20        Q    And can you review for us and tell us

21   whether that essentially states the facts as you recall

22   them or if there are any corrections to be made that

23   you know of?

24        A    Well, I have looked at this before and this

25   is the, uh, this was an accurate record of what we

All Florida Reporting, Inc.
800-898-7373

1    believed to be the truth tell and I can continue to

2    believe it's the truth, so yes.

3         Q      Now, on the second page of the document in

4    subsection or section D --

5         A      D as in David?

6         Q      D as in David, it states, quote, contrary

7    to recent news articles any material that was reported

8    as missing was dead, end quote.

9         A      Uh-huh.

10        Q      And then later on it says in this case the

11   anthrax spores would have been inactivated by gamma

12   radiation as previously described in a relevant

13   publication entitled -- and then it gives the citation

14   reference to it.  What does it mean inactivated by

15   gamma radiation?

16        A      Gamma radiation is, well, gamma radiation

17   is gamma radiation, which is, you know, we had cobalt

18   source that put out the high-intensity gamma rays.  And

19   gamma rays are known to inactivate, basically it

20   intercalates nucleic acid, crinkles it up, if you will,

21   and effectively kills a bug.  And we have inactivation

22   curves for all the bugs.  And my recollection of the

23   protocol was that, you know, based on the curve the

24   radiation dose was calibrated and the calibrated

25   radiation dose was ten times the dose that would be

Page 89

1   necessary to kill all the infectious material.

2        Q    So all the material in the blocks you're

3   referring to?

4        A    Yeah.  I mean that material would have been

5   dead to start with because it had already been fixed in

6   glutaraldehyde, but, so it was built in suspenders.

7        Q    Can that material be used, this killed

8   virus material be used for biological terrorism or to

9   cause harm?

10       A    It's, it -- it's dead.  No.  The answer is

11  no.  Has no use.

12       Q    And I don't have any further questions on

13  that one so if you'll -- when you, prior to the anthrax

14  letter attacks did Army Regulation 385-69 concerning

15  biosafety, did that apply to USAMRIID?

16       A    Yes.

17            MR. SCHULER:  Object to the form.

18       Q    Did USAMRIID follow that?

19       A    Yes.

20       Q    And was there, are you familiar with a

21  CDC/NIH publication guidelines entitled biosafety in

22  microbiological and biomedical laboratories, for short

23  BMBL?

24       A    Yes.  I wrote the virology section.

25       Q    And the current edition is the fifth

Page 90

1    edition?

2         A    Fifth edition.

3         Q    And that was published when?

4         A    It was published online about a year ago, I

5    think.  I think it's got a publication date of 2010.

6         Q    Now, the -- before that there was a fourth

7    edition?

8         A    That one right there.

9         Q    Right, which I brought a copy of the

10   original here.  That's, that was, the fourth edition

11   was in effect prior to the anthrax letter attacks?

12        A    You know, I'm not sure.  You have to look

13   at the publication date.

14        Q    All right.

15        A    I think -- I'm not sure.

16        Q    Well --

17        A    It was a BMBL 3, would you believe and --

18        Q    Actually, a copy of it was produced in this

19   litigation and I can give counsel the Bates number for

20   it, Army 02-002099, and it's dated April of 1999.  Does

21   that --

22        A    And, and I'm sorry.  That's what?

23        Q    It's dated April 1999.

24        A    What is?

25        Q    The BMBL fourth edition.

Page 91

1      A      Oh.   Okay.

2      Q      All right.  Did you USAMRIID follow that?

3      A      Yes.

4             MR. SCHULER:  Let me see that book for a

5      second.  Thanks.

6      Q      In making a -- were you -- withdrawn.   In

7      making biosecurity choices or measures for a biological

8      research facility do such biosecurity choices or

9      measures impact operations or performance of labs such

10     as USAMRIID?

11     A      Do biosecurity measures impact operations?

12     Q      Right.

13     A      To some extent, yes.

14     Q      All right.  Would application of a

15     two-person rule impact operations?

16            MR. SCHULER:  Object to the form.

17     A      A two-person rule would be very onerous.  I

18     mean it would require double staffing.  It would

19     inhibit initiative.  A lot of, a lot of the more

20     innovative work and what have you that gets done in a

21     facility like that is done by post-docs and junior

22     investigators who have great motivation to do whatever

23     needs to be done, which means coming in, in the middle

24     of the night and if you had to initiate a study that

25     required checking your flasks at midnight and there was

Page 92

1    a requirement for a second person who might not share

2    your zeal for that experiment to come in and babysit

3    the study wouldn't be done.

