Page 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MAUREEN STEVENS, as Personal
Representative of the Estate of
ROBERT STEVENS, Deceased, et al.,

        Plaintiffs,

    vs.             CASE NO:  9:03-CV-81110-CIV

UNITED STATES OF AMERICA,

        Defendant.


DEPOSITION OF REYNOLDS M. SALERNO, Ph.D.
January 28, 2011
10:12 a.m.
201 Third Street, Northwest, Suite 1630
Albuquerque, New Mexico


PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  MR. RICHARD D. SCHULER
        Attorney for the Plaintiffs




REPORTED BY:   Jennifer Bean, FAPR, RDR-RMR CCR #94
          Bean & Associates, Inc.
          Professional Court Reporting Service
          201 Third Street, N.W., Suite 1630
          Albuquerque, New Mexico  87102

Job No.:  1420J (JB)

```
 1                A P P E A R A N C E S

 2    For the Plaintiffs:

 3         SCHULER, HALVORSON & WEISSER
           1615 Forum Place
 4         Fourth Floor
           West Palm Beach, Florida   33401
 5         BY:  MR. RICHARD D. SCHULER

 6    For the Defendant:

 7         UNITED STATES DEPARTMENT OF JUSTICE
           1331 Pennsylvania Avenue, Northwest
 8         Room 8018-S
           Washington, DC  20004
 9         BY:  MR. LEON B. TARANTO

10    For the United States Army:

11         UNITED STATES ARMY LITIGATION DIVISION
           901 N. Stuart Street, Suite 400
12         Arlington, VA   22150
           BY:  CAPTAIN ERIK CLAUDIO
13
      For the Deponent:
14
           SANDIA NATIONAL LABORATORIES
15         P.O. Box 5800   MS 0141
           Albuquerque, NM   87185-0141
16         BY:  MS. MARIANNE B. HILL

17    Also Present:  Videographer, Herb Fiedler

18

19

20

21

22

23

24

25
```

All Florida Reporting, Inc.
800-898-7373

```
 1                    INDEX
 2   EXAMINATION OF REYNOLDS M. SALERNO, Ph.D.
 3       By Mr. Schuler                            7
         By Mr. Taranto                          198
 4       By Mr. Schuler                          258
 5   CERTIFICATE OF COMPLETION OF DEPOSITION     263
 6                    EXHIBITS
 7   121  Sandia News Release                     24
     122  Security Review, Final Report, 9/26/02  28
 8   123  Memo, Salerno to Carr, 5/30/02          34
     124  40 photographs                         107
 9   125  Blueprints                             114
     126  Memo, Jahrling to Salerno, 10/31/01    118
10   127  Handwritten notes                      120
     128  Fax cover sheet, McCrudy to Carr, 3/02 121
11   129  Security Review, First Draft, 6/21/02  123
     130  Nuclear Surety Army Regulation 50-5    124
12   131  Chemical Surety, Army Regulation 50-6  125
     132  Handwritten drawing                    126
13   133  Floor plan of Bldg 1425                126
     134  Fax cover sheet to Carr, 6/16/02       126
14   135  E-mails re Bean counting, 6/13/02      127
     136  Guard shift chart                      128
15   137  Article about Anthrax attack, 6/27/02  128
     138  Department of Defense Directive        129
16   139  Boston Globe article about anthrax attacks 129
     140  Articles regarding anthrax attacks     131
17   141  Handwritten notes, 1/30 02             132
     142  Request for access approval, 10/29/01  133
18   143  Fax cover sheets, 11/9/01              135
     144  Power Point slides                     136
19   145  Biological Defense Safety Standards    137
     146  Biological Defense Safety Program      137
20   147  Power Point slides of Targets and Threats 139
          meeting
21   148  Power Point slides Biological Security at 140
          Federal Laboratories
22   149  Biosafety-Biosecurity Taskforce report 141
     150  Security Review, First Draft, 6/15/02  143
23   151  Security Review, First Draft, 6/21/02  144
     152  Security Review, First Draft, 6/15/02  144
24   153  Security Review, Final Report, September 145
          blank, 2002
25   154  Security Review, Final Report, September 145
          blank 2002
```

All Florida Reporting, Inc.
800-898-7373

| 1  | 155 | Info Needed Before Site Assessment | 145 |
|    | 156 | Systems Review slides, 4/29/02 | 146 |
| 2  | 157 | Card Access Report, 5/1/02 | 146 |
|    | 158 | Custom Access list, 5/2/02 | 147 |
| 3  | 159 | Article re Japanese chemical attack | 147 |
|    | 160 | List of Army regs, 4/30/02 | 147 |
| 4  | 161 | Handwritten notes RIID questions | 148 |
|    | 162 | Letter Suthard to Carr, 4/12/02 | 148 |
| 5  | 163 | Findings from Inspector General's report | 150 |
|    | 164 | Distinctive Aspects of Biosecurity, Draft | 151 |
| 6  | 165 | Washington Post article re Security of Germ Lab, 1986 | 151 |
| 7  | 166 | Subcommittee hearing transcript, 7/27/88 | 151 |
|    | 167 | JAMA article, 2002 | 152 |
| 8  | 168 | Card Access Report, 5/1/02 | 152 |
|    | 169 | Custom Access report, 5/2/02 | 153 |
| 9  | 170 | Foreign National Register | 154 |
|    | 171 | Resume for Buren Hanson | 155 |
| 10 | 172 | Memo re Use of Federal Government Communications Systems and Equipment | 155 |
| 11 | 173 | Consent to Monitoring | 156 |
|    | 174 | Security SOP from Arrison | 157 |
| 12 | 175 | USAMRIID Policy re Access to BSL3/4 labs | 157 |
|    | 176 | Accident or Incident Guard Reporting Quick | 158 |
| 13 |     | List | |
|    | 177 | Security SOPs from Arrison | 158 |
| 14 | 178 | USAMRIID Facility entry/exit inspection policy | 159 |
| 15 | 179 | Physical Security Inspection Report, 5/25/00 | 160 |
| 16 | 180 | Audit inspections | 160 |
|    | 181 | Memo re Joint Staff Integrated | 161 |
| 17 |     | Vulnerability Assessment | |
|    | 182 | Memo re Procedures to initiate NAC | 162 |
| 18 | 183 | Memo re Request for e-mail account | 162 |
|    | 184 | Memo re Request for Access to Network | 162 |
| 19 | 185 | Bomb Threat Evacuation Plan | 163 |
|    | 186 | Handwritten notes | 164 |
| 20 | 187 | Key Control Policy | 164 |
|    | 188 | Monthly Manpower Strength Report | 164 |
| 21 | 189 | Johnson Controls Work Statement | 165 |
|    | 190 | Immunization List | 165 |
| 22 | 191 | Badge issuance policy | 166 |
|    | 192 | Emergency Preparedness Plan | 166 |
| 23 | 193 | Handwritten notes about inspections done at Fort Detrick | 167 |
| 24 | 194 | Procedures for Entry/Exit AA310 | 168 |
|    | 195 | Alarm Activation | 168 |
| 25 | 196 | E-mail Parish to Salerno, 5/30/02 | 168 |
|    | 197 | Army Reg 38-67 | 168 |

```
 1   198   Background screenings                     169
     199   IGM-1 Accountability and Physical Security 170
 2         charts
     200   Documents re how facilities addressed     171
 3         observations in Inspector General's report
     201   Handwritten notes                         172
 4   202   Personnel Data                            173
     203   Roster of USAMRIID Personnel              174
 5   204   Security Clearance Report                 174
     205   Analysis of inconsistencies               175
 6   206   Handwritten notes                         176
     207   DOD Draft Directive, 4/19/02              178
 7   208   Talking Points on DOD Directive 5210.XX   178
     209   Interim Guidance                          180
 8   210   Draft PAM                                 181
     211   Biological Defense Safety Program         182
 9   212   Personnel Security Program                182
     213   DOD Directive, 12/13/96                   183
10   214   Department of the Army Information        183
           Security Program
11   215   DOD Directive, 4/25/91                    183
     216   DOD Directive, 8/12/98                    184
12   217   Army Reg 70-65                            184
     218   Army Reg 190-16 Physical Security         186
13   219   Handwritten notes re clearance to wear    187
           respirator
14   220   New York Times article, 5/21/02           187
     221   Cyber section of report                   188
15   222   Example Cyber Security Policy             188
     223   DOD Directive, 4/19/02                    188
16   224   NAC form for new employees                189
     225   DOD Draft Security Policy Comments,       189
17         5/20/02
     226   Handwritten notes of Milloy, 5/6/02       190
18   227   Position Sensitivity Roster, 11/22/00     191
     228   Army Regulation 190-13                    191
19   229   Tentative Sandia Visit Schedule           192
     230   Handwritten notes 1 through 17            193
20   231   Memo re Safeguarding Information re WMD    193
     232   Memo re Action to Safeguard Information re 194
21         WMD, 3/19/02
     233   E-mail Krivitsky to Johnsen, 2/4/02       196
22
23
24
25
```

```
 1            THE VIDEOGRAPHER:  We are on the record.

 2   The date is January 28, 2011.  The time is about

 3   10:12 Mountain time.  This is a videotaped deposition

 4   of Reynolds M. Salerno, Ph.D., in the matter of

 5   Maureen Stevens, et al., versus United States of

 6   America.  Case number is 9:03-CV-81110-CIV.  In the

 7   United States District Court, Southern District of

 8   Florida.

 9            I'm the videographer; my name is Herb

10   Fiedler, on behalf of Bean & Associates.  The court

11   reporter is Jennifer Bean.

12            Will the attorneys please introduce

13   themselves and state whom they represent for the

14   record.

15            MR. SCHULER:  Richard Schuler on behalf of

16   the Stevens family and the Estate of Robert Stevens,

17   Deceased.

18            MR. TARANTO:  Leon Taranto, Civil Division,

19   U.S. Department of Justice, for the defendant, the

20   United States.

21            CAPTAIN CLAUDIO:  Captain Erik Claudio,

22   U.S. Army Litigation Division, U.S. Army.

23            MS. HILL:  Marianne Hill, Sandia National

24   Labs, on behalf of the subpoenaed witness, Dr.

25   Salerno.
```

```
 1            THE VIDEOGRAPHER:  And will the court
 2   reporter please swear in the witness.
 3                REYNOLDS M. SALERNO, Ph.D.,
 4        after having been first duly sworn under oath,
 5        was questioned and testified as follows:
 6                      EXAMINATION
 7   BY MR. SCHULER:
 8        Q.   Good morning.  And would you state your
 9   name, please.
10        A.   Reynolds Salerno.
11        Q.   What is your business address, Dr. Salerno?
12        A.   My business address is P.O. Box 5800, Mail
13   Stop 1363, Albuquerque, New Mexico.
14        Q.   Dr. Salerno, have you had your deposition
15   taken before at all?
16        A.   Many, many years ago for a minor traffic
17   event.
18        Q.   Okay.  Just a few ground rules that I go
19   over with most witnesses.  You speak very clearly and
20   distinctly and slowly, which is what we like.  When
21   we ask questions and you answer, wait till I finish
22   my question before you answer because our reporter
23   can only take us down one at a time.
24            Most people in normal conversation will
25   anticipate what the question is going to be and start
```

Page 8

1  with the answer.  And that's something that we have

2  to kind of steer away from, break that habit in

3  depositions.  If any of my questions are unclear to

4  you, please let me know and I'll try and rephrase

5  them.  And can we assume that if you answer my

6  question, that you understood?

7          A.    Okay.

8          Q.    Okay.  The other thing is shakes of the

9  head she can't take down either.  All responses have

10  to be verbalized.  So -- and rather than most of us

11  grunt in normal conversation to reflect yes or no, we

12  have to say yes or no in the deposition in order to

13  make a clear record.  Okay?

14          A.    I understand.

15          Q.    Dr. Salerno, are you presently employed?

16          A.    Yes.

17          Q.    By whom are you employed?

18          A.    Sandia National Laboratories.

19          Q.    And what is your position at Sandia

20  National Laboratories?

21          A.    As of today, my position is a Senior

22  Manager for Cooperative Threat Reduction.

23          Q.    How long have you been employed by Sandia

24  Laboratories?

25          A.    Since June of 1999.

1     Q.   Now, I'll go through the roughly 11 years

2  of employment in a minute, but would you favor us at

3  this time by summarizing your educational background,

4  training, and experience in your specialty?  And what

5  I'd like, at this point, is starting with the year of

6  graduation from college; tell us where you went to

7  college, year of graduation, the certificate, and any

8  further graduate degrees after that.

9     A.   Sure.  I graduated from college in 1989,

10 Middlebury College; my degree was in history.  I

11 worked for -- let's see, two years at a bank in New

12 York City.  I then went to graduate school at Yale

13 University.

14    Q.   Let me stop you there for a second.  What

15 did you do for the bank?

