## Richard L. Wade, Ph.D., M.P.H.
**Principal Scientist**

**Professional Profile**

Dr. Richard L. Wade is a Principal Scientist in Exponent's Health Sciences practice. He is an environmental health scientist with 37 years of experience in the development and management of environmental health programs. This work has included the management of regulatory agencies, the development of corporate environmental health and safety programs, and project management for large environmental restoration and enhancement projects. Dr. Wade's experience includes management of state and local health departments, as well as state occupational health and safety programs. He has also developed comprehensive quality control, environmental health and safety risk management programs for three large international corporations. This experience has included new program development, regulatory standards development, management of regulatory agencies, and the creation of analytic laboratories and health risk assessment groups. Programmatic responsibilities include regulatory compliance for wastewater, rodent and insect vector control, air pollution, radiation, safety, industrial hygiene, noise, food and water hygiene, solid waste, hazardous chemicals ,medical waste and hazardous waste management. Dr. Wade has worked on product contamination issues and incidents worldwide as well as worldwide environmental health and safety regulatory compliance.

Dr. Wade's work in public health has lead him to work with many disease causing organisms including viruses, bacteria and molds. Starting work in virology labs he worked with Rous Sarcoma Virus, as well as Hepatitis and Polio viruses. He has worked extensively on the microbiological basis of disease prevention through water, wastewater and food hygiene, as well as ways to limit the spread of infection and communicable diseases. Notable projects have included work on vector control for equine encephalitis, control and prevention of legionella, as well as hepatitis control programs. He has worked on both H1N1 and H1N5 Influenza prevention and management programs, Noro virus control programs and decontamination efforts for Salmonella and poultry control programs, microbiological basis food quality control (eg E coli), , as well as many other investigations as to bacteriological and viral control efforts. Dr. Wade has worked extensively on international public health concerns including issues of food quality and wastewater use in developing countries . Dr. Wade is currently an adjunct clinical professor of Medicine at UCSF and UCI Schools of Medicine. At UCSF and while working with the San Francisco Health Department in the 1980"s he worked on many hospital control efforts to prevent the spreads of HIV viruses during medical procedures at the university clinical settings.
Most recently, Dr Wade has worked on medical- legal proceedings related to food contamination from Hurricane Katrina food damage and risk of contamination from human pathogenic bacteria. He has conducted numerous cause and origin studies for food and product contamination. He has also worked on issues related to bottles water and food adulteration from storage and transport overseas. Dr. Wade last year served on a panel of the National Academy of Sciences to develop a report on Force Protection from Chemical and Biological warfare agents for the US Navy and Marine Corps. He co- chaired a report to the Department of Defense on the role of Naval Forces in the Global War on Terrorism. He is a national Associate of the National Academy of Sciences.

05/05

REMOVED FROM PROTECTIVE ORDER NO. 3

PL02-000153

His regulatory work includes food and water quality, noise, solid and hazardous waste, migrant housing, health risk assessments, industrial hygiene , environmental analytic services, radiological health, and occupational health.  Significant accomplishments included work on remediation of PAH contaminated drinking water, asbestos contamination in drinking water, revisions to food codes State of Minnesota, Seattle /King County, and USPH ( CDC) vessel sanitation code,  and mercury contamination in fresh water fish.  As a one-time Deputy Chief of Cal OSHA, he was responsible for enforcement of OSHA regulations, and radiation protection in the State of California.  Significant achievements included revisions to all the OSHA health and safety standards, setting new standards for asbestos exposure, banning the use of Ethylene Di- Bromide in California, and work on several significant PCB and Dioxin de-contamination projects.

Dr Wade has also held the position as Director of Emergency Response and Risk Management Services for International Technology Corporation.  This position managed an average of two chemical emergency responses per day worldwide.  Significant projects managed included PCB and Dioxin decontamination projects for EDF in France, site assessment and remediation of a 20 tank cars of hazardous chemicals derailment that dumped into an Arkansas river, and the decontamination of many industrial chemical and biological hazards sites.

