UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MAUREEN STEVENS, as Personal      )
Representative of the Estate      )
of ROBERT STEVENS, Deceased,      )
and on behalf of MAUREEN          )
STEVENS, Individually, NICHOLAS   )
STEVENS, HEIDI HOGAN and CASEY    )
STEVENS, Survivors,               )
                                  ) CASE NO.
          Plaintiffs,             ) 03-81110-CIV-HURLEY
                                  )
      vs.                         )
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Defendant.              )
_____ )

CONFIDENTIAL DEPOSITION PURSUANT TO PROTECTIVE ORDER

DEPOSITION OF RICHARD L. WADE, Ph.D., M.P.H.

(Pages 1 through 246)

taken on Tuesday, June 28, 2011, at 10:07 a.m.

Page 2

1             DEPOSITION OF RICHARD L. WADE, Ph.D., M.P.H.,

2    taken before TRACI A. DOKICH, a Certified Shorthand

3    Reporter for the State of California, with principal

4    office in the County of Orange, commencing at

5    10:07 a.m., Tuesday, June 28, 2011, in the offices of

6    DOKICH COURT REPORTERS, INC., at 19712 MacArthur

7    Boulevard, Suite 100, Irvine, California.

8

9    APPEARANCES OF COUNSEL:

10   For the Plaintiffs:

11             SCHULER, HALVORSON & WEISSER
               A Professional Association
12             Attorneys at Law
               Barristers Building
13             1615 Forum Place
               Fourth Floor
14             West Palm Beach, Florida  33401
               (561) 689-8180
15             BY:  RICHARD D. SCHULER
               rschuler@shw-law.com
16

17   For the Defendant:

18             UNITED STATES DEPARTMENT OF JUSTICE
               1331 Pennsylvania Avenue, N.W.
19             Room 8018-S
               Washington, D.C.  20004
20             (202) 616-4231
               BY:  LEON B. TARANTO
21             Leon.B.Taranto@usdoj-gov

22

23

24

25

Page 3

```
 1    Appearances, continued:

 2              UNITED STATES DEPARTMENT OF JUSTICE
                CIVIL DIVISION
 3              1331 Pennsylvania Avenue, N.W.
                Room 80145
 4              National Place Building
                Washington, D.C. 20004
 5              (202) 353-7750
                BY:  KIRSTEN L. WILKERSON
 6              kirsten.wilkerson@usdoj.gov

 7
                UNITED STATES DEPARTMENT OF JUSTICE
 8              CIVIL DIVISION
                1331 Pennsylvania Avenue, N.W.
 9              Room 8204N
                Washington, D.C.  20004
10              (202) 616-9386
                BY:  JACQUELINE C. BROWN
11              jacqueline.c.brown@usdoj-gov

12
      Also Present Telephonically:
13
      Major John R. Maloney, Department of the Army,
14    Litigation Director

15    Paul R. Wellons, Office of General Counsel for the FBI

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1                          INDEX

 2    EXAMINATION BY:                         PAGE

 3        Mr. Taranto  -----------------------   5

 4
                     EXHIBIT INDEX
 5
                                          MARKED
 6    DEFENDANT UNITED STATES'

 7    93    Document headed Historical chemical and    32
            biological attacks, Other attempted or
 8          planned attacks (1 page)

 9    94    Document entitled U.S. Army Medical        145
            Research Institute of Infectious
10          Diseases, Reference Material Receipt
            Record, dated 22 October '97, Bates
11          numbered ARMY02-010387 (2 pages)

12    95    Document headed Ivins was assigned to      171
            the USAMRIID, Ft. Detrick, Maryland, In
13          a Non Critical Sensitive Position (2
            pages)
14
      96    Document entitled USAMRIID Biosurety       189
15          Overview for the Frederick County
            Containment Laboratory Community
16          Advisory Committee (34 pages)

17    97    Handwritten notes from notebook of Dr.     205
            Wade (6 pages)
18
      98    Handwritten notes from notebook of Dr.     205
19          Wade (8 pages)

20    99    Document entitled Medical Aspects of       241
            Biological Warfare (84 pages)
21
      100   Document entitled Department of Defense,   243
22          Instruction, Number 5210.89, April 18
            2006 (28 pages)
23
                    CERTIFIED QUESTIONS
24
         BY MR. TARANTO  . . . . . . . . . . 228, 229
25
```

Page 5

1          Tuesday, June 28, 2011, at 10:07 a.m.

2

3             RICHARD L. WADE, Ph.D., M.P.H.,

4                called as a witness,

5          and having been first duly sworn by the

6                Certified Shorthand Reporter,

7              was examined and testified as follows:

8       THE WITNESS:  I do.

9

10                      EXAMINATION

11  BY MR. TARANTO:

12     Q.   Dr. Wade, my name is Leon Taranto.  I'm a

13  trial attorney for the Department of Justice.

14          I'm with my colleagues that you have met,

15  Ms. Brown and Ms. Wilkerson, and we have other

16  government counsel for the FBI and the Department of

17  the Army participating by telephone.

18          We are taking your deposition as a discovery

19  deposition in this case, concerning your opinions in

20  this case that you expect to testify to at trial, and

21  specifically your Declaration that you submitted in

22  this case, and the bases and reasons for your

23  opinion.

24          Let me, first of all, ask you, as we begin,

25  to state your full name for the record.

1      A.    My name is Richard Lincoln Wade, W-A-D-E.

2      Q.    And where do you reside, Dr. Wade?

3      A.    I reside in Orange, California.

4      Q.    And your present position, sir?

5      A.    I'm an Adjunct Professor of Medicine at the

6  University of California, Irvine, and a Principal

7  Scientist with a company called Exponent.

8      Q.    And Dr. Wade, have you been deposed before?

9      A.    I have.

10     Q.    Approximately how many times?

11     A.    Well, depends if you are talking about legal

12  proceedings or administrative proceedings.  Which

13  would you prefer?

14     Q.    Well, I wanted to get a sense in terms of

15  answering questions, sworn testimony in a transcript

16  for proceedings.

17     A.    I'd say 20 or 30 times.

18     Q.    All right.  So you are generally familiar

19  with the process, the way it works?

20     A.    That's correct.

21     Q.    All right.  If any of my questions to you,

22  sir, are unclear, please let me know, and I'll be glad

23  to rephrase them as needed.

24            Otherwise, I will presume that the question

25  is clear to you; is that fair?

Page 7

1      A.    Fair.

2      Q.    How much time have you spent on this case so

3   far?

4      A.    Approximately one and a half, two weeks.

5      Q.    Would that be 40-hour weeks, about 60 hours

6   total?

7      A.    I don't think it's been 60 hours.  Probably

8   closer to 40 hours.

9      Q.    And roughly how did your time break down?

10      A.    Most of the time, it was reviewing reports.

11   I would say that would be 30 percent; depositions, 40

12   to 50 percent; and 20 percent research on regulations,

13   policies and procedures.

14      Q.    Did you spend any time -- aside from counsel

15   for Plaintiffs -- did you spend any time discussing

16   the case with anyone as part of your work on the case?

17      A.    No.

18      Q.    Dr. Wade, have you ever conducted any

19   laboratory work with anthrax?

20      A.    With anthrax, no.

21      Q.    Have you ever conducted any laboratory work

22   regarding any other biological select agents?

23      A.    Yes.

24      Q.    And with which biological select agents have

25   you conducted work, laboratory work?

Page 8

1      A.   Well, these are high hazard virus materials,

2  including hepatitis, HIV virus, Rous sarcoma virus,

3  Burkitt's tumor virus, all highly infectious virus.

4           Also worked in pathogenic microbiology with

5  such things as E. coli, pathogenic E. coli;

6  salmonella, staph and strep -- staphylococcus and

7  streptococcus bacteria.

8      Q.   Over what time period have you conducted

9  laboratory work involving biological select agents?

10     A.   That was early-on in my career, from over a

11 period of direct laboratory research, about five

12 years, six years; and indirect, of oversight, another

13 ten years; and looking at policy and regulation and

14 risk management, including high hazard laboratories,

15 about 25, 30 years.

16     Q.   For the five years that you have spent on

17 direct laboratory work with biological select agents,

18 what's the time period, ballpark?

19     A.   That would be from 1966 through 1972.

20     Q.   So about 1972 is the last time you did any

21 direct hands-on work with biologicals?

22     A.   Direct, working in a laboratory, that's

23 correct.

24     Q.   Would that be the last time that you worked

25 in any high hazard biocontainment facilities?

Page 9

1      A.   That I personally worked as an employee, yes,

2  but I had many more years of experience, either

3  setting standards for such facilities or enforcing

4  standards for such facilities, or involved with

5  military operations as they pertain to high-hazard

6  biological and chemical agents.

7      Q.   And for the work that you have done in the,

8  as you call it, indirect work that involved oversight

9  involving BSAT laboratory work, that you worked on for

10 about ten years, what time period is that?

11     A.   That would be from 1975 through approximately

12 1985, 1989, in that range.

13     Q.   And during that time period, did you have any

14 occasions during that time period to enter

15 biocontainment facilities, to enter the containment

16 facilities themselves, the labs where the work was

17 being done?

18     A.   I was in the laboratory, with one exception:

19 I did not go into the inner BSL-3 or 4 individual

20 rooms.

21     Q.   All right.

22     A.   Because I was not immunized.

23     Q.   So since 1972, approximately how many times

24 have you been in a BSL-3 or BSL-4 biocontainment lab?

25     A.   Since 1972.

Page 10

```
 1      Q.   Since 1972.  The last, since you finished

 2  your direct work?

 3      A.   I think I just answered that question where I

 4  indicated I had been in laboratories that have BSL-3

 5  and 4 facilities, but I was not in those individual

 6  containment rooms.

 7      Q.   All right.  Which facilities have you either

 8  worked in or visited within the containment areas for

 9  BSL-3 or BSL-4 containment facilities?

10      A.   There are a number of laboratories at the

11  University of California system.

12           When I was the Chief of OSHA, that's the

13  California Occupational Safety and Health

14  Administration, we set standards for worker

15  protection, for all workers in California, including

16  employees of the University of California, and had

17  opportunity to visit those labs, either in the process

18  of developing standards for such labs or to

19  investigate injuries, or in one case, deaths in those

20  laboratories.

21      Q.   And aside from the labs at the University of

22  California, have you worked in or visited within the

23  containment areas of other BSL-3 or 4 facilities?

24      A.   There was some biotech companies that I did

25  visit for the purposes of enforcement actions; one was
```

Page 11

1    the head of OSHA.

2           I believe there was also some in Minnesota

3    when I was the -- in charge of Occupational Safety and

4    Health of the State of Minnesota, as well as in

5    California, some private laboratories.

6       Q.   What time period was that?

7       A.   That would be from 1979 through 1985.

8       Q.   Do you recall the names of any of those

9    facilities?

