1 | Richard D. Schuler, Esq.

2 | SCHULER, HALVORSON & WEISSER, P.A.

3 | 1615 Forum Place, 4th Floor

4 | West Palm Beach, FL  33401

5 | Telephone:  561-689-8180

6 | Facsimile:  561-684-9683

7 |

8 | Attorneys for Plaintiff

9 |

10 | **UNITED STATES DISTRICT COURT**

11 | **SOUTHERN DISTRICT OF FLORIDA**

12 |

13 |

14 | MAUREEN STEVENS, as Personal

15 | Representative of the Estate of

16 | ROBERT STEVENS, Deceased, and

17 | on behalf of MAUREEN STEVENS,

18 | Individually, NICHOLAS STEVENS,

19 | HEIDI HOGAN and CASEY STEVENS,

20 | Survivors,

21 |

22 |     Plaintiffs,

23 |

24 | vs

25 |

26 | UNITED STATES OF AMERICA,

27 |     Defendant.

28 |

**DECLARATION OF RICHARD L. WADE, PH.D., M.P.H.**

DATE: JUNE 16, 2011

TIME: 4:00PM

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

REMOVED FROM PROTECTIVE ORDER NO. 3

1

*Declaration of Richard L. Wade*

I, Richard L. Wade, Ph.D., M.P.H., declare as follows:

1.      I am a Principal Scientist in Exponent's Health Sciences practice and I have personal knowledge of the facts contained in this declaration, except as to those matters stated upon information and belief.  I am competent to testify as to the facts stated herein, and, as to those matters stated upon information and belief, I believe them to be true.

2.      I have been retained on this matter by counsel for Maureen Stevens to offer opinions on the issues surrounding the access, control, and safe handling of Anthrax spores from the United States Army Medical Research Institute of Infectious Diseases (USAMRIID) laboratory that allegedly caused the death of Robert Stevens, a former resident of Palm Beach, Florida.  This Anthrax was used as a terrorist weapon that infected 22 individuals and killed five.

3.      The focus of my opinions will be directed at the safe handling of highly pathogenic organisms in secure biohazard laboratories, and security precautions that should be taken in such facilities to prevent external and internal threats made through the inappropriate use of these pathogenic organisms.

4.      I am a health scientist trained in public health, environmental sciences and engineering. I hold a B.S. in biological chemistry, a Masters degree in Public Health, and a Ph.D. in environmental sciences and engineering.  I have expertise by training and experience in the history of biological terrorism.  I have worked in high hazard microbiological laboratories, and in enforcing bio-safety standards in research facilities that use high hazard microbiological agents.  I have also investigated deaths and disease from improper safeguards in high hazards laboratories. In the last 10 years, I have worked on several national study groups on terrorism established by the Department of Defense under the auspices of the National Academy of Science. These study groups on terrorism include risk and prevention of both foreign and domestic bioterrorist attacks.  From 2003-2005, I co-chaired a national study on "The Role of US Naval Forces in the Global War on Terrorism". In 2002, I was a member of a National Academy of Science study that reported on the status of "Force Protection from Chemical and Biological Terrorism."

5.      I have worked as a public health officer for city and state governments and I have been responsible for prevention of the spread of infectious disease through air, water, occupational

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

exposures, food and poor sanitation. I developed standards for microbiological quality and biosafety practices in the work place.  In addition, I have enforced such standards. As an adjunct clinical professor of Medicine at UCSF in the 1980-1998, I was involved in setting safety procedures and safeguards for the handling of high hazard infectious biological materials from HIV patients.

6.     I have also taught environmental health at several universities including the University of Washington, University of Minnesota, University of California San Francisco Medical Center, and the University of California, Irvine.

