**DEPARTMENT OF THE ARMY**
OFFICE OF THE INSPECTOR GENERAL
1700 ARMY PENTAGON
WASHINGTON DC 20310-1700

SAIG-TI   (20-1c)                                      7 November 2001

MEMORANDUM FOR Commander, U.S. Army Medical Research Institute of
Infectious Diseases, ATTN: MCMR-UIZ-ZA, 1425 Porter
Street, Fort Detrick, Frederick, MD  21702-5011

SUBJECT:  DAIG Special Inspection (U.S. Army Biological Defense
Program - Anthrax) (FY 02)

1.  References:

   a.  AR 20-1, Inspector General Activities and Procedures, 16 April
2001.

   b.  Memorandum, Office of the Vice Chief of Staff, HQDA, 5
November 2001, subject: Directive for Special Inspection (U.S. Army
Biological Defense Program - Anthrax).

2.  The Vice Chief of Staff has directed this office to conduct a
special inspection of Army installations storing anthrax.  This
memorandum furnishes planning information for this special inspection
of your organization to be conducted during the period 13-14 November
2001.

3.  The scope of the inspection will be as outlined in reference 1b
(enclosure 1).  Enclosure 2 contains additional guidance regarding the
inspection and lays out information which should be furnished to the
team upon its arrival at your location.  The team chief will acquaint
unit personnel with the conduct of the inspection and coordinate final
details at the entrance briefing.

4.  The inspection team will consist of the following individuals:

| NAME | RANK | SSN | POSITION | CLNC ID Card # |
|------|------|-----|----------|----------------|
| Jerry B. Elliott | COL | | Team Chief | |
| | LTC | | Admin | |
| | MAJ | | Admin | |
| | MSG | | Security | |
| | COL | | Medical | |

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

Printed On ♻ Recycled Paper

ARMY02-010041

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S.; No. 03-cv-81110

Received: 11/ 7/01 16:49;            3016192982 -> OFFICE OF THE COMMANDER USAMRIID; Page 3
07/11 '01 WED 17:12 FAX 3016192982      USAMRMC
NOV-07-01 14:07 FROM:MEDCOM IG                  ID:2217850              PAGE   003

SAIG-TI
SUBJECT:  DAIG Special Inspection (U.S. Army Biological Defense
Program - Anthrax) (FY 02)

| NAME | RANK | SSN | POSITION | CLNC | ID Card # |
|------|------|-----|----------|------|-----------|
| ████ ████ | GS13 | ████ | Accountability | ██ | ████ |
| ████ | GS13 | ████ | Accountability | ██ | ████ |

5.  The names, clearances and ID card numbers of additional augmentee
inspectors will be furnished at a later date.  The team members will
require access to classified areas, records, and information relative
to your mission responsibilities.

6.  The Department of Defense Inspector General (DODIG) has asked to
accompany the DAIG team in the execution of its mission.  Personnel
information concerning those individuals is attached as enclosure 3.

7.  Request the name and telephone number of your point of contact be
provided as soon as possible to facilitate inspection planning.

8.  Security clearance information can be verified by contacting the
USAIGA Acting Security Manager, ██ ████████, at ████████.
Security clearance information for ████ can be verified by
contacting the Office of the Surgeon General security manager, DSN
761-0022.

9.  POC and Operations Officer for this inspection is ████████
████ ████████ ████████ ██
commercial ██ ████████; email: ████████████████

FOR THE INSPECTOR GENERAL:

3 Encls                          J. B. ELLIOTT
as                               COL, IG
                                 Chief, Technical
                                 Inspections Division

CF:
Commander, U.S. Army Medical Research and Materiel Command, ATTN:
   MCMR-RCQ-S, Fort Detrick, Frederick, MD  21702-5012
Office of the Surgeon General, ATTN: DASG-ZA, 5109 Leesburg Pike,
   Falls Church, VA  22041-3258

"This document contains information
EXEMPT FROM MANDATORY DISCLOSURE
under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except
as authorized by AR 20-1."