4         Q    Now, in Army regulation 385-69 there's a

5    provision in there about minimizing exposure.  Are you

6    familiar with that?

7         A    Minimizing?

8         Q    Minimizing exposure of personnel.

9         A    Well, okay, I'm not quite sure what's in

10   the regulation but I mean there's all kinds of

11   operational controls.

12        Q    Right.

13        A    -- in biosafety cabinets and the like.

14        Q    Right.

15        A    Yeah.

16        Q    All right.  Is there, in operating a

17   biological research facility is there any goal or

18   objective to minimize exposure to personnel?

19        A    Oh, of course.

20        Q    If you have a two person rule how does that

21   impact on minimizing exposure of personnel?

22        A    It goes the other way.  You've put another

23   person at risk unnecessarily.

24        Q    Does using a two-person rule assure

25   protection against theft or misuse of a pathogen such

Page 93

1   as anthrax?

2        A    Does it assure it?

3             MR. SCHULER:  Objection.  Predicate.

4        A    Does it assure it?  Certainly not.  You

5   know, it depends on how the two-person rule is actually

6   administered.  You know, if the two-person rule is the

7   same as a buddy rule that means there's somebody else

8   in the suite at the same time as you.  He may or may

9   not be looking over your shoulder.  If that person

10  isn't looking over your shoulder and isn't serving as a

11  policeman it serves no purpose whatsoever.  If you have

12  made the decision to hire somebody else to look over

13  somebody else's shoulder then yes, I guess that goes

14  some distance toward assuring stuff is not

15  misappropriated.  But I don't think the two-person rule

16  has ever been interpreted that way.

17       Q    To use a two-person rule for biosecurity

18  purposes can you use just any person as the second

19  person or --

20       A    Um, that's the way it -- I mean you would

21  think not but in reality yes.

22       Q    You're saying in reality that's the way

23  it's done?

24       A    When there was a fleeting requirement to

25  have a two-person rule before common sense applied,

Page 94

1   prevailed, yeah.  There was a second person in the lab.

2   That second person could be over feeding the monkeys or

3   sweeping the floor or looking over your shoulder.

4   Didn't matter.  You needed the second person in the lab

5   period.

6        Q     For a two-person rule to be effective for

7   biosecurity purposes would you need the second person

8   to have some level of knowledge or experience with the

9   procedures or pathogens?

10       A     Um, if you're worried about anything other

11  than just flagrant theft, yes.  The second person would

12  have to have an intimate knowledge of what the first

13  person was doing; otherwise, otherwise the material

14  could be misused right in plain site and it wouldn't be

15  recognized.

16       Q     What about if you're worried about a theft

17  of a minute quantity of pathogen like the size of a

18  grain of salt, would you need to have experienced

19  personnel?

20             MR. SCHULER:  Object to form.

21       A     Well, certainly not.

22       Q     Does using a two-person rule impact

23  operations of the laboratory or the mission of the

24  laboratory?

25       A     Well, certainly, as I mentioned, if you

Page 95

1    have to double-hire you're going to have to, you know,

2    you're going to go have trained personnel that are

3    diverted from doing something more productive looking

4    over the shoulder of somebody else.

5         Q    Yeah.  Prior to 2001 did USAMRIID have the

6    funding or the money to employ a two-person rule?

7         A    No.

8              MR. SCHULER:  Objection.  Predicate.

9         A    Still doesn't.

10        Q    I'm sorry?

11        A    Still doesn't.

12        Q    Two-person rule is not used today in

13   USAMRIID?

14        A    I'm not intimately familiar with what's

15   going on at USAMRIID but I do know they have

16   surveillance cameras with DVD backup what have you.

17   I've actually written an article -- not that anybody

18   asked me to but I did it anyway -- on how that's

19   probably preferable to a two-person rule.  I mean

20   there, you know, the eye is always watching.

21        Q    Yeah.

22        A    Being recorded for posterity, you can go

23   back and look at it, so it's not just he said, she

24   said.