16    A.   I was a financial analyst.

17    Q.   And what bank did you work for?

18    A.   Manufacturers Hanover.

19    Q.   And then you said you went to Yale

20 University for graduate school?

21    A.   Yes.

22    Q.   And what did you -- how long did you go

23 there and what kind of degree did you get?

24    A.   I was at Yale for six years, and I received

25 a Ph.D.  The degree field was history, but my field

Page 10

1    of specialization was international security,

2    nonproliferation, counterterrorism.

3         Q.   And that would have been about '97, then,

4    that you got your Ph.D.?

5         A.   '97, correct.

6         Q.   What did you do after you got your degree?

7         A.   I went to work for the United Nations for

8    two years.  And I worked in -- I was the Chief of

9    Staff for the United Nations Department of

10   Peacekeeping Operations.

11        Q.   Were you based in New York?

12        A.   Yes.

13        Q.   And that brings us -- would have brought us

14   to about '99.  Is that when you started working with

15   Sandia National Laboratories?

16        A.   Yes.

17        Q.   How did it come about that you got your

18   initial position with Sandia?  I'll just say "Sandia"

19   for short.

20        A.   Sure, that's fine.

21             Let's see, the position that I was hired

22   into didn't -- I was not filling an empty position.

23   I was -- they created a new position that they asked

24   me to fill.

25             At that time Sandia's work in the

Page 11

1    international security field was relatively limited.

2    It was limited to work in Russia on nuclear security

3    issues.  And there was a concern that Sandia needed

4    to evolve into the post Cold War world.  And I

5    expressed an interest in working globally, and in

6    particular, in the biological arena.  And so I was

7    given a job to explore that opportunity at Sandia.

8    So I was considered an unconventional hire because of

9    my academic background.

10        Q.    And when I asked how you got the job, was

11   there someone that you knew that already worked at

12   Sandia, or did you do your own research and then make

13   contact?

14        A.    No, I knew no one.  To be honest, when I

15   applied, I didn't even really know what Sandia was.

16        Q.    Okay.

17        A.    So I was hired by a Ph.D. physicist who I

18   didn't know until I interviewed with her.  I was

19   from -- I grew up in upstate New York, and I was from

20   the east coast, so I knew very little about this part

21   of the country.

22        Q.    Now, you mentioned you didn't know what

23   Sandia was.  I'm in that position right now.  So if

24   you would explain to me what Sandia National

25   Laboratories -- what its relationship is to the

Page 12

```
 1   government or -- and just in general.

 2        A.    Sure.   Yeah.   So Sandia National

 3   Laboratories is owned by the Department of Energy.

 4   It is -- we have a couple different acronyms that

 5   describe our status.   One is a GOCO, a government

 6   owned corporate -- contractor operated institution,

 7   which means that everything at Sandia physically is

 8   owned by the Department of Energy.   But the

 9   Department of Energy gives a contract currently with

10   Lockheed Martin to operate the laboratories on behalf

11   of the government, to ensure that we operate cleanly

12   and legally and meet all the requirements established

13   by the government.

14             We are not federal employees.   I am an

15   employee of Sandia Corporation, which is an

16   independent corporation, again, that operates Sandia

17   National Laboratories, which is fully owned by the

18   government.

19             We're also -- probably a more accurate

20   acronym that describes us is an FFRDC.   And there are

21   many FFRDCs.   It's a Federally Funded Research and

22   Development Corporation.   We have a unique status.

23   We're not federal employees, but we are prohibited

24   from competing with private industry.   So FFRDCs have

25   been established by the Government to provide unique
```

1   technical R & D expertise for the government that the

2   government is not able to find in the private sector.

3   So we're supposed to work on the kinds of issues that

4   are cutting edge, where, you know, we have a national

5   security mandate and mission.  And so we provide work

6   for the government in areas that are relevant to

7   national security where the government can't rely on

8   the private sector to do the implementation.

9        Q.    Thank you, Dr. Salerno.

10            Sandia Corp, that you said that you were an

11   employee of, is that a corporation that is still

12   owned by the Department of Energy, or is it a private

13   corporation or publicly traded, or if you know?

14        A.    No, I mean -- I don't know.  I'm not even

15   sure I know these details.  So it's not publicly

16   traded.  It's -- what am I allowed -- I don't know

17   what to say.

18            MS. HILL:  You can explain anything.  But

19   he may not know.

20        Q.    That's other thing I should have told you

21   in the beginning.  If I ask you a question you don't

22   know the answer to, just tell me you don't know and

23   we'll move on.

24        A.    Yeah, I don't know these legal details of

25   the arrangement, to be honest.  I should, but I

Page 14

1    don't.  I mean, it's a -- as I said, Sandia National

2    Laboratories is fully owned by the Department of

3    Energy.  Sandia Corporation is the entity that's

4    created -- the financial operation of the

5    laboratories.

6         Q.   Okay.

7         A.   It's a -- I think it's technically a

8    subsidiary of Lockheed Martin, although there is no

9    financial relationship between Sandia Corporation and

10   Lockheed Martin.  The only financial relationship is

11   between Lockheed Martin and the government,

12   Department of Energy, to oversee our operations.

13        Q.   Now, Sandia National Laboratory, the

14   physical place where you work, is located where?

15        A.   Well, it has a series of sites around the

16   country, but the primary site is here in Albuquerque,

17   New Mexico.

18        Q.   And that's the physical structure that you

19   work out of?

20        A.   Yes.

21        Q.   You gave me a post office box address

22   earlier.  Do you know what the street address is of

23   the main portion of Sandia?

24        A.   Oh, I mean, I think -- you know, our Fed Ex

25   address is 1515 Eubank, Southeast, Albuquerque, New

Page 15

1    Mexico.  The street address of the building in which

2    I work is 10600 Research Road, Albuquerque, New

3    Mexico.

4         Q.   Now, you said that you started in 1999 --

5    and if I can sort of paraphrase -- in a relatively

6    new position for Sandia.  Did you have --

7    technically, did you have a title back then when you

8    first got hired?

9         A.   I was hired as a senior member of the

10   technical staff.

11        Q.   And you said you expressed interest in the

12   biological security arena; correct?

13        A.   Yes.

14        Q.   And right from the beginning, that's what

15   you were working on when you started with Sandia?

16        A.   Yeah.  I mean, there wasn't funding

17   specifically for that work when I arrived, so my

18   initial work was in a few different areas.  But that

19   was one of the areas that I was given the opportunity

20   to try to develop.

21        Q.   And tell me, since '99, about your -- just

22   an overview of your career with Sandia up to this

23   point in time.

24        A.   Well, so one of the things that was clear

25   to me when I arrived at Sandia was that, you know,

```
 1    we -- our work is paid for by the government.  And in
 2    order to survive, you need government funding.  And
 3    so understanding both what Sandia's historical
 4    capabilities were and understanding what the needs of
 5    the government were in various agencies was critical.
 6              You know, I couldn't -- as much as I wanted
 7    to just sit in my office and think good thoughts, you
 8    know, that's not how you survive.
 9              So while I was interested in biological
10    security issues in the broadest sense, I made a point
11    of trying to understand what existing capabilities at
12    Sandia I could leverage.  And one of the things that
13    quickly became obvious to me was that a historical
14    capability, expertise, responsibility that Sandia has
15    is in physical protection, primarily for the U.S.
16    nuclear weapons stockpile, as well as special nuclear
17    weapons, special nuclear materials owned by the U.S.
18    Government.
19              You know, part of our history is that
20    Sandia was set up shortly after Los Alamos was
21    created during the Second World War to build a
22    nuclear weapon for the United States.  Los Alamos was
23    created as the nuclear physics laboratory.  They
24    actually created the inside of the nuclear weapon.
25              Sandia was created shortly thereafter,
```

Page 17

1    actually as an arm of Los Alamos, to be the

2    engineering laboratory, to help put the bomb

3    together, and make sure that it would function as a

4    delivery device; not just that it would go "bang."

5              So we -- Sandia has always been, and still

6    today remains, the leading science and engineering

7    laboratory, national laboratory for the U.S.

8    Government.  And in that engineering expertise,

9    Sandia, you know, dating back 50 or 60 years, became

10   the laboratory that the government turned to first

11   for physical protection, security related issues,

12   originally focused on nuclear materials and nuclear

13   weapons.

14             So there was just a huge portion of Sandia

15   that was dedicated to this mission and a tremendous

16   amount of expertise.  So I said to myself, Well, this

17   is interesting.  Let me go talk to these people and

18   see if they know anything about biology.  And they

19   didn't.  They really had never focused on that at

20   all.  And even though I wasn't a biologist, you know,

21   it had long been a -- sort of a passion of mine.  And

22   so since this was one of the things that I was asked

23   to look at, I decided to, you know, pursue the idea

24   of matching my interest in biology with Sandia's

25   capabilities in physical protection and security.

```
 1              At the same time -- and this overlapped

 2   very well with my academic training and expertise and

 3   what I brought to the topic, in that, you know,

 4   again, my background was international.  In fact, I

 5   still -- my field today is still focused on

 6   international security.

 7              And at that time -- and you may not be

 8   aware of this -- but at the same time that I started

 9   at Sandia, a book was published by a former defector

10   from the Soviet Union, and that book was called

11   "Biohazard."  And that book basically blew open the

12   cover of the former Soviet biological weapons

13   program.  And it described in detail how the Soviet

14   Union had abrogated the biological weapons convention

15   since its signing in 1972.  And this was -- and the

16   infrastructure that remained in the former Soviet

17   states associated with this biological weapons

18   program was my primary -- one of my primary concerns

19   at that time.  And this was part of why I thought

20   Sandia should be focusing in this area when I started

21   my job.

22              And I happened to know some people in

23   Washington who were focused in this area.  At this

24   time this was a very, very small field.

25   Biological -- former biological weapons issues in the
```

1  former Soviet Union was not high on anyone's radar in

2  the late '90s.  You know, frankly, it was an academic

3  pursuit of mine.  And there were half a dozen people

4  in the U.S. Government who cared about it.  So I

5  happened to know some of these people.  It wasn't

6  hard to get to know them.

7          Anyway, with the publication of this

8  particular book -- and this book revealed to the U.S.

9  Government, in an unclassified sense, that the Soviet

10  program had laboratories all over the former Soviet

11  Union that were associated with this biological

12  weapons work.  And now, in the late '90s, with Russia

13  collapsing and the former Soviet states having lost

14  their Soviet protector, these facilities were

15  languishing.  And the scientists didn't have money,

16  the facilities were, in all likelihood, not being

17  well cared for.  And so I was among the small group

18  of people associated with the field who were very

19  concerned about the status of these facilities

20  overseas.  Because we knew -- especially with this

21  book released -- that these facilities were working

22  with many, many dangerous pathogens.

23          So this is a long way of saying an idea

24  that occurred to me and a colleague of mine at the

25  time that was working at the Monterey Institute was,

1   we should -- and at the same time there was money

2   available through what was called the Nunn-Lugar

3   Cooperative Threat Reduction Program, to -- it was

4   mostly focused on loose nukes in the Soviet Union.

5   And it was money that the government set aside, the

6   U.S. Government set aside, to help former Soviet

7   states get control of loose nukes, loose nuclear

8   material left over from the Soviet regime.

9           So the idea was, Hey, can we leverage this

10  notion, this money, this funding, and get the

11  government to pay attention to -- for all intents and

12  purposes, loose biological materials in the former

13  Soviet Union?

14          And so one -- so a pitch that I made very

15  early on -- I mean, this would have been within the

16  first six or nine months that I came to work at

17  Sandia -- was to the Department of Defense, where

18  this money was allocated, you know, Why don't we have

19  a meeting with the lab directors from these Soviet

20  states, former Soviet states, about biosecurity,

21  about securing their biological material?

22          Lo and behold, we got -- this was my first

23  external contract -- and in the fall of 2000, we were

24  given -- we were asked by the Department of Defense

25  to conduct this conference here in Albuquerque on --

1   called Biosecurity.  And at the time the term didn't

2   even exist.  Okay.  From my point of view, this was

3   the origins of this technical field.

4            And so quickly, I spent, you know, most of

5   the first nine months or so of the year 2000 working

6   with my colleagues in the physical protection area,

7   and trying to adapt their methodologies and

8   approaches to securing nuclear material to an

9   approach that we thought would be reasonable for

10  biological facilities.

11           And it was through this process of

12  preparing for this big meeting, as well as the

13  meeting itself, that I got to know a lot of

14  principals at many of the most important U.S.

15  facilities that work with dangerous materials.

16  USAMRIID was one of them.  CDC, NIH, Plum Island.

17  Because they, in one way or another, were being

18  engaged by the Defense Department to work with these

19  former Soviet lab directors, lab directors of

20  facilities in the former Soviet Union.

21           And that was really the -- you know, my

22  very rapid introduction to a field that I had little

23  practical experience with.  But you know, it was in a

24  subject area that was very new to them, as well as to

25  us.  And so I just happened to be in the right place

Page 22

1    at the right time to focus on this area.