Directly prior to joining Exponent, Dr Wade managed his own consulting company Risk Management Sciences, which specialized in corporate risk management consultancy to large international corporations.  Significant projects included the development of international risk management and compliance programs for quality control  as well as  health and safety for P&O shipping London, England and Norwegian Cruise Lines, Miami Florida.

**Credentials and Professional Honors**

Post Doctoral Training, Executive Training Program in Health Policy and Management,
    Harvard University, 1978
Ph.D., Environmental Health Sciences and Engineering, University of Michigan, 1973
M.P.H., Environmental Health, University of Michigan, 1970
B.S., Biological Chemistry, University of New Hampshire, 1968

Registered Environmental Assessor (CA Registration # 00222); Certified Hazardous Material Specialist (Certification # HW-147) Certified Trainer in Food Safety and HACCP , The Education foundation of the National Restaurant Association. NRA

National Associate of the National Academy of Science

Member:  American Public Health Association (Past Officer); American Industrial Hygiene Association; Society of Risk Analysis; Air Pollution Control Association (Program Organizer); American Chemical Society (Program Organizer); Local Public Health and Industrial Hygiene Associations (Past Officer); American Association for the Advancement of Science; New York Academy of Science; National Environmental Health Association; American Society of Microbiology; Association of Professionals in Infection Control,   National Safety Council; National Academy of Sciences, Naval Studies Board (2001–Present): National Top Secret Clearance.

Richard L. Wade, Ph.D., M.P.H.
Page 2
05/05

REMOVED FROM PROTECTIVE ORDER NO. 3

PL02-000154

Lifetime Achievement Award, American Public Health Association, 2000;
Fellow, American Institute of Chemists; Rockefeller Fellow, University of Michigan (1971–1972); Calver Memorial Environmental Health Award, American Public Health Association (1970); Alpha Zeta Honorary Society; Smithsonian Institutes award for excellence in Environmental Program Management (2000); British Airlines award for achievements in environmental tourism (1998);

**Selected Publications**

Wade RL  Co-chair Report on Naval Forces and the Global War on Terrorism, Naval Studies Board National Academy of Sciences Press  2007

Wade Et al.  Report on Force Protection for US Military Forces from Chemical and Biological Agents, National Academy of Sciences Press. 2006

Wade RL, et al.  Principles of safety management.  Textbook on safety management.  Published by the National Safety Council, 1999; Vol. 1 and 2 (contributing author).

Wade RL.  Pollution control technologies for ocean going passenger ships.  Proceedings, Conference on Marine Debris, Society of Marine Engineers New Orleans, LA, 1994.

Wade RL, Fedoruck J, Bosan W.  Utilization of analytical data and risk assessment methods for determination safe re-use levels of shorelines, following a major off shore oil spill.  Proceeding, Hazmat Conference, Long Beach, CA, 1992.

Wade RL.  Limitations on utilization of analytic detection limits under proceeding Proposition 65 in the state of California.  Hazmat West, Long Beach, CA, 1990.

Wade RL.  Development of decontamination guidelines for PCB\PCDF and PCDD decontamination in areas of high exposure potential.  Chapter Book on Hazards, Decontamination And Replacement of PCB's, Plenum Press, New York, 1989.

Wade RL.  Verification of engineering site audits to quantify risk and liability form pollution. JASA, 1988.

Wade RL, el. al.  Pilot survey of urinary prophyrins from persons transiently exposed to a PCB transformer fire.  Chem Toxicol 1987; 24(6):533–544.

Wade RL, Woodyard J.  Sampling and decontamination methods for buildings and equipment contaminated with TCDD or equivalents.  Managing Hazardous Materials, The TCDD Experience, Eurgen Exner (ed.), American Chemical Society, New York City, NY, 1987.

Wade RL.  Role of risk management engineering in reducing pollution liability.  Proceedings of Haz Mat West, Conference Proceedings, Long Beach, CA, 1986.