10      A.   Not the individual companies.

11      Q.   Have you done any work, Dr. Wade,

12   specifically in the area of laboratory biosecurity?

13      A.   Yes.

14      Q.   And first of all, can you explain what the

15   difference is between laboratory biosecurity and

16   laboratory biosafety is, if there is a difference?

17      A.   There is a difference.

18           Laboratory biosafety concerns itself with

19   protection of the employees of the laboratory, and

20   preventing the dissemination of those biological

21   agents from distribution and affecting individuals in

22   the laboratory, or a loss of containment of those

23   organisms into the community in general.

24           biosecurity takes off from biosafety and

25   further looks at malicious intents that could occur,

Page 12

1    either internally or externally, from the malicious

2    use of biohazardous materials, either chemicals,

3    toxins or biological agents.

4        Q.   Can you please tell us generally, sir, what

5    your experience is in the field of laboratory

6    biosecurity?

7        A.   In laboratory biosecurity, most of my work

8    was through the National Academy of Science.

9             I sat for six years as a member of the Naval

10   Studies Board of the National Academy of Science, and

11   in that capacity, was involved with numerous studies

12   on what was called force protection for U.S. military

13   operations, particularly Navy and Marine Corps, under

14   the auspices of the Naval Studies Board, force

15   protection from biological, chemical and nuclear

16   hazards.

17            I also studied and was on numerous task

18   forces, one which I just finished last month, on the

19   nature of bioterrorism, and the reports of work we did

20   was at a high level, Top Secret level, which was

21   looking at intent, individual terrorist groups'

22   activities, using biological, chemical or nuclear

23   weapons, so-called weapons of mass destruction.

24            In the course of doing that, we looked at

25   biosecurity issues in laboratories, among other

Page 13

1    things, as a source of biological, chemical and

2    nuclear materials that could be used as weapons of

3    mass destruction, either for domestic terrorism or for

4    international terrorism.

5        Q.    Now, which of the reports is that from the

6    National Academy?

7        A.    Well, there were a number of reports.

8        Q.    I'm sorry, let me rephrase that.  The one

9    that looks specifically at biosecurity in

10   laboratories?  Did several --

11       A.    There are three reports on terrorism and

12   weapons of mass destruction that I was part of.

13            The first one was on force protection, and

14   force protection was, we specifically looked at Naval

15   and Marine Corps operations and the amount of

16   protection that they were providing to troops and

17   military assets from chemical, nuclear, biological

18   attack.

19            In the course of doing that, we looked at

20   many sources of chemical, nuclear and biological

21   materials, including domestic sources from

22   laboratories, as well as international sources of

23   chemical, biological weapons.

24            The second study was the role of the Navy and

25   Marine Corps on the global war on terrorism; that was

Page 14

1    a two-year, Top Secret study, under the auspices of

2    the Chief of Naval Operations and the Chairman of the

3    Joint Chiefs, where we looked at a broader perspective

4    at chem, biological and nuclear weapons, and looked at

5    Navy operations, Marine Corps operations in

6    particular, of how they were organized, structured,

7    regulated, policy, doctrine, weapon systems, planning,

8    budgeting, for intervention of global war on

9    terrorism, going out 50 years.

10          The third study which I just finished, which

11   was specifically focused on the use of weapons of mass

12   destruction, which included chemical, biological and

13   nuclear weapons, the risk of importation of such

14   weapons from outside sources coming into the U.S.

15   through small boats, and the concern of having these

16   weapons entering into the U.S. through terrorist

17   activities, through small vessels.

18      Q.   Dr. Wade, did your work on these -- I think

19   it was three National Academy of Science reports or

20   National Academy of Science projects, did all of them

21   occur after 9/11 and after the anthrax letter attacks?

22      A.   No, the first one started before 9/11.

23          As a matter of fact, our meetings were

24   delayed because of 9/11 where we couldn't travel.

25      Q.   And the publication was issued when for that

Page 15

1    one?

2       A.    The publication for that -- well, there's two

3    different publications.

4            There was a general publication, and then

5    there was a Secret classified report for that

6    particular project.

7            The first one on force protection, we wrote

8    the report on a Secret level.  The classification from

9    the military escalated it into Top Secret.

10           The second two reports -- so that report was

11   issued in about 2002, I believe, 2003.

12           The second report, which was on the role of

13   Naval forces in the global war on terrorism, again,

14   was classified as Top Secret.

15           That was published by the National Academy

16   and sent to the Chairmans of the Joint Chiefs of Staff

17   in about 2005; and the last report, which we finished

18   just this last month, is under peer review and is

19   scheduled to be sent to the Secretary of the Joint

20   Chiefs on about September of this year.

21      Q.    Do you generally regard the reports of the

22   National Academy of Science, National Research

23   Council, as generally reliable?

24      A.    I think as an independent body, yes, the

25   National Academy does issue reliable reports.

Page 16

1    Q.   Aside from the National Academy reports that

2   you discussed, have you had any other publications or

3   writings on biosecurity?

4    A.   No.

5    Q.   In any of the reports that you have written

6   concerning biosecurity for BSAT's, biological select

7   agents or high-consequence pathogens, have you

8   advocated or proposed a two-person rule for access to

9   pathogens?

10   A.   We did not get down to that degree of

11   granularity in our reports.

12   Q.   For any of those reports, did you advocate or

13   propose exit searches of personnel for pathogens,

14   personnel leaving containment facilities?

15   A.   Our focus was to look at degree of security

16   provided in total.

17        In the course of doing that, we looked at a

18   number of things for security that can be taken all

19   the way from physical security, personnel security,

20   inventory control, duplication of audit systems, key

21   systems, but our reports were looking at the global

22   issue, bigger issue of security; was a facility secure

23   or not, and we worked at the degree of granularity to

24   say, this facility is deficient or that facility is

25   deficient because they don't have this or this.

Page 20

1          Yes, these are Biological Safety Lab levels

2    2, 3 and 4.

3       Q.   All right.  And the CDC, BMBL 4th Edition

4    also uses those terms, BSL-2, 3 and 4?

5       A.   Are you talking about the 1999 edition or the

6    2009 edition?

7       Q.   The 2009 edition, also -- I'm sorry, the 1999

8    edition which is the 4th Edition.

9       A.   I believe they do refer to BSL-1, 2, 3 and

10   4.

11      Q.   Now, in your Declaration at paragraph 10, you

12   say that, The anthrax work performed at USAMRIID was

13   in P-3 facilities" so this is the same as BSL-3, for

14   example; right?

15      A.   That's correct.

16      Q.   Does BSL-3 work involve a higher level of

17   biosafety and biosecurity than BSL-2 work?

18      A.   Yes.

19      Q.   For the CDC, BMBL 4th Edition from 1999,

20   didn't that prescribe that some anthrax work can be

21   conducted at BSL-2, and that other anthrax work has to

22   be conducted at a level of BSL-3 for minimum safety?

23      A.   The CDC, I believe, makes a distinction in

24   the 1999 version for when one is doing diagnostic work

25   on tissues, and doing work on laboratory confirmation;

Page 24

1    mental health professional?

2        A.    No.

3        Q.    It would be by a physician who would conduct

4    a physical examination, and as part of the physical

5    examination, it has a mental health component?

6        A.    These laboratories were not using weapons-

7    grade materials, or materials that could be made

8    readily into weapons.

9            Medical screening was a routine medical

10   evaluation annually of the individuals, assuring

11   immunizations, assuring there was nothing to allow

12   them to become compromised because of the use of

13   personal protective equipment, including full-body

14   suits, and also evaluation of any mental health issues

15   that person might have been experiencing.

16       Q.    Dr. Wade, if we can return now to your

17   Declaration, and I'm going to go, for the most part,

18   in order, so that will be easy to follow along, I

19   think.

20           In paragraph 11 of your Declaration, you

21   refer to the history of bioterrorism worldwide and in

22   the U.S. using highly pathogenic microbes or toxins,

23   maliciously to cause human casualties.

24           Prior to the anthrax letter attacks, how many

25   reported deaths were there in the U.S. from the use of

Page 41

1    have reviewed, familiar with, over the years on

2    biohazards and biosecurity.

3         Q.   In paragraph 15 of your Declaration, you say

4    that the Ames strain of anthrax was isolated in Texas

5    in 1981 and shipped to USAMRIID, and then in the next

6    sentence, you refer to the Ames strain as originating

7    from a flask identified as RMR-1029, and that this

8    strain was created and maintained by Dr. Ivins.

9              Just for clarification, are you saying that

10   the Ames strain did not exist until Dr. Ivins created

11   it?

12        A.   No.  I'm saying that in 1981, I believe it

13   came from a sick or deceased cow, that the Ames strain

14   went to, I believe, Ames, Iowa, and at that time, it

15   was identified as a particularly pathogenic disease

16   causing a highly hazardous strain of anthrax, and that

17   was further purified, selectively bred, the biological

18   materials, by Dr. Ivins.

19        Q.   In paragraph 16 of your Declaration, you

20   state that you reviewed material provided to you, and

21   then in paragraph 42 of your Declaration you say that

22   in addition to the references cited in your

23   Declaration and throughout the Declaration, you

24   reviewed, and you list a number of items.

25              Army Regulation 70-65 --

Page 45

 1      Q.   And when you say basic stock, working stock,

 2   you are not talking about reference stock?

 3      A.   I'm talking about reference stock.  Reference

 4   stock is the core stock; it's referred to in different

 5   labs, in different regulations differently, but

 6   reference stock is the core basic stock of which you

 7   develop other permeations thereof.

 8      Q.   And concerning the opinion or statement that

 9   you discerned from Dr. Jarhling about USAMRIID having

10   about the same biosecurity as other labs, would that

11   be your own impression as well?

12      A.   That's his impression.  That was not my

13   impression.

14      Q.   Are you able to identify any laboratories,

15   biological select agent laboratories, that you know of

16   to have had better biosecurity than USAMRIID prior to

17   October of 2001?

18      A.   I think it's important here to distinguish

19   between biological select agents versus biological

20   agents of high consequence, and which might not be

21   precursors are used as biological weapons, but yet are

22   very hazardous.  Hazardous in terms of, if they are

23   released, they could inflict harm both on the

24   employees as well as the community, if it was either

25   malicious or accidental.

Page 46

1          "Select agents" is a term of art that is used

2     mostly in the bioweapons community for those agents

3     that have been identified as either historically or

4     potentially could be used as biological weapons.

5          In terms of your question, yes, I am familiar

6     with other labs that use higher levels of security to

7     protect stock agents, working agents, in high hazard

8     laboratories that have highly infectious organisms,

9     including CDC, and NIH, National Institute of Health,

10    and some university laboratories.