7.     I hold a Top Secret SCI national security clearance.

8.     I am a National Associate of the National Academy of Sciences.

9.     A copy of my Curriculum Vitae is attached.

10.     It is my opinion that the work at US Army Medical Research Institute of Infectious Diseases (USAMRIID) involved the handling of highly pathogenic bacteria.  These pathogenic bacteria, including Anthrax, could be used by terrorists, both domestic and foreign, as weapons of mass destruction.  If there were accidental releases of these organisms from the laboratory building, they could become a major public health threat to the surrounding base and beyond.  If internal biohazard control efforts failed, the presence of these organisms would be a significant risk to the scientists and staff working in these laboratories.  For these reasons, these highly pathogenic and toxin-producing materials were intended to be handled in biosafety control facilities designated as P-2, P-3, and P-4. P-4 facilities are designated for handling of the most hazardous biological materials for which there is no vaccine or effective treatment.  The Anthrax work performed at USAMRIID was in P-3 facilities

11.     There is a history of Bioterrorism worldwide and within the US.  Eighteen separate incidents have been recorded, whereby highly pathogenic microbes and/or toxins have been maliciously used to inflict human casualties. The agents reported to have been used included influenza virus, Rican, Salmonella, and Anthrax bacteria.

12.     In P-3 facility research laboratories, security is provided through physical barriers, air filters, inventory control, access control, biological agent control, secured professional employees working in the facility, training, clear and precise procedures and policies, situational awareness, tight staff

*Declaration of Richard L. Wade*

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

1  supervision and audit oversight (CDC, 2009, p. 105-106).[1], [2]

2  13.    My opinions will neither address issues of guilt or innocence of any individual, nor the

3  ability of individuals or the USAMRIID labs to produce the spores that were found in the letters sent

4  to Senators and the media.  I will also not opine on the use of scientific methods as part of the FBI

5  investigation or the perpetrator of the crimes.

6  14.    My opinions will focus on the principles of management of high-hazard environments,

7  including biosecurity facilities and the deficiencies found at the USAMRIID facilities.

8  15.    In total, a known 22 victims contacted Anthrax as a result of exposure of mailings in

9  envelopes containing Anthrax bacteria. Of these 22 victims, 11 suffered cutaneous Anthrax by

10  absorption through the skin and 11 contacted inhalation Anthrax.  Five of the inhalation Anthrax

11  victims died as a result of the Anthrax exposure. The strain of Anthrax was identified as the Ames

12  strain, which was isolated in Texas in 1981 and shipped to the USAMRIID facility.  The FBI

13  determined that these letters were sent between September 17-18, 2001 and October 9, 2001.

14  Studies further defined the Ames strain of Anthrax as originating from the flask identified as RMR-

15  1029.  This strain had been created and maintained by Dr. Bruce Ivins, a principle investigator in the

16  Division of Microbiology at the USAMRIID laboratories.

17  16.    Based on my review of material provided to me, as well as material I have collected and

18  referenced herein, I offer the opinion that the USAMRIID physical security, biohazard operations

19  controls, and personal security were deficient.  My statements below provide the basis and reasons

20  supporting my opinions.

21  17.    In the fall of 2001, the policy for control of hazardous materials in the USAMRIID

22  laboratories was covered under AR 70-65 (Effective as of September 1, 1979).  Under this policy,

23  the commander of each facility was to set forth programmatic efforts to:

24  • Manage controlled substances so defined including biological hazards in their facility

25

26

27  [1] Biosafety in Microbiological and Biomedical Laboratories, 5th edition, Centers for Disease Control and Prevention, National Institutes of Health, HHS Publication No. (CDC) 21-1112, December 2009.

28  [2] Demmin, G.L.  2007.  Biosurety, Chapter 23 in Medical Aspects of Biological Warfare (eds. Lenhart, Lounsbury, and Martin), Office of The Surgeon General and Borden Institute.

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

- Establish and implement internal review procedures to ensure the use of controlled substances as warranted and authorized in pursuit of legitimate research operations

- Establish and maintain an ongoing education program on hazards and awareness

- Appoint a qualified person as the controlled substance program manager

- Conduct periodic audits on the location and qualities of controlled substances, including harmful biological agents

18.    It is my opinion that the operations in USAMRIID did not comply with the above facility requirements, as detailed in my statements below.

19.    It is also my opinion that the laboratory did not comply with good management practices that should be understood by any scientists working in high-hazard microbiological facilities, as well as its own requirements under Army Regulation (AR) 385-69.