FOR OFFICIAL USE ONLY

ARMY02-010042

Received: 11/ 7/01 16:49;          3016192982 -> OFFICE OF THE COMMANDER USAMRIID;  Page 4
07/11 '01 WED 17:13 FAX 3016192982      USAMRMC                                         ☑004
NOV-07-01 14:07 FROM:MEDCOM IG                      ID:2217850                      PAGE



DEPARTMENT OF THE ARMY
OFFICE OF THE VICE CHIEF OF STAFF
201 ARMY PENTAGON
WASHINGTON DC 20310-0201

REPLY TO
ATTENTION OF

5 NOV 2001

MEMORANDUM FOR THE INSPECTOR GENERAL

SUBJECT: Directive for Special Inspection (U.S. Army Biological Defense Program - Anthrax)

1. You are directed to conduct a special inspection of Army installations storing anthrax.

2. The special inspection will focus on, but not be limited to, the accountability and physical security procedures for anthrax bacterium in storage at U.S. Army installations and the current system of DA/MACOM oversight. As a minimum, you will:

   a. Assess the adequacy of policies governing U.S. Army Biological Defense Programs for Anthrax and identify systemic problems in execution.

   b. Assess the efficacy of existing oversight programs for anthrax research, development and acquisition.

   c. Assess guidance regarding anthrax accountability, inventory management, and personnel training/screening, to include a current rollup of the DA anthrax inventory.

   d. Assess the adequacy of physical security measures for protection of anthrax stocks at Army installations.

3. You are authorized to task the Army Staff and subordinate headquarters for those resources needed to ensure accomplishment of the mission. You are authorized unlimited access to the Army Staff and other Army agencies necessary to complete this inspection.

4. You will provide me a report at the conclusion of the assessment.

JOHN M. KEANE
General, United States Army
Vice Chief of Staff

Encl 1

ARMY02-010043

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S.; No. 03-cv-81110

# GENERAL INFORMATION AND REQUIREMENTS FOR SPECIAL INSPECTION
## U.S. ARMY BIOLOGICAL DEFENSE PROGRAM - ANTHRAX

1. **General Guidance**: AR 20-1 and VCSA 5 November 2001 memorandum are the authority for the inspection. VCSA memorandum outlines the purpose and scope of the inspection.

2. **Specific Information Required**. Please provide the following to the Operations Officer upon arrival:

   a. An organization chart identifying key staff personnel.

   b. A current mission statement and organization and functions manual. If not readily apparent, please indicate those mission functions which are related to your biological defense mission.

   c. Command, installation, or activity memoranda identifying and assigning biological defense responsibilities.

   d. Supplements to regulations, installation peculiar policy documents, letters of instruction, and a listing of all SOPs (active and inactive) which serve as guidelines for your biological defense mission.

   e. Copies of Memorandums of Understanding or Agreement with any external organization providing biological defense program support.

   f. A list of current biological defense-related waivers and exceptions and a chronological description of actions taken with respect to each.  ← ?

   g. A list of personnel whose primary duties involve biological defense programs.

   h. A proposed itinerary of inspection events for the time period covered by the inspection. Briefing requirements are detailed in paragraph 5. The Operations Officer will assist you with finalizing the itinerary prior to our arrival.

   i. A copy of your current TDA.

3. **Access to Documents**. We will require access to all documents which support or impact upon the installation's, organization's, or activity's biological defense mission. These will typically include mission statements; organization and functions manuals; operational plans; TOE/TDA; training records which support qualifications of personnel performing biological defense-related functions; SOPs;

"This document contains information which is EXEMPT FROM MANDATORY DISCLOSURE under the FOIA."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

1

ENCL 2

ARMY02-010044

Received: 11/ 7/01 16:50;                3016192982 -> OFFICE OF THE COMMANDER USAMRIID; Page 6

07/11 '91 WED 17:13 FAX 3016192982        USAMRMC                                            FAGE        006

NOV-07-01 14.08 FROM:MEDCOM IG                           ID:2217850

regulations; technical and field manuals; and various technical
publications. Please have copies available of all reports of previous
inspections and technical assistance visits conducted within the past
two years at your location.

4.  **Records.**  A review of personnel, security and medical records will
be conducted to assess personnel hiring and retention policies within
your biological defense programs.  Please notify the commanders of the
supporting Regional Personnel Center Activity, the supporting Civilian
Personnel Operations Center, Supporting Security Activity (SSA), and
the supporting medical and dental treatment facility of the dates of
the inspection.  A knowledgeable individual from each supporting
organization should be present to answer any questions which may arise
during the records inspection.  Personnel, medical and dental records
will be requested for review on the first day of this inspection.