25        Q    Prior to October of 2001 was a two-person

Page 96

1    rule in use at other biological research facilities

2    with which you are familiar?

3         A    Um, no, I don't believe it was.

4         Q    All right.

5         A    And I was familiar with a fair number of

6    them.

7         Q    That would include CDC?

8         A    It would.

9         Q    Walter Reed, Army Research Institute?

10        A    Yes.

11        Q    Others as well?

12        A    Academic labs with select agents.

13        Q    Prior to October of 2001 USAMRIID did not

14   have a process in place whereby all persons are

15   searched upon exiting labs.  The parties have so

16   stipulated to that.  Are you aware of any sort of

17   system in place at CDC or other labs with which you are

18   familiar prior to October of 2001 for searching all

19   personnel on exiting a lab?

20        A    No biological facility.

21        Q    All right.  For purposes of biosecurity

22   would searching personnel on exit assure protection

23   against theft of all pathogens?

24             MR. SCHULER:  Object to form.

25        A    Almost surely not.  I mean the quantities

Page 97

1    are so minute and the ways in which that could be

2    hidden are so numerous that I fail to see how rummaging

3    through every nook and cranny of somebody's briefcase

4    would turn it up.

5         Q    If strip searches were employed, searches

6    of body cavities, would that assure prevention of all

7    theft of pathogens?

8              MR. SCHULER:  Object to the form.

9         A    Can't answer that one.  Might, might give

10   people second-thought.  Would it assure it?  No.

11        Q    Okay.  If a routine practice of searching

12   all personnel on exiting labs to search for pathogens

13   were instituted would that have any impact on

14   operations of USAMRIID or other biological laboratories

15   if such practices were instituted?

16             MR. SCHULER:  Object to the form.

17        A    I can't imagine how that could be done

18   realistically.  You know, I mean if you're entering a

19   building you can put stuff into a magnetometer and

20   x-ray and sort of look for suspicious packages and what

21   have you.  But to go out, I mean unless, you know, if

22   there were rigorous search of every person leaving the

23   building, you know, you would have to have a staggered

24   work schedule, 24-hour shifts, you know, I mean or a

25   hell of a guard force to do that, and it would still be

Page 98

1    just the appearance of precision when in fact the

2    opportunities to evade detection are numerous.

3         Q     Would conducting such searches have any

4    impact on morale?

5         A     You bet.  Probably lose half your workforce

6    the day it was implemented.

7         Q     The parties have stipulated that prior to

8    the anthrax letter attacks USAMRIID did not have

9    routine video surveillance in all of its individual

10   laboratory rooms.  Does having video surveillance in

11   all laboratory rooms, would that assure protection

12   against all theft of pathogens?

13        A     No.

14              MR. SCHULER:  Object.  Form.

15        A     Again I think it's a, I think it's a false

16   sense of security, you know.  Think about the convex

17   mirror in the 7-Eleven that's there to deter theft and

18   ask yourself, does that really deter theft?  It

19   doesn't.  You can't see anything in it.

20        Q     Well, would video surveillance assure

21   prevention of all improper activities involving a

22   pathogen?

23              MR. SCHULER:  Object to form.

24        A     It would not assure it.  It would deter it.

25   It would just force the perpetrator to be a little bit

Page 99

1   more devious.

2        Q    Now, would video surveillance of all

3   laboratories, in order for video surveillance to be

4   effective for biosecurity purposes would there have to

5   be monitors?

6        A    Yes.  Lots of monitors.

7        Q    And would there need to be realtime viewing

8   of the monitors?

9        A    Well, this has been an ongoing discussion.

10  I mean, um, you know, how many guards do you need to

11  watch how many monitors with stuff that isn't

12  happening?  There are systems that are being devised

13  now, I mean technology marches on and, you know,

14  certainly for off-hours there are systems which turn on

15  when somebody enters a laboratory.  So, you know, if

16  the whole place is dark and one place lights up

17  somebody might pay attention to that.  But I mean this

18  is technology that's just evolving it's.  It certainly

19  didn't exist back then.

20       Q    For video surveillance to be effective for

21  biosecurity purposes would the person who is doing the

22  monitoring need to have any training, education or

23  experience with the pathogens and the procedures?

24       A    Um, you know, unless it was blatant theft

25  from a marked freezer box or something the

Page 112

1              MR. SCHULER:  And I won't stand on the

2      ceremony of additional cross.  Go ahead.