2         Q.   Okay.  And have you since -- giving us

3    that -- I appreciate the detailed explanation --

4    since that first six or nine months, has that program

5    at Sandia -- I'll call it evolved -- in the last 10

6    years?

7         A.   Yeah, absolutely.  I mean, so -- you know,

8    short story is that this -- the field of biosecurity

9    didn't exist, but it became extremely important.

10   Obviously, the anthrax attacks, combined with 9/11,

11   you know, put -- among other things -- but it put

12   biosecurity, the field of laboratory biosecurity on

13   the -- in the lights, if you will.

14             And the ironic thing is that, you know, by

15   the fall of 2001, I had spent, you know, a solid

16   year-and-a-half thinking and working on this issue.

17   Not very long, but it was 18 months longer than

18   pretty much anyone else had.

19             And so we -- and I think also because we

20   were Sandia, you know, we were asked by the

21   government to do a tremendous amount of work in this

22   field, you know, hands on, boots on the ground

23   assessments of laboratories, beginning in the fall of

24   2001.

25             And, you know, so since that time, you

1              (Plaintiffs' Exhibit 121 marked.)

2         Q.   And I think what this describes is a -- it

3    refers to Sandia's International Biological Threat

4    Reduction Team.  Is that, essentially, what you had

5    described earlier what you're working on now?

6         A.   Right, that's the name of my team.

7         Q.   And I'll have some other questions about

8    this a little later.  But let me get back to the time

9    period that's germane to our case here and USAMRIID.

10             Ultimately, I think you and your team did a

11   report about the various aspects of the security at

12   USAMRIID; correct?

13        A.   Yes.

14        Q.   When were you first contacted -- when was

15   the initial contact made to -- either to you or to

16   Sandia to engage you to do this report?

17        A.   It would have been -- you know, I'm just

18   trying to guess here.  But I'm fairly sure it would

19   have been sometime in the winter or very early spring

20   of 2002, was when USAMRIID actually wanted a Sandia

21   team to come and do a specific assessment of their

22   facility.

23        Q.   Do you recall who first contacted you about

24   this?

25        A.   Yeah.  Well, I'm -- so I knew Peter

 1   hand, and she was our principal point of contact for

 2   this particular work.

 3        Q.   Did you ever, yourself, speak with Colonel

 4   Eitzen at the outset?

 5        A.   Yes, many times.

 6        Q.   This memo that we've marked Plaintiffs' 123

 7   is dated May 30, 2002; correct?

 8        A.   Correct.

 9        Q.   And it refers to meetings at USAMRIID

10   between April 29 and May 22.  And that's when your

11   team would have had the actual physical presence

12   there?

13        A.   That's right.

14        Q.   Did you, yourself, physically go to

15   USAMRIID?

16        A.   Yes.

17        Q.   And again, approximately, can you tell me

18   how many visits, how many days you may have spent

19   there between April 29 and May 22?

20        A.   I know the first -- the first visit --

21   well, I think I -- I think I went three different

22   times.  I think initially for a couple of days.  The

23   second visit was the main assessment visit when all

24   seven of us were there for five or six solid days.

25   And then I went back for two or three more days all

1    within that time.  So I think I made three different

2    trips in that three weeks.  It was pretty intensive.

3         Q.   Did you ever speak with a Colonel Andrews

4    who was head of the bacteriology division?

5         A.   So, I don't recall exactly, but I know that

6    we spent one day meeting with the heads of all of the

7    divisions, and I know all the heads were accounted

8    for.  So if he was head of the bacteriology division,

9    then I'm sure he was in our meetings.  Whether or not

10   I spoke to him directly, I don't recall.

11        Q.   Did you ever speak with any of the

12   individual scientists, for example?  Did you ever

13   speak with Bruce Ivins?

14        A.   I don't recall whether or not I spoke with

15   Bruce Ivins, specifically.  The answer to your

16   question is, Yes, we spoke to dozens and dozens of

17   scientists across all of the units.  This was -- part

18   of our assessment is to really understand how the

19   system worked.  So we talked to lots and lots of

20   people.  I do not remember specifically speaking to

21   him.

22        Q.   When you spoke with individual scientists,

23   did you make notes or recordings on a dictating type

24   machine?

25        A.   No.  No, I mean, we were -- you know, we

1    had notebooks, yes, but we didn't bring in individual

2    scientists for formal interviews like this.  You

3    know, we were walking around the facility, you know,

4    running into people all the time, and you know, sort

5    of having often very informal conversations in the

6    hall.

7              You know, again, our one point that maybe

8    you understand, but is important to stress, is that

9    we were not auditors.  You know, we were not asked to

10   look for, you know, mistakes that individuals at the

11   facility had made.  We were hired by USAMRIID to help

12   USAMRIID make improvements.

13             And so it was important from our point of

14   view that we did not have, you know, formal inquiries

15   or -- you know, we wanted -- in order to get the

16   information, we wanted to have sort of casual,

17   friendly relationships with as many people at the

18   facility as possible, so that they --

19        Q.   You wanted people to open up?

20        A.   That's right, yeah.

21        Q.   Okay.

22        A.   So we had no legal standing.  You know, we

23   were not there to assess their regulatory compliance.

24   We were there trying to understand their system and

25   help them design an improved one.

1        Q.   And the purpose -- evaluate the existing

2   security program at USAMRIID and recommend security

3   improvements to -- and the purpose was to "deter,

4   detect, respond to, and contain unauthorized access

5   to high-consequence pathogens and toxins"; correct?

6        A.   Correct.

7        Q.   In the second paragraph you refer to

8   Primary Targets as being these -- for lack of a

9   better word -- dangerous pathogens and critical

10  information specifically related to those pathogens;

11  correct?

12       A.   Correct.

13       Q.   And among the high-consequence pathogens in

14  paragraph 3, and you list -- enumerate them, and one

15  of them is Bacilus anthracis, or anthrax; correct?

16       A.   Correct.

17       Q.   Skipping down to the last large paragraph,

18  it's mentioned that "A comprehensive biosecurity

19  system should include all of the following elements:"

20  Physical protection and personnel reliability and

21  pathogen and toxin accountability among them;

22  correct?

23       A.   Correct.

24       Q.   And then it appears that there is a list of

25  findings saying, "The current biosecurity system at

1  USAMRIID does not adequately protect high-consequence

2  pathogens and toxins and related information against

3  the defined threats"; correct?

4      A.   Correct.

5      Q.   And the very first finding here I need to

6  ask you about.  And the language is, "Perhaps the

7  most important observation in the report is that the

8  culture at USAMRIID does not reflect the same

9  indisputable commitment to security as it does to

10  research."

11          Can you expand upon that for a minute?

12      A.   Yeah, sure, it -- to be honest, at this

13  time in our -- you know, in 2002, this was a problem

14  all over the place.  I mean, this kind of problem was

15  not specific to USAMRIID.

16          Laboratory biosecurity, as I tried to imply

17  a few minutes ago, as a field really didn't exist.

18  There was not a regulatory system in place.  The

19  Select Agent Rule, which was the only federal rule

20  related to dangerous pathogens, did not address

21  security in facilities.  It was specific to the

22  transport of dangerous pathogens between facilities.

23          And, unfortunately, what that meant in

24  practice was that science ruled the day at USAMRIID.

25  And so the most important people at USAMRIID

1    understandably were the scientists.  And science was

2    the mission and science was the priority.  At the

3    time, the security professionals -- there was really

4    very, very few security professionals at USAMRIID.

5    And those who were there were not the most

6    sophisticated people.  And, you know, the number of

7    comments by the security people who got in trouble

8    for "bothering the doctors," I think is a quote that

9    we used in here, was quite high.

10           And so the -- so this was, you know, one of

11    the things that I was passionate about then and still

12    passionate about today is that particular to this

13    biological problem that if the scientists and the

14    personnel are not committed to the protection of the

15    materials, then, you know, security will not be

16    effective.

17           But maybe -- it's different in other areas,

18    you know, the nuclear area that I'm also very

19    familiar with, because the materials are much larger,

20    and you can actually use physical systems to give you

21    a high degree of confidence, security confidence.  In

22    the biological area, even the physical -- even a

23    highly intrusive physical system is not adequate to

24    prevent someone from surreptitiously walking out with

25    an organism.

Page 46

```
 1        Q.    Yeah.

 2        A.    -- or --

 3        Q.    Yeah.

 4        A.    Depending on the circumstance, because the

 5   organisms are so small, you know, can be microscopic

 6   in quantity, and are not detectable by standoff

 7   detection technology, yes, it's easier for an

 8   individual working at one of these laboratories to

 9   covertly steal for misuse one of these agents than it

10   would be to covertly steal a nuclear weapon or

11   special nuclear materials from a nuclear facility.

12              Yeah, so the personnel -- well, both the

13   management commitment to security and the importance

14   of personnel security is extremely important in this

15   particular field.

16        Q.    And they are called personnel reliability

17   programs; right?

18        A.    Well, they have many different terms.

19   Yeah, I mean, you know, the military in particular

20   uses the term PRP very specifically.  And there is a

21   whole variety of PR -- personnel reliability

22   programs.

23              But from my point of view, you know, it's

24   not just whether or not you subject your people to

25   lie detector tests or medical screenings, but it's
```

Page 49

```
 1        Q.   The next one down, "Although material
 2   accountability at USAMRIID is adequate, the process
 3   has not been formalized.  There are no policies and
 4   procedures that establish chain of custody for
 5   high-consequence pathogens and toxins when they are
 6   in transit from one secure laboratory (or building)
 7   to another within USAMRIID."  Was that another
 8   finding?
 9        A.   Yes.
10        Q.   And you mentioned that, "USAMRIID's new
11   'inventory database' program is not currently part of
12   an automated, user-friendly system that is available
13   within all the laboratory suites, and it has not been
14   consistently used or completely updated since early
15   in 2002."  Is that also a finding?
16        A.   Yes.
17        Q.   Now, if you'll skip to -- it actually
18   begins on page 13, Dr. Salerno.  And the portion I
19   want to refer to is on page 14 under the provision
20   dealing with "High-consequence Pathogens and Toxins,"
21   of which anthrax is a part.  And I'm looking at the
22   last paragraph of that section on page 14, your group
23   in this report found that USAMRIID high-consequence
24   pathogens and toxins can be found in Petri dishes,
25   cell cultures, environmental samples, clinical
```

Page 50

 1   specimens, infected animal models, and animal

 2   carcasses, as well as stored in refrigerated or

 3   freeze-dried forms.

 4          And further down you mentioned that, The

 5   self-replicating nature of high-consequence pathogens

 6   and toxins, the diverse places within a legitimate

 7   laboratory where these pathogens and toxins are

 8   located, and the various quantities of these

 9   pathogens and toxins required to do legitimate

10   research indicate that the absolute amount of any

11   given organism at USAMRIID cannot be reliably

12   quantified from day to day.  That is another finding?

13        A.   Yes.  Well, it's not a finding.  I mean

14   it's a reality.

15        Q.   Okay.

16        A.   That's not unique to USAMRIID.  I mean,

17   that's common of any facility that works with

18   pathogens and toxins.

19        Q.   At the time that you went to USAMRIID, did

20   they have a buddy system in the laboratory?

21        A.   No, not a formal one.

22        Q.   Okay.  Did they have one since --

23        A.   I don't know.

24        Q.   -- your report?

25        A.   I don't know.

Page 51

```
 1        Q.   Is there a section of this report that

 2    deals with -- well, let me strike that.  Let me ask

 3    you from your knowledge -- and you can refer to the

 4    report if you'd like -- but was USAMRIID taking any

 5    steps or had they taken any steps in the past from

 6    your observations when you were out there and

 7    discussing these things with people to ensure that

 8    those with access to the BSL level 3 and BSL level 4

 9    labs were both mentally and physically sound?

10        A.   At the time that we did our work, that was

11    not an explicit requirement, nor was it in policies

12    and procedures.  And whether or not they were doing

13    it on a, you know, an ad hoc laboratory to laboratory

14    basis, you know, I would assume so.  You know, they

15    were quite sensitive when I pressed them hard on

16    these personnel reliability issues, because, you

17    know, their responses were, Well, we know who our

18    people are, and we hire good people, and we trust our

19    people.  And that may have been true.

20             You know, from my point of view what they

21    didn't have -- and I think it's clear in this

22    report -- is they didn't have a formal system in

23    place to evaluate the reliability of their employees.

24    It wasn't required of them, and you know, they

25    weren't doing it in the way that we thought they
```

Page 52

1   should be.  I mean, they had a system, a requirement

2   to do a National Agency Check or a National Agency

3   Check with L and Cs, or a NACI.  And they were

4   following that requirement.  But, you know, part of

5   our argument was that in our judgment, based on our

6   understanding of the field, that those limited

7   federal checks may not be good enough.