REMOVED FROM PROTECTIVE ORDER NO. 3

PL02-000155

Wade RL.  Utilization of quantitative health risk assessment techniques in determination of acceptable decontamination standards.  Electric Power Research Institute, Palo Alto, CA, 1985.

Wade RL.  Acute toxicity of ethylene dibromide toxicity: a case study of two fatalities.  J Am Med Assoc 1984.

Wade R.L.  Qualitative and quantitative assessment of the toxicity of ethylene dibromide.  American Public Health Association, Montreal, Canada, 1983.

Wade RL.  Combustion toxicity—methods of chemical decontamination.  John F. Redmond Foundation, Toronto, Canada, Int Fire Fighter, 1983.

Wade RL.  Technological advances in occupational health in the 1980's.  West J Med, October 1983.

Wade RL.  Health Hazards in the Semiconductor Industry.  Publication of State of California, 1982.

Wade RL.  Principles of decontamination following exposure to toxic materials encountered in fire fighting operations.  Calif Fire Fighter, July 1981.

Wade RL, et. Al.  Guidelines for hazardous chemical response for state and local resources for the state of California.  Publication of the Governors Office of Emergency Response, 1979.

Wade RL.  Ethylene oxide:  evidence of human chromosomal effects.  Environ Mutagenesis 1979; 375–382.

Wade RL, Gray D. Methyl mercury residues and toxicity in fish in northern Minnesota.  State of Minnesota Press, 1978.

Wade RL, Gray D.  Health implications of polynuclear aromatic hydrocarbons in St. Louis Park drinking water.  State of Minnesota Press, 1978.

Wade RL.  Systematic management of hazardous waste.  Proceedings of Legislative Workshop, Minnesota State Legislature, State of Minnesota Press, 1977.

Wade RL.  Health effects of small particulate materials.  Environment 1975.

Wade RL.  Urban air pollution.  Chapter in Text on Urban Health Issues.  Council on Environmental Quality, New York City, NY, 1974.

Wade RL.  Environmental health:  a lack of federal concern.  J Nat Environ Health Assoc, December 1973.

Carnow B, Morris S., Wade RL.  The health effects of a national energy policy.  Ford Foundation Publication, 1973.

Richard L. Wade, Ph.D., M.P.H.
Page 4
05/05

REMOVED FROM PROTECTIVE ORDER NO. 3          PL02-000156

Wade RL.  Concern for environmental quality as a factor in energy supply and demand schedules.  Proceedings of Airlines Public Relations Conference, 1973.

Wade RL.  The role of health standards in improving health services in correctional institutions.  Proceedings of Conference on Health Care in Correctional Institutions, Minneapolis, MN, 1972.

Wade RL.  The benefits of pollution (cost-benefit analysis).  Ecology Today, 1972.

Wade RL.  Utilization of system engineering techniques in family planning program optimization.  University of Michigan Press, 1970.

**Presentations**

Many presentations to local, state and national professional associations, state legislator conferences, and meetings.  Currently average two technical presentations per month.

Lectures at Tulane University, Howard University, Harvard University, University of Michigan, Minnesota, Washington, and University of California (Davis, Berkeley, San Francisco Medical Center, Santa Barbara, Irvine Medical School).

**Academic Appointments**

- Clinical Associate Professor, University of California Medical Center, San Francisco, 1979–present

- Clinical Professor of Medicine University of California, Irvine ( Current)

- Instructor, University of California, Davis, Certification Program in Hazardous Materials Management, 1981–1987

- Adjunct Assistant Professor, University of Washington, Seattle Washington, School of Public Health, 1973–1975

- Adjunct Associate Professor, University of Minnesota, School of Public Health, Minneapolis Minnesota, 1975–1979

Richard L. Wade, Ph.D., M.P.H.
Page 5
05/05

REMOVED FROM PROTECTIVE ORDER NO. 3

PL02-000157

Attachment  1.0

Richard L Wade PhD, MPH

Depositions  and court testimony in the last 4 years.