11    Q.   In terms of protecting pathogens or

12    facilities, prior to October 2001, are there any

13    practices at any other biological select agent

14    facilities or high-consequence pathogen facilities

15    that before October of 2001, other labs had in place

16    that USAMRIID did not, to your knowledge?

17    A.   Yes.

18    Q.   First of all, can you tell us what the labs

19    were?

20    A.   Part of this involves some agents which are

21    select agents, and they are in laboratories that I

22    don't think should be identified, particularly for

23    smallpox virus.

24         And in reviewing those laboratory practices

25    and safeguards, they were at a higher level than what

Page 47

1    I considered to be those at USAMRIID.

2        Q.   For smallpox, CDC is known as a facility for

3    smallpox.

4        A.   So I'm either going to say --

5        Q.   Well, at least many years ago, I had to get

6    immunized when I worked at CDC, and that was public

7    knowledge.

8             But anyway, aside from smallpox specifically,

9    are you aware of, in anything -- aside from smallpox

10   and anything that's classified relating to smallpox or

11   other pathogens, can you identify any biosecurity

12   practices involving BSAT's or high-consequence

13   pathogens that other labs had prior to October 2001

14   that USAMRIID did not have in place?

15       A.   Yes.

16       Q.   First of all, what were those labs?

17       A.   NIH, National Institute of Health.

18       Q.   Any other labs?

19       A.   CDC and NIH.

20       Q.   Any others that you can name?

21       A.   Some of the California -- University of

22   California laboratories that I had occasion to

23   investigate did have higher levels of biosecurity.

24       Q.   All right.  And which UC labs did you have in

25   mind for this?

```
 1        A.    UC San Francisco Medical School.

 2        Q.    Any other UC labs?

 3        A.    No.

 4        Q.    All right.  Aside from NIH, CDC and the

 5   University of California at San Francisco, their

 6   laboratories, any other laboratories involving BSAT or

 7   high-consequence pathogens that you knew of that had

 8   more or better biosecurity in place for BSAT's or

 9   high-consequence pathogens than USAMRIID had in place,

10   prior to October 2001?

11        A.    Not that I'm personally aware.

12        Q.    Prior to October of 2001, what biosecurity

13   measures or practices did NIH have in place that

14   USAMRIID lacked?

15        A.    NIH, and I had occasion to visit the NIH

16   laboratories, had very strict control over who was

17   going in; personnel access, security background checks

18   of individuals, access to agents, use of video

19   monitoring, search and -- in and out, and I would say,

20   very high-level physical security, and security of the

21   core agents in freezers or containers.

22        Q.    Anything else?

23        A.    No.

24        Q.    When were these visits that you had to NIH in

25   which you observed these biosecurity practices prior
```

Page 49

1    to October 2001?

2         A.   These would be in the '80s.

3         Q.   Were these employed in connection with all

4    pathogens or for only specific pathogens?

5         A.   These were in the laboratory procedures,

6    regardless of which pathogens they were working with,

7    and some of these were not only pathogens but working

8    with unknown viruses that wouldn't be on the list of,

9    quote, "select agents."

10        Q.   Now, in terms of personnel searches, are you

11   saying that when you visited NIH, you observed that

12   all personnel were searched as a matter of routine on

13   exiting the labs to look for pathogens?

14        A.   If you wanted to get into the area where the

15   work was being done, you, as a matter of fact, had to

16   strip and put on scrubs, surgical scrubs.

17        Q.   Like at USAMRIID?

18        A.   Before you got into the laboratory, not into

19   the -- there's a generic lab and then there is a

20   research lab.

21             There's a lab within a lab, so when we

22   visited there, we had to go into scrubs just to get

23   into the building, to get into the hallways which led

24   into the other labs.

25        Q.   And then if you wanted to get into

All Florida Reporting, Inc.
800-898-7373

Page 50

1    containment, then you had to --

2       A.   Well, if you wanted to get into containment,

3    we did not go into containment, because we did not

4    have the proper classification or immunization and

5    training to do that.

6       Q.   What searches of personnel were done?

7       A.   What searches?

8       Q.   Yes.  You have indicated that there were some

9    in and out searches done at NIH.

10      A.   You had to leave your materials at an outer

11   locker so you couldn't take it in with you.

12           You had no way -- you had nothing to carry

13   stuff in on the way out.  You had no bags, you had no

14   briefcase, you had no carrier.

15      Q.   So were there body searches?

16      A.   No.

17      MR. SCHULER:  Whenever you get to a point, if we

18   could take a short break.

19      MR. TARANTO:  This would be fine.

20      MR. SCHULER:  Okay.  Five minutes.

21   (Brief recess taken from 11:26 a.m. until 11:38 a.m.)

22   BY MR. TARANTO:

23      Q.   Dr. Wade, we were discussing biosecurity at

24   NIH, and biosecurity features that you noticed there,

25   in the 1980s.  You mentioned having visited there.

Page 51

1                   How many times did you visit there?

2           A.   Once.

3           Q.   And what was the purpose of your visit?

4           A.   It was not with the military.  It was an

5    ex-colleague of mine who was working there, and doing

6    research on pathogenic microbes.

7           Q.   And was your visit a social visit?

8           A.   No, it was to show me research that was going

9    on at NIH.

10          Q.   And how long was your visit to NIH?

11          A.   One day.

12          Q.   And did you go inside any of the containment

13   labs in NIH?

14          A.   I think I testified earlier today, no.

15          Q.   You mentioned video monitoring.

16                  What video monitoring -- well, are you aware

17   of any video monitoring that was in place at NIH,

18   inside individual lab rooms prior to October of 2001?

19          A.   I can't testify, I don't know.

20          Q.   What video monitoring were you referring to

21   that you knew of that was in place at NIH?

22          A.   There was video monitoring in the hallway, I

23   was told there was video, but I didn't go into the

24   individual containment labs to see.

25          Q.   So that was outside containment that you

Page 52

1  observed video?

2       A.   It was inside the secure area but outside of

3  the individual laboratories themselves.

4       Q.   You referred, I think, to biosecurity for

5  access to agents at NIH.

6            What security are you aware of that was in

7  place at NIH prior to October 2001 for access to

8  agents that was not in place at USAMRIID?

9       A.   I was told that the agents were cultures of

10  highly pathogenic microbes, viruses and bacteria; were

11  sealed inside locked containers, inside locked chests,

12  inside locked rooms, inside the containment P-3 or P-4

13  facility.

14       Q.   Who told you that?

15       A.   The people I was visiting with.

16       Q.   So that was back in the 1980s?

17       A.   Late '80s, yeah.

18       Q.   And were you told that that was the case for

19  all working stocks, pathogens that are dipped into on

20  a daily basis?

21       A.   Working stocks?  No.

22       Q.   Yes.

23       A.   No, I was not told that.

24       Q.   Were you given the impression that the sort

25  of pathogen access restrictions that you just

Page 53

1    discussed were in place for archival materials,

2    reference stocks, pathogens that are not dipped into

3    on a routine basis?

4        A.   I was there visiting.  I can't say exactly

5    what level of stocks.

6            I know the reference stocks were under that

7    type of containment.

8            Now, how much, how they made the decision

9    what was reference versus in-use stock, I couldn't

10   say.

11       Q.   You also referred to, for personnel security,

12   background checks that were in place at NIH prior to

13   October 2001, indicating that that went beyond what

14   USAMRIID had.

15           What background checks were in place that you

16   are aware of at NIH prior to October of 2001?

17       A.   I'm not sure I testified it went beyond

18   USAMRIID.  I'm saying they had a secure personnel

19   program in place.

20       Q.   All right.  Are you aware of any background

21   checks that were conducted at NIH that were not

22   conducted for USAMRIID personnel who had access to

23   pathogens?

24       A.   I'm not sure.

25       Q.   Do you know if there was any mental health

Page 54

1   examinations of professionals at NIH for access to

2   pathogens prior to October 2001?

3       A.   I think I answered that before.  I can't say

4   there was any specific mental health exams given.

5       Q.   Are there any physical security features that

6   you observed at NIH prior to October of 2001 that you

7   believe that USAMRIID did not have?

8       A.   I think in terms of how you access, the

9   clothing you wore, security guards, having to be

10  signed in and out and escorted, that as a visitor, I

11  was not allowed to go in without an escort.

12          I had an escort badge and had to be escorted.

13      Q.   And in reviewing the depositions or documents

14  in this case, have you made any findings or

15  observations concerning practices at USAMRIID prior to

16  October 2001 in connection with visitors?

17      A.   I have.

18      Q.   And have you made those observations in

19  connection with visitors to the containment suites?

20      A.   Visitors to the containment suites?

21      Q.   Yes.  At USAMRIID?

22      A.   That's two separate questions there.

23      Q.   Right.

24      A.   The first question was, have I developed an

25  opinion as to visitors, handling of visitors at

1    USAMRIID.

2         Q.   Yes.

3         A.   And I have.

4         Q.   And beyond that, do you have any information

5    concerning the practice or policies at place in

6    USAMRIID in connection with visitors going into

7    containment suites?

8         A.   I do not.

9         Q.   All right.  So you don't know whether they

10   had to be escorted or not, for example?

11        A.   I do not.

12        Q.   All right.  What observations have you made

13   concerning practices at USAMRIID for visitors,

14   compared to practices at NIH concerning visitors,

15   prior to October of 2001?

16        A.   I think I just answered that question.

17             That at USAMRIID, they had a visitors badge;

18   whether that was an escorted and how rigorously that

19   was enforced, I think is the issue and concern in my

20   mind, because there is evidence from the deposition of

21   people who worked there, as well as the auditors who

22   reviewed the facility, that there was lack of specific

23   standard procedures.  There was lack of enforcement,

24   and the procedures were quite informal.

25        Q.   Are you aware of any evidence in this case

Page 56

1    showing that the anthrax letter attacks occurred as a

2    result of some visitor having gained access to anthrax

3    at USAMRIID?

4        A.   In the FBI investigation, I think they

5    explored that issue, but I'm not aware of any evidence

6    from the deposition or the FBI report, that I'm aware

7    of, that shows that there was any actual threat

8    assessed of visitors to the laboratory.

9        Q.   You mentioned having to put on scrubs to

10   enter the laboratory hallways at NIH.

11            Was that just for visitors or for NIH

12   employees as well?

13       A.   Both, in the laboratories that I visited.

14            I wouldn't say that's true for all NIH

15   laboratories at all.

16       Q.   You when you say the laboratories, you are

17   talking about the laboratory buildings but outside the

18   containment; right?

19       A.   Interior to the laboratory buildings which

20   held the containment laboratories that handled highly

21   pathogenic bacteria and viruses.

22       Q.   Prior to October of 2001, how many times had

23   you been to CDC?

24       A.   Once or twice, I'm not sure.

25            Actually, it was more than that.  I worked on

1    facilities, inside the containment labs?