- Although a more recent edition is available, the Centers for Disease Control and Prevention (CDC) published its 4th edition of "Biosafety in Microbiological and Biomedical Laboratories" in April 1999, which was prior to the Anthrax letters events in 2001.  CDC (1999) recommended Anthrax, in its use relevant to this case, as a Biosafety Level 3 agent (p. 89).  At this Biosafety level, laboratory access should be restricted (p. 28, 29).  Also, training should be conducted (p. 27), clean-up procedures established (p. 29), safe handling of material defined (p. 29), routine risk assessments conducted to identify potential hazards (p. 77), and other measures taken to assure good laboratory management practices.

- Appendix F of CDC 1999 recommends laboratory security and emergency response guidance for agents requiring biosafety and biosecurity measures (Office of Health and Safety, 2002).

- Under AR 385-69, the Assistant Secretary of the Army is responsible for establishing an effective Biosafety program and identifying the responsibilities of all parties to assure compliance with AR 385-69.  These parties include the Director of Army Safety of the Office of the Chief of Staff, the Surgeon General, the commander of US Army Medical Research and Development Command, and Commanders of major Army commands with a biological defense program mission (AR 385-69, December 1993, Chapter 1, p. 1).

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

1 • Training, emergency preparedness with written Standard Operating Procedures, labeling and

2 posting of hazards, and maintenance controls are also regulated for biological research programs

3 (AR 385-69, December 1993, Chapter 2, p. 2).

4 20. In November 2001, General M. Keane, USA Vice Chief of Staff, sent a request to the Army

5 Inspector General's office asking that a review be conducted on the security and operation controls

6 in place at three US Army research laboratories that worked with highly infectious biological agents.

7 This review included the USAMRIID facility.  In January 2002, a report was issued by the Inspector

8 General of the Army.[3]

9 21. In that review, the Inspector General's report identifies deficiencies in security clearances of

10 employees, inconsistent enforcement of security requirements, and the lack of accountability for

11 stockpiles of biological agents.  There was minimal compliance with CDC's guidelines for working

12 in biohazardous environments[4] and these were inconsistent, often times verbal and not documented.

13 22. In September 2002, The Sandia National Laboratories (SNL) issued a report on their

14 biosecurity audit of the USAMRIID laboratories in April-May of 2002.

15 23. In that report, the SNL team focused on the control of high consequence pathogens and

16 toxins (HCPT) held at the USAMRIID facility.[5]

17 24. SNL's audit report found overall that the laboratories lacked a security culture.  They found

18 that research was conducted as the priority mission, without treat security an an important part of

19 laboratory operations.  SNL did not find any comprehensive security plan in place, as one would

20 expect to see at a facility with stockpiles and has ongoing usage of high consequence pathogens and

21 toxins.  They could not find any accountability for either stock agents or working stocks of

22 biological agents.  SNL also observed unarmed, lightly trained security staff with minimal training in

23 biological hazards and who had inadequate knowledge of the location of the pathogens within their

24 laboratory.  Access control for all staff and visitors was inadequate and employees were noted to be

[3] Memorandum for Vice Chief of Staff, Army Jan 25, 2002. Subject DAIG Special investigations (US Army Biological Defense Programs _ Anthrax (FY 02)- Actions Memorandum.
[4] Biosafety in Microbiological and Biomedical Laboratories, 4th Edition – Centers for Disease Control and Prevention and National Institutes for Health, 1999.
[5] Security Review of the United State Army Medical Research Institute of Infection Diseases Fort Detrick, Maryland – Sandia National Laboratories September 2002

REMOVED FROM PROTECTIVE ORDER NO. 3                6
*Declaration of Richard L. Wade*

1   entering through security doors in groups, thus not accounting for the employees in the building.

2   Access control seemed to be more by familiarity than through the use of access control badges or

3   sign in/out procedures.  SNL also found no access alarms.  In some cases, employees were allowed

4   access to the building with biological agents prior to completion of security clearance checks.  SNL

5   did not find any chain of custody as to who in the laboratory had what containers of pathogens in

6   their labs at any given time.