5.  **Briefing Requirements.**  To orient the inspection team, please
provide a short briefing to cover general information, including
introductions of key personnel; the installation's, organization's, or
activity's biological defense mission, including command structure,
organizational relationships and responsibilities, and support
provided by external agencies; biological defense program management;
current biological defense problems and corrective actions planned or
initiated.

6.  **Administrative Support Requirements.**  The inspection team will
require the following administrative support:

   a.  Badging (if required) to permit access to restricted areas and
facilities.

   b.  A room where classified entrance and exit briefings can be   ← not necessary
conducted.

   c.  A team meeting room where the inspection team can assemble and
discuss classified matters privately.

   d.  A Class A telephone in the team meeting room.

   e.  A laser printer compatible with *Microsoft Word for Windows.*

"This document contains information which is
EXEMPT FROM MANDATORY DISCLOSURE
under the FOIA."

"Dissemination is prohibited except
as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2

ARMY02-010045

REMOVED FROM PROTECTIVE ORDER NO. 3
~~SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S., No. 03-cv-81110~~

Received:  11/ 7/01 16:50;        3016192982 -> OFFICE OF THE COMMANDER USAMRIID;  Page 7
07/11 '01 WED 17:14 FAX 3016192982        USAMRMC                              @007
NOV-07-01 14:00 FROM:MEDCOM IG                    ID:2217050                     PAGE



### INSPECTOR GENERAL
DEPARTMENT OF DEFENSE
400 ARMY NAVY DRIVE
ARLINGTON, VIRGINIA 22202-4704

November 7, 2001

DUPLICATE

The Inspector General
ATTN: SAIG-TI
1700 Army Pentagon
Washington DC 20310-1700

SUBJECT: DoD IG Visit with Army IG Team

This certifies the U.S. citizenship, security clearance, and completion of Antiterrorism Force
Protection Training of the following named AUD-RLS individuals who will visit the facilities listed:

| VISITOR'S NAME, SSN, & DPOB | PASSPORT NUMBER | CLEARANCE DATE |
|---|---|---|
| Barnes, Michael J., 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 | 0444619028 | TOP SECRET – 08/28/00 |
| DPOB: 11/28/60, Pensacola, FL | | |
| Davis, Sean A., 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 | None | SECRET – 08/11/97 |
| DPOB: 07/14/75, Fairfax, VA | | |
| *Fossel, Sandra L., 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 | None | SECRET – 12-15-97 |
| DPOB: 09/19/54, York, PA | | |
| **Klemstine, Evelyn R., 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 | 801253916 | TOP SECRET- 09/09/98 |
| DPOB: 06/25/58, Hamburg, Germany | | |
| ***Young, Shelton R., 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 | Pending Update | TOP SECRET – 03/21/00 |
| DPOB: 11/11/46, New Brunswick, NJ | | |
| Vojtecky, Mark A., 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 | Pending Update | SECRET – 04-25-01 |
| DPOB: 06/18/58, Waldorf, MD | | |

*Project Manager      **Program Director      *** Director, Readiness & Logistics Directorate
### END OF LISTING
Facility to be visited: All biological facilities identified by the Army Inspector General
Person to be contacted: Colonel J. Bruce Elliott, (703) 601-1161
Period of visit: November 12, 2001 through November 30, 2001
Purpose of visit: Evaluation of Security Controls at Biological Facilities
(Project No. D2002LG-0005)
Division contact: Lt Colonel Michael J. Barnes, (703) 604-9611 or DSN 604-9611
Clearance verification contact: DoDIG Security, (703) 604-9715 or DSN 664-9715

Gary C. Llewellyn
Chief, Security Division

"Privacy Act Information"
In compliance with the Privacy Act of 1974, this information is Personnel Data and must be
protected from public disclosure.

ENCL 3

ARMY02-010046

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S.; No. 03-cv-81110



# HEADQUARTERS
## U.S. ARMY MEDICAL COMMAND

COMMANDER
U.S. ARMY MEDICAL COMMAND
ATTN: MCIG
FT SAM HOUSTON, TX 78234-6000

(210) 221-6017/
DSN 471-6017/
FAX    - 7850

| TO: LTC Carr | | | | 301-619 4625 |
|---|---|---|---|---|

| CLASSIFICATION | PRECEDENCE | NO. PAGES (Including this Header) | DATE-TIME | MONTH | YEAR | RELEASER'S SIGNATURE |
|---|---|---|---|---|---|---|
| UNCLAS | R | 14 + 16 | 6 1550 | Mar | 02 | DBMcCready |

O NOT PROCESS. STORE OR TRANSMIT CLASSIFIED INFORMATION ON NON-SECURE TELECOMMUNICATIONS
YSTEMS. OFFICIAL DOD TELECOMMUNICATIONS SYSTEMS. INCLUDING FACSIMILE.