3              MR. TARANTO:  All right.

4              EXAMINATION BY MR. TARANTO:

5        Q     In the fourth edition of the CDC/NIH

6      biosafety and microbiological, biomedical laboratories,

7      the BMBL from 1999, it contains an Appendix F entitled

8      laboratory, security and emergency response for

9      microbiological and biomedical laboratories.  If you

10     could just -- can you confirm that that's the case?

11       A     Um, there certainly is an Appendix F with

12     that title.

13       Q     Right.  Now, it's only six pages.  The

14     CDC/NIH BMBL was primarily on biosafety?

15       A     Uh-huh.

16       Q     But it also --

17             MR. SCHULER:  That's a yes?

18             THE WITNESS:  Oh.  I'm sorry.  Yes.

19             BY MR. TARANTO:

20       Q     Was that a yes?

21       A     That was a yes.

22       Q     But did it address security at all?

23       A     Did this address security?

24       Q     Yes.

25       A     It does to a limited extent, yes.

Page 113

1        Q      All right.

2        A      It says you should be worried about

3   security.

4        Q      All right.

5        A      It doesn't give any specific plans about

6   how to lock things --

7        Q      Right.

8        A      -- or restrict access or any of that.  It

9   just says you should be concerned about it.

10       Q      On the security portion do you see, are you

11   able to tell us from the security standpoint how

12   USAMRIID's practices prior to October 2001 measure up

13   to the BMBL concerning biosecurity?

14            MR. SCHULER:  Object to the form.

15       A      I'm looking at specific stuff in here which

16   is almost quaint.  "Refrigerators, freezers, cabinets

17   and other containers where stocks of biological agents

18   are stored should be locked when they're not in direct

19   view of workers as in when located in unattended

20   storage areas."  So I mean this just reflects the state

21   of awareness at that time.

22       Q      Right.  And what did USAMRIID do in that

23   respect?

24       A      As I mentioned several times, all of the

25   select agents and what have you was contained within

Page 114

1    freezers, frequently locked freezers but within hot

2    suites with restricted access that could be regarded as

3    locked containers.

4              MR. TARANTO:  All right.  All right.  Thank

5    you, sir.

6              THE WITNESS:  Okay.

7              MR. TARANTO:  Nothing further.

8              MR. SCHULER:  I have nothing further, Dr.

9    Jahrling.  Just about every witness, I think every

10   witness has desired to read and sign the deposition but

11   you have to state for the record whether you waive the

12   reading and signing or whether you would prefer the

13   reading and signing.

14             THE WITNESS:  I would prefer to read and

15   sign.

16             MR. SCHULER:  So done.  Thank you.

17             THE WITNESS:  You're welcome.

18             MR. TARANTO:  Thank you, Dr. Jahrling.

19             THE WITNESS: All right.

20             MR. TARANTO:  Greatly appreciate it.

21             VIDEOGRAPHER:  This concludes the video

22   deposition.  The time is 12:32.

23             (Deposition concluded at 12:32 p.m.)

24

25

Page 115

1                    CERTIFICATE OF DEPONENT

2

3            I hereby certify that I have read and

4    examined the foregoing transcript, and the same is a

5    true and accurate record of the testimony given by me.

6

7            Any additions or corrections that I feel

8    are necessary, I will attach on a separate sheet of

9    paper to the original transcript.

10

11

12                    _____

13                    Peter B. Jahrling, Ph.D.

14

15

16

17

18

19

20

21

22

23

24

25

Page 116

1   State of Maryland

2   Baltimore County, to wit:

3               I, ROBERT A. SHOCKET, a Notary Public of

4   the State of Maryland, County of Baltimore, do hereby

5   certify that the within-named witness personally

6   appeared before me at the time and place herein set

7   out, and after having been duly sworn by me, according

8   to law, was examined by counsel.

9               I further certify that the examination was

10  recorded stenographically by me and this transcript is

11  a true record of the proceedings.

12              I further certify that I am not of counsel

13  to any of the parties, nor in any way interested in the

14  outcome of this action.

15              As witness my hand and notarial seal this

16  17th day of June, 2011.

17

18

19                            _____

20                            Robert A. Shocket

21                               Notary Public

22

23

24  My Commission Expires:

25  November 23, 2014