8        Q.   Were you -- and going through this whole

9   report, and maybe it's covered with terminology that

10  is consistent with what I'm about to ask you, but I

11  didn't see any reference to it.

12       A.   Okay.

13       Q.   Did you come across, in your visit to

14  USAMRIID, a -- what they call the special

15  immunizations program?

16       A.   Yes, sure.

17       Q.   And is that referred to in this report at

18  all?

19       A.   I mean, it's not explicitly referred to,

20  but, you know, it was clear that, depending on the

21  kind of work that a scientist or even a technician

22  would do, they may or may not need to be in the

23  immunizations program.  And -- yeah.

24       Q.   So you did come across that special

25  immunizations program?  I just didn't see it referred

Page 53

1    to in here, that's all.

2         A.   Well, it wasn't -- you know, from our point

3    of view, it wasn't relevant to the mission that we

4    were being asked to focus on.

5         Q.   Okay.

6         A.   You know, we weren't asked is everyone who

7    has access to these facilities safe, right?  We were

8    being asked, are the pathogens adequately protected?

9    Immunizations don't really have anything -- I mean,

10   they are relevant to the safety of the individuals

11   who work there, but it's not specifically relevant to

12   the security of the materials.

13        Q.   I understand.  Okay.  So your focus was

14   really on the latter, the security of the materials?

15        A.   That's absolutely -- absolutely.

16        Q.   But part of that security of the materials

17   has to do with personnel reliability, as we discussed

18   before; correct?

19        A.   That's right.

20        Q.   And you have a section on page 32 of the

21   report, if you want to take a look at it, on the

22   Personnel Reliability?

23        A.   Right.

24        Q.   And at the bottom of the first paragraph

25   you say that "the effectiveness of a security system

1    at a high containment biological research laboratory

2    will depend first and foremost on the integrity of

3    the individuals who have access to the

4    high-consequence organisms; right?

5         A.   Correct.

6         Q.   So if you had a bad actor in there, it

7    wouldn't make too much difference how much the

8    physical security was or how detailed the keeping

9    track of the amount of the material happened, if you

10   had somebody inside that was not reliable and wanted

11   to, in fact, obtain some of these pathogens for

12   illicit purposes or aggressive purposes, that could

13   be done?

14        A.   Correct.

15        Q.   You mention in the next paragraph, "At the

16   time of the Sandia National Laboratory review, there

17   were 678 USAMRIID employees (256 civilians, 58

18   military officers, 147 enlisted personnel, and 217

19   others).  The positions at USAMRIID are designated by

20   one of three categories, based on the type of

21   information the individual in that position will be

22   required to access."  And then you get into the

23   "Critical-sensitive positions, the Top Secret

24   clearance; noncritical-sensitive positions with a

25   secret clearance; and then nonsensitive positions do

Page 55

```
 1   not require a security clearance."  Is that an
 2   accurate summary of what you found?
 3        A.   Yes.
 4        Q.   You mentioned, "At the time of the Sandia
 5   review, 13 USAMRIID employees held a Top Secret
 6   security clearance and 168 USAMRIID employees held a
 7   Secret security clearance.  Thus the overwhelming
 8   majority, 497 USAMRIID employees, held no security
 9   clearance."  Correct?
10        A.   Correct.
11        Q.   Now, you mentioned I think earlier this
12   National Agency Check Inquiry, NACI.  That's at the
13   top of page 33?
14        A.   Right.
15        Q.   Civilians were supposed to receive that at
16   the outset, correct, of their employment?
17             MR. TARANTO:  You're asking -- Mr. Schuler,
18   you're asking as of the time -- as of April of 2002?
19             MR. SCHULER:  Whenever he did his review,
20   that's right.
21        A.   So -- let's see, I'm going to read from the
22   top of page 33 there.  "Different staff members are
23   subject to different types of background checks.
24   Officers and contractors receive an NAC, enlisted
25   personnel receive a NACLC, and civilians receive a
```

Page 56

1    NACI."

2         Q.    And you mentioned there are a few security

3    vulnerabilities in this personnel reliability system.

4    And then that's -- they are listed 1 through 5 below;

5    correct?

6         A.    Correct.

7         Q.    And the first thing you list is that, "The

8    policy does not require a completed National Agency

9    Check prior to receiving facility and network

10   access"; right?

11        A.    Correct.

12        Q.    Second, "no requirement to review the NAC

13   as an employee's circumstances change over time, or

14   as an employee's responsibilities change"; correct?

15        A.    Correct.

16        Q.    Third, "no requirement to screen employees

17   for substance abuse with a random breath analyzer

18   test or to subject employees to random drug testing.

19   (Only those employees with security clearance are

20   subject to random drug testing.)"  Correct?

21        A.    Correct.

22        Q.    Now, was it your understanding that --

23   whether military or civilian employees that had

24   security clearance were subject to random drug

25   testing?

1      A.    I'm trying to remember.  I'm not sure that

2    we asked that question specifically.  But my

3    understanding is that that's a federal requirement of

4    those -- of those security clearances.  Whether or

5    not -- I'm fairly sure I didn't ask the question, Do

6    you have examples of individuals at USAMRIID who were

7    subject to random drug tests.  I'm not sure.  I don't

8    recall.

9      Q.    Fourth -- I think that the fourth

10   vulnerability has to do with foreign influences or

11   requirement to report foreign influences or contacts.

12          And the fifth is -- although -- it talks

13   about foreign nationals, and although they are

14   employed at USAMRIID and they must undergo an NAC,

15   it's not designed to screen background of foreign

16   nationals, particularly if they spent a considerable

17   amount of time in a foreign country; correct?

18      A.    (Witness nods head.)

19          MR. TARANTO:  I object to the

20   characterization of what number 4 said.

21          MR. SCHULER:  I'm referring to 5.

22          MR. TARANTO:  Well, you did a summary of 4,

23   and then went to 5.

24      Q.    That is correct.  On the last -- trying to

25   summarize it up?

Page 66

1        Q.   Yes.

2        A.   So, as I said, we were -- we had two

3   principal tasks for USAMRIID.   One was a

4   vulnerability assessment, which comprises the first

5   half -- I mean, all the material that we just

6   finished covering from -- let me see -- make sure I'm

7   clear here.

8             So section 3, which starts on page 24 and

9   ends on page 38, is the -- essentially, a description

10  of the operations as they stood at the time in April,

11  May of 2002, and the vulnerabilities or the

12  weaknesses of the system from our perspective, okay.

13  So that was one of our taskings.

14            The second one was to make recommendations

15  or suggestions for how USAMRIID might develop a

16  laboratory biosecurity system in the future.   So

17  everything from page 39 until, really the end of the

18  report -- I guess it would be 87, 88 -- was -- were

19  recommendations for how USAMRIID could change their

20  operations to improve their protection of

21  high-consequence pathogens and toxins.

22        Q.   And looking at page 39, it appears that one

23  of the recommendations is to improve the closed

24  circuit TVs deployment, if you will?

25        A.   Yes.

Page 67

1        Q.    And skipping down to 4.2.2 on page 41.

2        A.    Um-hum.

3        Q.    Some recommendations were also made for

4    Insider Protection as well; right?

5        A.    Yes, in 4.2.2, yes.

6        Q.    And one of the bases for that was to stress

7    the fact that since a "Detailed accounting for

8    individual microorganisms is unachievable and this

9    fact underscores the need for a personnel security

10   program for anyone with access to high-consequence

11   pathogens or toxins"; correct?

12       A.    Correct.

13       Q.    Let me ask you a little bit about what I

14   think you've called in this report Cyber Security.

15   And I just want to make sure that I'm not

16   misunderstanding some of the references here.   The

17   internal or the work e-mail, if you will, internal

18   e-mail for employees was being used, was it not, when

19   you were there?

20       A.    Was e-mail being used?

21       Q.    Yes.   I mean, in other words, one employee

22   from their work computer could send an e-mail to

23   another employee on their work computer and

24   vice-versa?

25       A.    Yes, yes.

Page 68

```
 1        Q.    And do you know if anything was being done,
 2   when you were there, to monitor internal e-mails that
 3   were being sent from employee to employee?
 4        A.    No, I do not know.  But we were not told
 5   that that was happening.
 6        Q.    Did you make any recommendations for any
 7   type of internal monitoring of e-mails of employees?
 8        A.    No.
 9        Q.    You mentioned in the last paragraph of
10   4.2.2, Insider Protection, that appropriate "control
11   measures, (e.g., chain of custody), and cyber
12   security are also incorporated with access control
13   and personnel security strategies for protection
14   against a malevolent insider.  The personnel security
15   strategies begin with the careful selection of
16   personnel, which should include a reliable background
17   investigation and periodic background investigation
18   updates.  Some high-security environments also have
19   continuing human reliability programs that include
20   supervisory training, annual physical examination,
21   random drug screening," updates of financial
22   histories.  And insider strategies including strict
23   escorting procedures.  Are you making recommendations
24   that those things be implemented at USAMRIID?
25        A.    We made an observation that the personnel
```

1    reliability system was not adequate.  And we did not

2    recommend here a specific personnel security system

3    for USAMRIID, but we wanted them to be aware that

4    there are many different strategies that can be used

5    to the achieve personnel reliability, and that

6    USAMRIID did have to think about a variety of them

7    and implement something.

8         Q.   And these were some of the things to think

9    about?

10        A.   That's right.

11        Q.   When you refer to "strict escorting

12   procedures," is that what I was talking about before,

13   the buddy system going into these high-containment

14   laboratories, or is that something else?

15        A.   No, that's something else.  Maybe I should

16   ask for a clarification.  When you say buddy

17   system --

18        Q.   Right.

19        A.   -- do you mean, essentially, what we call

20   The Two Man Rule?

21        Q.   Correct.

22        A.   Okay, yeah.  No, definitely something else.

23             So escorting is critical, right, in that

24   these facilities operate -- sorry, let me back up.

25   The number of people who have access to the sensitive

Page 184

1    not sure Waylon Jennings would appreciate his name

2    being connected --

3         A.    I don't know why that's there.

4         Q.    You've got to find some humor sometimes.

5         A.    Yeah, this is a DOD directive, dated August

6    12, 1998, on "Visits, Assignments, and Exchanges of

7    Foreign Nationals."  This is a DOD policy.

8         Q.    All right.  I'll mark this as Plaintiffs'

9    216.

10             (Plaintiffs' Exhibit 216 marked.)

11        Q.    Next is Sandia 1146 to Sandia 1152.  If you

12   could tell us what that is.

13        A.    That's the Army Reg 70-65, dated October 1,

14   1979, Management of Controlled Substances and

15   Hazardous Biological Substances in Army Research

16   Facilities.  And this is one of the few regs that

17   existed at the time for management of biological

18   materials in the Army.  And it differentiated between

19   the repository stocks and working stocks.

20        Q.    Okay.  I'll mark that as Plaintiffs' 217.

21             (Plaintiffs' Exhibit 217 marked.)

22        Q.    And I'm having a little trouble seeing

23   where the next exhibit ends.  I think I'm -- okay --

24   up to here, unless these are out of sequence.  Let me

25   just take a look at this for a minute.

Page 198

```
 1              MR. TARANTO:  All right.  Can we go off the
 2    record?
 3              THE VIDEOGRAPHER:  We are off the record at
 4    5:55.
 5         (The deposition was in recess.)
 6              THE VIDEOGRAPHER:  We are on the record.
 7    It's 6:15.  Here marks the beginning of tape number 4
 8    in the deposition of Reynolds Salerno.  You may
 9    proceed.
10                        EXAMINATION
11    BY MR. TARANTO:
12         Q.   Dr. Salerno, I appreciate your staying with
13    us this evening to finish what has been a long
14    deposition.
15              Back in 2002, did any of the laboratories
16    in the U.S. that handled biological select agents or
17    high-consequence pathogens and toxins have in place
18    all of the practices that you recommended for
19    USAMRIID?
20         A.   No.
21              MR. SCHULER:  Object to the form.  Go
22    ahead.
23         A.   At that time, among the facilities that I
24    was familiar with, no facility that I knew of, that I
25    was aware of, had a comprehensive biosecurity system
```

1   in place.

2        Q.   For the laboratories that dealt with

3   biological select agents and high-consequence

4   pathogens, were you aware of any labs in the U.S.

5   that were superior to -- in biosecurity -- to

6   USAMRIID back in 2002?

7             MR. SCHULER:  Object to the form.

8        A.   At that time in 2002, I -- no, I wouldn't

9   know of any U.S. facility, with those pathogens, that

10  had better security.

11       Q.   Back in 2002, were there any books or

12  treatises on biosecurity in laboratories?

13       A.   No.

14       Q.   All right.  Are there any books on that

15  now?

16       A.   Yes.

17       Q.   Yes.  And how many books are you aware of

18  on that?

19       A.   Full-length manuscripts, one.

20       Q.   Yes.  And who is that book by?

21       A.   I wrote that book along with my colleague,

22  Jennifer Gaudioso.

23       Q.   And when was that published?

24       A.   2007.

25       Q.   Has the state of the art in biosecurity

1    evolved much since October of 2001, up to today?