2006- Declaration on bacterial /chemical and fugal contamination of flooded coffee beans

2007- Declaration on risk and health effects of hydrogen sulfide exposures in agriculture

2008-Trial expert on OSHA compliance for worker right to know and training

2009-Trial expert on heat stress

2009- Deposition on fungal health risk in school setting

2010- Deposition on forest   fire residues health threats

REMOVED FROM PROTECTIVE ORDER NO. 3

PL02-000158

1  Richard D. Schuler, Esq.

2  SCHULER, HALVORSON & WEISSER, P.A.

3  1615 Forum Place, 4th Floor

4  West Palm Beach, FL  33401

5  Telephone:  561-689-8180

6  Facsimile:  561-684-9683

7

8  Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

MAUREEN STEVENS, as Personal
Representative of the Estate of
ROBERT STEVENS, Deceased, and
on behalf of MAUREEN STEVENS,
Individually, NICHOLAS STEVENS,
HEIDI HOGAN and CASEY STEVENS,
Survivors,

      Plaintiffs,

vs

UNITED STATES OF AMERICA,
      Defendant.

**DECLARATION OF RICHARD L.
WADE, PH.D, M.P.H.**

DATE: APRIL 1, 2011
TIME: 4:30PM

I, Richard L. Wade, Ph.D., M.P.H., declare as follows:

1.    I am a Principal Scientist in Exponent's Health Sciences practice and I have personal knowledge of the facts contained in this declaration, except as to those matters stated upon information and belief.  I am competent to testify as to the facts stated herein, and, as to those matters stated upon information and belief, I believe them to be true.

2.    I have been retained on this matter by counsel for Maureen Stevens to offer opinions on the issues surrounding the access, control and safe handling to Anthrax spores from the United States Army Medical Research Institute of Infectious Diseases (USAMRIID) laboratory that caused the

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

1

*Declaration of Richard L. Wade*

1  death of Robert Stevens a former resident of Palm Beach, Florida.  This Anthrax bacteria was used as
2  a terrorist weapon that infected 22 individuals and killed five.
3  3.        The focus of my opinions will be directed at the safe handling of highly pathogenic organisms
   in secure biohazard laboratories and security precautions that should be taken in such facilities to
4  prevent external and internal threats being made through the inappropriate use of these pathogenic
5  organisms.
6  4.        I am a health scientist trained in public health, environmental sciences and engineering. I hold
7  a B.S. in biological chemistry, a Masters degree in Public Health, and a Ph.D. in environmental
8  sciences and engineering.  I have expertise by training and experience in the history of biological
9  terrorism.  I have worked in high hazard microbiological laboratories, and in enforcing bio-safety
10 standards in research facilities that use high hazard microbiological agents.  I have also investigated
11 deaths and disease from improper safeguards in high hazards laboratories. In the last 10 years, I have
12 worked on several national study groups on terrorism established by the Department of Defense
13 under the auspices of the National Academy of Science. These study groups on terrorism include risk
14 and prevention of both foreign and domestic bioterrorist attacks.  Between 2003-2005, I co-chaired a
15 national study on "The Role of US Naval Forces in the Global War on Terrorism". In 2002, I was a
16 member of a National Academy of Science study that reported on the status of "Force Protection
   from Chemical and Biological Terrorism."
17 5.        I have worked as a public health officer for city and state governments and I have been
18 responsible for prevention of the spread of infectious disease through air, water,  occupational
19 exposures , food and poor sanitation. I developed standards for microbiological quality and bio safety
20 practices in the work place. In addition, I have enforced such standards. As an adjunct clinical
21 professor of Medicine at UCSF in the 1980-1998, I was involved in setting safety procedures and
   safeguards for the handling of high hazard infectious biological materials from HIV patients.
22 6.        I have also taught environmental health at several universities including the University of
23 Washington, University of Minnesota, University of California San Francisco Medical Center, and
   the University of California, Irvine.
24 7.        I hold a Top Secret SCI national security clearance.
25 8.        I am a National Associate of the National Academy of Sciences.
26
27 9.        A copy of my Curriculum Vitae is attached.
28 10.       It is my opinion that the work at the USAMRIID involved the handling of highly pathogenic
   bacteria. These pathogenic bacteria including Anthrax could be used by terrorist, both domestic and