2        A.    I did not.

3        Q.    Would it be fair to say that you don't know

4    what CDC's practices were prior to October of 2001

5    concerning presence or absence of video cameras and

6    video monitoring in individual lab rooms?

7        A.    We did have briefings as part of the project

8    I was working with on CDC at that time on

9    Legionnaires' disease.

10           We had briefings on biosecurity from CDC, but

11   I did not personally go into the laboratories.

12       Q.    Okay.  From the briefing that you had on

13   biosecurity or other information that you were given

14   at CDC, did you obtain any information that you can

15   recall now on presence or absence of video cameras in

16   all lab rooms?

17       A.    I don't remember specifically which security

18   systems they had in place at the time I was there.

19           I do remember coming away, and the committee

20   was impressed, that I was working with the biosafety

21   and biosecurity procedures in place at CDC at the time

22   of our visit.

23       Q.    Do you recall who gave the presentation on

24   biosecurity when you visited CDC?

25       A.    I do not.

Page 59

1       Q.   Did you learn anything about whether or not

2    CDC had searches of personnel upon exiting containment

3    facilities?

4       A.   I do not recall.

5       Q.   Do you recall having learned anything about

6    whether or not CDC had in place for biosecurity, a

7    two-person rule for all work involving pathogens at

8    any level?

9       A.   I think I just testified, and I'll say it

10   again, that based upon that security briefing of what

11   CDC was doing at the time, came away impressed with

12   both the biosafety and biosecurity in place at CDC

13   laboratories.

14      Q.   Is there anything that you can identify for

15   us here today that you are aware of that CDC had in

16   place for biosecurity prior to October of 2001 that

17   USAMRIID did not have in place?

18      A.   We had another briefing when I was working

19   on -- 2000, 2001, in that time period, of force

20   protection from biological hazards.

21           We had a briefing at the Secret level, I

22   believe it would have been at the Secret level, of

23   biosecurity procedures at CDC.

24           This is before the National Academy of

25   Science Committee on Bioterrorism.

Page 60

```
 1        Q.   Are there any security practices that you can

 2   identify for us that aren't classified or confidential

 3   information, that aren't classified information, that

 4   you know of that CDC had in place, prior to October of

 5   2001, that USAMRIID did not have in place?

 6        A.   Again, the Committee -- this was a separate

 7   effort of the National Academy of Science now -- the

 8   Committee and myself came out of that briefing

 9   impressed that the biosecurity was adequate at the CDC

10   facilities for the organisms which they may or may not

11   have in storage, that could be used as biological

12   weapons.

13        Q.   And in addition to the fact that you were

14   impressed by what you learned on the biosecurity, can

15   you identify any biosecurity that CDC had in place,

16   prior to October 2001, that USAMRIID lacked?

17        A.   We were looking at principles of biosecurity

18   being physical security, being no inventory control,

19   personnel control, inventories, external reviews of

20   operations.  If you look at those principles, we were

21   asking questions of the presenter of what they did in

22   these various areas, and the net result of that, when

23   you go before National Academy Committee, such as I

24   was serving on, if you have an hour briefing, we ask

25   two hours of questions, that we ask a lot of
```

Page 61

1    questions.

2           As a result of that, it was our opinion that

3    that was a secure facility.

4    Q.   And in addition to it being a secure

5    facility, you are not able to identify any biosecurity

6    practices that CDC had in place, prior to October

7    2001, that USAMRIID lacked; is that correct?

8    A.   We went down the list of physical security of

9    the plant.  We looked at personnel security procedures

10   in place.  We looked at active monitoring.  We looked

11   at passive monitoring.

12          We looked at inventory of repositories of

13   agents.  We looked at inventory control in the

14   laboratories.

15          We looked for outside audits or reviews that

16   were going on within their operations, so we looked at

17   each of those principles, and we felt satisfied that

18   they did have an adequate level of security in those

19   laboratories.

20   Q.   And aside from giving us that general

21   impression of what you found, are you able to

22   specifically identify anything that USAMRIID did not

23   have in place that you found at CDC, for biosecurity?

24   A.   I had that briefing in, I guess it would be

25   about 2000, we had not looked at USAMRIID.  We did not

Page 62

1    look at USAMRIID; that we went down those principles

2    and we were satisfied of what we saw.

3         Q.   For the University of California lab at San

4    Francisco, concerning your observations of their

5    biosecurity, how many times have you been to that

6    facility prior to October of 2001?

7         A.   I was employed -- well, I had two exposures

8    there; one in about 1992, I was the Deputy Chief for

9    OSHA, California Occupational Safety and Health

10   Administration, and we had a report of a fatality from

11   tularemia, and a number of people were injured.

12         They had signs and symptoms of tularemia, and

13   were hospitalized, and we went in and did

14   investigation of biosafety and biosecurity in that

15   laboratory.

16         Tularemia is one of the select agents that

17   can be used as a biological weapon.

18         So we did an investigation into the fatality

19   and the illnesses, and we did issue citations against

20   the university for lapses in biosecurity -- in

21   biosafety; they were specific to biosafety, but we did

22   see their biosafety and biosecurity program were

23   deficient.  We did not have the regulatory authority

24   to cite them on biosecurity.  We did on biosafety.

25         Q.   So altogether, how much time have you spent

Page 65

```
 1      Q.    Yes.

 2      A.    It would be hours.

 3      Q.    So less than 10?

 4      A.    Less than five.

 5      Q.    And are you aware of biosecurity practices or

 6  measures that were in place at University of

 7  California at San Francisco for BSAT's or high-

 8  consequence pathogens that, before October of 2001,

 9  were not in place at USAMRIID?

10      A.    I'm aware of the biosecurity and biosafety

11  procedures at UCSF prior to 2001.

12            I did not compare those to USAMRIID at that

13  time because I never had been to USAMRIID.

14      Q.    And you have not gone back to do that

15  comparison?

16      A.    No, I have not.

17      Q.    In paragraph 17 of your Declaration, you

18  discuss Army Regulation 70-65, and you have a

19  statement in there about the regulation setting forth

20  programmatic efforts to appoint a quantified person as

21  the controlled substance program manager.

22      A.    Quantified?  It's actually "qualified."

23      Q.    All right.  First of all, the regulation

24  concerns not just pathogens but controlled substances

25  such as drugs; it concerns alcohol, it concerns a
```

Page 84

1   one in college, microbiology, that you always label

2   your container, you always secure your container.

3         You never let anybody else have access to

4   that container so that you don't either mix them up or

5   get problems with cross-contamination from one

6   investigator to the other, or accidental exposure from

7   one investigator to the other.

8         Those are tenets that are taught in

9   Microbiology 101 in college.

10    Q.   Now, are you saying that before the anthrax

11   letter attacks, that USAMRIID was required to follow

12   the BMBL, 4th Edition?

13    A.   They weren't required.  It's not a

14   regulation.  It's guidelines.

15    Q.   And in fact, the BMBL -- are you familiar

16   with the Federal Register entry from August 31st,

17   2001, concerning requirements for facilities

18   transferring or receiving select agents?

19    A.   Yes.

20    Q.   And so you know from that, that the 4th

21   Edition of the BMBL, and with its biosecurity

22   standards, that they were not put into effect until

23   January 1st, 2002?

24    A.   There's -- I think I said, these are

25   guidelines as issued by CDC.

Page 85

1         If they are adopted by regulation, at a

2    subsequent date, then they become not guidelines but

3    standards.

4         Q.   And that was in January of 2002, after the

5    anthrax letter attacks, that they became adopted as

6    standards?

7         A.   I don't have that date in front of me, but if

8    that's what you are saying.

9         Q.   What are the, quote, unquote, "good

10   management practices" that you believe or you have the

11   opinion that USAMRIID failed to comply with?

12        A.   Based upon my reading of the independent

13   reports done by the Inspector General, and by the

14   Sandia National Laboratory, that they did not have

15   adequate control over their working stock inventory;

16   that there was items which were not labeled; they were

17   not secured; and there were not strict protocols in

18   place, which were written protocols, in place for the

19   safe handling of these materials.

20        Q.   Anything else?

21        A.   Well, your question was about the working

22   stock.

23        Q.   Well, no, it was about in general.  I had

24   asked you, what were the failures to comply with good

25   management practices that you believe USAMRIID had --

Page 94

1    functions.

2              He did see changes after 2001.

3              So that's some testimony, as I can recall.

4         MR. SCHULER:  Could we take a short break?

5         MR. TARANTO:  Yes, that would be fine.

6    (Off-the-record discussion was held.)

7    (Lunch recess taken from 1:09 p.m. until 2:15 p.m.)

8    BY MR. TARANTO:

9         Q.    Ready to resume?

10        A.    Ready.

11        Q.    Very good.  We are back on the record.

12             Dr. Wade, in paragraph 19, I'd like to take

13   you now to Paragraph 19 of your Declaration, the one

14   from this month, you offer the opinion that USAMRIID

15   did not comply with, quote, "its own requirements

16   under Army Regulation 385-69."

17             I have a copy of the regulation which I'm

18   going to present to you.  It's actually -- it's marked

19   as Plaintiffs' Exhibit 8 from October 2010, and I

20   think that's from Mr. Elliott's deposition.

21             In your Declaration, you don't state the

22   sections or parts or paragraphs in 385-69 that you

23   contend USAMRIID failed to comply with.

24             Can you do that now for us, sir, and tell us

25   what specific sections or provisions in Army

Page 95

1  Regulation 385-69 you believe USAMRIID failed to

2  comply with?

3      A.   Here again, give me a minute, I'll read

4  through it and come back with an answer to your

5  question.

6      Q.   And here I'm asking about only those that are

7  relevant to your opinions concerning the anthrax

8  letter attacks and the exposures and claims in this

9  case.

10     A.   Counsel, please restate the question.

11     MR. TARANTO:  Can you please read that question

12  back?

13     THE REPORTER:  Yes.

14         (Record read.)

15     THE WITNESS:  Okay.  I'll go down through this

16  list if you are ready.

17  BY MR. TARANTO:

18     Q.   Yes, sir, please.

19     A.   First would be section 1-4, g (1), says,

20  "Commanders of MACOMs with a biological mission will

21  establish and operate an effective safety program."

22         It is my opinion that based upon the reports

23  that I reviewed, and the testimony I reviewed, that

24  the USAMRIID did not operate an effective safety

25  program.

Page 96

1              "(2), Publish a command program to implement

2       headquarter's biological safety standards and to

3       identify responsibilities for all subordinate

4       organizations that maintain, store, handle, use,

5       transport, or dispose of etiologic agents," I do not

6       believe that based on the reports that I reviewed,

7       that USAMRIID was doing that at that time in terms of

8       not develop safety standards and identify individual

9       responsibility of all subordinate divisions.

10             I'm assuming that means, says "subordinate

11      organizations," that that would include divisions to

12      maintain, store, use, handle, transport and dispose of

13      etiological agents.