7   25.      In the above audits of the USAMRIID facility, both sets of investigations (SNL and the

8   Army Inspector General team), found a disconnect between the facility commander, the department

9   heads, scientists and security.  It is my opinion that this attitude and demonstrated practices is in

10  conflict with security program requirements, where the operational managers need to take

11  responsibility for security.  Furthermore, the audits did not find procedures and practices in place

12  that would assure effective implementation of security steps around and in the laboratory.  It is

13  critical to have a secure workforce within any bio-hazard laboratory.  A personal security assurance

14  effort is essential to assure both the protection of the employees of the lab and the public.  Given the

15  nature and small size of these highly pathogenic weapons, it is relatively easy to either mistakenly or

16  maliciously mishandle these bio weapons.

17  26.      USAMRIID had in place a personal reliability program, which required that personnel be

18  cleared physically and mentally for work in the labs.  Aside from the obvious security needs, this

19  screening process is important to assure that workers can appropriately use the required level of

20  personal protective equipment, including air filtration respirators and work in semi-confined spaces

21  with dangerous organisms, without causing personal injury or anxiety.

22  27.      The laboratories have a medical office that has responsibility of initially screening and

23  annually reviewing all employees' physical and mental health, and of assuring that employees are

24  able to work in this environment without being a danger to themselves, their fellow employees, or

25  the general public.

26  28.      In a report for the court, a panel of renowned psychiatrists found that in the case of Dr. Bruce

27  Ivins, the medial review functions of the laboratory were very deficient.  The panel's findings

28  support the Department of Justice's determination that Dr. Ivins was responsible for the attacks (p.

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

*Declaration of Richard L. Wade*

1-2 of Executive Summary).  In addition, the panel found that Dr. Ivins had signs and symptoms that should have been clear to any medical reviewer checking on his qualifications as a scientist working with these pathogen organisms.  It is the panel's opinion, based on their review of the medical records and files, that Dr. Ivins exhibited the potential, the means, and the motivation to carry out the attacks.  It is their opinion that, with proper medical review by the laboratory medical staff and his supervisor, the acts of murder were preventable and that Dr. Ivins should have been excluded from the laboratory long before the mailing of the Anthrax spores.[6]

29.     The USAMRIID laboratory had in its possession deadly Anthrax bacteria.  The laboratory routinely stored, shipped, tested, and conducted research on Anthrax to substantiate its extreme hazard through repeatedly killing both rodents and monkeys with the Anthrax bacteria.

30.     The USAMRIID laboratory had the expertise, training, and knowledge to fully understand the extreme risk that release of these Anthrax bacteria would have on both employees and the public.

31.     The laboratory did not have an adequate security system in place to prevent access to the laboratory and highly pathogenic bacteria by persons not cleared by security.

•       Security clearances for several employees of the US Army Biological Defense Program for Anthrax "had lapsed and their five or ten-year periodic reinvestigations were outdated.  Additionally, these individuals did not have their access restricted to hazardous biological materials during the reinvestigation process.  Some workers, originally hired to occupy noncritical-sensitive positions have been upgraded to critical-sensitive without proper clearances.  One individual with dual citizenship was granted an interim security clearance." (Department of the Army Inspector General, November 2001, p. 2-4, Finding 001, Inspection Result #1a)

•       Employees within the US Army Biological Defense Program for Anthrax in different organizations may perform similar duties, yet have varying personnel security investigations requirements due to different position codes.  "As such, there is a significant variation in the personnel security investigations of individuals having access to hazardous biological materials."

---

[6] Report of the Expert Behavioral Analysis Panel – Research Strategies  Network  Report  Submitted  to Honorable Chief Judge Royce C Lambert,  August 23 2010.2011

SCHULER  HALVORSON  &  WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

REMOVED FROM PROTECTIVE ORDER NO. 3

8

*Declaration of Richard L. Wade*

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

1   (Department of the Army Inspector General, November 2001, p. 2-4, Finding 001, Inspection Result

2   #1b)

3   •   The facilities lack written standard operating procedures that are current and valid

4   (Department of the Army Inspector General, November 2001, p. 2-12, Finding 004, Inspection

5   Result #1d)

6   •   Access through the front door is controlled by civilian security guards and military medical