ACHINES ARE SUBJECT TO MONITORING FOR TELECOMMUNICATIONS SECURITY PURPOSE AT ALL TIMES.
BE OF THIS COMPUTER SYSTEM CONSTITUTES CONSENT TO TELECOMMUNICATIONS SECURITY MONITORING.

LTC Carr
Per Your Request
Note — OFFICIAL USE ONLY
— Close Hold —

Col Mc

MAR-06-02 16:13 FROM:MEDCOM IG
Received: 3/ 6/02 17:01;

221850 + OFFICE OF THE COMMANDER USAMIIDC Page 1
ID:221785850                    PAGE  1/16

ARMY02-010047

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S., No. 03-cv-81110

## Chapter II

### Findings

#### General

Three different laboratories were inspected, each owned by a separate Army MACOM - AMC, ATEC, and MEDCOM. Each laboratory was taking a different approach because there is no standard Army policy in effect for the accountability and security of Army anthrax stocks. While AR 70-65, Management of Controlled Substances, Ethyl Alcohol, and Hazardous Biological Substances in Army Research, Development, Test, and Evaluation Facilities, 1 September 1979, has not been superceded and is still considered current by some, two of the three laboratories (and their MACOMs) were not aware of its existence. The third laboratory was not following this regulation since they felt it was so outdated.

Each laboratory is making an effort to account for and protect their anthrax stocks in their own way. Each approach is largely based upon their own experiences and preferences. Local guidance concerning these matters has been established, but it is not always written and specific and is sometimes oral and implied. Some of the self-imposed requirements are a result of the permitting process established by a non-DOD agency - the CDC. Traditional Army methods of accounting for property are simply not realistic for a living organism. Furthermore, it is not clear if anthrax (or any other biological agent for that matter) is considered to be "Army property" with all the normal controls and responsibilities inherent thereto.

Biological agents and pathogens under the direct control of the U.S. Army are not afforded a standard, minimum level of protection similar to that, which is mandated for nuclear and chemical weapons. It must be noted, however, that there was no evidence during this inspection that any of the Army's anthrax stockpile is missing or has been misused. However, as noted earlier, that statement reflects the elusive nature of the organism in question and cannot be guaranteed to be completely accurate since there is no countable historical baseline from which to start and no scientific method by which additions and subtractions to the stockpile can be objectively measured. Since these agents are so difficult to inventory in the traditional sense, trusted personnel are perhaps more important in the control and protection of these items than for other special weapons for which the Army is responsible.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA, Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2-1

ARMY02-010048

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S., No. 03-cv-81110

While existing biological agent guidance embodied in AR 70-65 may have been sufficient for 1979, it may not be sufficient in today's environment. The ARSTAF must determine whether it wants to manage the Biological Defense Program as it manages the Army's nuclear and chemical weapons programs, or merely update existing guidance and continue to leave the three MACOMs involved free to determine their own requirements.

Absent quantifiable, achievable and verifiable accountability and inventory requirements for anthrax, security of the stockpile by default is based upon trusted personnel from within and physical security barriers from without. However, Army personnel screening and hiring requirements for individuals working in the Bio-Safety Level 3 & 4 labs are not extraordinary and do not include the continuing evaluation mandates that are a vital aspect of personnel reliability programs that protect our national nuclear and chemical assets. Physical security standards are not consistent throughout and are often based upon local interpretation and application of Army 190-series regulations or derive a collateral benefit from other security programs in place for that building, such as a pharmacy or chemical surety laboratory.

There is no visible oversight program for biological agent accountability or security being conducted by either the MACOMs or HQDA. There is a periodic DA biological defense safety inspection program mandated for the Army Safety Office by AR 385-69, Biological Defense Safety Program, but their mission is largely limited to safety.

It is critical that the research being conducted by Army laboratories is not unduly hindered as the Army Staff addresses this issue and proposes remedies. Therefore, it is vital that the scientific community be given a key role in determining what improvements can be realistically made to the biological defense management program and not simply adopt a nuclear/chemical surety-like program on a word-for-word basis.