2         A.    Tremendously.

3         Q.    And could you point out or summarize some

4    of the key changes that have occurred?

5         A.    Well, so probably the biggest change that's

6    occurred since 2001, was the revision of what we call

7    the Select Agent Rule in the United States.  And so,

8    prior to December -- I think it was December of 2002,

9    the only federal regulation for security of select

10   agents, or what the U.S. Government calls dangerous

11   pathogens and toxins was limited to the security of

12   the transfer of select agents from one facility to

13   another.

14         In the -- late 2002, that regulation was

15   revised to include the security of select agents at

16   facilities and while they were being used.

17         And so that was a major change that I think

18   was at least partially prodded by the events of 2001,

19   was a federal regulation to require certain

20   protections of those materials in laboratories, not

21   only in transport between laboratories.

22         In addition to that regulation, there

23   are -- since 2001, there has been a lot of

24   documentation, a lot of information that's been

25   published in -- by government agencies, by

1   international agencies -- to provide technical

2   guidance to laboratories that work with dangerous

3   pathogens and toxins that didn't exist before.

4           So for instance, CDC and the NIH have

5   published for many years the -- it's called the

6   biosafety guidelines -- the official title is the

7   BMBL.  I'm trying to remember what BMBL stands for.

8   The Biosafety Manual for Microbiological and

9   Bioscience Laboratories.

10          Up until 2000 -- the edition that was

11  available in 2001, had a very thin reference to

12  security of biological materials.

13          That CDC/NIH manual was revised, and the

14  fifth edition came out in -- I think it was 2005 or

15  2006.  And that had the first full length chapter on

16  biosecurity.

17          In that manual at an international level,

18  the WHO has published, for 20-odd years, a biosafety

19  manual as well, it's called the Laboratory Biosafety

20  Manual.

21          It was revised in 2004.  And for the first

22  time in that document's history included a chapter on

23  biosecurity specifically.

24          So the guidance that was -- technical

25  guidance that was available prior to 2004, at an

Page 202

1    international level, did not include anything

2    specific to biosecurity.

3           So regulations changed in the U.S.

4    Regulations were changed in half a dozen developed

5    world countries:  The United Kingdom, Japan,

6    Australia, since 2001, 2002, for laboratory

7    biosecurity.  Technical guidance has been made

8    available since, like I said 2004, 2005.  The

9    publication of our book in 2007, as well as a

10   significant amount of work at U.S. laboratories, as

11   well as laboratories around the world in this field

12   that didn't happen before.

13          I mean -- I think that the, clearly, the

14   anthrax attacks had a significant influence on the

15   creation of the field of laboratory biosecurity.

16   Q.   Prior to the anthrax letter attacks, were

17   there restrictions, legal restrictions in the United

18   States on ownership or possession of high-consequence

19   pathogens or biological select agents?

20          MR. SCHULER:  Object to the form.

21   A.   You know, I mean, the only -- the select

22   agent regulations prior to 2001 were established in

23   1996, and went into effect in 1997, controlled the

24   transfer of select agents from one facility to

25   another.

1        Implied in that regulation, however, was

2   some sort of legitimate purpose for possessing the

3   agents.

4        You know, an individual was prosecuted in

5   the late '90s for trying to obtain a select agent

6   illegitimately.  But they had to -- that was done

7   within the nature of -- because he requested

8   shipments of those select agents to himself.

9        So, you know, the regulatory framework in

10  the United States, prior to 2002, really did not

11  explicitly prohibit the possession of dangerous

12  biological materials from anyone.

13     Q.   Is that different today?

14     A.   Yes.  In the U.S. now, there is --

15          MR. SCHULER:  If I may object to the form.

16  Go ahead.

17     A.   Today, in the United States, ever since the

18  revision to that Select Agent Rule in 2002, there is

19  now a list of about 82 select agents.  And no one in

20  the United States may possess any one of those agents

21  without being registered with the government and

22  approved by the government to possess those agents.

23     Q.   Dr. Salerno, we've placed in front of you

24  Defendants' Exhibit 1.  It is a -- do you recognize

25  that as being a copy of your report?

Page 204

1        A.    Yes.

2        Q.    I've taken the liberty of highlighting --

3   yellow highlighting portions of it that I want to

4   direct your attention during my questioning.

5              If you could turn, please, sir, to page 13

6   of the report.  There is a section at the top of the

7   page:  "Objectives for the Security Assessment and

8   Conceptual Design."  Can you read the highlighted

9   sentence below that?

10       A.    "The primary mission of the security system

11  was determined to be:  To protect the defined targets

12  against USAMRIID's designated threats, impacting

13  operations only to the level required, and not

14  unnecessarily hindering the laboratory's primary

15  research mission."

16       Q.    Why is it important that a security system

17  impact operations only to the level required and not

18  unnecessarily hinder a lab's primary research

19  mission?

20       A.    Security is a support function.  And, you

21  know, I think the mission of the laboratories was to

22  do research and was to do research on dangerous

23  pathogens.  And what that means is that there is an

24  inherent risk, a safety risk and an inherent security

25  risk to meeting that mission.

 1          At some level, someone in the government,

 2     in the Army, and in the Department of Defense has

 3     accepted a level of risk with that mission.  And the

 4     objective was to determine what an appropriate level

 5     of security would be that would allow that mission to

 6     continue, and yet adequately protect dangerous

 7     pathogens from specific threats.

 8          Q.   How could a security system impact

 9     operations or hinder a lab's primary research

10     mission?

11          A.   Well, one way is that you make it so

12     difficult to do the work because of your priorities

13     on security that you significantly increase the cost

14     of doing the research to a level that hinders the

15     facility's ability to complete that research.

16          Ultimately, the USAMRIID or any laboratory

17     has an operating budget, a budget that they have to

18     allocate different amounts of money and resources to

19     different elements of the system, of the laboratory's

20     function.

21          And so if you choose to put a tremendous

22     amount of money into security, you're also choosing

23     to not -- you must take that money from somewhere

24     else.  And a decision has to be made how -- to what

25     extent a laboratory wants to increase its security,

 1   ultimately recognizing that at some point more and

 2   more security means less and less research.

 3           For instance, you can limit -- security

 4   might limit -- severely limit who can have access to

 5   a particular location.  Security can require that you

 6   have multiple numbers of people in a space that do

 7   work that one person could previously do.  Security

 8   could require a -- you know, a significant amount of

 9   bureaucratic processes and procedures that would

10   precede anyone doing any work in the laboratory that

11   may deter scientists from working at that particular

12   facility.

13           There is -- you know, security can be a --

14   both a mechanism to ensure a safe working

15   environment, but also can be very counterproductive

16   if it's implemented in a way that doesn't take into

17   account the technical operations of the facility.  If

18   security is implemented in such a heavy -- with such

19   a heavy hand that it infuriates or frustrates or

20   makes all of the people who work at that facility

21   extremely cynical about security, it can actually be

22   counterproductive.

23       Q.   In the next paragraph of your report, also

24   on page 13, in the last sentence of that paragraph

25   you write, "There are currently no federal guidelines

Page 213

```
 1        Q.   Also, in the same paragraph in the next

 2   sentence you write, "Third, HCPTs are living,

 3   self-replicating organisms and their by-products

 4   which can be continually amplified throughout

 5   legitimate research activities."

 6             How should that affect the development of

 7   systems designed to protect microorganisms from

 8   diversion?

 9        A.   That's important because, essentially, any

10   amount of biological material is relevant from a

11   diversion point of view.  So in the -- the best way

12   to describe this is to compare it with the nuclear

13   security field.  In the nuclear arena, you need a

14   substantial amount of radiological material in order

15   to make a nuclear weapon.  And all of that -- that

16   radiological material, especially in those

17   quantities, emits a certain amount of energy that

18   allows security experts to develop and implement

19   detection systems that can detect that amount of

20   radiological material from a distance.  And so that

21   you can use technology to ensure that somebody

22   walking out of a room is or is not carrying an amount

23   of material that could be turned into a nuclear

24   weapon.

25             In the biological field, however, that
```

Page 214

1    analogy really doesn't hold, because a microscopic

2    amount of a biological agent could be removed from a

3    laboratory and very easily -- if the individual had

4    enough technical expertise, could be amplified into a

5    larger quantity and misused outside of a facility.

6              Also, sticking with the nuclear analogy,

7    that applies -- this fact applies to the relevance of

8    inventory control to security of the material.  In

9    the nuclear field, inventory control is a critical

10   element of nuclear security, and that's because we

11   literally can measure the amount of nuclear material

12   that exists; have an extremely high amount of

13   confidence that that material in a static form will

14   not change its shape, size, or amount.  And then we

15   can measure the amount of material that we remove

16   from a particular repository and transfer into a

17   different location.  And we can do a -- you know, a

18   measure-in/measure-out, input-output mathematical

19   determination to ensure that no material has been

20   lost in the process.

21             We don't have that ability in the

22   biological world.  Even in a static repository, you

23   can -- it's extremely difficult to measure the number

24   of organisms.  You can measure the number of vials in

25   a repository.  But one vial may have millions of

1   organisms, another vial next to it may have thousands

2   of organisms, another vial next to it may have only a

3   few hundred.  And that vial and the number of

4   organisms in that vial may fluctuate on its own.

5   Because these organisms, as I said -- as it says are

6   self-replicating, they grow at unpredictable rates,

7   and they also will die at unpredictable rates.  So

8   the difficulty of quantifying numbers of organisms

9   makes the traditional inventory control mechanism for

10  securing the material particularly challenging.

11       Q.   Is that why at the end of that paragraph

12  you write that, "the absolute amount of any given

13  organism at USAMRIID (or another active bioresearch

14  facilities) cannot be reliably quantified from day to

15  day"?

16       A.   Yes.

17       Q.   Now, does counting vials effectively

18  protect a facility from an authorized insider

19  diverting material?

20       A.   No.

21       Q.   Mr. Schuler asked you about Army Regulation

22  70-65.  And in response you mentioned that it has

23  provisions concerning reference stocks and working

24  stocks?

25       A.   Right.

Page 216

1          Q.    Are there inventory requirements for

2     working stocks?

3          A.    Are you asking the question about today, or

4     at the time of --

5          Q.    At the time, back in 2001.

6          A.    Well, in 2002, when we did our study, there

7     were -- USAMRIID was following the regulations in

8     AR -- remind me what the number was.

9          Q.    70-65.

10         A.    That was the regulation that was written in

11    1979; correct?

12         Q.    Yes.

13         A.    So USAMRIID was following that regulation,

14    and that regulation required a fairly strict

15    accounting of the -- of their materials in their

16    reference collection.  And it also required fairly

17    strict access to the reference collection.  And, in

18    fact, USAMRIID had a dedicated room, a repository

19    room that had their reference collection.  And they

20    had a -- you know, they were meeting the regulation,

21    and that they knew exactly what was in there, and

22    they controlled who could go in there.  And, in fact,

23    there was a -- you know, two-person rule for

24    accessing the repository.

25               The problem with that particular regulation

Page 217

1   is that it left wide open how the facility could

2   manage access and use of working materials.  And from

3   my point of view, that's where the heart of the issue

4   is.  And so in many respects that regulation

5   reflected a level of ignorance on the security

6   community's side to the fundamental problems that

7   biological materials present in this respect.

8           So, you know, USAMRIID was doing what the

9   regulation required, but the regulation was extremely

10  inadequate, from my perspective.

11      Q.   Can I please direct your attention to page

12  15 of your report in the Section 2.3, "Threat of

13  Diversion."  There is a portion that I highlighted

14  starting at the third sentence.  Could you please

15  read that into the record?

16      A.   The third sentence of the highlighted, or

17  starting at the highlighted?

18      Q.   I'm sorry, the third sentence of the

19  paragraph.

20      A.   Okay.  So you want me to read the entirety?

21      Q.   Yes.

22      A.   "Because of the nature of HCPTs and the

23  manner in which they are used in a laboratory

24  setting, inventory controls will not necessarily

25  deter or detect diversion of material.  Additionally,

Page 218

1    current federal regulations regarding the official

2    transfer of HCPTs between registered facilities are

3    inadequate to prevent diversion of material by a

4    knowledgeable insider.  Diversion of even small

5    amounts can be significant, as HCPTs can be released

6    in small amounts or amplified with common,

7    commercially available equipment for bioterrorism

8    purposes.  HCPTs do not emit adequate amounts of

9    energy or other signatures to be detected with

10   available standoff technologies and, if properly

11   contained, removal of most HCPTs would pose little

12   health risk to the perpetrator.  Therefore, HCPTs

13   could be diverted or released from their controlled

14   environments in research facilities for terrorism or

15   proliferation purposes."

16        Q.   Why did you conclude that inventory

17   controls will not necessarily deter or detect

18   diversion of material?