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4ᵀᴴ FLOOR
WEST PALM BEACH, FLORIDA 33401

2

*Declaration of Richard L. Wade*

foreign, as weapons of mass destruction.  If there were accidental releases of these organisms from the laboratory building they could become a major public health threat to the surrounding base and beyond. If internal biohazard control efforts failed, the presence of these organisms would be a significant risk to the scientist and staff working in these laboratories. For these reasons, these highly pathogenic and toxin producing materials were intended to be handled in *biosafety* control faculties so designated as P2, P-3 and P-4. P-4 facilities are designated for the handling of the most hazardous biological materials for which there is no vaccine or affective treatment. The Anthrax work performed at this laboratory was in P-3 facilities.

11.     There is a history of Bioterrorism worldwide and within the US.  Eighteen separate incidents have been recorded whereby highly pathogenic microbes and or toxins have been maliciously used to inflict human causalities. The agents reported to have been used included influenza virus, Rican, Salmonella and Anthrax bacteria.

12.     In P-3 facilities research laboratories, the security is provided through physical barriers, filters, inventory control, access control, biological agent control, secured professional employees working in the facility, training, clear and precise procedures and policies, situational awareness, tight stall supervision and audit oversight.

13.     My opinions will not address issues of guilt or innocence of any individual nor the ability of individuals or the USAMRIID labs to produce the spores that were found in the letters sent to Senators and the media. I will also not opine on the use of scientific methods as part of the FBI investigation of the perpetrator of the crimes.  The National Academy of Sciences and FBI reports on these topics speak for themselves.[1],[2]

14.     My opinions will focus on the principles of management of high hazards environments including biosecurity facilities and the deficiencies found at the USAMRIID facilities.

In total, a known 22 victims contacted anthrax as a result of exposure of mailings in envelopes containing anthrax bacteria. Of these 22 victims, 11 suffered cutaneous anthrax by absorption through the skin and 11 contacted inhalation anthrax. Five of the inhalation anthrax victims died as a result of the Anthrax exposure. The strain of anthrax was identified as the, so called, Ames strain that was isolated in Texas in 1981 and shipped to the USAMRIID facility. The FBI determined that these letters were sent between 9-17-18, 2001 and 10-9-2001. Studies further defined the Ames strain of Anthrax as originating from so called flask RMR-1029. This strain had been created and maintained

---

[1] Review Of The Scientific Approaches Used During the FBIs Investigations of the 2001 Anthrax Letters – National Research Council of the National Academy of  Sciences  2011.

[2] Anthrax Investigation Summary, US FBI October 30, 2009

3

*Declaration of Richard L. Wade*

REMOVED FROM PROTECTIVE ORDER NO. 3

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

1  by Dr. Bruce Ivins a principle investigator in the Division of Microbiology at the USAMRIID

2  laboratories.

3  15.     Based on my review of material provided to me as well as material I have collected from the

4  National Academy of Sciences, I offer the following opinions.

5  •       The USAMRIID physical security, biohazard operations controls and personal security was
   deficient.

6

7  16.     In the fall of 2001, the policy for this control of hazardous materials in the USAMRIID

8  laboratories was covered under AR 70-65 (Effective as of September 1, 1979).    Under this policy

   the commander of each facility was to  set forth programmatic efforts to:

9  •       Manage controlled substances so defined including biological hazards in their facility

10

11 •       Establish and implement internal review procedures to ensure the use of controlled substances

12         is warranted and authorized in pursuit of legitimate research operations

13 •       Establish and maintain ongoing education program on hazards and awareness

14

15 •       Appoint a quantified person as the controlled substance program manager

16 •       Conduct periodic audits on the location and qualities of controlled substances including

17         harmful biological agents

18 17.     It is my opinion that the operations in the USAMRIID did not comply with the above facility

19 requirements.