14             Item number 5, to "Appoint a safety and

15      occupational health manager AR 385-10, occupationally

16      qualified under Office of Personnel Management

17      standards and has special knowledge of biological

18      safety and health requirements.

19             "The safety and occupational manager should

20      be the single point of contact for all aspects of the

21      Biological Safety Program."

22             I do not believe that, based upon the reports

23      that I have reviewed or the testimony I reviewed, that

24      USAMRIID did that adequately.

25             Number six, "Review standing operating

Page 97

1    procedures for biological defense operations."

2          I do not believe that they had sufficient

3    detailed SOP's, and all of these will be prefaced,

4    based upon my review of depositions and the Sandia

5    National Laboratory and Inspector General laboratory

6    report, so the same; my opinions are based upon those

7    reports for all these issues.

8          The next one is "Mishap reporting and

9    investigation, Biological defense related mishaps will

10   be reported and investigated per 385-40."

11   Q.   I'm sorry, where are you now, sir, which

12   provision?

13   A.   Chapter 2.

14   Q.   Chapter 2, and --

15   A.   2-2.

16   Q.   Thank you.

17   A.   "Mishap reporting and investigation."

18         I do not believe they had adequate procedures

19   in place for reporting an investigation of mishaps.

20   That there was a record of mishaps that occurred in

21   the lab which were not always reported up through the

22   chain of command.

23         "Hazard analysis.  A hazard analysis" should

24   be performed "to determine safety precautions,

25   necessary personnel protection and engineering

1    think that was after 2002; and also the testimony of

2    the Commanding Generals that said basically everything

3    was done on an informal basis, and it was a small

4    community and we didn't need the written procedures

5    and protocols.

6         We all knew what we were supposed to do --

7    I'm paraphrasing here -- but that was the testimony, I

8    believe of, many -- two of the Commanding Generals,

9    and the head of the bacteriology sections.

10   Q.   I think you earlier referred to, in going

11   through the regulation, a commander of MACOM.

12        By commander of MACOM, are you referring to

13   the commander of USAMRIID?

14   A.   No, separate, they call him Medical

15   Commander.

16   Q.   So you are referring to a level above

17   USAMRIID?

18   A.   Yes, yes.

19   Q.   The parent organization.

20   A.   The Commanding General, usually referred to

21   as the Commanding General, sometimes the Colonel,

22   sometimes just the General.

23   Q.   In paragraph 20 of your Declaration,

24   Dr. Wade, you refer to the Army Inspector General's

25   office, in that paragraph, and in later paragraphs of

Page 110

1   your report to the Inspector General Inspection Team

2   report.

3          I have a copy of the Inspector General Team

4   Report that I'd like to hand you.  It was Plaintiffs'

5   Exhibit 2 to a deposition October 6th of 2010, which I

6   think was Mr. Elliott's deposition.

7          And you have reviewed that report; correct?

8   A.   Yes, I have.

9   Q.   Then you note from that report that the

10  Inspector General Team did an inspection of three Army

11  biodefense laboratories?

12  A.   That's my understanding.

13  Q.   One of which was USAMRIID; right?

14  A.   That's correct.

15  Q.   And do you see anything in the report saying

16  which specific findings were made at USAMRIID versus

17  which specific findings were made at the other two

18  labs?

19  A.   No, I do not.

20  Q.   You have read the deposition of Mr. Elliott

21  who was head of the Inspection Team; right, sir?

22  A.   Yes, he was the head of the Inspection Team

23  which generated this report, November, 2001.

24  Q.   And can you recall from Mr. Elliott's

25  deposition which specific findings were made at

Page 111

1    USAMRIID versus which specific findings were made at

2    other labs?

3        A.   I do not recall from his deposition right now

4    if he did refer to items with USAMRIID versus the

5    other laboratories.  I couldn't testify to that right

6    at this moment.

7        Q.   We can leave that aside here because I'll

8    probably take you back to the Inspector General Report

9    momentarily, but I have a couple other questions

10   before we get --

11       A.   Excuse me, I'm confused which report you are

12   on now.

13       Q.   The last couple of questions were on the

14   Inspector General report.

15       A.   All right.

16       Q.   But I'm going to shift now and move away from

17   that.

18       A.   Okay.

19       Q.   So you may just want to keep it handy when it

20   comes back again, but for the time being, the next

21   couple of questions aren't from the report.

22            I'm going back to your Declaration at this

23   point.

24            In your Declaration at paragraph 26, you

25   write that USAMRIID, quote, "had in place a personal

Page 118

```
 1       A.   I think, in order to answer that, you need to

 2  look beyond what these Army regulations say, and you

 3  have to go into security clearances, whether it's a

 4  National Security Agency check, which is the minimal

 5  type of check, all the way up through granting of

 6  Secret and Top Secret clearance.

 7            And certainly for the people who were working

 8  in sensitive areas that require Secret or Top Secret

 9  clearance, it does spell out that you have to look at

10  mental health records.  It does spell out that you

11  need to look at physical conditions, financial

12  conditions.

13            I have been through that process three times

14  myself.  You sign away your rights to any protection

15  of your medical records under HIPAA, the protection of

16  your rights of medical records.

17            They do access those mental health records,

18  and that all goes into the decision of the Office of

19  Personnel, which on USAMRIID, was part of military

20  review of each individual prior to 2001.

21       Q.   All right.  For those persons who have

22  already been granted clearance, and let's assume a

23  Secret clearance, for those persons who have already

24  been granted the clearance, are you aware of anything

25  that the Army labs, by regulation, or USAMRIID, by
```

Page 119

 1    regulation, had to do to assure that its personnel,

 2    working in the labs, were mentally or emotionally

 3    stable?

 4        A.    They had to be evaluated every year for

 5    mental and physical conditions; by National Security,

 6    you have to be reviewed ever five years, and either

 7    accepted again for continuation, or rejection.

 8            And both of those processes went on -- with

 9    some employees in the lab, there was a fair amount of

10    discrepancy as to who actually was working in the lab

11    between one office and the other, how many employees,

12    so it's not clear who got checked, who didn't get

13    checked.

14            But if you have a Secret clearance, you have

15    to be cleared every five years for a personal security

16    clearance.

17            Any time you have a change in status, which

18    includes -- I know from my own personal experience,

19    that if you have mental conditions, suffer from

20    depression, if you have financial conditions, you get

21    divorced, you have any creditors, you lose your job,

22    you are fired from a job, you have to report -- you

23    are required to report to your security officer.

24        Q.    That's the way it's worked with your

25    clearances through the Navy; correct, sir?

Page 120

```
 1      A.   That is a Department of Defense, not just
 2   Navy policy.
 3      Q.   But your clearances have all been through the
 4   Navy; is that correct?
 5      A.   Doesn't make any difference.
 6      Q.   I understand that.
 7      A.   I work on Army projects, outside of the
 8   National Academy where I have that clearance for my
 9   company, and a clearance is a central clearinghouse
10   for all the agencies, Army, Navy, Marine Corps,
11   whatever, civil service.
12      Q.   What was the first year in which you obtained
13   a clearance?
14      A.   '95, '96.
15      Q.   Your Declaration in this case doesn't cite or
16   refer to any of the Army personnel security
17   regulations or the DOD personnel security
18   regulations.
19           Did you review any of them in connection with
20   this case?
21      A.   No, I did not.
22      Q.   All right.
23      A.   But I am familiar with them from my own
24   personal experience.
25      Q.   And you do not intend to testify in this case
```

Page 121

1    concerning the requirements of the DOD personnel

2    security regulations, or the Army personnel security

3    regulations, prior to October of 2001, are you, sir?

4        A.   I am going to testify that based upon the

5    review of the Panel of Experts, mental health experts,

6    that was convened for this case, it was their opinion

7    as part of that review that was ongoing for employees,

8    particularly Dr. Ivins, that there were red flags,

9    mental health issues that should have stopped his

10   clearance, or withdrawn his clearance.

11       Q.   Anything else that you are going to rely upon

12   concerning the personnel security investigations in

13   this case, concerning Dr. Ivins?

14       A.   My opinion will be based upon three

15   conditions; one is, I believe there was a confused

16   relationship within USAMRIID between the Personnel

17   Department, the Security Department, and the Command

18   of the research operations, the Commanding General;

19   that that organization in accountability was very

20   confused.

21            That has been testified to, or has been

22   stipulated in the reports and testified to by

23   Dr. Salerno, so I will testify to that.

24            And I will also testify that the Panel of

25   Experts, who are psychiatrists and experts in

Page 122

1    personnel review, found many issues why Dr. Ivins'

2    security clearance should have been revoked and he

3    should have been discontinued from work with high-

4    hazard agents in the laboratory.

5        Q.   All right.  Do you know if any of these, the

6    members of this Panel of psychiatrists and behavioral

7    analysis experts, had any experience with security

8    investigations, personnel security investigations?

9        A.   I don't know if they did or not.

10       Q.   All right.  Aside from having gone through

11   the process yourself to obtain a clearance, do you

12   have any expertise on personnel security clearances or

13   the requirements of personnel security regulations?

14       A.   I do not.

15       Q.   Do you know what level of clearance was

16   required in the way of personnel security for

17   Dr. Ivins for the position that he held at USAMRIID

18   prior to October of 2001?

19       A.   Prior to 2001, he was at the Secret level,

20   and after that, since he was working with select

21   agents, it went up to a Top Secret.

22       Q.   Right.  And you are aware that he had a

23   position that was classified, I mean, a position that

24   was listed, prior to October of 2001, as sensitive,

25   non-critical; right?  You understand that or know

Page 123

1   that?

2       A.   He was sensitive in terms of handling

3   sensitive materials; non-critical, but did require a

4   Secret clearance.

5       Q.   All right.  And are you aware of any

6   requirements in the Army personnel security

7   regulations for Secret clearances or for personnel

8   assigned to sensitive non-critical positions, prior to

9   October 2001, that required obtaining and reviewing

10  medical records or mental health records?

11      A.   Anyone who has a Secret clearance, a top

12  Secret clearance, does have a review of medical

13  records, including mental health records.

14      Q.   Can you cite us to any DOD regulations or any

15  Army regulations that required such a review of

16  medical records for Dr. Ivins prior to October 2001?

17      A.   I signed away, in 1995, in my application for

18  Secret clearance that they could access my mental

19  and/or physical health records, and I signed that

20  right away, and I was -- and the questionnaire that I

21  completed asked for a complete record of physicians,

22  hospitals, healthcare providers, mental health experts

23  that I have seen, if I was under counseling or any

24  other kind of mental health evaluations.

25      Q.   Have you examined the form that was used by

Page 124

1    the DOD and by the Army that would have been

2    applicable to Dr. Ivins, that's been produced in this

3    litigation?

4         A.   I reviewed the form.  I have my application

5    that I had submitted in 1995.