7   personnel who have no documentation to show that they have received any type of security/response

8   training (Department of the Army Inspector General, November 2001, p. 2-13, Finding 004,

9   Inspection Result #2a).

10   •   "Permanent employees are provided with an electronic badge while visitors are given a

11   visitors badge of the type that has been in circulation since 1987.  The electronic badge controls

12   access through magnetic slide-type doors.  Although visitors are not issued this type of badge, two

13   inspectors were able to gain access through two restricted areas by piggybacking with other

14   permanent employees."  (Department of the Army Inspector General, November 2001, p. 2-13,

15   Finding 004, Inspection Result #2b)

16   •   "Although local policy dictates that all bags, packages, and backpacks be checked upon entry

17   into the facility, such checks were not being done consistently.  Even though the facility recognizes

18   that the biggest threat to this facility is an internal threat, personal items such as brief cases and bags

19   are not checked on the way out."  (Department of the Army Inspector General, November 2001, p.

20   2-13, Finding 004, Inspection Result #2c)

21   •   "No additional checks of bags are conducted when personnel enter or leave higher biosafety

22   levels."  (Department of the Army Inspector General, November 2001, p. 2-13, Finding 004,

23   Inspection Result #2d)

24   •   "Doors that lead to power supplies and air vents were unsecured."  (Department of the Army

25   Inspector General, November 2001, p. 2-13, Finding 004, Inspection Result #2e)

26   •   "Personnel authorized to receive keys/possess combinations are not designated by an official

27   who is aware if they have continued access."  (Department of the Army Inspector General,

28   November 2001, p. 2-13, Finding 004, Inspection Result #3e)

1   •     No person acting alone is allowed to access or use the key(s) or combination(s) to the lock(s)

2   on the controlled hazardous biological substances (CHBS) reference stock repository or container(s)

3   unless accompanied by another individual.  This rule is to be enforced continuously (AR 70-65,

4   Chapter 3, # 3-3.c.2, p. 3-1).

5   32.   USAMRIID did not have an adequate inventory or control system in place to track the

6   locations and use for these pathogenic organisms.

7   •     No common standard was observed for oversight of the Biological Defense Research,

8   Development, Test, and Acquisition operations for the US Army Biological Defense Program for

9   Anthrax.  The only Army Command actively involved in the Biological program was AR 70-65,

10  which has not been updated since it was published in September 1979, and it is not well-known or

11  adhered to (Department of the Army Inspector General, November 2001, p. 2-7, Finding 002,

12  Inspection Result #1).

13  •     There is no standard Army policy for the management and control of Anthrax stocks.  While

14  Army Regulation 70-65 has not been superseded and is still considered current, the inventory

15  guidance established in paragraph 3-3d is not being followed.  Local guidance concerning this matter

16  has been published, but it is not being followed either (Department of the Army Inspector General,

17  November 2001, p. 2-9, Finding 003, Inspection Result #1).

18  •     There is no readily identifiable way to determine if a biological agent is present in a

19  particular room.  A room may be a Biosafety Level 3 or 4 room, but the material may not necessarily

20  be present (Department of the Army Inspector General, November 2001, p. 2-10, Finding 003,

21  Inspection Result #6).

22  •     The facilities do not have a physical security plan to address basic physical security practices

23  applicable to biological material (Department of the Army Inspector General, November 2001, p. 2-

24  12, Finding 004, Inspection Result #1a).

25  •     It was also found that a formal vulnerability assessment, which would ensure that

26  vulnerabilities associated with biological material are addressed, has not been conducted at any of

27  the facilities storing biological material (Department of the Army Inspector General, November

28  2001, p. 2-12, Finding 004, Inspection Result #1b).

REMOVED FROM PROTECTIVE ORDER NO. 3

*Declaration of Richard L. Wade*

**SCHULER HALVORSON & WEISSER**
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

1  •      "A Physical Security Inspection of rooms containing biological material has not been

2  conducted by either the installation or the next higher commands."  (Department of the Army

3  Inspector General, November 2001, p. 2-12, Finding 004, Inspection Result #1c)

4  •      Inventories and submitted reports should have been executed at least yearly to reflect

5  quantities of controlled hazardous biological substances, and the audit trail maintained by the

6  Commanding General of USAMRIID (AR 70-65, Chapter 3, # 3-3.d, p. 3-1).

7  33.      USAMRIID did not have a physical lock for security of freezers, coolers, or other storage

8  areas for these highly pathogenic bacteria.