While designated the DOD Executive Agent for Biological Defense by DOD Directive 5160.5 (Responsibilities for Research, Development, and Acquisition of Chemical Weapons and Chemical and Biological Defense), the Army should ensure that any new management initiatives for its laboratories are compatible with the standards established for other DOD and military service biological defense research laboratories.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

FOR OFFICIAL USE ONLY

ARMY02-010049

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S., No. 03-cv-81110

While the focus of this inspection was upon the control and management of Army anthrax stocks, it should be noted that the findings, recommendations, and conclusions could be applied to virtually any biological agent, pathogen, or toxin in the Army's inventory.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2-3

ARMY02-010050

REMOVED FROM PROTECTIVE ORDER NO. 3

SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S.; No. 03-cv-81110

## Observations

**FINDING 001:**  Policies governing U.S. Army Biological Defense Programs for anthrax are inadequate.  Execution of current procedures needs improvement.

**OBJECTIVE:**  Assess the adequacy of policies governing U.S. Army Biological Defense Programs for anthrax and identify systemic problems in execution.

**INSPECTION RESULTS:**

1.  While the safe handling, storage and physical security of biological materials has been of paramount importance to both Program Managers and laboratory personnel since the inception of the BDRP, efforts with regards to personnel security can be significantly improved.  For example:

   a.  In numerous instances, required security clearances for several individuals had lapsed and their five or ten-year periodic reinvestigations were outdated.  Additionally, these individuals did not have their access restricted to hazardous biological materials during the reinvestigation process.  Some workers, originally hired to occupy noncritical-sensitive positions, have been upgraded to critical-sensitive without proper justification.  One individual with dual-citizenship was granted an interim security clearance.

   b.  Organizations have different PSI requirements for individuals with access to hazardous biological materials.  These positions are coded as critical-sensitive, noncritical-sensitive, or nonsensitive.  However, individuals in different organizations may perform similar duties, yet have varying PSI requirements due to different position codes.  As such, there is a significant variation in the personnel security investigations of individuals having access to hazardous biological materials.

   c.  In some instances, organizations were slow to identify all personnel with access to their various BSLs.  There was no readily available current roster identifying individuals and their social security numbers, PSI type and date, clearance, and their highest approved BSL to assist with access or to monitor the status of PSIs and clearances.

   d.  A review of two person rule policies (if any) in place at the laboratories revealed the following:

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2-4

ARMY02-010051

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S., No. 03-cv-81110

        (1)  Documentation suggests that that foreign nationals
have had sole access to BSL3 and 4 labs;  countries of origin:
China, Latvia, Iraq.

        (2)  There is evidence that maintenance personnel whose
clearances are unknown are permitted sole access to labs (at
times during non-duty hours).

2.  Adequate policies were not demonstrated to assure
coordination between Occupational Health Clinics and research
activities.  This results in fragmented Occupational Health
services.  Workers with potential medical problems that may
impact their ability to reliably and safely perform their duties
are not being identified.  This policy gap can result in workers
that are potentially medically unqualified being allowed to
perform duties that might pose a hazard to themselves or others,
the activity, or the community.  For instance, individuals were
found with neuropsychiatric disorders, histories of alcohol
dependence, claustrophobia, and asthma with no documentation that
they had been cleared to work or restricted.  No apparent systems
are in place to coordinate this information with the staff.

RECOMMENDATIONS:

1.  Army G3:

    Promulgate a regulation identifying disqualifying factors and
PSI requirements for workers with BSL access.  Clearly identify
personnel who are ineligible for BSL access (i.e. foreign
nationals).

2.  Army G2:

    Review the sensitivity of positions with BSL access and
include them in either the criteria for critical-sensitive or
noncritical sensitive positions in AR 380-67, Personnel Security.

3.  Installations with biological material:

    a.  Ensure that personnel security investigations correspond
to the access required.

    b.  Limit access by individuals to etiologic agents during
periods of personal security reinvestigations or if an issue
arises concerning an individuals' security qualifications.

    c.  Establish a roster identifying individuals and their
social security numbers, PSI type and date, clearance, and their

"This document contains information
EXEMPT FROM MANDATORY DISCLOSURE
under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except
as authorized by AR 20-1."