19        A.   Well, so, let's say -- let's look at deter

20   first.  So, if a knowledgeable insider with technical

21   expertise could easily remove a small amount of

22   material from an existing inventory, from a vial

23   within an existing inventory, return that vial to the

24   inventory, and walk out of the facility with either a

25   new vial or a -- you know, anything that would allow

1    him or her to transport that small amount of organism

2    outside the laboratory.  And yet from an inventory

3    point of view, even if you -- even if they had an

4    inventory of the working stocks -- and they didn't --

5    the number of vials, for instance, would not have

6    changed.

7              So it -- and then from a detection point of

8    view, if you're an auditor -- and I know this happens

9    today -- you know, auditors will go around and

10   they'll count vials, and they will check their count

11   against the logbook that says there are 30 vials in

12   freezer 6 on level 4.  And then they'll open the

13   freezer, and they'll determine, yes, there are indeed

14   30 vials there.  But they have no way of knowing --

15   detecting whether or not a small microscopic amount

16   of organisms from one of those vials was removed for

17   malicious purposes.

18             So the inventory itself is a -- is not a --

19   will not deter a determined insider from removing

20   material, nor will the inventory be able to flash red

21   lights and say something is missing.  And even if you

22   did an inventory and you saw -- you determined there

23   was something missing, that wouldn't necessarily

24   indicate that it was missing because someone removed

25   it maliciously.

1            So, you know, nevertheless, we still think

2    that material control accountability is an important

3    part of an overall biosecurity system, but we use the

4    term material control and accountability in a larger

5    sense than a specific inventory system in a very

6    narrow sense.

7         Q.   When you write that "Diversion of even

8    small amounts can be significant," would that apply

9    also to microscopic amounts?

10        A.   Absolutely.  All you need is one organism,

11   in theory.  If you have one organism, which can be

12   extremely microscopic, and you have the right growth

13   media and the right technical expertise, you can

14   amplify that single organism into hundreds,

15   thousands, and millions of organisms.

16        Q.   Dr. Salerno, please turn to page 16.

17   Please read aloud the top paragraph.

18        A.   "At the present time, however, the nature

19   and extent of the threat involving HCPT diversion is

20   controversial and there is no U.S. interagency

21   consensus on the issue.  The preferred method for

22   identifying appropriate threat level is based on data

23   collected through past events coupled with

24   information obtained from law enforcement and

25   intelligence agencies.  Subsequently, using

Page 221

1    inference, a reasonable prediction of likely, future

2    events can be made.  Unfortunately, as will be

3    described in the following sections, little

4    information exists in open literature or law

5    enforcement intelligence reports that document the

6    diversion of HCPTs from federal laboratories."

7        Q.   Is there a consensus today among federal

8    agencies on this issue?

9        A.   On the -- I guess, please, can you specify

10   what issue you're talking about.

11            MR. SCHULER:  Object to the form.

12       Q.   In the first sentence you had said that

13   "there is no U.S. interagency consensus on the issue"

14   concerning the nature and extent of the threat

15   involving HCPT diversion.

16       A.   Yeah.  You know, whether or not there is a

17   consensus in the U.S. interagency is probably more

18   than I can express an opinion on.

19            At least one thing that I think we have

20   accomplished in the last eight or nine years on this

21   issue is a recognition that the insider is a

22   significant threat.

23            You know, back in 2001, even 2002, just the

24   notion of an inside threat, insider threat at

25   biological institutes was surprisingly controversial.

Page 227

```
 1    component of both the likelihood of its use as a
 2    weapon and the consequences of its use as a weapon.
 3    And so it deserves protection, but it doesn't deserve
 4    to be protected in the way that we would protect
 5    special nuclear material or a nuclear weapon.
 6        Q.   On page 20, at the end of the same
 7    paragraph in the last sentence you state, "Thus it
 8    would be inappropriate to protect the HCPTs at
 9    USAMRIID in a manner commensurate with, or at a level
10    of expenditure similar to, the protection of nuclear
11    weapons."
12            I was going to ask you what you meant by
13    that, but did you just already give us the
14    explanation?
15        A.   Yeah, I think so.
16        Q.   All right.  Now, I'd like to direct your
17    attention, Dr. Salerno, to the top of page 22.  You
18    refer in that paragraph to "the insider threats are
19    not armed."  And then later on you say that, "It was
20    the opinion of both USAMRIID and SNL, Sandia National
21    Laboratory, that weapons would likely not be used by
22    insiders to further the diversion of HCPTs."
23            Is the arming of guards -- is that intended
24    to protect against authorized insiders?
25        A.   No.
```

1        Q.    What is that for?

2        A.    You would arm guards because you believe

3   that you are -- that your facility is threatened by

4   an outside group that would be armed.  So one of the

5   challenges that we had is that there was, among the

6   defined outsider threats, a weapon.  And so if -- and

7   that was a decision that USAMRIID made.  Frankly, it

8   wasn't necessarily recommended by us.  But if you

9   define one of your threats, as an outsider who has

10  weapon capabilities, then, therefore, the security

11  requirement will be that you have a guard force with

12  equal or superior weapon capabilities than your

13  threat.

14       Q.    Okay.  Dr. Salerno, please turn to page 24.

15  The first highlighted paragraph.  If you could read

16  that into the record, sir.  It's the second paragraph

17  on the page.

18       A.    "USAMRIID is an organization of the U.S.

19  Army Medical Research and Materiel Command, and is

20  the lead medical research laboratory for the U.S.

21  Biological Defense Research Program.  As the DOD lead

22  laboratory for medical aspects of biological warfare

23  defense, USAMRIID conducts research to develop

24  vaccines, drugs, and diagnostics for laboratory and

25  field use.  In addition to developing medical

1   countermeasures, USAMRIID formulates strategies,

2   information, procedures, and training programs for

3   medical defense against biological threats.  USAMRIID

4   plays a key role in national defense and in

5   infectious disease research because it is the largest

6   biological containment laboratory in the DOD for the

7   study of hazardous diseases.  USAMRIID investigates

8   naturally occurring infectious diseases that require

9   special containment, and provides critical capability

10  to the U.S. Army's infectious disease research

11  program as the only DOD laboratory equipped to study

12  highly hazardous viruses at Biosafety Level 4.

13  USAMRIID also operates a world-renowned reference

14  laboratory for definitive identification of

15  biological threat agents and diagnosis of the

16  diseases they produce."

17       Q.   You wrote this in September -- well, the

18  final report -- in September of 2002.  Was this true

19  also prior to the anthrax letter attacks?

20       A.   Yes, I believe so.  I believe it's still

21  true today.

22       Q.   And could you please read the next

23  paragraph.

24       A.   "Although the primary focus of USAMRIID is

25  protecting military service members, its research

Page 230

1    programs have applications that benefit society as a

2    whole.  USAMRIID investigators actively contribute to

3    advances in scientific knowledge and collaborate with

4    the Centers for Disease Control and Prevention in

5    Atlanta, the World Health Organization in Geneva, and

6    academic centers of excellence worldwide."

7        Q.   What sort of research program does USAMRIID

8    have that have applications that benefit society as a

9    whole?

10       A.   These guys are guys -- these scientists at

11   USAMRIID are cutting edge scientists in verology,

12   bacteriology, and infectious disease work.  Although

13   the amount of infectious disease research in the

14   country has gone up significantly since 2001 --

15   especially at this time, 2001 and 2002 -- we in the

16   U.S. had a very limited number of medical

17   professionals who focused their career on infectious

18   diseases, much less research into infectious

19   diseases.  And the USAMRIID and places like CDC in

20   Atlanta, at that time, really they were the only two

21   facilities that had, you know, the leading scientists

22   in the field of infectious disease research.  And

23   this was one of very few facilities in the world that

24   had the ability to study particularly dangerous

25   infectious diseases.

1            So the best example of how, you know,

2    USAMRIID's work could impact the health of the world

3    is in the -- related to their studies of hemorrhagic

4    fever virus, okay.  So the Ebolas, the Marburgs, the

5    kinds of extremely dangerous diseases that frequently

6    kill off hundreds of people in Africa, sub-Saharan

7    Africa, where these diseases are naturally occurring.

8            And places like USAMRIID and CDC were two

9    of the only facilities in the world, especially at

10   that time, that had the -- had technical expertise on

11   these extremely rare but extremely dangerous

12   naturally occurring diseases.  And USAMRIID would be

13   in the front lines of responding to these kinds of

14   disease outbreaks in the middle of Africa.  It had

15   nothing to do with bioterrorism.  It had nothing to

16   do with biological weapons, but was critical,

17   arguably, for the health and well-being of some of

18   these African countries.

19           So that would be an example of the, you

20   know, the importance of the work done at USAMRIID

21   from a purely international public health point of

22   view.

23      Q.   Prior to October of 2001, USAMRIID had

24   adopted as biosecurity practices the quantification,

25   the inventory of all pathogens on a constant basis,

1   USAMRIID.  And so, undoubtedly, scientists made many

2   sacrifices to be able to work in these sorts of

3   facilities.

4            And what I don't know is, you know, at what

5   point would the -- would onerous security discourage

6   a scientist from doing what he or she really wanted

7   to do?  You know, how many sacrifices would a

8   scientist accept before throwing up his or her hands

9   and saying, Screw it, I'm not going to work on this

10  agent.

11       Q.  Is that something for policy makers and

12  Department of Defense to take into consideration when

13  they develop biosecurity?

14            MR. SCHULER:  Object to the form.

15       A.  Yeah.  I mean, I think that's true, you

16  know, when anyone is developing security policies for

17  any application, is that at what point, you know --

18  well, we're always told that the way to stop

19  terrorists from blowing up airplanes is to stop

20  flying airplanes.  So somebody has to decide what

21  risk is acceptable and how to achieve the mission

22  without -- while maintaining safety and security.

23       Q.  Dr. Salerno, please turn to page 34, and

24  the very last paragraph there is a portion that I've

25  highlighted.  The paragraph that begins with, "The

Page 234

1    USAMRIID biosafety office."  If you could read that

2    into the record, sir, please.

3         A.   "The USAMRIID biosafety office ensures that

4    USAMRIID complies with 42 CFR part 72 -- the Select

5    Agent Rule.  All shipments of Select Agents from

6    USAMRIID are documented, both internally and with the

7    CDC.  USAMRIID requires a requestor of a Select Agent

8    to complete and submit the EA101 form, justifying the

9    request and indicating how the material would be used

10   prior to USAMRIID shipping the requestor the Select

11   Agent."

12        Q.   Do you know whether or not that was a

13   practice that USAMRIID had in place before the

14   anthrax letter attacks, or whether it was adopted

15   afterwards?

16        A.   Well, so -- the work that we did at

17   USAMRIID was in the spring of 2002.  So I can't tell

18   you what USAMRIID did or didn't do in the summer of

19   2001.

20        Q.   So you didn't get a historical time line on

21   when that practice was in place?

22        A.   No.  But there was nothing to lead me to

23   believe that they were not in compliance with the

24   federal regulation which went into effect in 1997.

25        Q.   Dr. Salerno, please turn to page 38 of your

Page 238

1    away from research?  If they implemented a strenuous

2    personnel reliability system that required a lot of

3    deep background checks, regular background checks,

4    medical exams, you know, regular psychological

5    evaluations, would that discourage -- would that make

6    it more difficult for them to recruit and hire

7    people?  Would they end up with a less highly

8    qualified professional staff than they had?

9           These were -- you know, we were not told

10   explicitly that there was a line that the security

11   system couldn't cross.  I think one of the things

12   that USAMRIID was looking to us to do for them was to

13   help them understand what a reasonable security

14   system could look like.  And they -- I think they had

15   a level of confidence that we were not -- that we

16   understood biology well enough that we weren't going

17   to come in and simply impose on them a security

18   strategy that was used, for instance, in the nuclear

19   weapons -- on the nuclear weapons community.

20        Q.   So you sought to come up with security

21   recommendations for security enhancements that would

22   not unnecessarily hinder the lab's primary research

23   mission?

24        A.   Yeah, we believed that we could.  I mean,

25   you know, to be honest, I was -- you know, I was

Page 239

1   frequently frustrated by the scientists at USAMRIID,

2   and elsewhere in this field, who believed that, you

3   know, any security will hinder their ability to do

4   work.  I have no tolerance for that.  And, you know,

5   I was frustrated by many of the scientists at

6   USAMRIID who wanted no security, and thought what

7   little security they had at that time was too much.

8           So I don't mean to imply that no security

9   was the answer.  And I was horrified by many of the

10  things that we saw at USAMRIID at that time.  But I

11  think there is a big -- there is a wide variety of

12  types of security that you can implement to achieve

13  different objectives.  And I thought we could help

14  USAMRIID identify what would be significantly more

15  than they had, but significantly different than,

16  again, nuclear weapons security, which was really the

17  only form of high-consequence material security that

18  the government was -- at a policy level was

19  comfortable with at that time.