20 18.     It is also my opinion the laboratory did not comply with good management practices that

21 should be understood by any scientists working in high hazard microbiological facilities as well as its

22 own requirements under Army  regulation  385-69.

23 19.     In November 2001, General M. Keane, USA Vice Chief of Staff sent a request to the Army

24 Inspector General's office asking that a review be conducted on the security and operation controls in

25 place at three US Army research labs that worked with highly infections biological agents . This

26 review included the USAMRIID facility. In January 2002, a report was issued by the Inspector

27 General of the Army.[3]

28 _____

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

[3] Memorandum for Vice Chief of staff , Army Jan 25 2002. Subject DAIG Special investigations (US Army Biological Defense Programs _

4

*Declaration of Richard L. Wade*

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

20.     In that review, the Inspector General's report finds deficiencies and significant variations between laboratories as to security clearances of employees, inconsistent enforcement of security requirements, lack of accountability for stockpiles of biological agents, many laboratory operations policies were often verbal and varied significantly between facilities and individual laboratories within facilities. There was minimal reliance with CDC guidelines for working in biohazardeous environments and these were inconsistent, often times verbal and not mandatory. The screening and hiring requirements for employees were lax and did not always include either initial or comprehensive periodic security or fitness evaluations. Physical security practices were not in compliance with Army 19 security series requirements.

21.     In September 2002, The Sandia National Laboratories issued a report on biosecurity audit at the USAMRIID laboratories in April-May of 2002.

22.     In that report the Sandia lab team focused on the control of high consequence pathogens and toxins (HCPT) held at the USAMRIID facility.[4]

23.     This audit report found that overall the laboratories lacked a security culture. They found that research and research projects were carried out as the priority mission but that security was not an important part of the laboratory operations. They did not find any comprehensive security plan as one would expect to see at a facility with stockpiles and has ongoing usage of high consequence pathogens and toxins. They could not find any accountability for either stock agents or working stocks of biological agents. They also found unarmed, lightly trained security staff with little training in biological hazards and who had inadequate knowledge of the location of the pathogens within their laboratory. Access control for all staff and visitors was inadequate and employees were noted to be entering through security doors in groups thus not accounting for employees in the building. Access control seemed to be more by familiarity than through the use of access control badges or signing in/out procedures. They also found no access alarms. In some cases, employees were allowed access to the building and biological agents before any security clearance checks. They were not able to find any chain of custody as to who in the laboratory had what containers of pathogens in their labs at any given time.

24.     In the above audits of the USAMRIID facility, both sets of investigations found a disconnect between the facility commander, the department heads, scientists and security. There was an attitude of we are the scientist, we do our work and let the security types worry about security. It is my

---

Anthrax (FY 02)- Actions Memorandum.
    [4] Security Review of the United State Army Medical Research Institute of Infection Diseases Fort Detrick, Maryland – Sandia National Laboratories September 2002

5

*Declaration of Richard L. Wade*

REMOVED FROM PROTECTIVE ORDER NO. 3

PL02-000163

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

opinion that this attitude and demonstrated practices is in conflict with security program requirements where the operational managers need to take ownership of responsibility for security.  Furthermore, the audits did not find procedures and practices in place in order to assure effective implementation of security steps on and in the laboratory. Nowhere is this more important than the need to have a secure workforce within this bio hazard laboratory. This personal security assurance effort is essential to assure both the protection of the employees of the lab as well as the public. Given the nature and small size of these highly pathogenic weapons, it is relatively easy to either mistakenly or maliciously mishandle these bio weapons.  The Lab had in place a personal reliability program. That program required that personal be cleared physically and mentally for work in the labs. Aside from the obvious security needs, this screening process is important to assure that workers can use the required level of personnel protective equipment including air filtration respirators and work in semi confined spaces with dangerous organisms without causing personal injury or anxiety.

25.     The laboratories had a medical office that has a job responsibility to initially screen and then review all employees as to physical and mental health annually under the personal reliability program,  and to assure that they were able to work in this environment without being a danger to themselves, their fellow employees or the general public.