6         Q.   Is there anything else that you plan to

7    testify was required by DOD personnel security

8    regulations that USAMRIID failed to do in connection

9    with either Dr. Ivins or anybody else at USAMRIID?

10        A.   No, I think I covered the issues.

11        Q.   Is there a distinction between signing a

12   waiver and the investigative agency for a personnel

13   security investigation actually having cause to obtain

14   the records?

15        A.   I don't understand the question.

16        Q.   Well, simply because you sign a waiver, does

17   that -- does the investigative agency, do they need

18   some type of justification or reason to go and obtain

19   the records, your records?

20        A.   I do not believe so.

21        Q.   And what makes you say that?

22        A.   You sign away -- it's their discretion

23   whether they are going to get the records or not.

24        Q.   So they make a decision based upon what they

25   assess is necessary, and then they make a

Page 125

1    determination whether or not to obtain your records;

2    is that what you are saying?

3        A.   Personal security clearance, I think I have

4    already stated, I'm not a personal security expert,

5    but I can say from my experience in talking with

6    colleagues that go through this process, there are

7    several steps.

8            One is that you fill out a questionnaire; I

9    believe it's about a 30-page questionnaire, which is

10   quite detailed, and quite invasive.

11           Then you undergo a review internally with the

12   security officer in the Personnel Department.

13           Then you have an interview with that

14   personnel security officer.  For me that was a four-

15   or five-hour interview, and then after that, there's

16   field investigations done where data is collected,

17   depending upon the interviews, what you filled out,

18   the field investigation, and they will collect

19   information as they seem appropriate, whether that's

20   financial, medical, mental health.

21           They will talk to colleagues.  They will talk

22   to family members, neighbors.

23           I've had guys three times in my neighborhood

24   walking the streets knocking on doors, and in offices

25   I have worked, talking with individuals.

Page 126

1      Then they go back, and based upon the field

2  investigation, the interviews with the security

3  officer, they may ask you for a lie detector test.

4      Then they will ask you to come in, which I

5  had to do to go to Washington, and meet with my

6  security officer again; be interviewed by other

7  parties.

8      They may or may not ask you to take a lie

9  detector test, and will just -- you have to go through

10  a training program of security, what it means, what

11  it's not; videos, written materials and answer

12  questions on it.

13      And then there's an annual refresher that you

14  have to take online now on security, which asks you

15  questions and gives a presentation which you have to

16  answer.

17      Q.  If I can turn back to the form that you

18  submitted in 1995, was the form the same in 1997; do

19  you know?

20      A.  I do not know.  I can just say, it hasn't

21  gotten any easier.

22      Q.  All right.  Dr. Wade, you are not a

23  physician, are you?

24      A.  No, I'm not.

25      Q.  And you comment at page -- I'm sorry,

1  paragraph 28 of your report, that the behavioral

2  analysis panel, which included psychiatrists and

3  included M.D.'s, that the panel found that the medical

4  review function was very deficient at USAMRIID.

5       Have you done this type of medical review

6  before?

7       A.   I did not pretend to do the medical review.

8  I'm reporting on the report of the Expert Panel who

9  was convened on this case.

10      Q.   So you are not rendering your own opinion on

11 this?

12      A.   I'm reciting what they -- right.

13      Q.   So that's the extent of any opinion you will

14 give on medical reviews; that you would defer to the

15 Panel's medical review?

16      A.   Mental review or the physical?

17      Q.   The mental review?

18      A.   Yes.

19      Q.   And for your review on the personnel security

20 investigation, your opinions on that, is that also

21 essentially based on the findings of the Panel?

22      A.   No, there was other evidence that security

23 clearance investigations had lapsed, where you are

24 supposed to be reviewed every five years.

25      You have to be medically cleared every year,

Page 134

1    security, gained access to the BSL-3 suite where

2    anthrax was kept?

3        A.   What do you mean by personnel security?  Of

4    USAMRIID personnel security?

5        Q.   The DOD and Army's personnel security for

6    clearances, for issuing clearances, for Secret

7    clearances or higher level or different level?

8        A.   I believe there is testimony that, and in the

9    reports, indicated a number of people had not -- that

10   their security had lapsed, or some of them had not had

11   security clearances, either the Secret, Top Secret or

12   at the National Security Review level, who were

13   working in the labs.

14       Q.   Okay.  Now, are you intending to testify in

15   this case as an expert concerning personnel security?

16       A.   Of personnel security, no.

17       Q.   All right.  Does your report contain whatever

18   opinions you are going to give in this case concerning

19   personnel security?

20       A.   I'm going to testify that given what these

21   reports show, that personnel security, which is one of

22   the hallmarks of laboratory biosecurity, was deficient

23   at this laboratory, and I will go into details of why

24   that's true.

25       Q.   Are there any opinions that you plan to give

Page 162

1          "Activity commanders" -- my interpretation

2     being Division Chiefs -- "will publish and implement

3     directives that will give adequate decentralized,"

4     meaning the Commanding General doesn't inspect

5     everything.

6          Commanding general says, the Division Chief

7     will give adequate decentralized procedures to

8     safeguard the working stocks under their control.

9          So this says, Commanding General has

10    accountability to be sure those working stocks are

11    protected.

12         The Commanding General then goes to the

13    Division Director and says, you, Division Director,

14    you develop written procedures -- it does say written

15    procedures -- to handle those working stocks.

16         So the question is, were there written

17    procedures for the handling?  The Inspector General,

18    Sandia Laboratory says, no, there weren't.

19         They couldn't find any.  Either they weren't

20    there or they were inadequate, one or the other, to

21    safeguard working stocks, so it doesn't say, what kind

22    of lock do you use?  A Schlage lock or a Yale lock,

23    but it says, it's your responsibility, Commanding

24    General, and it's your responsibility, Division Chief,

25    to protect those weapons.

Page 163

1    Q.   And they had to make the decisions as to what

2  things should be done to afford the protection?

3    A.   In the context of their working laboratory,

4  but the Commanding General is to be sure that those

5  procedures are in place, both in policy and in

6  practice.

7    Q.   Okay.  Let me ask you this, Dr. Wade:

8         If the refrigerators, coolers, freezers,

9  storage areas, within a BSL-3 suite are locked and

10  secured, would there be keys to the locks or ways to

11  get into the refrigerators or freezers?

12    A.   There has to be some way you can get into it

13  if you are going to work with it.

14    Q.   Right.

15    A.   But then you control who has it.

16    Q.   Right.

17    A.   Do you have two people with two different

18  locks, which is customary in a lot of laboratories,

19  and a lot of weapon systems.

20         It's not just one individual can unlock it;

21  you have you have got two locks with two keys.  It

22  takes two people, so you know where that material

23  goes.  You know who is accountable.

24         You have written procedures in place; that's

25  true for chemical weapons, it's true for nuclear

Page 164

1   warheads, so it's just not one individual going into

2   their lab or their warehouse or their bunker and

3   saying, well, I think I'll take this bomb out and I'll

4   put it over here and take it out of there.

5        Q.   Do you recall Dr. Salerno's testimony that

6   you shouldn't be imposing the same security

7   requirements on biological materials that you apply

8   for the Nuclear Weapons Program?

9        A.   I would argue the requirements for biological

10  weapons should be more stringent because you don't

11  have the physical sensors, you don't have the physical

12  size, dimensionality, that you have with chemical and

13  nuclear weapons, so the scrutiny has to be more

14  rigorous.

15       Q.   So you disagree with Dr. Salerno on that?

16       A.   I do.

17       Q.   Is there anything else with which you

18  disagree with Dr. Salerno, from having reviewed his

19  deposition?

20       MR. SCHULER:  I'm going to object to form.

21       THE WITNESS:  I think that's a broad question.  He

22  had some 200 pages of comments, so you would have to

23  ask me your specific question.

24  BY MR. TARANTO:

25       Q.   Any general criticisms that you have of his

Page 178

1   medical records from review as part of his security

2   position.

3          So the opinion, my opinion would be, and the

4   opinion of this Expert Panel was, they had a right to

5   see that since he had already signed away his rights

6   to have those records exposed.

7   Q.   Well, is it one of your opinions in this case

8   that the action of the U.S. Attorney's Office in

9   blocking the ability for Federal investigators to

10  access Dr. Ivins' medical records in some way

11  contributed to the anthrax letter attacks?

12  A.   I think it was an obstruction of the

13  investigation; not as a causation of the event.

14  Q.   Do you know when this occurred, by the way?

15  The U.S. Attorney's Office blocking access?

16  A.   I presume it was sometime '78, excuse me,

17  2008, whenever the Expert Panel was convened.  I

18  believe it was '08, '09.  I wouldn't swear to that.  I

19  don't have the exact date.

20  Q.   In that same paragraph, 34, in your next to

21  the last bullet, you write that, "Despite conclusions

22  of suicidality and homicidality, the psychiatrist who

23  treated Dr. Ivins from 2000 to 2008 continued to take

24  the position that Dr. Ivins should have full access to

25  agents such as anthrax."

Page 179

1          USAMRIID, as a laboratory working with

2  pathogens such as anthrax, when they have information

3  from Dr. Ivins as to who his treating psychiatrist is,

4  should they look to and rely upon what his

5  psychiatrist says about his mental health?

6      A.   Absolutely.

7      Q.   All right.  Should they distrust the findings

8  of the psychiatrist and seek information from other

9  persons who worked for the psychiatrist, other mental

10  health counselors, that might have different opinions?

11      A.   I think the individual doing this assessment

12  in security has to rely upon a psychiatrist or a

13  psychologist, if there was a diagnosis, and if there

14  were positions taken by that healthcare professional,

15  that those had to be taken very seriously.

16          If they wanted to seek out a second opinion,

17  they certainly could do that, but the fact is, an

18  opinion was rendered by a psychiatrist as to his

19  mental health conditions at that time, and I think the

20  Office of Personnel would have been prudent to take

21  heed to those recommendations.

22      Q.   With the psychiatrist treating Dr. Ivins from

23  2000 to 2008 continuing to take the position that

24  Dr. Ivins should have full access to agents such as

25  anthrax, was there any requirement by regulations for

Page 181

1      A.    That's correct.

2      Q.    And in your third and fourth bullets to

3  paragraph 35, they concern Army Regulation 190-51,

4  regulation on military police, and titled Security of

5  Unclassified Army Property, Sensitive and

6  Non-Sensitive.

7          Are you saying that 190-51 applies to anthrax

8  and other pathogens at the Army biological research

9  laboratories?

10     A.    My statement was it applies to their command,

11 the command of the Commanding General, as a facility

12 commander, is responsible for security, inspections,

13 overall security for all aspects of the operation

14 under his or her command, including, if they worked

15 with anthrax, it includes anthrax.  If they are

16 working with nuclear weapons, it includes nuclear

17 weapons.