9  •      "Access to the biological material rooms as well as the refrigerators/cabinets is possible by

10  only one individual due to having only one lock protecting each of these sites" (Department of the

11  Army Inspector General, November 2001, p. 2-13, Finding 004, Inspection Result #3a).

12  •      AR 70-65 clearly states that no person acting alone is allowed to access or use the key(s) or

13  combination(s) to the lock(s) on the controlled hazardous biological substances reference stock

14  repository or container(s) unless accompanied by another individual, a two-man rule required to be

15  enforced continuously (AR 70-65, Chapter 3, # 3-3.c.2, p. 3-1).

16  •      "There are combination locks on doors containing biological material.  There is no record of

17  who controls these combinations or when they have been changed."  (Department of the Army

18  Inspector General, November 2001, p. 2-13, Finding 004, Inspection Result #3b)

19  •      "There are several different types (high, medium and low security) of locks on containers

20  with biological material.  There was no inventory and/or accountability of these locks."  (Department

21  of the Army Inspector General, November 2001, p. 2-13, Finding 004, Inspection Result #3c)

22  •      "There is a chain link door that houses numerous refrigerators containing BSL [Bio Safety

23  Level] 3 and BSL 4.  Some of the refrigerators have built in locks, some only have the factory

24  installed locks and two were found unsecured."  (Department of the Army Inspector General,

25  November 2001, p. 2-13, Finding 004, Inspection Result #3d)

26  34.      USAMRIID did not have an adequate personal clearance and annual review program that

27  would qualify employees for work in the lab based on physical and or mental health conditions.

28

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

SCHULER HALVORSON & WEISSER

1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

- Individuals were found with neuropsychiatric disorders, histories of alcohol dependence, claustrophobia, and asthma with no documentation that they had been cleared to work or were restricted.  No apparent systems were in place to coordinate this information with the staff (Department of the Army Inspector General, November 2001, p. 2-5, Finding 001, Inspection Result #2).

- Determining individual reliability and documenting the conclusions prior to employees having access to hazardous biological materials is considered critical for countering internal threats. USAMRIID was found to have no standards for potentially disqualifying information to be used as a guide during these screenings (Department of the Army Inspector General, November 2001, p. 2-9, Finding 003, Inspection Result #2).

- There is no requirement for biological defense workers to inform supervisors whenever their reliability status changed, or for supervisors to determine changes in an employee's reliability.  "For example, if a worker is put on a narcotic pain medication or is undergoing a period of extreme emotional turbulence, this information is currently not required to be self-reported by the worker to the supervisor prior to resuming assigned laboratory duties" (Department of the Army Inspector General, November 2001, p. 2-9, Finding 003, Inspection Result #3).

- "Employees with access to hazardous biological materials are not in testing designated positions (TDP) to monitor for illegal drug use.  However, it appears that such personnel perform duties, which clearly fall within the parameters of Executive Order 12564, Drug-Free Federal Workplace (i.e., national security or other functions requiring a high degree of trust and confidence)" (Department of the Army Inspector General, November 2001, p. 2-9, Finding 003, Inspection Result #4).

- Dr. Ivins was determined to have a "significant and lengthy history of psychological disturbance and diagnosable mental illness at the time he began working for USAMRIID in 1980…that would have disqualified him from a Secret level security clearance had they been known. Such disqualification would have prevented him from having access to Anthrax prior to and after 2001" (Report of the Expert Behavioral Analysis Panel, Amerithrax Case, 2011, p. 15, Finding #1).

REMOVED FROM PROTECTIVE ORDER NO. 3

*Declaration of Richard L. Wade*

- "Information regarding [Dr. Ivins'] disqualifying behaviors was readily available in the medical record and accessible to personnel had it been pursued under mechanisms that existed prior to and after 2001 (Report of the Expert Behavioral Analysis Panel, Amerithrax Case, 2011, p. 15, Finding #2).