FOR OFFICIAL USE ONLY

2-5

ARMY02-010052

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S.; No. 03-cv-81110

highest approved BSL to assist with access and to monitor the
status of PSIs and clearances.

    d.  Improve coordination between the Research Activities and
the Health Clinics to ensure that the Occupational Health
services adequately address potential medical problems that may
impact workers' abilities to reliably and safely perform their
duties.

ACTION CMD:

1.  Army G3.

2.  Army G2.

3.  Installations with biological material.

INFO CMD:

1.  Commanding General AMC.

2.  Commanding General MEDCOM.

3.  Commanding General ATEC.

"This document contains information
EXEMPT FROM MANDATORY DISCLOSURE
under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except
as authorized by AR 20-1."

FOR OFFICIAL USE ONLY

2-6

ARMY02-010053

REMOVED FROM PROTECTIVE ORDER NO. 3

SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S.; No. 03-cv-81110

**FINDING 002:** Existing oversight programs for anthrax research, development and acquisition are outdated and inadequate.

**OBJECTIVE:** Assess the efficacy of existing oversight programs for anthrax research, development and acquisition.

**INSPECTION RESULTS:**

1. There is no common standard from the ARSTAF for oversight of the Biological Defense Research, Development, Test, and Acquisition operations for the Army's Biological Anthrax Defense Program. The only Army Command actively involved in the Biological program is MEDCOM. AR 70-65, Management of Controlled Substances, Ethyl Alcohol, and Hazardous Biological Substances in Army Research, Development, Test, AND Evaluation Facilities, dated 1 September 1979, promulgated by the Surgeon General, established policy and guidance for controlled hazardous biological substances. It has not been updated in the past twenty-two years and is not well known or adhered to. AR 385-69, Biological Defense Safety Program, dated 31 Dec 1993, only establishes the Army Safety Program for the Army's Biological Defense Program. There is not a dedicated ARSTAF responsible for establishing common standards and policies, only an ARSTAF presence on Joint boards.

2. Oversight of contractor laboratories working with hazardous biological materials is primarily limited to the requirements found in the regulation governing the Biological Defense Safety Program. There are no other Army requirements for accountability, inventory management, and personnel training/screening of individuals placed on these laboratories. Unfortunately, there is the potential for unauthorized access to these materials and resulting possible harm to individuals or negative reactions to the Army's involvement. However, there is also a need to maintain a strong working relationship between Army researchers and these contractor laboratories.

3. There is an apparent lack of coordination between special immunizations programs and Occupational Health. Special immunizations programs appear to be doing portions of Occupational Health, but little information is shared. Though some information pertaining to investigational new drugs may not be shared, much information should be shared.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2-7

ARMY02-010054

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S., No. 03-cv-81110

**RECOMMENDATIONS:**

1. Army G3:

   a.  Develop, implement and enforce stringent standards concerning the Army's Biological Agent Defense Program.

   b.  Explore standardized accountability, inventory management and personnel training/screening requirements for contractor laboratories, which reflect the current need for heightened precautions in dealing with hazardous biological materials.

   c.  As DOD Executive Agent for Biological Defense, effect necessary changes to the other Services biological material storage programs to ensure that they develop, implement and enforce the same stringent standards as the Army.

2. OTSG:

   Appoint an Occupational Medicine physician to oversee the Occupational Health program and to coordinate the activities of special immunizations programs to ensure that information required to assure the worker is safe and reliable is shared between both programs.

3. DAIG:

   Revise Army Regulation 20-1, Inspector General Activities and Procedures, to reflect the requirement to conduct compliance inspections of organizations with biological materials.

**ACTION CMD:**

1.  Army G3.

2.  OTSG.

3.  DAIG.

**INFO CMD:**

1.  Commanding General AMC.

2.  Commanding General MEDCOM.

3.  Commanding General ATEC.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2-8

ARMY02-010055

REMOVED FROM PROTECTIVE ORDER NO. 3

SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S., No. 03-cv-81110

**FINDING 003:** Guidance regarding anthrax accountability, inventory management, and personnel training/screening is either outdated, inadequate, non-existent or being disregarded. A current rollup of the DA anthrax inventory cannot be measured.

**OBJECTIVE:** Assess guidance regarding anthrax accountability, inventory management, and personnel training/screening, to include a current rollup of the DA anthrax inventory.

**INSPECTION RESULTS:**

1. There is no standard Army policy for the management and control of anthrax stocks. While Army Regulation 70-65, Management of Controlled Substances, Ethyl Alcohol, and Hazardous Biological Substances in Army Research, Development, Test, and Evaluation Facilities, 1 September 1979, has not been superceded and is still considered current, the inventory guidance established in paragraph 3-3d is not being followed. Local guidance concerning this matter has been published, but it is not being followed either.