20      Q.   Did you make any recommendations for

21  searching all laboratory personnel routinely on

22  exiting the lab?

23      A.   No.

24      Q.   Why not?

25      A.   They actually had a search policy in place.

Page 240

```
 1    They did random searches of people exiting the
 2    facility.  And it was, to be honest, it was
 3    laugh-out-loud funny.  Because first of all, the
 4    guards who were doing the searching had no biology
 5    background, no familiarity with the work that was
 6    actually happening inside these labs.  So if you ask
 7    the guards what they were looking for, they couldn't
 8    give you a straight answer.  The guards had no
 9    training on doing the searches.
10            For the most part, the only thing that they
11    were looking for were, like, laptop computers that
12    they thought that somebody might be stealing.  And
13    you can tell that, at least in our report, laptop
14    computers were not identified as primary assets of
15    concern here.
16            As I say -- I mean, you know, I think we
17    mentioned this before, but the idea of -- you know,
18    even a strip search would not prevent a determined
19    insider from removing biological agent from this
20    laboratory.
21            And so, I hate to -- it's late in the day,
22    and I'm tired, but the juice wasn't worth the
23    squeeze, right?  So why hire people, why spend time,
24    why frustrate the staff by doing searches, when the
25    staff would readily know that they weren't effective?
```

1          You know, for me -- you know, as we said

2    before, security at a facility like this depends on

3    the people.  And the overwhelming majority of the

4    people who work at this facility are scientists.  And

5    almost all of them were biological scientists.  They

6    knew the material that they are working with.  They

7    knew how to -- if they wanted to, they would have the

8    ability to know how to remove the material from the

9    facility.

10          So, if you put in place a security system

11   that doesn't recognize that technical reality, that

12   scientific reality, then what you've done is you've

13   discredited the notion of security amongst your

14   technical staff, among the people that you need to

15   buy into the system that you're trying to establish.

16          So from my point of view, don't do any

17   security that doesn't have a legitimate intellectual

18   rational, scientific rationale to it.  Searching

19   people leaving the laboratory, unless you were

20   concerned about theft of laptops or theft of

21   classified information, had no purpose.

22        Q.   Did you recommend applying a two-person

23   rule for all work with pathogens?

24        A.   No.

25        Q.   Why not?

1        A.   Okay.  So, again, what we're talking

2    about -- so why would you do that?  So if the asset,

3    the thing that you're most concerned about being

4    stolen is a biological agent, and the biological

5    agent we know is microscopic in size, in order for a

6    two-person rule to be effective, you would have to

7    have two equally qualified scientists, equally

8    qualified with that particular agent, doing the work

9    of one.

10        So you couldn't hire -- the second person

11   in a two-person rule could not be a security guard,

12   okay.  Because a security guard could stare at a

13   scientist for eight hours and never know whether or

14   not that scientist is actually diverting material.

15   In fact, you could even make an argument that another

16   scientist who is not familiar with that particular

17   organism wouldn't necessarily know if the first

18   scientist was diverting that organism.

19        So, in other words, the only -- it would

20   only be effective if you had two equally skilled

21   scientists with that particular agent.  What that

22   means, in my mind, is you double the cost of doing

23   that work.  And so -- and this is not my judgment.

24   Obviously, if it was the laboratory's decision that

25   it was worth doubling the cost of the research to

Page 243

1    provide that level of confidence that diversion

2    wasn't happening, that's fine.  I would even say

3    that, even if you had two scientists of equal

4    caliber; one doing no work and only being responsible

5    for monitoring the other, that that, in and of

6    itself, is not a foolproof system either.

7            And so, you know, it's a -- you'd have to

8    do a cost benefit analysis.  And in my point of view,

9    what you would do is you -- again, you would upset

10   the people who you need to be most supportive of the

11   overall security system.  They would find it very

12   intrusive.  They would find it humiliating.  I can't

13   imagine that you could be successful hiring a -- you

14   know, an advanced scientist to be a monitor of

15   another scientist, and assume that that scientist

16   would remain engaged in that kind of work for very

17   long.  So you would lose staff.

18           So it's not something we've ever

19   recommended.

20           MS. HILL:  Mr. Taranto, can we take a

21   process check where you are, because the time here is

22   7:35.

23           MR. TARANTO:  I think I'm about two-thirds,

24   probably three-quarters of the way done.  Probably

25   three-quarters.  It's 7:45 -- how long have I been

Page 244

1    going?

2             MS. HILL:  About an hour and 20 minutes, I

3    believe.

4             THE VIDEOGRAPHER:  Do we want to go off the

5    record?

6             THE WITNESS:  I'm okay.

7             MR. TARANTO:  I'll try to get it closed

8    within 20.  I'm sorry it's not 10.  I'll strive for

9    20.

10        Q.   Dr. Salerno, can you please read into the

11   record, at page 41, the first paragraph of the

12   Section 4.2.2, "Insider Protection"?

13        A.   "Insiders have unique access authority, and

14   knowledge of operating procedures.  It is difficult

15   for a physical security system to prevent diversion

16   of microorganisms by insiders.  Detailed accounting

17   for individual microorganisms is unachievable and

18   this fact underscores the need for a personnel

19   security program for anyone with access to

20   high-consequence pathogens or toxins."

21        Q.   Would that still be your conclusion today?

22        A.   Yes.

23        Q.   Please, Dr. Salerno, turn to page 42.  In

24   the section at the bottom of the page, 4.2.4,

25   entitled, "Graded Physical Protection."  Please read

Page 245

1    the highlighted portion.

2         A.    "Certain risks must be accepted (i.e.,

3    that actions cannot be taken to reduce the

4    probability or consequences of all malevolent events

5    to zero); however, an acceptable level of risk should

6    be determined based on evaluation of a variety of

7    facility-specific goals and considerations."

8         Q.    Is that also your -- would that be your

9    conclusion today as well?

10        A.    Yes.

11        Q.    Please Dr. Salerno, turn to page 43,

12   Section 4.2.5, "General Considerations," and read the

13   first paragraph.

14        A.    "An essential aspect of a security system

15   design is that it must not unduly hinder the normal

16   operations of the site.  Most security measures

17   introduce some level of inconvenience into the

18   existing work environment, but yield benefits in

19   personal security and safety, material

20   accountability, and property control.

21   Security-related impositions may increase some task

22   times, and security equipment, personnel, and

23   maintenance can be expected to add to recurring

24   operational costs."

25        Q.    Would your conclusion today be any

Page 246

1   different?

2        A.   No.

3        Q.   Dr. Salerno, please turn to page 46, the

4   section on "Material Accountability."  Could you

5   please read the first paragraph.

6        A.   "Material control and accountability,

7   traditionally elements of insider security.  Often

8   referred to as 'inventory control' in nuclear

9   materials security systems, this process relies on

10  the ability to state exactly how much of the target

11  material is present in the facility at a certain

12  time.  Yet at a biological research facility,

13  infectious material cannot be measured and may be

14  found at any time in a wide variety of places, such

15  as a storage freezer, laboratory incubator, a living

16  animal, an animal's excrement, or an animal carcass."

17       Q.   So the pathogens could be in any of these

18  locations?

19       A.   Yes.

20       Q.   So and that would be a living organism that

21  can be taken or cultured --

22       A.   Sure.

23       Q.   -- or used?

24       A.   Yes.

25       Q.   All right.  Please read the next paragraph.

1       A.   "For this reason, effective implementation

2   of material accountability activities for the purpose

3   of providing security is fraught with problems in the

4   biological environment.  It is not physically

5   possible to measure the amount of any one pathogenic

6   organism present at USAMRIID at any one particular

7   time.  Moreover, it is not possible to quantify the

8   rate of growth or decay of these organisms; bacteria

9   and viruses grow at various rates depending on their

10  genetic makeup, the reagents or other material used

11  to supplement their growth, and the environment in

12  which they are grown."

13      Q.   Would this be your conclusion today as

14  well?

15      A.   Yes.  I mean, I think the one thing that

16  we've worked on since 2002, that is not stressed in

17  this report as much as probably I would today is, you

18  know, we believe highly in the need for material

19  accountability.  And what that means, in my mind

20  today is, you need to -- a facility has an obligation

21  to know what materials it has, where those materials

22  are located within the facility, who specifically in

23  the facility has access to those materials, and who

24  is responsible for the cradle-to-grave management of

25  those materials at the facility.

Page 248

1             So accountability versus accountancy.  So

2    accountancy, in my use of the term, is number -- vial

3    counting or organism counting.  I don't believe that

4    that has a particularly good security application.  I

5    think accountability is extremely important in a

6    biological laboratory sense -- setting.

7        Q.   Please read the next paragraph.

8        A.   "Although vials of pathogens in storage

9    freezers can be counted, inventory control will not

10   detect or deter the diversion an HCPT.  Additionally,

11   a rigorous biological inventory control system,

12   monitored by regular and random audits and a

13   compliance process may have more detrimental than

14   positive outcomes."

15       Q.   Briefly, can you explain that second

16   sentence about how such an "inventory control system,

17   monitored by regular and random audits and a

18   compliance process may have more detrimental than

19   positive outcomes."

20       A.   So this is the notion of counting vials.  A

21   facility like USAMRIID -- I don't know, but I mean --

22   has millions of vials.  And if it was judged that

23   counting -- keeping an accurate accounting of the

24   numbers of vials in the facility was a -- something

25   that would positively contribute to security, I think

1    that would, one, give a false sense of security, for

2    reasons that I've already addressed; and two, it

3    would raise the level of cynicism among the technical

4    staff of biosecurity.  Because the technical staff

5    would say, Oh, biosecurity is just so stupid because

6    they are just making us count vials, and, you know, I

7    could steal something from a vial that someone was

8    counting anyway.

9            So I mean, I think those are my thoughts,

10    is:  One, it would cost a lot of money to implement;

11    and two, it wouldn't have a direct security benefit;

12    and three, it would increase the level of cynicism

13    among the staff of biosecurity in general.

14        Q.   Dr. Salerno, if you could read the next

15    sentence.

16        A.   "First, even if the number of vials in an

17    inventory were correct, an insider could remove a

18    sample, amplify it, divert the amplified portion, and

19    return the original amount to the freezer."

20        Q.   Is that still your conclusion or opinion

21    today?

22        A.   Yes.

23        Q.   Please read the next paragraph.

24        A.   "Second, it is generally recognized that an

25    inventory at a biomedical research laboratory can

Page 250

1   only be imposed on the 'repository collection' or the

2   'reference stocks' of HCPTs.  Yet these collections

3   do not represent the entire amount of HCPT in the

4   facility; an insider could divert an HCPT from the

5   'working stocks' without affecting the repository's

6   inventory."

7       Q.   Would the answer to that be to require

8   rigorous inventory also on a daily basis of the

9   working stocks?

10      A.   Okay, how do you do that?  I mean, working

11  stocks includes animals.  I mean, so at a place like

12  USAMRIID, it was working with many, many animals.

13  They had animal models, animals that they would

14  infect with organisms.  So they would have dozens and

15  dozens, arguably hundreds of animals infected with

16  HCPTs.  That means that taking a sample or a -- from

17  one of these animals, would have to be -- or the

18  animals themselves and the number of organisms inside

19  those animals, as well as inside the animal's

20  excrement, as well as in any animal carcasses, you'd

21  have to inventory those.  And I don't know how you do

22  that.  Because you'd be inventorying different

23  things; you'd be inventorying numbers of animals, you

24  know, amount of excrement, numbers of carcasses, you

25  know, Petri dishes versus vials, versus something

Page 251

1    else.  I mean, it would be a logistical nightmare

2    that I don't think would have valuable security

3    benefits.

4         Q.   In the next section, subsection,

5    "Recommendations for Material Accountability," there

6    is a paragraph 1 on "Annual accounting for HCPTs."

7    And you talk in terms of an annual accounting of

8    HCPTs, and establishing your reporting system for new

9    strains.  Is that for security purposes?

10        A.   Well, in this -- the middle of this

11   paragraph says that this is a -- that this sort of

12   "accounting system would serve an important

13   administrative function, but not necessarily a

14   security function."

15             Does that answer your question?

16        Q.   Yes.  And then, if you could read the last

17   two sentences of that paragraph.

18        A.   "If it is described as a required security

19   measure, USAMRIID's staff members will recognize that

20   it does not provide security.  This will make it

21   considerably more difficult to generate support from

22   the scientific staff for the overall security

23   program."

24        Q.   And is that your conclusion today as well?

25        A.   Yes.

Page 252

1        Q.    Dr. Salerno, please turn to page 73 of the

2    report.

3        A.    I'm sorry, 73?

4        Q.    Page 73, yes, sir.  We're getting close to

5    the end.  If you could read the highlighted part, the

6    last paragraph.