26.     In a report for the court by a panel of renowned psychiatrists, they found that in the case of Dr. Bruce Ivins, the medial review functions of the laboratory were very deficient. This panel found that Dr. Ivins had deeply rooted mental health problems that were contributory to his alleged perpetration of the crime of murder.  In addition, the panel found that Dr. Ivins had signs and symptoms that should have been clear to any medical reviewer checking on his ability to be a qualified scientist working with these pathogen organisms. It is their opinion, based on their review of these medical records and files, that Dr. Ivins exhibited the potential, the means and the motivation to carry out the attacks. It is their opinion that, with proper medical review by the laboratory medical staff and his supervisor, the act of murder were preventable and that Dr. Ivins should have been excluded from the lab long before the mailing of the anthrax spores.[5]

27.     Based on the review of scientific evidence and extensive genetic testing as reported by the FBI and as substantiated by the National Academy of Sciences, the Anthrax organism that killed Mr. Robert Stevens of Palm Beach, Florida originated from flask RMR 1029 which was held in the laboratory of Dr. Bruce Ivins, a research scientist at the USAMRIID.

---

[5] Report of the Expert Behavioral Analysis Panel – Research Strategies  Network  Report  Submitted  to Honorable Chief Judge Royce C Lambert,   August 23 2010.2011

REMOVED FROM PROTECTIVE ORDER NO. 3

PL02-000164

28.     The USAMRIID laboratory had, in its possession, deadly anthrax bacteria that were used as a weapon of mass destruction by a domestic terrorist. The laboratory routinely stored, shipped, tested and did research with anthrax that substantiated its extreme hazard by repeatedly killing both rodents as well as monkeys with the Anthrax bacteria.

29.     The Laboratory had the expertise, training and knowledge to fully understand the extreme risk of the release of these anthrax bacteria would have on both employees and the public.

30.     The laboratory did not have an adequate security system in place to prevent access to the laboratory and highly pathogenic bacteria by persons not cleared by security.

31.     They did not have an adequate inventory or control system in place so that they knew the locations and use for these pathogenic organisms

32.     They did not have a physical lock for security of freezers, coolers or other storage areas for these highly pathogenic bacteria.

33.     They did not have an adequate personal clearance and annual review program that would qualify employees for work in the lab based on physical and or mental health conditions.

34.     There was a management disconnect between the medical screening staff and the laboratory management and division's chiefs.

35.     The physical plant security was deficient in terms of controlled access.

36.     The laboratory lacked effective perimeter alarms and control of laboratory access points.

37.     There was no surveillance on laboratory operations by the security department.

38.     There were no cameras placed in the labs that should be present for both security as well as fire and personal safety of the employees

39.     It is my opinion, that given the Army turnover of commanders at the base and the turnover of microbiology division heads, that security was never addressed in any comprehensive manner nor was security given a priority.

40.     It is further my opinion that had the above physical security, personal security reviews, medical reviews and biohazard facility controls been in place that these Anthrax spores would not have been used as a weapon of mass destruction.

41.     . In addition to the references above, I have reviewed the Army Regulations AR 70-65 October 1, 1979 and USAMRIID regulation 385-69.  I also reviewed the depositions of the following:

- Jay Anthony Arrison

*Declaration of Richard L. Wade*

REMOVED FROM PROTECTIVE ORDER NO. 3

PL02-000165

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

- Susan Welkos
- Gerald P. Andrews, Ph.D.
- William R. Bryne, M.D.
- Jerry Bruce Elliott

rs

preliminary opinions at this time, based on materials reviewed to date.  I retain

h opinions when and if additional material becomes available.

r penalty of perjury of the laws of the State of California that the foregoing is

__1____ day of April, 2011, at Irvine, California.

Richard L. Wade, Ph.D., M.P.H.
Principal Scientist

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

8

*Declaration of Richard L. Wade*

REMOVED FROM PROTECTIVE ORDER NO. 3

PL02-000166