18     Q.    And have you reviewed the deposition

19 testimony of Mr. Arrison, the Security Manager, who

20 has testified and explained that this regulation, Army

21 Regulation, 190-51 does not apply to BSAT's or to

22 containment laboratories; it applies to security

23 property generally such as computer equipment,

24 pilferage of supplies, pharmaceuticals, syringes and

25 narcotics?

Page 182

1    A.   I do not agree with that assessment.

2    Q.   Do you have any expertise in interpreting

3  regulations on military police?

4    MR. SCHULER:  Object to the form.

5    THE WITNESS:  I'm not an expert in military police

6  security.

7         All I can do is recite what the commander is

8  responsible for, and if the commander is commanding a

9  military operation that uses biological weapons, has

10  biological weapons under their command, they are

11  responsible for the security of those weapons or

12  biological materials that can be made into weapons.

13  BY MR. TARANTO:

14    Q.   And you are aware that the Inspector General

15  report made no mention at all of Army Regulation

16  190-51?

17    A.   I'm not.

18    Q.   And additionally made the point that

19  pathogens like anthrax are not property in the

20  traditional sense for Army property?

21    A.   I'm not sure it says that.  I can't testify.

22    Q.   You don't recall that?

23    A.   I don't recall that.

24    Q.   At at paragraph 36 of your Declaration,

25  Dr. Wade --

Page 184

1    multiple barriers, and every time you violate a

2    barrier, you increase the risk of an adverse effect

3    happening because you have one less protection between

4    you and bad stuff.

5        Q.   Can you identify any evidence of anyone

6    gaining unauthorized access to anthrax as a result of

7    any deficiency in controlled access or any deficiency

8    in physical plant security?

9        A.   Well, if the FBI report is correct, which I

10   believe it is, then the anthrax in these letters came

11   from that laboratory, so someone had access to it, and

12   used it maliciously.

13       Q.   But that doesn't answer the question whether

14   the access was authorized access or unauthorized

15   access; right?

16       A.   No, it was access.

17       Q.   All right.  But my specific question is, are

18   you aware of any evidence of anyone gaining

19   unauthorized access to anthrax at USAMRIID as a result

20   of any deficiency in controlled access, or any

21   deficiency in physical plant security, again,

22   unauthorized access?

23       A.   I personally --

24       MR. SCHULER:  I'm going to object to the form.

25            Go ahead.

Page 185

1      THE WITNESS:  I have no personal knowledge of

2  anyone gaining unauthorized access to anthrax at the

3  USAMRIID facility.  I don't know if they did or did

4  not.

5          But I would like to say that if there was

6  evidence, as there was, of lax security at the bidding

7  entrance, both front or rear access to the building,

8  then that increases the probability that someone could

9  have had unauthorized access.

10 BY MR. TARANTO:

11     Q.  I'd like to move now to paragraph 37 of your

12 Declaration.

13          It's the one in which you give your opinion

14 that USAMRIID lacked effective perimeter alarms and

15 control of laboratory access points.

16          First of all, what do you mean by "perimeter

17 alarm"?  What do you have in mind that USAMRIID lacked

18 in the way of perimeter alarms that should have been

19 in place?

20     A.  Perimeter alarms are alarms which are

21 activated if someone goes outside this building in an

22 area that they should not have access to.

23          They are either light tripped or wire tripped

24 or pressure tripped, perimeter around a building.

25          They can also be perimeter around an area of

Page 199

1      A.    I think their general position was that there

2    was more problem with the disconnect between security

3    and the researchers, and that because of a number of

4    factors, including turnover, not only at the commander

5    level but also at the Division Chief, Microbiology,

6    that there was difficulty that they had in

7    understanding why there was such a discrepancy between

8    the researchers and the security, occupational health,

9    medical, administration.

10          And that's my personal experience too, that

11    in institutions where there's academic institutions or

12    any place you have highly skilled researchers working

13    on particular aspects, whether it's weapons

14    development, biological systems or engineering

15    research, that they focus on their world and they

16    don't look at the bigger picture of security, worker

17    protection, institutional development.

18          And they develop this institutional blindness

19    where they don't fully understand what the

20    consequences are, and there's a separation between the

21    us and them; and that was -- I believe there was

22    testimony to that effect.  I can't remember who said

23    it, but it's been my experience as well.

24          And the Sandia National Lab also highlighted

25    that issue of separation between us and them.  And it

Page 212

1    your word.

2         Q.   Well, that's what I'm asking you about.

3         A.   I said, inconsistencies or deficiencies.

4         Q.   All right, well, I'm asking you specifically

5    about violations of the regulations; things that the

6    regulations specifically required of USAMRIID or the

7    Army.

8         A.   I have one, two, three, four, five, six, so

9    far, so if you want to go over those six items.

10        Q.   Those are six, what you believe are

11   violations of the Regulations by USAMRIID?  That's my

12   question.

13        A.   I did not say there was violations.  I'm

14   saying it is based upon what I know from these

15   reports, and the testimony in the depositions, that I

16   think there are a number of areas in this Regulation

17   that were not complied with to the degree that shows a

18   competent program.

19        Q.   That's fair.  Now, let me say this:  There

20   are two areas that I want to focus on.

21             Number one, I want to find out what

22   violations there were of the regulations.

23             Now beyond that is a separate question, I

24   would be very interested to ask you and find out also,

25   aside from or in addition to any regulatory violations

Page 213

1    that you can identify, what other things do you think

2    USAMRIID did improperly in connection with that

3    regulation?

4        A.   Okay.

5        Q.   That's a different question, and I think

6    that's the broader question, that you look like you

7    are prepared to answer in part, but I want to first

8    start -- I don't want to go there yet.

9             I need to first find out, because it's very

10   important to us to find out what violations of that

11   regulation, if any, can you identify concerning

12   USAMRIID and that resulted or contributed to the

13   anthrax letter attacks?

14       A.   Okay.  In terms of this particular

15   regulation, Army 190-13, which I'm surprised you

16   haven't had in your possession up until this time --

17       Q.   Oh, I have it, but I didn't know it was the

18   basis of your opinion, but go ahead.

19       A.   Okay.  Page 3, and again, I have only done

20   four pages, when you cut me off, so page 3, item 1-21,

21   "Commanders of major Army commands, MACOMs," which we

22   know there was, MACOM is a commander of USAMRIID,

23   shall "appoint a command physical security officer who

24   will determine command-wide physical security needs."

25            That is a very discrete person that has

Page 214

1    assessed security needs.  I'm not sure that that

2    person was designated.

3              Based upon the Inspector General report, and

4    the Sandia National Laboratory report, it does not

5    seem clear at all, and from the deposition of

6    security, us and them, and the confusion within the

7    division chiefs, they were not as clear as who was

8    responsible for physical security, so commander will

9    have one person, security officer, who is responsible

10   for their command.

11             Number c, will "Identify resource needs for

12   meeting physical security requirements," I'm not sure

13   whether that was done or not.

14             "d, shall "Review for content and accuracy

15   the threat statements prepared by subordinate

16   installations and activities," so they are to go

17   within that command and look for threat statements of

18   where they are vulnerable and what the threat

19   assessment is of all the components of that command,

20   and do a threat an assessment.

21             To "Identify personal security performance

22   requirements, and coordinate these requirements" with

23   other commands, particularly TRADOC and PSEMO, which

24   I'm not sure what TRADOC or PSEMO are.

25             Item 1-23, Commanders of installation or

Page 215

1    activities, section a, "Those commanders who are

2    subject to jurisdiction or administration, or in the

3    custody of Defense agencies" to prepare "necessary

4    regulations to protect and secure personnel, places

5    and property under their command, per the Internal

6    Security Act of 1950," so they have to have a plan to

7    assure security of property and personnel in places

8    under their command.

9        Q.   And you don't know whether that was done or

10   not; right?

11       A.   If there was a written document that shows

12   they have to have a plan and a document of how they

13   are going to protect those assets, and if they had a

14   plan, there should have been procedures which show

15   what you do in order to protect those assets.

16       Q.   Are you saying that wasn't done, or are you

17   saying you don't know if that was done?

18       A.   I don't know if it was done, and if it was

19   done, there is evidence, based on the testimony and

20   the inspection reports, that it was not adhered to.

21            Section b (2), "Develop an installation local

22   security threat statement in coordination with local

23   intelligence and law enforcement support elements,

24   based on DA and MACOM threat statements."

25            So you have a threat statement, you are to

Page 216

```
1   develop with local security, which would be the base

2   security, in this case, since they were inside a base,

3   of what the local threat is.

4          And then to "Develop an installation physical

5   security plan."

6          Item (7), "Designate and approve restricted

7   areas."

8          Item (10), "Designate, in writing, mission

9   essential or vulnerable areas under their control."

10          (12), To "Ensure risk analyses are performed"

11   in accordance with DOD requirements, for new and

12   existing facilities.

13     Q.   Now, are you saying you don't know whether

14   these things were done, were done?

15     A.   If they were done, then it wasn't translated

16   into operational security at the facility.

17     Q.   So you are not saying that they weren't done;

18   you are just saying if they were done, they were not

19   done properly?

20     A.   Maybe the plan was developed properly, but

21   what was seen by the auditors when they went to these

22   facilities is that it wasn't being implemented.

23          Number (3), "Monitoring and response to

24   electronic security equipment" within the facility, so

25   they are talking about electronic security clearance
```

Page 217

1   monitoring response.  There was evidence --

2        Q.    I'm sorry, where are you now?

3        A.    This is item 124-3.

4        Q.    I see.

5        A.    "Monitoring and response to electronic

6   security equipment when not within the tenant

7   activity's capability."

8        Q.    3 b, I see, 1-24 b (3)?

9        A.    B (3).

10       Q.    I see.

11       A.    So the command has a responsibility for

12  monitoring and response, and there was, I think, a

13  fair amount of discussion in the Sandia National

14  Laboratory report where the alarm system, in some

15  cases, did into the work, and in all cases, they were

16  not able to identify where the threat was, what the

17  nature of the alarm was, and the procedure used was

18  dispatch an individual, and we talked about my

19  perception of the consequences of doing that.

20            I've seen that happen before and people have

21  been killed, because they were dispatched to find out

22  where a fire was, open an elevator door and they are

23  incinerated because there was no way to tell where it

24  was and what degree.

25            1-25, on page 4, The PM or security officer

Page 220

1    Q.   All right, and that work was done from about

2    the year 2000 to 2000 and what?

3    A.   Well, the first one, chem, biological

4    vulnerability was, I think, it was around 2000, 2002.

5    Q.   So you regard yourself as an expert on

6    physical security?

7    A.   No, I do not.  You asked me the question,

8    what is my experience, and I indicated that over the

9    course of two years, we had many, many briefings and

10   had to write a report on physical, biological and

11   chemical risk analysis, vulnerability analysis of U.S.

12   forces.