- Background medical record investigators had the opportunity during the security clearance process to request and review available medical records, but did not, despite omissions and inconsistencies in Dr. Ivins' self-reporting (Report of the Expert Behavioral Analysis Panel, Amerithrax Case, 2011, p. 15, Finding #3). "Dr. Ivins had signed multiple waivers of his right to health information privacy." (Report of the Expert Behavioral Analysis Panel, Amerithrax Case, 2011, p. 15-16, Finding #4)

- The US Attorney's Office within the Department of Justice blocked the ability for federal investigators to access Dr. Ivins' medical records based on their interpretation of privacy law and its relationship to mental health and medical records (Report of the Expert Behavioral Analysis Panel, Amerithrax Case, 2011, p. 16, Finding #5).

- As a civilian working within secure USAMRIID laboratories, Dr. Ivins' did not undergo routine drug and alcohol testing (Report of the Expert Behavioral Analysis Panel, Amerithrax Case, 2011, p. 16, Finding #6).

- Even in 2008, a risk assessment with regard to Dr. Ivins' potential harm to his self and to others did not appear to adequately take into consideration the potential significance and imminence of his legal situation (Report of the Expert Behavioral Analysis Panel, Amerithrax Case, 2011, p. 16, Finding #8).

- Despite conclusions of suicidality and homicidality, the psychiatrist who treated Dr. Ivins from 2000-2008 continued to take the position that Dr. Ivins should have full access to agents such as Anthrax (Report of the Expert Behavioral Analysis Panel, Amerithrax Case, 2011, p. 17, Finding #9).

- "Failures in supervision, documentation, and communication allowed Dr. Ivins to avoid scrutiny before and after the Anthrax mailings (Report of the Expert Behavioral Analysis Panel, Amerithrax Case, 2011, p. 17, Finding #10).

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

*Declaration of Richard L. Wade*

35.     There was a management disconnect between the medical screening staff and the laboratory management and division's chiefs at USAMRIID.

•       In the SNL security review, multiple departments at the USAMRIID facility had responsibilities for personal security, but inconsistent or unclear communication was found among the departments:  human resources, security, network administration, operations, personnel security, and international affairs (SNL, 2002, p. 33, par. 7-8).

•       AR 70-65 defines the required roles in the management of controlled hazardous biological substances, as that for the USAMRIID Commanding General, The Surgeon General, and the commander of each Research, Development, Test and Evaluation activity.  Roles of individual responsibility include acquisition, control, maintenance, security, storage, access, key and lock control, inventory, records management, safety and reporting requirement, training, etc. of controlled biological hazardous substances (AR 70-65, October 1979, Chapter 3, p. 3-0 to 3-3).

•       AR 190-51 states that the Deputy Chief of Staff for Operations and Plans has overall staff responsibility for security, including overseeing: unit commanders or activity chiefs in controlling and safeguarding all supply and equipment areas within their command or activity; facility commanders in ensuring security inspections; and commanders and individuals responsible for physical security and selection of personnel (AR 190-51, September 1993, Chapter 1, p. 1-2).

•       Commanders are required to conduct risk analysis or potential activities of espionage, sabotage, terrorism, damage, misuse, or theft at least every 3 years at the discretion of the unit or activity commander or when an incident occurs in which an asset is compromised (AR 190-51, September 1993, Chapter 2, p. 3).

•       Also see relevant supporting detail under #19 regarding AR 385-69 regulation.

36.     The physical security at USAMRIID was deficient in terms of controlled access.

•       See relevant supporting details under #32 and #34 above.  Also:

•       "An analysis of the building structure versus the amount of time it would take a perpetrator to impede protective barriers has not been addressed.  Specifically, such issues as the type of construction, window openings, exposed exterior bolts are not addressed."  (Department of the Army Inspector General, November 2001, p. 2-12, Finding 004, Inspection Result #1e)

REMOVED FROM PROTECTIVE ORDER NO. 3

*Declaration of Richard L. Wade*

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

**SCHULER HALVORSON & WEISSER**
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

1    37.    The USAMRIID laboratory lacked effective perimeter alarms and control of access points.