2. Determining individual reliability prior to employees having access to hazardous biological materials is critical to counter internal threats. Documented supervisor reviews of laboratory workers personnel and security files prior to accession, with emphasis placed on a pre-employment interview, would better serve the existing BDRP. There are currently no standards for potentially disqualifying information to be used as a guide during these screenings to preclude acceptance of individuals of questionable reliability.

3. There is no requirement for biological defense workers to inform supervisors whenever their reliability status changed. Nor is there a requirement for supervisors to determine if the condition warranted restriction to etiologic agents for a temporary period of time. For example, if a worker is put on a narcotic pain medication or is undergoing a period of extreme emotional turbulence, this information is currently not required to be self-reported by the worker to the supervisor prior to resuming assigned laboratory duties.

4. Employees with access to hazardous biological materials are not in testing designated positions (TDP) to monitor for illegal drug use. However, it appears that such personnel perform duties, which clearly fall within the parameters of Executive Order 12564, Drug-Free Federal Workplace (i.e. national security or other functions requiring a high degree of trust and confidence).

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2-9

ARMY02-010056

REMOVED FROM PROTECTIVE ORDER NO. 3

SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S., No. 03-cv-81110

5. There is no unifying Army regulation, medical regulation or pamphlet, which allows enforcement of components of the Army biological program for medical purposes. Mandatory drug testing special immunizations, use of personal protective equipment, an potentially disqualifying information cannot be required of employees at present by regulation. For instance, though some programs require urine testing for workers involved in biologic warfare agent activities, participation in a drug-screening program is voluntary on the part of the worker. This presents considerable gap in our ability to medically assure that worker are safe and reliable to handle these agents. The only regulation to cite might be AR 70-65 or the CFR 32 626/627 that "seems" to require this.

6. There is no readily identifiable way to determine if a biological agent is present in a particular room (i.e., it may a BSL3 or BSL4 room, however material may not be present).

RECOMMENDATIONS:

1. Army G3:

Develop, implement and enforce stringent standards regardin accountability, inventory management and personnel training/screening requirements for the Biological Agent Defens Program. Include standards for potentially disqualifying information and make the requirement to self-report reliability issues a condition of employment.

2. Army G1:

Identify personnel positions with BSL access as TDPs and incorporate this into AR 600-85, Alcohol, Drug Abuse Prevention and Control Program.

3. OTSG:

Develop and implement a regulation, which addresses the requirements for special immunizations and personal protective equipment by personnel with BSL access.

4. ASO:

Incorporate a method in the safety regulation to enable differentiation of rooms that are certified for BSL2-BSL4 work from BSL rooms, which currently contain BSL2-BSL4 biological material.

"This document contains information
EXEMPT FROM MANDATORY DISCLOSURE
under the FOIA. Exemption 5 applies."

"Dissemination is prohibited
as authorized by AR 20-1."

FOR OFFICIAL USE ONLY

2-10

ARMY02-010057

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S.; No. 03-cv-81110

**ACTION CMD:**

1. Army G3.

2. Army G1.

3. OTSG.

4. ASO.

**INFO CMD:**

1. Commanding General AMC.

2. Commanding General MEDCOM.

3. Commanding General ATEC.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA.  Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

**FOR OFFICIAL USE ONLY**

2 -11

ARMY02-010058

**FINDING 004:** Physical security measures for protection of anthrax stocks at Army installations were inadequate.

**OBJECTIVE:** Assess the adequacy of physical security measures for protection of anthrax stocks at Army installations.

**INSPECTION RESULTS:**

1. A review of physical security plans and procedures in place at the laboratories revealed the following:

    a. One facility has no internal Physical Security Plan (PSP). Another facility has an internal Physical Security Plan but it does not adequately address basic physical security practices. The installation PSP contains information concerning the building that houses the Biological material, however, this is because the building also contains a pharmacy/controlled substances and/or chemical agent, and not because of the biological material.

    b. A formal vulnerability assessment (VA) has not been conducted at any of the facilities storing biological material. This would ensure that vulnerabilities associated with biological material are addressed.

    c. A Physical Security Inspection of rooms containing biological material has not been conducted by either the installation or the next higher commands.

    d. One facility has SOPs that govern key and lock control and badge requirements; however, these SOPs are outdated and, in numerous cases, are no longer applicable or being implemented.

    e. An analysis of the building structure versus the amount of time it would take a perpetrator to impede protective barriers has not been addressed. Specifically, such issues as the type of construction, window openings, exposed exterior bolts are not addressed. In addition, weaknesses in the construction such as dunk tanks on the doors, enclave openings, etc., have not been addressed.

    f. The U.S. Department of Agriculture (USDA) has a laboratory with biological material on an Army installation but there is no established Memorandum of Agreement to address its security. Procedures regarding this facility are undetermined.