7        A.    "No video coverage is proposed inside the

8    containment suites because the suites are

9    compartmentalized to the extent that precludes

10   practical video design.  The conceptual design does

11   not recommend any specific sensors or alarms inside

12   the containment suites, thus there is nothing to call

13   up the cameras for assessment.  Further, surveillance

14   cameras inside the containment suites would not be

15   able to distinguish an act of diversion by a certain

16   individual.  While there may be some biosafety

17   benefits to having video surveillance inside the

18   containment suites, cameras inside those areas would

19   neither deter nor detect the diversion of material.

20   General video surveillance of an area or activity has

21   been shown to provide ineffective security, except

22   possibly for reconstruction of events after the

23   fact."

24       Q.    And what did you base that conclusion on

25   briefly?

Page 253

1        A.    Which conclusion?  The last sentence?

2        Q.    Yes, the last part.

3        A.    Well, so, we have a perhaps a fairly narrow

4   definition of security, right.  If you're talking

5   about high-consequence materials security, is how do

6   you prevent those materials from being misused.  So

7   if the objective is prevention of misuse, or even in

8   a nuclear security environment it's prevention of

9   access to the materials by an adversary, the camera,

10   in itself, doesn't prevent access or diversion.

11        A surveillance camera could give you

12   evidence that diversion or theft has taken place at

13   some time in the past, but then you still have a

14   security incident.  More specifically, however, when

15   we're talking about biological materials, we're

16   talking about microscopic quantities of material that

17   potentially could be diverted.  And the likelihood of

18   having a camera adequately positioned such that it

19   would identify specifically the diversion of

20   biological materials from a legitimate Petri dish

21   into an illegitimate container of some kind that was

22   used, could be used to transport the organism

23   illegally or surreptitiously outside the containment

24   area, it would be highly -- you know, the likelihood

25   of having that kind of detailed surveillance would be

Page 254

1  very low.  You would have to erect so many video

2  surveillance cameras to be able to cover, with that

3  level of detail, all the areas in these laboratories

4  where that kind of diversion could take place.

5          So it -- there is a possibility, if you had

6  a lot of these cameras, that you might be able to

7  reconstruct the diversion that had happened sometime

8  in the past.  But I think there is an equal amount of

9  possibility that a determined insider could divert

10  material, even if there were cameras in the room.

11          So we -- you know, from our point of view,

12  surveillance cameras inside containment would be

13  appropriate for safety.  You know, if you wanted to

14  know whether or not someone had a heart attack or one

15  of your researchers or one of your employees suddenly

16  had a personal safety problem, especially if they

17  were working alone, then the camera could help you

18  determine that.

19          But video surveillance inside these

20  containment suites should not be justified as a

21  security measure, because we thought they would be a

22  very ineffective security measure.

23      Q.  Earlier you testified, I think, about the

24  importance of creating a culture or support for

25  security among the scientists.  Could you please turn

Page 255

1    to page 84, Section 5.11.  Is that what you discuss

2    in this section?

3         A.   Yes, that's exactly what 5.11 is about.

4         Q.   Could you please -- to clarify that, could

5    you please read into the record the first paragraph.

6         A.   "Perhaps the most important recommendation

7    in this report is the need to create a genuine

8    security culture at USAMRIID.  The effectiveness of

9    any security system depends on the willingness of the

10   individuals who work at the site to support the

11   mission of the security system.  The unique nature of

12   microbiological research, particularly that diversion

13   of small quantities of high-consequence pathogens and

14   toxins can be significant and that organisms cannot

15   be detected at a distance, makes the effectiveness of

16   a biosecurity system dependent on the development of

17   a supportive security culture."

18        Q.   And please also read the last paragraph on

19   that page.

20

21        A.   "By creating a security culture, USAMRIID

22   will ensure that security remains a supporting

23   function that does not unnecessarily impede the

24   laboratory's critical biomedical research mission.

25   Without the staff's endorsement of and compliance

All Florida Reporting, Inc.
800-898-7373

Page 256

1   with the biosecurity plan, many of the security

2   measures recommended in this report will create only

3   the perception of security."

4        Q.   Prior to the anthrax letter attacks, and

5   prior to 9/11, would it have been easier or more

6   difficult to get scientists to go along with changes

7   for security, biosecurity?

8        A.   I'm sorry?

9             MR. SCHULER:  Object to the form.

10       A.   Could I just ask you to repeat the

11  question.

12       Q.   Sure.  If you compared the period before

13  the anthrax letter attacks and 9/11, to the period

14  after the anthrax letter attacks and 9/11, is there

15  any difference in the willingness of scientists to

16  accept biosecurity, or convincing scientists of the

17  need for biosecurity enhancements?

18            MR. SCHULER:  Object to the form.

19       Q.   If you know, or have a view on it?

20       A.   Well -- in the U.S.?

21       Q.   Yes.

22       A.   So you're asking for a generalization

23  that's hard for me to make.

24       Q.   All right.

25       A.   I think some scientists clearly saw a --

Page 257

1    you know, that a change had happened that required

2    them to change the way they did business.  Other

3    scientists in the U.S., frankly, were not affected by

4    the events of 9/11 from a biological security

5    perspective; didn't believe in it before 9/11, didn't

6    believe in it after.  So I think it really is an

7    individual opinion.

8         Q.   The last item in your report that I want to

9    ask you about is on the next page, page 85.  Section

10   5.12, "Incident Response Planning."

11             Would you please, Dr. Salerno, read the

12   first paragraph.

13        A.   "The fundamental element of security is an

14   understanding that there is not such thing as perfect

15   security.  The risk of the occurrence of an

16   undesirable event cannot be reduced to zero.

17   Protecting against every imaginable event is only

18   possible at extraordinary financial and operational

19   expense.  Therefore, it is necessary to prioritize

20   the various threats facing USAMRIID and appropriate

21   countermeasures."

22        Q.   Would that be your conclusion today as

23   well?

24        A.   Yes.

25             MR. TARANTO:  I have nothing further.

Page 258

1    Thank you very much, Dr. Salerno.

2             MR. SCHULER:  I just have a couple of

3    follow-up questions, take about three minutes.

4                        EXAMINATION

5    BY MR. SCHULER:

6        Q.   Dr. Salerno, your finding that the people

7    at anthrax -- people at USAMRIID were compliant with

8    Regulation 70-65 was made in the spring of 2002;

9    correct?

10       A.   Well, so -- first of all, our job was not

11   to assess compliance with any regulation, nor were we

12   qualified or authorized to do so.  So we didn't --

13   you know, I don't want to give you the impression

14   that we did, during our work, assess compliance with

15   AR 70-65.

16       Q.   Okay.

17       A.   What I can tell you is that, in our

18   judgment at that time, they were -- they had an

19   accounting of their repository stocks, which was what

20   AR 70-65 required them to do.  And they carefully

21   controlled access to the -- their defined repository

22   room and the freezers within that room.

23       Q.   And the reason I ask is because I think you

24   touched on the Inspector General's report.  And they

25   were out there in October -- or rather, November

1   2001 -- and they found specifically that USAMRIID was

2   not in compliance with that Regulation 70-65.  Do you

3   recall that?

4            MR. TARANTO:  I object.  I object to form

5   and I object to the characterization of the findings

6   of the Inspector General report.  They did not make

7   findings on specific labs.

8        Q.   Well, they said two of the labs didn't even

9   know the regulation existed, and one of them wasn't

10  following it.  So my question to you is that -- and

11  if you don't remember or don't recall, I'll move on,

12  and I don't want to spend a lot of time on it.  But

13  the Inspector General was out there in November of

14  2001, about six months or so before you.

15       A.   Yes.

16       Q.   And found that there was noncompliance with

17  Regulation 70-65.  Do you recall that finding?

18            MR. TARANTO:  Continuing objection.  Answer

19  if you're able to.

20       A.   I don't specifically remember that as a

21  finding against USAMRIID.  I mean, the Inspector

22  General report was very critical of the labs,

23  management of their biological materials and

24  biological security.  But, you know, as I recall,

25  that AR 70-65, you know, was a pretty general set of

Page 260

 1    requirements that was specific to the repository

 2    stocks.  And I think, you know, what -- from my

 3    perspective USAMRIID got away with is that they had a

 4    very narrow definition of repository stock.  And the

 5    overwhelming majority of the biological materials at

 6    USAMRIID, USAMRIID had defined as working stocks.

 7    And the working stock requirements in AR 70-65

 8    were -- as I recall, were left to the discretion of

 9    the commander.

10         Q.   All right.  And you asked some questions

11    about budget and cost and so forth in connection with

12    security.  In 1994, do you know how much it would

13    have cost at USAMRIID to get copies of less than 20

14    pages of psychiatric records?

15         A.   No.

16         Q.   And assuming that cost would have been

17    under $20, that kind of expenditure wouldn't have

18    posed a risk to the mission or interfere with

19    technical operations, would it?

20              MR. TARANTO:  Object to form.

21         A.   Twenty, no.

22         Q.   Okay.  One last question.  Cameras; you

23    didn't recommend them.  Do you know whether they have

24    cameras there now in the biocontainment suites?

25         A.   Well, first of all, you said that we didn't

Page 263

```
 1

 2              IN THE UNITED STATES DISTRICT COURT

 3                 FOR THE DISTRICT OF NEW MEXICO

 4   MAUREEN STEVENS, as Personal
     Representative of the Estate of
 5   ROBERT STEVENS, Deceased, et al.,

 6                    Plaintiffs,

 7        vs.           CASE NO: 9:03-CV-81110-CIV

 8    UNITED STATES OF AMERICA

 9

10                    Defendant.

11

12        CERTIFICATE OF COMPLETION OF DEPOSITION

13       I, JENNIFER BEAN, New Mexico CCR #94, DO HEREBY

14   CERTIFY that on January 28, 2011, the deposition of

15   REYNOLDS M. SALERNO, Ph.D. was taken before me at the

16   request of, and sealed original thereof retained by:

17        MR. RICHARD D. SCHULER
          SCHULER, HALVORSON & WEISSER
18        Attorney for the Plaintiffs
          1615 Forum Place
19        Fourth Floor
          West Palm Beach, FL  33401
20

21       I FURTHER CERTIFY that copies of this

22   certificate have been mailed or delivered to the

23   following counsel of record and parties not

24   represented by counsel:

25
```

Page 264

```
 1
             MR. LEON B. TARANTO
 2           Attorney for the Defendant
             UNITED STATES DEPARTMENT OF JUSTICE
 3           1331 Pennsylvania Avenue, Northwest
             Room 8018-S
 4           Washington, DC  20004

 5           MS. MARIANNE HILL
             Attorney for the Deponent
 6           SANDIA NATIONAL LABORATORIES
             P.O. Box 5800 MS 0141
 7           Albuquerque, NM  87185-0141
```

 8           I FURTHER CERTIFY that examination of this

 9    transcript and signature of the witness were required

10    by the witness and all parties present.

11           On _____, a letter was mailed or

12    delivered to Mr. Marianne Hill regarding obtaining

13    signature of the witness.

14           I FURTHER CERTIFY that the recoverable cost of

15    the original and one copy of the deposition,

16    including exhibits, to MR. RICHARD D. SCHULER is

17    $_____.

18           I FURTHER CERTIFY that I did administer the oath

19    to the witness herein prior to the taking of this

20    deposition; that I did thereafter report in

21    stenographic shorthand the questions and answers set

22    forth herein, and the foregoing is a true and correct

23    transcript of the proceeding had upon the taking of

24    this deposition to the best of my ability.

25           I FURTHER CERTIFY that I am neither employed by

Page 265

```
1    nor related to nor contracted with (unless excepted

2    by the rules) any of the parties or attorneys in this

3    case, and that I have no interest whatsoever in the

4    final disposition of this case in any court.

5

6
                     _____
7                    Jennifer Bean, FAPR, RDR, RMR, RPR
                     Bean & Associates, Inc.
8                    Certified Court Reporter #94
                     License Expires: 12/31/2011
9

10

11   Job No:  1420J (JB)
     Date Taken:  January 28, 2011
12   Proofread by:  JS

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 266

```
 1   STEVENS v. USA

 2              WITNESS SIGNATURE/CORRECTION PAGE

 3        If there are any typographical errors to your
          deposition, indicate them below:
 4

 5   PAGE  LINE

 6   _____ Change to _____

 7   _____ Change to _____

 8   _____ Change to _____

 9   _____ Change to _____

10        Any other changes to your deposition are to be
     listed below with a statement as to the reason for
11   such change.

12   PAGE  LINE  CORRECTION            REASON FOR CHANGE

13   _____

14   _____

15   _____

16   _____

17   _____

18        I, REYNOLDS M. SALERNO, Ph.D., do hereby certify
     that I have read the foregoing pages of my testimony
19   as transcribed and that the same is a true and
     correct transcript of the testimony given by me in
20   this deposition on January 28, 2011, except for the
     changes made.
21

22              _____
                REYNOLDS M. SALERNO, Ph.D.
23

24   Job No.:  1420J (JB)
     Date Taken:  January 28, 2011
25   Proofed by:  JS
```