13   Q.   Now, you know from the -- from looking at the

14   front of the Regulation, Army 190-13, that this

15   regulation on the Army Physical Security Program is

16   part of their series on military police.

17        Do you regard yourself as an expert on

18   military police?

19   A.   I do not.

20   Q.   Now, for the opinions that you are offering

21   in connection with Army Regulation 190-13 and how, in

22   your opinion, USAMRIID's performance was in a number

23   of ways deficient, compared to what the regulation

24   sought to achieve, I understand you are relying, in

25   part, upon the Sandia report and also the Army

Page 224

1   Third looks like it's notes on the Sandia report.

2        I believe these are all notes on the Sandia

3   report, except the last page which is notes on the

4   Inspector General report.

5        So pages one, two, three, four, five, six,

6   seven, were notes on Sandia lab; and page eight was

7   some notes on the Inspector General report.

8   Q.   Thank you, sir.

9        Aside from Mr. Arrison's deposition, did you

10  read any depositions of any security guards or

11  security officers or any of the security people at

12  USAMRIID?

13  A.   I did not.

14  Q.   In your Declaration, Dr. Wade, in paragraph

15  41, you state your opinion that "had the above

16  physical security, personal security reviews, medical

17  reviews and biohazard facility controls been in place,

18  that these anthrax spores would not have been used as

19  a weapon of mass destruction."

20       You didn't add any bullets to this particular

21  paragraph of your statement or do any additional

22  explanation here.

23       Could you tell us now what the bases and

24  reasons are for your opinion that, had the various

25  physical security, personnel security reviews, medical

Page 225

1  reviews, and biohazard facility's controls have been

2  in place, that the anthrax spores would not have been

3  used for the anthrax letter attacks and for the

4  exposure of Mr. Stevens?

5       MR. SCHULER:  Let me just say, I think he's -- a

6  lot of his earlier testimony went to that question.

7            I'm not going to instruct him not to answer

8  but I'm going to object to the form.

9       THE WITNESS:  My answer is that I have been

10  answering the question why I developed that opinion

11  for the last seven and a half hours.

12  BY MR. TARANTO:

13       Q.   What are the bases and reasons for your

14  opinion that the anthrax letter attacks would not have

15  occurred had the physical security, personnel security

16  reviews, and medical reviews and biohazard facility

17  controls that you referred to in your Declaration, had

18  they been in place?

19       MR. SCHULER:  Object to the form.

20       THE WITNESS:  I think that's the same question you

21  just asked me, and the reasons that I developed that

22  opinion, I have stated for the last seven and a half

23  hours.

24  BY MR. TARANTO:

25       Q.   I'll repeat the question, and I'd like -- I

Page 226

1   haven't asked you questions on causation with the

2   exception of a couple of instances, and this is a

3   global opinion on causation as to all your opinions in

4   the case.

5        You have testimony at length on what your

6   opinions on the various deficiencies, and your

7   opinions on the deficiencies that occurred.

8        I now want to go beyond that and ask you how

9   those claimed deficiencies, the ones that are

10  identified on your report, led to the anthrax letter

11  attacks.  Please tell us how.

12  MR. SCHULER:  Object to the form.

13  THE WITNESS:  I believe that you asked me, in

14  fact, on many occasions today if something had been in

15  place or not been in place, if that was the cause or

16  contributory to the release of the anthrax organisms

17  from this facility which resulted in these deathes.

18       And my answer has been consistently, that in

19  total, if you look at the physical security issues,

20  you look at the personal security issues, you look at

21  the control of materials in the laboratory, you look

22  at the inventory, you look at the checks and balances,

23  you look at the audits, or the lack of -- deficiencies

24  in all of those, that the net sum is a security system

25  which failed, and that failure resulted in an attack

Page 227

 1   on the United States.

 2   BY MR. TARANTO:

 3       Q.   Let's take them one-by-one because there are

 4   several things I asked you about, like labeling on

 5   pathogens and several other things for example.

 6            But on the medical reviews, how would the

 7   medical reviews that you say should have been

 8   conducted have prevented the anthrax letter attacks?

 9       MR. SCHULER:  That was asked and answered before,

10   Leon.  Come on.

11       MR. TARANTO:  I didn't --

12       THE WITNESS:  You have asked that question, I've

13   answered it.

14            You asked me on containers, you asked me on

15   security, of security in freezers, of the vials.  You

16   looked at agent stock, you looked at use stock, and if

17   this had occurred, would it have been prevented?

18            You asked me each one of those, and I

19   answered, and I answered at that time and I reiterate,

20   the net sum gain of deficiencies in all of these

21   efforts resulted in a deficient program, which the

22   security lapses allowed, in my opinion, those agents

23   to become available to be used as a weapon of mass

24   destruction.

25            Had parts of those been in place, if all of

1  "institutional blindness" I was referring to any one

2  individual report.

3          Institutional blindness is a term of art used

4  in management to look at how institutions become

5  focused in how they do things, what they do, how they

6  do it; they become so focused at the expense of losing

7  the big picture.

8      Q.   When did you first obtain a security

9  clearance, the very first year?

10     A.   I think I said about 2005.

11     Q.   So you worked --

12     A.   Excuse me, 1995.

13     Q.   So you were allowed to work in biological

14  laboratories with biological select agents, and had

15  indirect overseeing responsibilities for biological

16  select agent laboratories, even before you had a

17  security clearance?

18     A.   Let's back up.  I did not work with select

19  agents of biological hazard.  I worked with highly

20  pathogenic viruses and pathogenic bacteria; that's a

21  different issue.

22     Q.   And you were allowed to do that without a

23  security clearance?

24     A.   Absolutely.  There are people that work in

25  labs all over this country doing that everyday, but

Page 234

1    these are not select agents, they are not biohazard,

2    they are not weapons of destruction or commonly listed

3    agents that can be used as weapons of mass

4    destruction.

5              There are laboratories who do clinical

6    diagnosis and sample analysis.  Few or any of them

7    have security clearance, but they do clinical lab work

8    in hospitals or public health laboratories.

9              If you are researching for the military,

10   either making weapons grade, propagating, harboring,

11   then you do need security clearance as defined by DOD.

12        Q.   Now, in the Sandia report, Dr. Salerno uses a

13   term HCPT, high-consequence pathogens and toxins; does

14   that mean the same thing as what you were just

15   describing?

16        A.   The way he used it in his report is high-

17   consequence pathogens and toxins were specific

18   biological agents that could or have historically been

19   used for weapons purposes.

20        Q.   And are you saying that the biological agents

21   with which you worked are not associated with the

22   potential for bioterror?

23        A.   I was working with materials that could be

24   but are not commonly used.  Salmonella,

25   staphylococcus, streptococcus, HIV virus, later on.

All Florida Reporting, Inc.
800-898-7373

Page 235

1          I didn't work in the lab directly, but we

2    worked in human papillomavirus.  We worked with

3    hepatitis virus.  We worked with polio viruses.

4        Q.   Okay.  And prior to October of 2001,

5    salmonella was the only biological agent that was

6    successfully used for biological attacks in the United

7    States; isn't that correct, to your knowledge?

8        A.   Yes.  But there are people in labs, if you

9    take a 10-mile radius around here, which includes the

10   University of California, and all the clinical labs, I

11   bet you can come up with 20 or 30 people that work

12   with salmonella every day but they do not have

13   security clearances.

14       Q.   Previously you testified that you don't

15   recall yourself as an expert in personnel security.

16          Since you are not an expert in personnel

17   security, why do you address personnel security in

18   your report and Declaration?

19       A.   Because personal security is one of the

20   hallmarks of overall biosecurity programs.

21          You have to have a security -- rigorous

22   personnel security, particularly biohazards because of

23   the nature of biohazards, being so small, so easy to

24   smuggle, and less amenable to detection by physical

25   means.

Page 236

1          A lot of the reliance in these security
2   programs is a reliance on the people working with
3   those pathogens and toxins.
4       Q.   What expertise, if any, do you believe you
5   have that qualifies you to testify about personnel
6   security in this case?
7       A.   Otherwise, the requirement to have personal
8   security and clearance, those requirements are spelled
9   out in the regulations.  They are hallmarks of the
10  biosecurity program, and there was evidence that we
11  talked about many times today, that that was not
12  addressed in a comprehensive or adequate manner at
13  USAMRIID.
14      Q.   Is there anything that you plan to review
15  between now and the time of trial in connection with
16  this case?
17      A.   I'm open to any materials that might become
18  available.
19      Q.   For instance, are you planning to review any
20  of the Army personnel security regulations or any of
21  the DOD personnel security regulations?
22      A.   I'm not planning to at this time.
23      Q.   When you visited or interacted with the
24  University of California at San Francisco, did they
25  have any weapons grade pathogens or any high-

Page 244

1   (Brief recess taken from 6:50 p.m. until 6:56 p.m.)

2       MR. TARANTO:  We have nothing further.

3       MR. SCHULER:  I'd like him to read it when it's

4   prepared.  If you can send me an E-transcript, along

5   with scanned copy of the errata sheet, I can provide

6   Dr. Wade with it.

7       MR. TARANTO:  And I guess just on the paperwork, I

8   need to make sure you have everything.  Off the

9   record.

10          (WHEREUPON THE DEPOSITION CONCLUDED AT 6:57

11  P.M.)

12          (CERTIFICATE OF DEPOSITION OFFICER ATTACHED

13      HERETO.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 245

1

2                              * * * * *

3

4          I do solemnly swear under penalty of perjury

5      under the laws of the State of California that the

6      foregoing is my deposition under oath; are the

7      questions asked of me and my answers thereto; that I

8      have read same and have made the necessary

9      corrections, additions, or changes to my answers that

10     I deem necessary.

11         In witness thereof, I hereby subscribe my

12     name this _____ day of _____,

13     20_____.

14

15

16                      _____

17                      RICHARD L. WADE, Ph.D., M.P.H.

18

19

20

21

22

23

24

25

```
  1                    REPORTER'S CERTIFICATE

  2

  3            The undersigned Certified Shorthand Reporter,

  4    licensed in the State of California, does hereby

  5    certify:

  6            That the foregoing deposition was taken

  7    before me at the time and place therein set forth at

  8    which time the witness was duly sworn by me;

  9            That the testimony of the witness and all

 10    objections made at the time of the examination were

 11    recorded stenographically by me and were thereafter

 12    transcribed, said transcript being a true copy of my

 13    shorthand notes thereof.

 14            That the dismantling of the original

 15    transcript will void the Reporter's Certificate.

 16            I further declare that I have no interest in

 17    the outcome of this action.

 18            In witness whereof, I have subscribed my name

 19    this 3rd day of July, 2011.

 20

 21                            _____

 22                            TRACI A. DOKICH
                               CSR NO. 3755
 23

 24

 25
```

All Florida Reporting, Inc.
800-898-7373