2    •    See supporting details under #32 and 37 above.  Also:

3    •    "IDS [Intrusion detection systems] is installed on the repository, however it is not tested on a

4    routine basis.  There are no measures in place for when it is inoperable nor is there any record to

5    show when it may have alarmed or malfunctioned.  Additionally, there are no maintenance records

6    on the system."  (Department of the Army Inspector General, November 2001, p. 2-14, Finding 004,

7    Inspection Result #4a)

8    •    "There is no IDS installed on the individual rooms storing biological material."  (Department

9    of the Army Inspector General, November 2001, p. 2-14, Finding 004, Inspection Result #4b)

10    •    "There is no Closed Circuit Television (CCTV) in place either inside or outside the rooms

11    storing biological material.  Not only is this a deterring security measure, it could also aid in

12    ensuring the safety of workers."  (Department of the Army Inspector General, November 2001, p. 2-

13    14, Finding 004, Inspection Result #4c)

14    •    "A review of security policies in place at the laboratories revealed that security personnel are

15    not checking rooms storing biological material."  (Department of the Army Inspector General,

16    November 2001, p. 2-14, Finding 004, Inspection Result #5)

17    38.    There was no surveillance on USAMRIID laboratory operations by the security department.

18    39.    There were no cameras placed in the USAMRIID labs that are required for security as well as

19    fire and personal safety of the employees.

20    40.    It is my opinion that, given the turnover of commanders at the Army base and the turnover of

21    microbiology division heads, that security was never addressed in any comprehensive manner nor

22    was security given a priority. For example:

23    •    At the time of SNL's security review of USAMRIID, there were 678 employees.  Thirteen

24    had Top Secret security clearance and 168 had Secret security clearance.  The remaining 497 had no

25    security clearance (SNL, 2002, p. 32, par. 4-5).

26    •    USAMRIID policy required that all employees have a National Agency check (NAC)

27    initiated (not necessarily completed) prior to having facility and network access.  The NAC process

28    typically took 1 to 8 months (SNL, 2002, p. 33, par. 2).

15

*Declaration of Richard L. Wade*

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401

1
2
3
4

•   Renewal of security clearance based on change in an employee's circumstances or responsibilities over time was not enforced, such as a recent criminal record or deep financial debt, despite the fact that such circumstances could affect the employee's reliability (SNL, 2002, p. 33, par. 3)

5
6
7
8
9
10
11

•   USAMRIID Human Resources (HR) and the Garrison Personnel Security Office did not have an accurate roster of current employees at USAMRIID.  Twelve employees were missing from the HR roster, and 56 additional were listed who were no longer employed with USAMRIID.  The Garrison Personnel Security Office listed 80 individuals who no longer worked at USAMRIID, but 213 current employees were not listed with them.  SNL verified that some of the 213 employees submitted or completed the NAC screening, but all had facility and network access (SNL, 2002, p. 34, par. 1).

12
13
14

41.   It is further my opinion that, had the above physical security, personal security reviews, medical reviews, and biohazard facility controls been in place, these Anthrax spores would not have been used as a weapon of mass destruction, based on information stated above.

15
16
17

42.   In addition to the references above, I have reviewed the Army Regulations AR 70-65 October 1, 1979 and USAMRIID regulation 385-69.  I have also reviewed the depositions of the following:

18   •   Jay Anthony Arrison

19   •   Susan Welkos

20   •   Gerald P. Andrews, Ph.D.

21   •   William R. Bryne, M.D.

22   •   Jerry Bruce Elliott

23   •   Patricia Fellows

24
25

43.   These are my preliminary opinions at this time, based on materials reviewed to date.  I retain the right to change these opinions when and if additional material becomes available.

26
27

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

28   Executed this ___16___ day of June, at Irvine, California.

1

2

3

4

5

6

7   Richard L. Wade, Ph.D., M.P.H.

8   Principal Scientist

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHULER HALVORSON & WEISSER
1615 FORUM PLACE, 4TH FLOOR
WEST PALM BEACH, FLORIDA 33401