2. A review of access controls in place at the laboratories revealed the following:

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 28-1."

**FOR OFFICIAL USE ONLY**

2-12

ARMY02-010059

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S., No. 03-cv-81110

a.  Access is controlled by civilian security guards and military medical personnel through the front door.  There is no documentation to show that they have received any type of security/response type training.

b.  Permanent employees are provided with an electronic badge while visitors are given a visitors badge of the type that has been in circulation since 1987.  The electronic badge controls access through magnetic slide-type doors.  Although visitors are not issued this type of badge, two inspectors were able to gain access through two restricted areas by piggybacking with other permanent employees.

c.  Although local policy dictates that all bags, packages, and backpacks be checked upon entry into the facility, such checks were not being done consistently.  Even though the facility recognizes that the biggest threat to this facility is an internal threat, personal items such as brief cases and bags are not checked on the way out.

d.  No additional checks of bags are conducted when personnel enter or leave higher biosafety levels.

e.  Doors that lead to power supplies and air vents were unsecured.

3.  A review of key and lock controls in place at the laboratories revealed the following:

a.  Access to the biological material rooms as well as the refrigerators/cabinets is possible by one individual due to having only one lock protecting each of these sites.

b.  There are combination locks on doors containing biological material.  There is no record of who controls these combinations or when they have been changed.

c.  There are several different types (high, medium and low security) of locks on containers with biological material.  There was no inventory and/or accountability of these locks.

d.  There is a chain link door that houses numerous refrigerators containing BSL 3 and BSL 4.  Some of the refrigerators have built in locks, some only have the factory installed locks and two were found unsecured.

e.  Personnel authorized to receive keys/possess combinations are not designated by an official who is aware if they have continued access.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 70-1."

FOR OFFICIAL USE ONLY

2-13

ARMY02-010060

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S.; No. 03-cv-81110

4. A review of intrusion detection systems (IDS) in place at the laboratories revealed the following:

   a. IDS is installed on the repository, however it is not tested on a routine basis. There are no measures in place for when it is inoperable nor is there any record to show when it may have alarmed or malfunctioned. Additionally, there are no maintenance records on the system.

   b. There is no IDS installed on the individual rooms storing biological material.

   c. There is no Closed Circuit Television (CCTV) in place either inside or outside the rooms storing biological material. Not only is this a deterring security measure, it could also aid in ensuring the safety of workers.

5. A review of security policies in place at the laboratories revealed that security personnel are not checking rooms storing biological material.

6. A review of training programs in place at the laboratories for their security personnel revealed the following:

   a. Military personnel controlling access to one facility receive no type of security/response type training.

   b. Security force personnel at one facility have no knowledge of biological material being stored there.

RECOMMENDATIONS:

1. Army G3:

   a. Develop, implement and enforce regulatory requirements that cover:

      (1) Implementation of a PSP so that a uniform approach is not only known but practiced by employees.

      (2) Requirement that a vulnerability assessment (VA) be conducted.

      (3) Requirement for Physical Security Inspections of rooms containing biological material.

      (4) Implementation of key and lock, and badge control procedures.

"This document contains information EXEMPT FROM MANDATORY DISCLOSURE under the FOIA. Exemption 5 applies."

"Dissemination is prohibited except as authorized by AR 20-1."

FOR OFFICIAL USE ONLY

2-14

MAR-06-02 15:17 FROM:MEDCOM IG

Received:   3/ 6/02 17:56;

ID:221786O

PAGE  15/16

221786O -> OFFICE OF THE COMMANDER USAMRIID; Page 15

ARMY02-010061

REMOVED FROM PROTECTIVE ORDER NO. 3
SUBJECT TO PROTECTIVE ORDER #3, Stevens v. U.S.; No. 03-cv-81110